## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

2014 SEP 30  P  9:35

S LISTRICT COURT SDNY

| | |
|---|---|
| PUBLIC EMPLOYEES' RETIREMENT SYSTEM OF MISSISSIPPI, Individually and on Behalf of All Others Similarly Situated, <br><br> Plaintiff, <br><br> v. <br><br> MILLENNIAL MEDIA, INC., PAUL J. PALMIERI, MICHAEL B. AVON, ANDREW J. JEANNERET, MICHAEL BARRETT, ROBERT P. GOODMAN, ARUN GUPTA, PATRICK J. KERINS, ALAN MACINTOSH, JOHN D. MARKLEY, JR., WENDA H. MILLARD, JAMES A. THOLEN, GEORGE ZACHARY, BESSEMER VENTURE PARTNERS, COLUMBIA CAPITAL, CHARLES RIVER VENTURES, NEW ENTERPRISE ASSOCIATES, INC., MORGAN STANLEY & CO. LLC, GOLDMAN, SACHS & CO., BARCLAYS CAPITAL INC., ALLEN & COMPANY LLC, STIFEL, NICOLAUS & COMPANY, INCORPORATED, CANACCORD GENUITY INC., and OPPENHEIMER & CO. INC., <br><br> Defendants. | No. <br><br> **CLASS ACTION COMPLAINT FOR VIOLATIONS OF FEDERAL SECURITIES LAWS** <br><br> **DEMAND FOR JURY TRIAL** |

Plaintiff Public Employees' Retirement System of Mississippi ("Mississippi PERS" or "Plaintiff"), by and through its undersigned counsel, alleges the following individually and on behalf of a class of all persons and entities similarly situated. All allegations are made upon information and belief, except as to those allegations concerning Plaintiff, which are alleged upon personal knowledge. Plaintiff's allegations are based upon the investigation of Plaintiff's counsel, which included a review of U.S. Securities and Exchange Commission ("SEC") filings

by Millennial Media, Inc. ("Millennial Media" or the "Company"), as well as regulatory filings and reports, securities analysts' reports and advisories about the Company, press releases and other public statements issued by the Company, and media reports about the Company. Plaintiff believes that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## I. NATURE OF THE ACTION

1. This class action is brought pursuant to the Securities Exchange Act of 1934 (the "Exchange Act") on behalf of all persons or entities who, between March 28, 2012 and May 7, 2014, inclusive (the "Class Period"), purchased or otherwise acquired the common stock of Millennial Media (the "Class"). The Exchange Act claims allege that certain Defendants engaged in a fraudulent scheme to artificially inflate the price of Millennial Media's stock during the Class Period.

2. This action also is brought pursuant to the Securities Act of 1933 (the "Securities Act") on behalf of all persons or entities who purchased the common stock of Millennial Media pursuant and/or traceable to two registered public offerings. On or about March 28, 2012, Millennial Media commenced its initial public offering (the "IPO") through which the Company and certain of its shareholders sold more than 11.7 million shares (including the full exercise of an underwriters' option) at $13.00 per share for aggregate gross proceeds of more than $152 million. Through a second stock offering, commenced on or about October 24, 2012 (the "Secondary Offering" and together with the IPO, the "Offerings"), Millennial Media and certain of its shareholders sold an additional 11.5 million shares of Company stock (including the full exercise of an underwriters' option) at $14.15 per share for aggregate gross proceeds of more than $162 million. The shareholders selling through the Secondary Offering included Defendants Bessemer Venture Partners, Columbia Capital, Charles River Ventures, and New

- 2 -

Enterprise Associates, Inc. ("NEA"), who were Millennial Media insiders by virtue of their representation on Millennial Media's board of directors (the "Board"). These shareholders liquidated more than 7.7 million of their privately held shares through the Secondary Offering.

3.     Pursuant to the Securities Act, Defendants are strictly liable for material misstatements in the Offering Documents (as defined herein) issued in connection with the Offerings, and these claims specifically exclude any allegations of knowledge or scienter. The Securities Act claims are based solely on strict liability and negligence, and are not based on any reckless or intentionally fraudulent conduct by or on behalf of Defendants—*i.e.*, the Securities Act claims do not allege, arise from, or sound in, fraud. Plaintiff specifically disclaims any allegation of fraud, scienter, or recklessness in these non-fraud claims.

4.     The Exchange Act and Securities Act claims asserted herein arise from a series of false statements of material fact and omissions of material adverse information, made by Defendants in Millennial Media's Offering Documents and throughout the Class Period, about the development of the Company's technology, its ability to accurately track and report critical commercial metrics, the rationale for and progress of certain corporate acquisitions, and Millennial Media's future prospects. The ultimate disclosure of the truth about the Company caused a precipitous decline in the market value of the Company's common stock, resulting in significant losses and damages to Plaintiff and the Class.

## II.   FACTUAL OVERVIEW AND SUMMARY OF ALLEGATIONS

5.     Millennial Media is a digital advertising company that provides advertising services focused on the mobile computing segment, such as smartphones that run Apple, Inc.'s iOS operating system, Google, Inc.'s Android operating system, or other operating systems.

6.     The Company provides its services to developers and advertisers. Key to Millennial Media's success in this industry is that its technology provides an easy and effective

- 3 -

way for developers of applications for mobile devices to integrate the Company's advertising mechanism into their software, and track and generate accurate reports of results for advertisers' campaigns.

7. Prior to Millennial Media's IPO and throughout the Class Period, the Company touted its proprietary technology and data platform, referred to as "MYDAS," as a solution for both application developers and advertisers insofar as MYDAS and its component services allowed for both: (1) the easy and effective integration of Millennial Media advertising into mobile applications by developers; and (2) the flexible targeting and accurate reporting of advertising campaigns for advertisers. Millennial Media also claimed that the features and performance of its MYDAS platform were drawing customers and that its strategic acquisitions were enhancing the Company's existing capabilities.

8. The true facts were as follows:

(a) technological products and services crucial to the Company's business model were not fully functional, but, in fact, were still in nascent stages when announced, leading to rushed, slipshod programming, poor performance, and failure;

(b) the Company had little meaningful ability to track and report end-user clicks, leading to significant over-billing, which in turn led the Company's core customers to abandon Millennial Media;

(c) corporate acquisitions that Millennial Media undertook during the Class Period did not offer the business synergies claimed by the Company, but were rather undertaken to fill gaping holes in the Company's capabilities;

(d) corporate acquisitions that Millennial Media undertook during the Class Period were misrepresented as progressing well through integration, when, in fact, the

- 4 -

Company faced insurmountable integration challenges stemming from its own prior rushed and slipshod development; and

(e)     Defendants' statements regarding the outlook and prospects of the Company were materially false at all relevant times.

9.     On February 19, 2013, after the close of the markets, the Company issued a press release announcing revenue for the fourth quarter of 2012 of $58 million—sharply below analysts' expectations of $62.9 million. Millennial Media also gave disappointing revenue guidance for 2013 and disclosed that it would acquire Metaresolver Inc. ("Metaresolver"). Millennial Media's poor results, weak guidance, and its need to acquire Metaresolver arose out of ongoing problems with the Company's then-existing technologies, such as the MYDAS platform's inability to provide accurate and reliable records of end-users clicks and actions, which were driving clients away. In response to this partial disclosure of the true state of the Company's proprietary software and related technologies, Millennial Media's stock price fell $5.38 per share, or 37.54 percent, to close at $8.95 per share on February 20, 2013.

10.     Then, on August 13, 2013, Millennial Media issued a press release announcing that the Company would acquire Jumptap, Inc. ("Jumptap") in a substantially all-stock transaction that then valued Jumptap at more than $200 million. Further, in connection with reporting its results for the prior quarter, the Company declined to offer revenue guidance for the coming quarter or an update to its guidance for the full year in the expected manner. Millennial Media's need to acquire Jumptap, whose technology centered around programmatic advertising for performance-based advertising—services that the Company claimed its MYDAS platform already provided—was the result of the Company's ongoing problems with its technologies. In response to this partial disclosure of the weaknesses in the Company's proprietary software and

related technologies, Millennial Media's stock price fell $1.60 per share, or 18.82 percent, to close at $6.90 per share on August 14, 2013.

11.    Later, on November 13, 2013, after the markets had closed, the Company issued a press release announcing disappointing results for the third quarter of 2013 and unexpectedly downcast guidance for the fourth quarter. In response to this partial disclosure of the continued erosive effect of unresolved weaknesses in the Company's proprietary software and related technologies on the Company's ability to generate revenue, Millennial Media's stock price fell $0.86 per share, or 11.98 percent, to close at $6.32 per share on November 14, 2013.

12.    Then, on February 19, 2014, after the markets had closed, the Company issued a press release revealing disappointing revenue guidance for the first quarter of 2014 of between $72 million and $76 million—far below analysts' expectations of $83 million—and weak guidance for 2014 earnings before interest, taxes, depreciation and amortization ("EBITDA") of between –$5 million and –$6 million, which sharply diverged from analysts' expectations of +$8.8 million. Millennial Media also revealed that, based on the then-current state of its technology, it could not expect to achieve earlier growth projections, or even match the growth rate of other firms in its industry. In response to this partial disclosure that the Company's proprietary software and related technologies would require significant additional investment and development and were not ameliorated by the Company's costly corporate acquisitions, Millennial Media's stock price fell $1.05 per share, or 14.58 percent, to close at $6.15 per share following the next trading session on February 20, 2014.

13.    Finally, on May 7, 2014, after the markets had closed, Millennial Media issued a press release reporting revenue for the first quarter of 2014 below analysts' projections and dour revenue guidance for the coming quarter of between $70 million and $75 million, well below

- 6 -

analysts' projections of $96.4 million. Additionally, the Company revealed that its Chief Financial Officer, Michael B. Avon ("Avon"), would step down from his role as of July 1, 2014 to "pursue other career interests." In response to the disclosure of the true state of the Company's competitive position, low revenue visibility, poor outlook for growth and the deleterious effects of its weak and underdeveloped technology on its prospects, Millennial Media's stock price fell $1.99 per share, or 37.20 percent, to close at $3.36 per share following the next trading session on May 8, 2014.

14.     As a result of Defendants' materially false and/or misleading statements and omissions: (1) Millennial Media's common stock was offered at artificially inflated prices; and (2) Millennial Media's common stock traded at inflated prices during the Class Period. However, as the truth about Millennial Media's operations and outlook became known to investors, the artificial inflation came out and the price of Millennial Media's common stock fell, declining by 86.56 percent from its Class Period high. These price declines caused significant losses and damages to Plaintiff and other members of the Class.

## III.    JURISDICTION AND VENUE

15.     The claims asserted herein arise under Sections 11, 12(a)(2), and 15 of the Securities Act, 15 U.S.C. §§ 77k, 77l and 77o, and Sections 10(b) and 20(a) of the Exchange Act, 15 U.S.C. §§ 78j(b) and 78t(a), and Rule 10b-5 promulgated thereunder by the SEC, 17 C.P.R. § 240.10b-5.

16.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331, Section 22 of the Securities Act, 15 U.S.C. § 77v, and Section 27 of the Exchange Act, 15 U.S.C. § 78aa.

17.     Venue is proper in this District pursuant to Section 22(a) of the Securities Act, Section 27 of the Exchange Act, and 28 U.S.C. § 1391(b). The Company conducted its IPO and

Secondary Offering in this District and many of the acts that constitute the violations of law complained of herein, including dissemination to the public of materially false and misleading information to the investing public in connection with those transactions, occurred in and/or were issued from this District. Additionally, a number of the Underwriter Defendants (as defined herein) maintain their principal places of business in this District.

18. In connection with the acts alleged in this complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications, and the facilities of the national securities markets.

## IV. CLASS ACTION ALLEGATIONS

19. Plaintiff brings this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of all persons who purchased or otherwise acquired Millennial Media's common stock during the Class Period. Excluded from the Class are Defendants and their families, directors and officers of Millennial Media and their families, and affiliates.

20. The members of the Class are so numerous that joinder of all members is impracticable. The disposition of their claims in a class action will provide substantial benefits to the parties and the Court. As of April 30, 2014, Millennial Media had 106,996,050 shares outstanding, owned by thousands of persons.

21. There is a well-defined community of interest in the questions of law and fact involved in this case. Questions of law and fact common to the members of the Class that predominate over questions that may affect individual Class members include:

    (a) whether the Securities Act was violated by Defendants;

    (b) whether the Exchange Act was violated by Defendants;

- 8 -

(c)    whether Defendants omitted and/or misrepresented material facts;

(d)    whether Defendants' statements omitted material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading;

(e)    whether Defendants knew or recklessly disregarded that their statements were false and misleading;

(f)    whether the prices of the Company's securities were artificially inflated; and

(g)    the extent of damage sustained by Class members and the appropriate measure of damages.

22.    Plaintiff's claims are typical of those of the Class because Plaintiff and the members of the Class sustained damages from Defendants' wrongful conduct.

23.    Plaintiff will adequately protect the interests of the Class and has retained counsel experienced in class action securities litigation. Plaintiff has no interests that conflict with those of the Class.

24.    A class action is superior to other available methods for the fair and efficient adjudication of this controversy.

## V.    RELEVANT BACKGROUND

25.    Millennial Media is a mobile advertising platform company that, through its proprietary software systems and related technology, seeks to offer an effective means for advertisers to run promotional campaigns on mobile computing devices, such as smartphones and tablets. Millennial Media's technology was portrayed as offering two critical selling points: (1) its ability to provide an easy method for developers of applications for mobile devices to

- 9 -

integrate the Company's advertising mechanism into their software; and (2) its ability to track and generate accurate reports of results for advertisers' campaigns.

26.     Although Millennial Media reports its operations in a single, undifferentiated business segment, the Company's operations are divided among two highly distinct types of advertisements: (1) "brand advertisements" intended only to be displayed before an audience; and (2) "performance advertisements" intended to spur audience members to engage in some action, such as clicking on the advertisement or downloading a file.

27.     Brand advertisements are generally sold on the basis of a cost per 1,000 impressions ("CPM"), while performance advertisements are generally sold on the basis of a cost per click ("CPC") or a cost per action ("CPA").

28.     Prior to Millennial Media's IPO and throughout the Class Period, the Company touted the MYDAS platform and its components as a solution for both application developers and advertisers insofar as MYDAS and its component services allowed for both: (1) easy integration of Millennial Media advertising into mobile applications by developers; and (2) flexible targeting and accurate reporting of advertising campaigns for advertisers.

## VI.    SECURITIES ACT CLAIMS

### A.    Parties

#### 1.    Plaintiff

29.     Mississippi PERS, headquartered in Jackson, Mississippi, is a defined benefit retirement system. As set forth in the attached certification, Mississippi PERS purchased Millennial Media stock at artificially inflated prices pursuant or traceable to the Offering Documents and has been damaged thereby.

- 10 -

**2. Securities Act Defendants**

**(a) The Company**

30. Defendant Millennial Media is a corporation that is organized in Delaware and maintains its principal executive offices at 2400 Boston Street, Suite 201, Baltimore, Maryland. Millennial Media completed offerings of its common stock through the IPO and Secondary Offering on the New York Stock Exchange (the "NYSE"), where its common stock trades under the ticker symbol "MM."

**(b) The Officer and Director Defendants**

31. Defendant Paul J. Palmieri ("Palmieri") was, at all relevant times prior to January 25, 2014, President and Chief Executive Officer ("CEO") of the Company, and a member of the Company's Board. CEO Palmieri signed the registration statements of the Company in connection with the Offerings.

32. Defendant Avon was the Executive Vice President and CFO of the Company from 2009 until July 1, 2014. CFO Avon signed the registration statements of the Company in connection with the Offerings. Prior to joining Millennial Media, Avon was a principal at Columbia Capital.

33. Defendant Andrew J. Jeanneret ("Jeanneret") is the Senior Vice President and Chief Accounting Officer ("CAO") of the Company. CAO Jeanneret signed the registration statements of the Company in connection with the Offerings.

34. Defendant Robert P. Goodman ("Goodman") is a member of the Company's Board and signed the registration statements in connection with the Offerings. He also is the founding partner of Bessemer Venture Partners' investment office in Larchmont, New York. At the time of the Secondary Offering, Goodman was a managing member of Deer Management Co. LLC, the management company for Bessemer Venture Partners' investment funds, including

- 11 -

Bessemer Venture Partners VI L.P., Bessemer Venture Partners VI Institutional L.P., and Bessemer Venture Partners Co-Investment L.P., which held investments in Millennial Media stock and sold 2.2 million shares of Millennial Media stock through the Secondary Offering. At the time of the Secondary Offering, Goodman also was a member of the board of directors of several private Bessemer Venture Partners portfolio companies.

35.     Defendant Arun Gupta ("Gupta") was a member of the Company's Board prior to the conclusion of the Company's 2013 Annual Meeting of Stockholders held on or about June 11, 2013, and signed the registration statements in connection with the Offerings. In addition, at the time of the Secondary Offering, Gupta was a partner with Columbia Capital, whose affiliate entities held investments in Millennial Media stock and sold more than 2.2 million shares of Millennial Media stock through the Secondary Offering. At that time, Gupta also served on the boards of directors of several privately held Columbia Capital portfolio companies.

36.     Defendant Patrick J. Kerins ("Kerins") is Chairman of the Company's Board and signed the registration statements in connection with the Offerings. In addition, at the time of the Secondary Offering, Kerins was a general partner of NEA, whose affiliate entities held investments in Millennial Media stock and sold more than 1.6 million shares of Millennial Media stock through the Secondary Offering. At that time, Kerins also served on the boards of directors of a number of privately held portfolio companies of NEA.

37.     Defendant Alan MacIntosh is a member of the Company's Board and signed the registration statements in connection with the Offerings.

38.     Defendant John D. Markley, Jr. ("Markley") is a former member of the Company's Board and signed the registration statements in connection with the Offerings. From 1996 to 2009, Markley was a partner at Columbia Capital.

- 12 -

39.     Defendant Wenda H. Millard is a member of the Company's Board and signed the registration statements in connection with the Offerings.

40.     Defendant James A. Tholen is a member of the Company's Board and signed the registration statements in connection with the Offerings.

41.     Defendant George Zachary ("Zachary") is a member of the Company's Board and signed the registration statements in connection with the Offerings. At the time of the Secondary Offering, Zachary was a general partner of Charles River Ventures, whose affiliate entitles held investments in Millennial Media stock and sold almost 1.7 million shares of Millennial Media stock through the Secondary Offering.

42.     The Defendants listed in paragraphs 31 to 41 are referred to as the "Officer and Director Defendants."

(c)     **Principal Shareholder Defendants**

43.     Defendant Bessemer Venture Partners advised or managed funds, including, but not limited to, Bessemer Venture Partners VI L.P., Bessemer Venture Partners Co-Investment L.P., and Bessemer Venture Partners VI Institutional L.P., that held more than 13.5 million shares of Millennial Media stock prior to the IPO, held more than 5 percent of Millennial Media's voting securities at the time of the IPO, and had a partner of Bessemer Venture Partners (Defendant Goodman) serve as a member of the Millennial Media Board of Directors. Bessemer Venture Partners sold more than 2.2 million shares of Millennial Media stock in the Secondary Offering. Bessemer Venture Partners is headquartered at 1865 Palmer Avenue, Suite 104, Larchmont, New York.

44.     Defendant Columbia Capital, a communications, media and technology investment firm, advised or managed funds, including, but not limited to, Columbia Capital Equity Partners IV (QP), L.P., Columbia Capital Equity Partners IV (QPCO), L.P., and Columbia Capital

Employee Investors IV, L.P., that held more than 13.5 million shares of Millennial Media stock prior to the IPO, held more than 5 percent of Millennial Media's voting securities at the time of the IPO, and had an affiliate (Defendant Gupta) serve as a member of the Millennial Media Board of Directors. Columbia Capital sold more than 2.2 million shares of Millennial Media stock in the Secondary Offering. Columbia Capital is headquartered at 204 South Union Street, Alexandria, Virginia.

45. Defendant Charles River Ventures is a venture capital firm that advised or managed funds, including, but not limited to, Charles River Partnership XIII, LP and Charles River Friends XIII-A, LP, that held more than 10.3 million shares of Millennial Media stock prior to the IPO, held more than 5 percent of Millennial Media's voting securities at the time of the IPO, and had a partner of Charles River Ventures (Defendant Zachary) serve as a member of the Millennial Media Board of Directors. Charles River Ventures sold almost 1.7 million shares of Millennial Media stock in the Secondary Offering. Charles River Ventures is headquartered at One Broadway, 15th Floor, Cambridge, Massachusetts.

46. Defendant NEA advised or managed funds, including, but not limited to, New Enterprise Associates 13, L.P. and NEA Ventures 2009, L.P., that held more than 9.8 million shares of Millennial Media stock prior to the IPO, held more than 5 percent of Millennial Media's voting securities at the time of the IPO, and had a partner of NEA (Defendant Kerins) serve as a member of the Millennial Media Board of Directors. NEA sold more than 1.6 million shares of Millennial Media stock in the secondary offering. NEA is headquartered at 5425 Wisconsin Avenue, Suite 800, Chevy Chase, Maryland.

47. The Defendants listed in paragraphs 43 to 46 are referred to as the "Principal Shareholder Defendants."

- 14 -

### (d)     The Underwriter Defendants

48.     Defendant Morgan Stanley & Co. LLC ("Morgan Stanley") acted as an underwriter of the Offerings and as a representative of the underwriters for the Offerings. Morgan Stanley maintains its principal place of business at 1585 Broadway, New York, New York.

49.     Defendant Goldman, Sachs & Co. ("Goldman") acted as an underwriter of the Offerings and as a representative of the underwriters for the Offerings. Goldman maintains its principal place of business at 200 West Street, New York, New York.

50.     Defendant Barclays Capital Inc. ("Barclays") acted as an underwriter of the Offerings and as a representative of the underwriters for the Offerings. Barclays maintains its principal place of business at 745 Seventh Avenue, New York, New York.

51.     Defendant Allen & Company LLC ("Allen & Company") acted as an underwriter of the Offerings. Allen & Company maintains its principal place of business at 711 Fifth Avenue, New York, New York.

52.     Defendant Stifel, Nicolaus & Company, Incorporated ("Stifel, Nicolaus") acted as an underwriter of the Offerings. Stifel, Nicolaus maintains its principal place of business at 501 N. Broadway, St. Louis, Missouri.

53.     Defendant Canaccord Genuity Inc. ("Canaccord") acted as an underwriter of the Secondary Offering. Canaccord maintains an office at 350 Madison Avenue, New York, New York, and its principal place of business is at 609 Granville Street, Vancouver, British Columbia, Canada.

54.     Defendant Oppenheimer & Co. Inc. ("Oppenheimer") acted as an underwriter of the Secondary Offering. Oppenheimer maintains its principal place of business at 85 Broad Street New York, New York.

- 15 -

55. The Defendants listed in paragraphs 48 to 54 are referred to as the "Underwriter Defendants." Millennial Media, the Officer and Director Defendants, the Principal Shareholder Defendants, and the Underwriter Defendants are collectively referred to as the "Securities Act Defendants."

**B.    Claims Against the Securities Act Defendants**

56. On January 5, 2012, Millennial Media filed a Form S-1 registration statement with the SEC in connection with the Company's contemplated IPO. The Company filed five amended versions of the registration statement between February 10 and March 27, 2012 (as amended, the "IPO Registration Statement").

57. On March 28, 2012, Millennial Media's IPO Registration Statement was declared effective and the Company finalized its completed prospectus in connection with the IPO (the "IPO Prospectus" and together with the IPO Registration Statement, the "IPO Documents"). As set forth in the IPO Prospectus, Millennial Media registered 10.2 million shares of common stock plus an underwriters' over-allotment option for an additional 1,530,000 shares to be offered to the public at $13.00 per share. Plaintiff and other members of the Class purchased Millennial Media common stock pursuant and/or traceable to the IPO Documents beginning on that day.

58. The IPO Documents included descriptions of the Company and its competitive strengths. For example, the IPO Prospectus stated:

> Our [proprietary technology and data platform, known as MYDAS] is specifically architected to deliver mobile advertising at scale, rather than applying traditional online advertising technology or focusing on particular mobile operating systems. . . . *Our platform is capable of accounting for, and efficiently analyzing, variables such as wireless connection strength, device operating system and audience profile in real-time* in order to decide which ad to send in response to a specific ad request from an app.

\*        \*        \*

- 16 -

*We offer developers sophisticated reporting and analytics through an integrated dashboard on our mmDev portal, which includes comprehensive ad revenue generation reports for their apps across all major mobile operating systems.* These reports help developers gain insight into user interaction and behavior and the performance of their apps. We share this performance data with developers to help them improve their apps and their deployment of our [software developers' kits, or "SDK"s] in order to maximize their ad revenue. In addition, through the more than 1.5 billion ad requests that we typically receive each day, we are able to gain important insights about users that we are able to share with developers on an aggregated basis.

\*   \*   \*

We help developers and advertisers remove complexity from mobile advertising. By working with us, developers gain access to our tools and services that allow their apps to display banner ads, interactive rich media ads and video ads from our platform. In return, developers supply us with space on their apps to deliver ads for our advertiser clients and also provide us with access to anonymous data associated with their apps and users. *We analyze this data to build sophisticated user profiles and audience groups that, in combination with the real-time decisioning, optimization and targeting capabilities of our technology platform, enable us to deliver highly targeted advertising campaigns for our advertiser clients.*

\*   \*   \*

After MYDAS identifies the unique user associated with a specific ad request, the context around the ad request and the audiences to which the user belongs, *MYDAS delivers the request to a real-time, bidded marketplace in which it matches available ads with available ad requests. MYDAS performs a sophisticated statistical analysis to automatically run an instantaneous virtual auction in which each qualified ad campaign bids on each available ad request.* We call this process optimization and decisioning. . . . When MYDAS enters an ad request into the marketplace, each agent bids on the ad request, and the platform then matches the best available ad to the specific ad request.

(All emphases are added unless otherwise noted.)

59.     However, the Company's positive descriptions of its software tools and related technologies in the IPO Documents were materially false because certain of these technological

services and features, although critical to Millennial Media's success as a mobile advertising portal, were either not yet functional or were not sufficiently functional to comport with their descriptions as set forth in the IPO Documents.

60. On March 29, 2012, prior to the opening of the markets, Millennial Media filed the effectiveness order for the IPO Registration Statement and filed its IPO Prospectus pursuant to Rule 424(b)(4) with the SEC. On or about April 4, 2012, Millennial Media completed its IPO, including the full exercise of the underwriters' over-allotment option.

61. On October 15, 2012, Millennial Media filed a Form S-1 registration statement with the SEC in connection with the Company's contemplated Secondary Offering. The Company filed an amended version of this registration statement on October 18, 2012 (as amended, the "Secondary Offering Registration Statement").

62. On October 23, 2012, the Secondary Offering Registration Statement was declared effective and the Company finalized its completed prospectus in connection with the Secondary Offering (the "Secondary Offering Prospectus" and together with the Secondary Offering Registration Statement, the "Secondary Offering Documents"). As set forth in the Secondary Offering Prospectus, Millennial Media registered 10 million shares of common stock plus an underwriters' over-allotment option for an additional 1.5 million shares to be offered to the public at $14.15 per share.

63. The Secondary Offering Documents included descriptions of the Company and its competitive strengths. For example, the Secondary Offering Prospectus stated:

> We enable advertisers to gain insights into the performance of their ad campaigns and to manage their campaigns with a view to maximizing return on their advertising investment. *Our solutions are designed to address the needs of large brand advertisers and advertising agencies as well as smaller, performance-based advertisers.* Large brand and performance advertisers typically

buy ads on our platform through our sales teams. Smaller advertisers typically buy ads either through our inside sales team or through our mMedia self-service advertising portal.

\* \* \*

As a result of the amount and nature of the data we collect through our platform, *our reporting to advertisers goes beyond traditional post-campaign analysis to provide actionable insights for current ad campaigns and future marketing strategies. We offer real-time reporting and analytics to help advertisers understand why some campaigns perform better than others.*

*Our self-service interface also enables advertisers to plan and alter live campaign parameters, such as audience targeting and pricing.* We also give our larger advertisers the option to work directly with our advertising account specialists, who help our clients manage their ad campaigns.

\* \* \*

After MYDAS identifies the unique user associated with a specific ad request, the context around the ad request and the audiences to which the user belongs, *MYDAS delivers the request to a real-time, bidded marketplace in which it matches available ads with available ad requests. MYDAS performs a sophisticated statistical analysis to automatically run an instantaneous virtual auction in which each qualified ad campaign bids on each available ad request.* We call this process optimization and decisioning. . . . When MYDAS enters an ad request into the marketplace, each agent bids on the ad request, and the platform then matches the best available ad to the specific ad request.

64. However, the Company's positive descriptions of its software tools and related technologies in the Secondary Offering Documents were incorrect because these technological services and features, although critical to Millennial Media's success as a mobile advertising portal, were either not yet functional or were not sufficiently functional to comport with their descriptions as set forth in the Secondary Offering Documents.

65. On October 24, 2012, prior to the opening of the markets, Millennial Media filed the effectiveness order for the Secondary Offering Registration Statement and filed its Secondary

Offering Prospectus pursuant to Rule 424(b)(4) with the SEC. On or about October 30, 2012, Millennial Media completed the Secondary Offering including the full exercise of the underwriters' over-allotment option. The Principal Shareholder Defendants sold more than 7.7 million of their privately held shares through the Secondary Offering.

66.    The IPO Documents and the Secondary Offering Documents are collectively referred to as the "Offering Documents." The Offering Documents were materially false and misleading and failed to disclose that Millennial Media's software and related technologies were either not yet functional or not sufficiently functional to offer the features and services as set forth in the Offering Documents. As a result, the Company's Offering Documents were deficient and misleading at all relevant times. The misstated and omitted facts would have been material to a reasonable person reviewing the Offering Documents.

67.    The Securities Act Defendants owed Plaintiff and the Class a duty to make a reasonable and diligent investigation of the statements contained in the Offering Documents to ensure that the statements contained or incorporated by reference therein were true and that there was no omission to state a material fact required to be stated therein or necessary to make the statements therein not misleading.

68.    The Securities Act Defendants did not make a reasonable and diligent investigation of the statements contained in or incorporated by reference into the Offering Documents and did not possess reasonable grounds for believing that the Offering Documents did not contain an untrue statement of material fact or omit to state a material fact required to be stated therein or necessary to make the statements therein not misleading.

69.    The falsity of the Offering Documents was revealed in part on February 19, 2013, when, after the markets had closed, the Company issued a press release that set forth its results of

- 20 -

operations for the quarter and full year ending December 31, 2012, and provided guidance for the first quarter and full year of 2013. Millennial Media reported fourth quarter revenues of $58 million, significantly below analysts' estimates of $62.9 million. The Company also provided disappointing revenue guidance for: (1) the first quarter of 2013 of between $48 and $50 million, compared to analysts' expectations of $56.4 million; and (2) the full year of 2013 of between $270 and $280 million, compared to analysts' expectations of $286.4 million. Additionally, on February 19, 2013, the Company disclosed that it would acquire Metaresolver. The Company's decision to acquire Metaresolver, a company developing real-time mobile ad bidding technology, began to reveal that the Company's proprietary MYDAS system was not functional to the extent described by Defendants. In reaction to these revelations, Millennial Media's stock price declined $5.38 per share, or 37.54 percent, to close at $8.95 per share following the next trading session on February 20, 2013.

70. The falsity of the Offering Documents regarding the MYDAS system's capabilities and Millennial Media's competitive position was further revealed in part when, after the close of the markets on August 13, 2013, the Company issued a press release that set forth its results of operations for the second quarter of 2013. Millennial Media reported revenues of $57 million, below analysts' estimate of $59.2 million. The Company also announced that it had reached an agreement to acquire Jumptap in a substantially all-stock transaction that would eventually value Jumptap at more than $200 million. The acquisition of Jumptap, a second company developing real-time mobile ad bidding technology, further revealed the extent to which the Company's descriptions of its MYDAS system as already offering a functional, competitive real-time bidding capability were false. In response to these announcements,

- 21 -

Millennial Media's stock price declined $1.60 per share, or 18.82 percent, to close at $6.90 per share following the next trading session on August 14, 2013.

71.     The falsity of the Offering Documents regarding the MYDAS system's capabilities and Millennial Media's competitive position was further revealed in part when, after the close of the markets on November 13, 2013, the Company issued a press release that set forth its results of operations for the third quarter of 2013, including lower-than-expected profits due to rising expenses. In response to this announcement, Millennial Media's stock price declined $0.86 per share, or 11.98 percent, to close at $6.32 per share following the next trading session on November 14, 2013.

72.     The falsity of the Offering Documents regarding the MYDAS system's capabilities and Millennial Media's competitive position was further disclosed in part on February 19, 2014, when, after the markets had closed, the Company issued a press release that set forth its results of operations for the quarter and full year ending December 31, 2013, and provided guidance for the first quarter and full year of 2014. The Company provided disappointing guidance for the first quarter of 2014 of revenue between $72 million and $76 million, compared to analysts' expectations of $83 million, and EBITDA of between −$5 million and −$6 million, compared to analysts' expectations of +$8.8 million. On this news, Millennial Media's stock price declined $1.05 per share, or 14.58 percent, to close at $6.15 per share following the next trading session on February 20, 2014.

73.     The full truth regarding the falsity of the Offering Documents regarding the MYDAS system's capabilities and Millennial Media's competitive position was finally disclosed on May 7, 2014, when, after the markets closed, the Company issued a press release setting forth results for the first quarter of 2014, including revenues below analysts' expectations.

Additionally, the Company revealed downbeat revenue guidance for the coming quarter of between $70 million and $75 million, more than 20 percent below analysts' projections of $96.4 million. On this news, Millennial Media's stock price fell sharply, declining $1.99 per share, or 37.20 percent, to close at $3.36, $9.64 or 74.15 percent below the IPO price and $10.79 or 76.25 percent below the Secondary Offering price, following the next trading session on May 8, 2014.

74. Plaintiff and the other members of the Class purchased or acquired Millennial Media's common stock pursuant or traceable to the IPO, the Secondary Offering or both and were damaged thereby.

75. Plaintiff and the other members of the Class did not know, nor in the exercise of reasonable diligence could they have known, of the untrue statements of material facts or omissions of material facts in the Offering Documents when they purchased or acquired Millennial Media's common stock.

## C. Counts Against Securities Act Defendants Related to the Offerings

### COUNT I
**For Violations of Section 11 of the Securities Act**
**Against the Securities Act Defendants**

76. Plaintiff repeats and realleges paragraphs 1 to 75, as if fully set forth herein, except that for purposes of Counts I, II, III, and IV, Plaintiff expressly excludes and disclaims any allegation that could be construed as alleging fraud or intentional or reckless misconduct, as these counts are based solely on claims of strict liability and/or negligence under the Securities Act.

77. This Count is brought against the Securities Act Defendants on behalf of all those who purchased or otherwise acquired the Company's common stock pursuant or traceable to the Offerings. The Offering Documents for the Offerings were inaccurate and misleading, contained untrue statements of material facts, omitted to state other facts necessary to make the statements

made not misleading, and concealed and failed to adequately disclose material facts, as described above.

78.     The Securities Act Defendants are strictly liable for the misstatements and omissions and for the damages that Plaintiff and the other members of the Class have sustained thereby. The Securities Act Defendants are responsible for the contents and dissemination of the Offering Documents, and did not conduct a reasonable investigation or possess reasonable grounds for the belief that the statements contained in the Offering Documents were true and without omissions of any material facts and were not misleading.

79.     The Securities Act Defendants issued, caused to be issued, and participated in the issuance of materially false and misleading written statements to the investing public that were contained in the Offering Documents, which misrepresented or failed to disclose, among other things, the facts set forth above. By reasons of the conduct herein alleged, each of the Securities Act Defendants violated and/or controlled a person who violated, Section 11 of the Securities Act.

80.     Less than one year has elapsed between the time the facts upon which this Count is based were or could reasonably have been discovered and the time this claim was brought. Less than three years have elapsed between the time that the securities upon which this Count is brought were bona fide offered to the public and the time this action was commenced.

## COUNT II
### For Violations of Section 12(a)(2) of the Securities Act
### Against the Underwriter Defendants

81.     Plaintiff repeats and realleges paragraphs 1 to 80, as if fully set forth herein, except that for purposes of Counts I, II, III, and IV, Plaintiff expressly excludes and disclaims any allegation that could be construed as alleging fraud or intentional or reckless misconduct, as these counts are based solely on claims of strict liability and/or negligence under the Securities

- 24 -

Act. This Count is brought against the Underwriter Defendants on behalf of all persons or entities who purchased the Company's common stock issued pursuant to the Offerings.

82.     The Underwriter Defendants were sellers, offerors, and/or solicitors of purchasers of the Company's common stock offered pursuant to the Offering Documents. The Offering Documents contained untrue statements of material facts, omitted to state other facts necessary to make the statements made not misleading, and failed to disclose material facts. The Underwriter Defendants' actions of solicitation included participating in the preparation and dissemination of the false and misleading Offering Documents.

83.     The Underwriter Defendants owed to the purchasers of the Company's common stock, including Plaintiff and the other members of the Class, the duty to make a reasonable and diligent investigation of the statements contained in the Offering Documents to ensure that such statements were true and that there was no omission to state a material fact required to be stated in order to make the statements contained therein not misleading. The Underwriter Defendants knew of, or in the exercise of reasonable care should have known of, the misstatements and omissions contained in the Offering Documents, as set forth above.

84.     Plaintiff and other members of the Class purchased the Company's common stock from the Underwriter Defendants pursuant to the defective Offering Documents. Plaintiff did not know, nor in the exercise of reasonable diligence could have known, of the false nature of the statements and omissions contained in the Offering Documents.

85.     By reason of the conduct alleged herein, the Underwriter Defendants violated and/or controlled a person who violated Section 12(a)(2) of the Securities Act. Accordingly, Plaintiff and the other members of the Class who hold the Company's common stock purchased

in or traceable to the Offerings have the right to rescind their purchases of and recover the consideration paid for their Millennial Media common stock.

86.     Plaintiff, individually and representatively, hereby offers to tender to the Underwriter Defendants any Millennial Media common stock that Plaintiff and the other members of the Class continue to own, on behalf of all members of the Class who continue to own such common stock, in return for the consideration paid for that stock, together with interest thereon. Plaintiff, individually and representatively on behalf of Class members who have sold their Millennial Media common stock, is entitled to and hereby claims rescission damages.

87.     Less than one year has elapsed between the time the facts upon which this Count is based were or could reasonably have been discovered and the time this claim was brought. Less than three years have elapsed between the time that the securities upon which this Count is brought were bona fide offered to the public and the time this action was commenced.

## COUNT III
### For Violations of Section 15 of the Securities Act
### Against the Officer and Director Defendants

88.     Plaintiff repeats and realleges paragraphs 1 to 87, as if fully set forth herein, except that for purposes of Counts I, II, III, and IV, Plaintiff expressly excludes and disclaims any allegation that could be construed as alleging fraud or intentional or reckless misconduct, as these counts are based solely on claims of strict liability and/or negligence under the Securities Act.

89.     This Claim is brought against the Officer and Director Defendants pursuant to Section 15 of the Securities Act on behalf of all persons or entities who purchased the Company's common stock pursuant or traceable to the Offerings conducted pursuant to the Offering Documents.

90.  As set forth in Count I herein, the Company is liable pursuant to Section 11 of the Securities Act. Each of the Officer and Director Defendants was a control person of the Company with respect to the Offerings by virtue of such individual's position as a senior executive officer and/or director of the Company and had direct and/or indirect business and/or personal relationships with other directors, officers, and/or major shareholders of the Company. By reason of their positions within the Company and/or positions on the board of directors of the Company, the Officer and Director Defendants had the requisite power to directly or indirectly control or influence the specific corporate policies that resulted in the unlawful acts and conduct alleged in Count I.

91.  Each of the Officer and Director Defendants was a culpable participant in the violations of Section 11 of the Securities Act alleged in Count I above, based on their having signed the IPO Documents and/or the Secondary Offering Documents and having otherwise participated in the process that allowed the Offerings to be executed. The Officer and Director Defendants, by virtue of their managerial and/or board positions with the Company, controlled the Company, as well as the contents of the Offering Documents, at the time of the Offerings. Each of the Officer and Director Defendants was provided with or had unlimited access to copies of the Offering Documents, and had the ability to either prevent their issuance or cause them to be corrected.

92.  As a result, the Officer and Director Defendants are liable pursuant to Section 15 of the Securities Act for the primary violations of Section 11 of the Securities Act by the Company.

93.     By virtue of the foregoing, Plaintiff and other members of the Class who purchased or otherwise acquired the Company's common stock pursuant or traceable to the Offerings are entitled to damages against the Officer and Director Defendants.

94.     Less than one year has elapsed between the time Plaintiff discovered or reasonably could have discovered the facts upon which this Count is based and the time this claim was brought. Less than three years have elapsed between the time that the securities upon which this Count is brought were bona fide offered to the public and the time this action was commenced.

## COUNT IV
### For Violations of Section 15 of the Securities Act
### Against the Principal Shareholder Defendants

95.     Plaintiff repeats and realleges paragraphs 1 to 94, as if fully set forth herein, except that for purposes of Counts I, II, III, and IV, Plaintiff expressly excludes and disclaims any allegation that could be construed as alleging fraud or intentional or reckless misconduct, as these counts are based solely on claims of strict liability and/or negligence under the Securities Act.

96.     This Claim is brought against the Principal Shareholder Defendants pursuant to Section 15 of the Securities Act on behalf of all persons or entities who purchased the Company's common stock pursuant or traceable to the Offerings conducted pursuant to the Offering Documents.

97.     Immediately prior to the IPO, the Principal Shareholder Defendants owned 71.6% of Millennial Media's common stock (or the equivalent number of shares of Millennial Media preferred stock, which automatically converted into common stock at the time of the IPO) giving them 71.6% of Millennial Media's total voting power. Immediately prior to the Secondary

- 28 -

Offering, the Principal Shareholder Defendants owned of 61.5% of Millennial Media's common stock giving them 61.5% of Millennial Media's total voting power.

98.    The Principal Shareholder Defendants, through their voting power and the appointment of Defendants Goodman, Gupta, Markley, Zachary, and Kerins as their designated directors to Millennial Media's nine-member board of directors, were each controlling persons of Millennial Media within the meaning of Section 15 of the Securities Act at the time of the IPO and the Secondary Offering.

99.    According to the Offering Documents, prior to the IPO, the Principal Shareholder Defendants had entered into a fourth amended and restated voting agreement, pursuant to which Defendants Goodman, Gupta, Markley, Zachary, and Kerins would serve on the Board of Directors during the IPO and Secondary Offering.

100.    At the time of the IPO, Defendants Goodman, Gupta, Zachary, and Kerins served as representatives of Bessemer Venture Partners, Columbia Capital, Charles River Ventures, and NEA, respectively, on the Millennial Media Board of Directors and were, effectively, the agents of those entities:

- Bessemer Venture Partners, Columbia Capital, Charles River Ventures, and NEA were the direct employers of Goodman, Gupta, Zachary, and Kerins, respectively;

- Bessemer Venture Partners, Columbia Capital, Charles River Ventures, and NEA had access to all reports, agendas, information and other information available to Goodman, Gupta, Zachary, and Kerins as Company directors;

- Bessemer Venture Partners, Columbia Capital, Charles River Ventures, and NEA participated in the preparation and dissemination of the IPO Documents through Goodman, Gupta, Zachary, and Kerins.

101.    At the time of the Secondary Offering, Defendants Goodman, Gupta, Zachary, and Kerins served as representatives of Bessemer Venture Partners, Columbia Capital, Charles River

- 29 -

Ventures, and NEA, respectively, on the Millennial Media Board of Directors and were, effectively, the agents of those entities:

- Bessemer Venture Partners, Columbia Capital, Charles River Ventures, and NEA were the direct employers of Goodman, Gupta, Zachary, and Kerins, respectively;

- Bessemer Venture Partners, Columbia Capital, Charles River Ventures, and NEA had access to all reports, agendas, information and other information available to Goodman, Gupta, Zachary, and Kerins as Company directors;

- Bessemer Venture Partners, Columbia Capital, Charles River Ventures, and NEA participated in the preparation and dissemination of the Secondary Offering Documents through Goodman, Gupta, Zachary, and Kerins.

102.    By reason of the foregoing, the Principal Shareholder Defendants were able to, and did, control the contents of the Offering Documents, which contained materially untrue or misleading information and omitted material facts.

103.    As a result, the Principal Shareholder Defendants are liable pursuant to Section 15 of the Securities Act for the primary violations of Section 11 of the Securities Act by the Company and Defendants Goodman, Gupta, Markley, Zachary, and Kerins.

104.    By virtue of the foregoing, Plaintiff and other members of the Class who purchased or otherwise acquired the Company's common stock pursuant or traceable to the Offerings are entitled to damages against the Principal Shareholder Defendants.

105.    Less than one year has elapsed between the time Plaintiff discovered or reasonably could have discovered the facts upon which this Count is based and the time this claim was brought. Less than three years have elapsed between the time that the securities upon which this Count is brought were bona fide offered to the public and the time this action was commenced.

## VII.   EXCHANGE ACT CLAIMS

### A.   Parties

#### 1.   Plaintiff

106.   Mississippi PERS, headquartered in Jackson, Mississippi, is a defined benefit retirement system.   As set forth in the attached certification, Mississippi PERS purchased Millennial Media stock at artificially inflated prices during the Class Period and has been damaged thereby.

#### 2.   Exchange Act Defendants

##### (a)   The Company

107.   Defendant Millennial Media is a corporation that is organized in Delaware and maintains its principal executive offices at 2400 Boston Street, Suite 201, Baltimore, Maryland. Millennial Media's common stock trades under the ticker symbol "MM" on the NYSE, which is an efficient market.

##### (b)   The Individual Defendants

108.   Defendant Palmieri was, at all relevant times prior to January 25, 2014, President and CEO of Millennial Media, and a member of the Company's Board of Directors.   During the Class Period, CEO Palmieri certified the Company's periodic financial reports filed with the SEC and spoke with investors and securities analysts regarding the Company on a regular basis.

109.   Defendant Avon was the Executive Vice President and CFO of Millennial Media from November 2009 to June 30, 2014.   During the Class Period, CFO Avon certified the Company's periodic financial reports filed with the SEC and spoke with investors and securities analysts regarding the Company on a regular basis.

110. Defendant Jeanneret is the Senior Vice President and CAO of the Company. During the Class Period, CAO Jeanneret spoke with investors and securities analysts regarding the Company on a regular basis.

111. Defendant Michael Barrett ("Barrett") has been, at all relevant times since January 25, 2014, President and CEO of the Company, and a member of the Company's Board of Directors.

112. Defendants described in paragraphs 97 through 100 are collectively referred to herein as the "Individual Defendants." The Individual Defendants, together with Defendant Millennial Media, are collectively referred to herein as the "Exchange Act Defendants."

## B. Substantive Allegations

### 1. Materially False and Misleading Statements

113. On January 5, 2012, Millennial Media filed the initial version of the IPO Registration Statement with the SEC in connection with the Company's contemplated IPO. The Company filed five amended versions of the IPO Registration Statement between February 10 and March 27, 2012.

114. On March 28, 2012, the IPO Registration Statement was declared effective and the Company finalized the IPO Prospectus. Plaintiff and other members of the Class purchased Millennial Media common stock in connection with the IPO that day.

115. As set forth in the IPO Prospectus, Millennial Media registered 10.2 million shares of common stock plus an underwriters' over-allotment option for an additional 1,530,000 shares to be offered to the public at $13.00 per share. The IPO Offering Documents set forth descriptions of the Company and its competitive strengths, including those described in paragraph 58 above.

- 32 -

116. On March 29, 2012, prior to the opening of the markets, Millennial Media filed the effectiveness order for the IPO Registration Statement and filed its IPO Prospectus pursuant to Rule 424(b)(4) with the SEC. Trading in Millennial Media shares commenced on the NYSE on March 29, 2012. The Company's stock price rose $12.00, or 92.31 percent, to close at $25.00 per share during the trading session that day.

117. On May 14, 2012, after the markets had closed, the Company issued a press release announcing its results of operations for the first quarter of 2012. The Company reported total revenue of $32.9 million, gross margin of 39.5 percent, and 300 million monthly unique users worldwide. The Company also offered revenue guidance for: (1) the second quarter of between $37 million and $38 million; and (2) the full year 2012 of between $173 million and $176 million.

118. In connection with these results, CEO Palmieri stated:

> Our first quarter performance exceeded expectations with strong year over year revenue growth, as well as expansion in the numbers of unique users and apps on the Millennial Media platform. We're excited that we became a public company during the first quarter, which significantly increased our market awareness and resources to execute our long-term growth strategy and investments. We are aggressively investing given we are still in the early stages of a large and rapidly growing mobile advertising market. As a market leader, *we believe Millennial Media is well-positioned to drive the business model of the worldwide app economy.*

119. At or about the same time, Millennial Media hosted a conference call for investors and analysts to discuss these results. As part of his prepared remarks, CEO Palmieri stated:

> [W]e are very excited about our Q1 performance. We've aggressively made the investments we said we were going to make, and we've done it more efficiently than was our goal.

\*    \*    \*

> We designed MYDAS for the mobile environment, where the delivery and targeting of ads must allow for a much greater number of variables than in traditional online advertising. When an ad request comes to the system, *MYDAS accounts for and analyzes hundreds of variables in real time. The system* uses our own anonymous identifier; appends profile, location, usage and audience data; and *operates a realtime marketplace to determine ad placement.* We then use our technology to handshake with our SDK software that developers have already embedded in their apps to determine and execute the best display of the ad within the app for mobile site.

Later, during the question-and-answer portion of the conference call, CFO Avon engaged in the

following exchange:

> [Analyst]: You guys talked about some of the strengths on the pricing side. You would expect some seasonality as far as [effective cost per thousand impressions, or "eCPMs"] but should we think about, on a year-over-year basis, pricing being—again this is a factor of the fill rate or what not, but should we think about lower eCPMs on a year-over-year basis for Q1 and going forward directionally?
>
> CFO Avon: I'll answer that question *as we answered it in the IPO road show.* The way to think about pricing, you really have to segment out the business into brand advertising, particularly highly-targeted and highly-engaging ads. In which case we've continued to see increases in pricing on the most-engaging and the most highly-targeted ads. The more performance ads, or the less targeted ads that we see, or the less engaging ads that we see, you do see prices move up and down. That's driven somewhat by seasonality, overall driven by supply and demand. No long-term discernible trends in the business to date, right now. But *overall there is a mix shift towards more targeted and more engaging ads, which over time have driven prices up for us.*

120. Equity analysts incorporated these positive statements relating to Millennial

Media's technology platform, the mobile industry's adoption of the Company's systems, and the

Company's positive outlook into their optimistic recommendations. For example, on May 14,

2012, Morgan Stanley issued a report entitled *Millennial Media Inc CQ1:2012: A Great Start*,

which stated in part:

> **Our take:** MM's 1Q outperformance across revenue, gross margin, and EBITDA metrics underscores *our belief that MM delivers market-leading ad targeting capabilities to advertisers and superior monetization to developers*. At a closing price of \$15.45, our risk/reward view improves relative to our May 8 report "*A Pure Play on Mobile Advertising, but Upside May Be Priced In*".

121.    On May 15, 2012, prior to the opening of the markets, Millennial Media filed its

quarterly report on Form 10-Q with the SEC, which included substantially similar financial

results as those set forth in the Company's earlier press release.

122.    The Company's Form 10-Q included a certification signed by CEO Palmieri,

incorporated therein as Exhibit 31.1, which stated:

> I, Paul J. Palmieri, certify that:
>
> 1. I have reviewed this Quarterly Report on Form 10-Q of Millennial Media, Inc.;
>
> 2. Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;
>
> 3. Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;
>
> 4. The registrant's other certifying officer(s) and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:
>
>> a) designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others

within those entities, particularly during the period in which this report is being prepared;

b) designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

c) evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

d) disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5. The registrant's other certifying officer(s) and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

a) all significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

b) any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

The Company's Form 10-Q also included a substantially similar certification, signed by CFO

Avon, as Exhibit 31.2.

123. On August 8, 2012, after the markets had closed, the Company issued a press release announcing its results of operations for the second quarter of 2012. The Company reported total revenue of $39.4 million, gross margin of 39.7 percent, and more than 350 million monthly unique users worldwide. The Company also offered revenue guidance for: (1) the third quarter of between $43.5 million and $45 million; and (2) the full year 2012 of between $176 million and $179 million.

124. In connection with these results, CEO Palmieri stated:

> We delivered strong revenue growth of 76% year over year, along with expanded gross margin performance and improved operating leverage in the second quarter. We now have over 35,000 enabled apps on our mobile advertising platform, which *we believe underscores the compelling value proposition we bring to our developer partners*. During the quarter, we also grew our base of advertising clients who rely on us to deliver targeted audiences for high impact campaigns across a broad range of mobile devices. With our large and growing data asset, along with a targeted approach that harnesses the unique capabilities of mobile devices, we continue to power the app economy, both domestically and increasingly into new international markets.

125. At or about the same time, Millennial Media hosted a conference call for investors and analysts to discuss these results. As part of his prepared remarks, CEO Palmieri stated:

> Our performance in the period reflects the positive momentum we've established in the mobile advertising market. As the industr[y']s leading independent provider, *we are positioned for continued growth and market share gains on the strength of our scale, our differentiated technology platform, our advanced targeting capabilities, based on this large and growing data asset, and our deep integrations and relationships with app developers and advertisers alike*. At Millennial Media we are singularly focused on delivering superior results in the market and to our clients.
>
> Mobile is all that we do and we have differentiated scale in that market. It is because of the years of this singular focus that we are succeeding in mobile monetization where others are not. *We have built the technologies and products that solve for the complexities*

*and challenges inherent in mobile*, while also taking advantage of
an entirely new opportunity presented by mobile.

\*       \*       \*

With our proprietary MYDAS technology and our large and
growing data assets, we are able to build real world audiences from
mobile specific data such as location data or point of sale data. We
use that data to better target [ads] to the right people at the right
time, so that they are more likely to engage with that ad. And once
a campaign has run, *we are able to provide increasingly more
comprehensive analytics and insights*, enabling them to develop
even more effective campaigns in the future on our platform.

Later, during the question-and-answer session, CEO Palmieri and CFO Avon engaged in the

following exchange:

> [Analyst]: Do you believe you're gaining share or do you think
> you're growing at about the rate of mobile advertising market
> growth?
>
> CEO Palmieri: I think we're ahead of the market growth, so I do
> think that we continue to take share. Mike might have a comment
> more specifically, but we think we're ahead of where the market is
> growing.
>
> CFO Avon: That's right, [Analyst]. As you know, most of the
> market share data comes out on an annual basis but we believe, as
> best as we can tell, we're growing at a rate faster than the market
> and have continued to do so.

126.     On August 9, 2012, prior to the opening of the markets, Millennial Media filed its

quarterly report on Form 10-Q with the SEC, which included substantially similar financial

results as those set forth in the Company's earlier press release. The Company's Form 10-Q also

included certifications substantially similar to those described in paragraph 111.

127.     On August 15, 2012, CFO Avon conducted a presentation in connection with

Canaccord's Global Growth Conference. As part of his prepared remarks, CFO Avon stated:

> [A]ll the features from the SDK enable a compelling interactive
> user experience with ads. We have a suite of tool sets that are
> embedded in a self-service business management system to allow

developers to run their business.  This includes tools like
mediation, that allow developers to allocate ad requests among
various campaign sources; the ability to serve their own sold
campaigns, or to run house ads or cross promote their apps
throughout our platform.

And then *we offer sophisticated reporting and analytics for
developers through an integrated dashboard. Our deep level of
technical integration with apps across our platform drives our
ability to deliver rich, differentiated ad experiences to advertisers.
Advertisers use our platform to reach[,] target and engage
specific audiences of consumers via apps on the platform*.

128.    Analysts incorporated Millennial Media's statements into their assessments of the

Company's technology and their optimistic projections for the Company's outlook. For example,

on September 11, 2012, Canaccord issued a report covering Millennial Media entitled *Upbeat

Management Meetings; Sound Competitive Position*, which noted in part:

**Key Points**

• *We believe business trends remain strong for the long term*, and
we note potential for Q3 and Q4 to show upside based on seasonal
factors including election ad spending, shift to higher mix of brand
advertising, and Apple device launches.

• We believe that Millennial's model *offers more forecasting
visibility* than would appear at first glance, and that *the risk of a
miss in the short term appears low*.

129.    On October 15, 2012, Millennial Media filed the initial version of the Secondary

Offering Registration Statement with the SEC in connection with the Company's contemplated

Secondary Offering.  The Company filed an amended version of the Secondary Offering

Registration Statement on October 18, 2012.

130.    On October 23, 2012, the Secondary Offering Registration Statement was declared

effective and the Company finalized the Secondary Offering Prospectus.

131.    As set forth in the Secondary Offering Prospectus, Millennial Media registered

10 million shares of common stock plus an underwriters' over-allotment option of an additional

- 39 -

1.5 million shares to be offered to the public at $14.15 per share. The Secondary Offering Documents set forth descriptions of the Company and its competitive strengths including those described in paragraph 63 above.

132. On October 24, 2012, prior to the opening of the markets, Millennial Media filed the effectiveness order for the Secondary Offering Registration Statement and filed its Secondary Offering Prospectus pursuant to Rule 424(b)(4) with the SEC.

133. On November 5, 2012, after the markets had closed, the Company issued a press release announcing its results of operations for the third quarter of 2012. The Company reported revenue of $47.4 million, gross margin of 40.9 percent, and more than 380 million monthly unique users worldwide. The Company also offered revenue guidance for: (1) the fourth quarter of between $61.5 million and $63 million; and (2) the full year 2012 of between $181 million and $182.5 million.

134. In connection with these results, CEO Palmieri stated:

> As previously announced, we delivered accelerated revenue growth for the third quarter along with strong gross margin performance. Our comprehensive suite of advertising solutions continues to be sought after by more and more brand advertisers looking to use a proven mobile platform to achieve their marketing objectives. During the quarter, we also continued to build on our leadership position with investments in technology and other resources as well as in the expansion of our international operations to accommodate both global and more regional demand for our platform.

135. At or about the same time, Millennial Media hosted a conference call for investors and analysts to discuss these results. As part of his prepared remarks CEO Palmieri stated:

> Our strong results for the period, along with our increased full year outlook, speak to the traction we've established as the go to provider of mobile monetization solutions. *There's been a lot of discussion in the media lately about a mobile monetization problem. From our perspective and as reflected in these*

- 40 -

*financial results, there is no mobile monetization problem, just the growing opportunity for Millennial Media to capitalize on.*

\*     \*     \*

*Performance advertisers, such as app developers who want to drive downloads of their apps, use our platform* to reach and target customers who will generate positive lifetime value for them. Lifetime value, or LTV, is a specific financial metric used by performance advertisers to determine the difference between the cost to drive a download and the revenue generated from that download over the lifetime of that app's usage by a single consumer. *Because we are able to deliver this long-term value-- or lifetime value, by quality downloads in[] addition to the quantity of downloads, we have become an invaluable source for delivering differentiated value for this segment of our advertiser base.*

Later, during the question-and-answer portion of the conference call, CFO Avon engaged in the

following exchange:

> **[Analyst]:** [I w]ould love to get your thoughts on real-time bidding as it relates to the mobile industry, specifically where are we currently in terms of adoption and how do you kind of see that evolving over the next 12 months or so?
>
> **CFO Avon:** Yes, you're hearing a lot about real-time bidding [("RTB")] in mobile. I think it's still the very early days for RTB and mobile. There are few companies out there that are starting to put offerings out in the market. I think it's still some time before you see broad adoption of RTB and in mobile given the complexities on the supply side of mobile, the many different devices and capabilities of the devices. But all that said, *we run a real-time bidded exchange within our core platform internally and over the long term, we think we're very well positioned if the market moves to real-time bidding.* But I think it's early days today. It's a very small percentage of the market and we'll see how it increases from there.

136.   On November 6, 2012, prior to the opening of the markets, Millennial Media filed

its quarterly report on Form 10-Q with the SEC, which included substantially similar financial

results as those set forth in the Company's earlier press release. The Company's Form 10-Q also

included certifications substantially similar to those described in paragraph 111.

- 41 -

## 2. The Truth Begins to Emerge

137. On February 19, 2013, after the close of the markets, the Company issued a press release announcing its results of operations for the fourth quarter and full year of 2012. The Company reported revenue in the fourth quarter of $58 million—sharply below analysts' expectations of $62.9 million—as well as gross margin of 41.2 percent, and more than 400 million monthly unique users worldwide. The Company's full-year results included revenue of $177.7 million and gross margin of 40.5 percent. The Company also offered disappointing revenue guidance for: (1) the first quarter of 2013 of between $48 million and $50 million; and (2) the full year 2013 of between $270 million and $280 million.

138. In connection with these results, CEO Palmieri stated:

> *Our success in 2012 speaks to the effectiveness of our platform model in delivering highly targeted and compelling mobile advertising solutions.* We delivered 68% revenue growth with record profitability in the fourth quarter. Mobile advertising is still in its early stages of development, and we believe its tremendous growth potential will transform digital advertising. As a native mobile company, we are excited about our leadership position in the market and our business prospects in 2013.

139. In connection with the earnings release, Millennial Media hosted a conference call to discuss its results with analysts and investors. As part of his prepared remarks, CEO Palmieri stated in part:

> [A]s we conduct this call today, there is no question Millennial Media is the leading independent platform in the Mobile Advertising business and powering the app economy. *There now also can be no doubt that our model is proven and strong. Our platform is having success and our investments in technology and data are delivering the solutions that show marketers the power and value of mobile*.
>
> *        *        *
>
> [W]e have some choices that we made in Q4 consistent with our long-held strategy on whether to chase some business in some

- 42 -

> performance segments or to continue to focus on large budget
> brand campaigns and premium performance campaigns that have
> always been our bread-and-butter business. *It wasn't until very
> late in the quarter that we saw that our choice not to participate
> in some of these lower end performance segments, coupled with a
> few large brand deals that didn't materialize would moderate our
> revenue growth metric for the quarter.*

CEO Palmieri also announced that the Company had reached an agreement to acquire

Metaresolver, a mobile media buying and targeting platform, stating in part:

> This small but strategic all cash acquisition will help us deliver
> additional programmatic buying solutions to advertisers and will
> enhance our ability to capture and analyze highly relevant data to
> produce better results for advertisers and developers.

140. On February 20, 2013, prior to the opening of the markets, Millennial Media filed

its Annual Report for 2012 on Form 10-K with the SEC, which included substantially similar

financial results as those set forth in the Company's earlier press release. The Company's 2012

Annual Report also included certifications substantially similar to those described in

paragraph 111.

141. In fact, weaknesses in the Company's proprietary software and related

technologies, including an inability to accurately track and report advertisement-related clicks

and actions by users, had begun to erode customer confidence in Millennial Media's MYDAS

system significantly prior to "very late in the [fourth] quarter," and the decline in revenue from

the performance-advertisement segment was not, in fact, due to any "choice" on the part of the

Company. These and other technical problems, well known to the Exchange Act Defendants but

concealed from investors, were driving away CPC and CPA clients and delaying deals with CPM

clients.

142. In response to this partial disclosure of the effects of the flaws in the Company's

proprietary software and related technologies on the Company's results and outlook, Millennial

- 43 -

Media's stock price fell $5.38 per share, or 37.54 percent, to close at $8.95 per share following the trading session on February 20, 2013. However, the Company's stock price remained inflated because the Exchange Act Defendants offered false and misleading explanations for, and continued to conceal, the true extent of the Company's problems.

143. On April 5, 2013, Millennial Media issued a press release and filed a Current Report on Form 8-K with the SEC announcing the completion of the acquisition of Metaresolver for $14.0 million in cash. Millennial Media also announced a "streamlin[ing]" of the Company's management, including the termination of employment of Chris Brandenburg, the Company's Executive Vice President and Chief Technology Officer, and Stephen Root, the Company's Executive Vice President and principal operating officer.

144. On May 8, 2013, after the markets had closed, the Company issued a press release announcing its results of operations for the first quarter of 2013. The Company reported revenue of $49.4 million, gross margin of 41.6 percent, and more than 420 million monthly unique users worldwide. The Company also offered revenue guidance for: (1) the second quarter of between $58 million and $60 million; and (2) the full year 2013 of between $270 million and $280 million.

145. In connection with these results, CEO Palmieri stated:

> We've gotten off to a solid start this year, with good growth and continued innovation. Usage of our platform continued to grow, with strong margins. We delivered a major new release of our SDKs, we closed on our acquisition in the programmatic mobile space, and we delivered financial performance consistent with or ahead of our prior guidance.

146. Later that same day, Millennial Media hosted a conference call for investors and analysts to discuss these results. As part of his prepared remarks, CEO Palmieri stated:

> Now on our last call, I talked about our areas of focus in 2013, and I would like to give you an update on our progress with each.

These key areas of focus and investment in 2013 are critical to Millennial achieving its strategic goals.

Our first area of focus for 2013 is to make it easier to buy and transact on our platform.

\* \* \*

The second area in making it easier for clients to buy and transact on the platform is programmatic buying and selling. We are determined to be a major player in premium programmatic media. We have made some aggressive moves in Q1 to move in that direction, and we intend to invest and make more moves in the coming quarters. *It's important to note that our MYDAS platform operates via a real-time bidded marketplace, and has throughout our history, so adding the interfaces for the strategic and growing sales channel is an extension of the platform, and not a change to it.*

147. On May 9, 2013, prior to the opening of the markets, Millennial Media filed its quarterly report on Form 10-Q with the SEC, which included substantially similar financial results as those set forth in the Company's earlier press release. The Company's Form 10-Q also included certifications substantially similar to those described in paragraph 111.

148. On August 13, 2013, Millennial Media issued a press release announcing that the Company had reached an agreement to acquire Jumptap in a transaction that would be funded nearly entirely by 24.6 million shares of Millennial Media stock. Concurrently, the Company issued a press release announcing its results of operations for the second quarter of 2013. The Company reported revenue of $57 million, gross margin of 42.4 percent, and more than 450 million monthly unique users worldwide. The Company did not include guidance for the coming quarter or an update to its guidance for the full year in the press release in a manner consistent with prior practice, but rather directed investors to a presentation on its website and stated that guidance would be discussed on its earnings call that day.

149. In connection with these results, CEO Palmieri stated:

- 45 -

We had a solid growth quarter in 2Q with good showing in international and brand advertising. We had strong margins during the quarter with increased platform usage by some of the largest brand advertisers in the world. We are also very pleased to announce our acquisition of Jumptap and look forward to bringing our integrated capabilities to the global mobile advertising market.

150. In connection with the earnings release, Millennial Media hosted a conference call

to discuss its results with analysts and investors. As part of his prepared remarks, CEO Palmieri

stated in part:

> Now turning to our future outlook, I'll share our thoughts regarding the third quarter and the full year 2013 based on information available to us as of today, August 13, 2013. Please keep in mind that in the near term our operations and financial results will be affected by acquisition and integration expenses, as well as any near-term market volatility we may face during the period between sign and close. Also, note that the future outlook we'll be giving today and moving forward will be on a pro forma combined basis. We decided to give combined guidance, because it will be extremely difficult to separate the discussion of results for these two businesses on a going-forward basis in a relevant manner.
>
> *     *     *
>
> For the third quarter of 2013 we anticipate revenue on a pro forma combined basis to be in the range of $80 million to $85 million. We anticipate adjusted EBITDA to be in the range of a loss of $1 million to negative $2 million in the third quarter for the combined Company on a pro forma basis. For the full-year 2013, we anticipate revenue on a pro forma combined basis to be in the range of $340 million to $350 million. We anticipate adjusted EBITDA to be in the range of a loss of negative $1 million to positive $1 million for the full year on a pro forma combined basis.

Later, as part of the question-and-answer portion of the conference call, CEO Palmieri

participated in the following exchange:

> [Analyst]: This is maybe [the] second quarter out of the last three where you guys have missed your top-line guidance but come considerably in above the EBITDA guidance. Can you talk to us about the thought process behind that? *Because [it is] hard to believe that you could not have hit those revenue numbers and*

- 46 -

*your EBITDA numbers had you been willing to forgo some of the EBITDA upside that we saw this quarter. Am I reading that the wrong way?*

CEO Palmieri: I think . . . there's a lot of things that go into that. What I'll say is we're a growth company and we are very focused on growth. But *we've also been a company that's been somewhat conservative along the way in terms of our spending, as well.* So, I think the results that you see here are the best results that were available to us in the second quarter. I think the real interesting thing here is, this is a company that is near or at the top of growth rates for technology, media and telecom companies across the board. Yet we're shy on the revenue side of about $1 million again, as I said during the call, that's not lost on us that we should take this opportunity to be a bit more conservative on the revenue side.

151.    On August 14, 2013, prior to the opening of the markets, Millennial Media filed its quarterly report on Form 10-Q with the SEC, which included substantially similar financial results as those set forth in the Company's earlier press release. The Company's Form 10-Q also included certifications substantially similar to those described in paragraph 111.

152.    In fact, weaknesses in the Company's proprietary software and related technologies that Millennial Media claimed to be fully functional had both: (1) driven the Company to acquire Jumptap; and (2) continued to erode Millennial Media's customer base. The existence and extent of these technical problems were known to the Exchange Act Defendants but concealed from investors.

153.    In response to this partial disclosure of the effects of the weaknesses in Millennial Media's proprietary software and related technologies on the Company's operational results and outlook, Millennial Media's stock price fell $1.60 per share, or 18.82 percent, to close at $6.90 per share following the trading session on August 14, 2013. However, the Company's stock price remained inflated because the Exchange Act Defendants offered false and misleading explanations for, and continued to conceal the true extent of, these problems.

- 47 -

154. On November 6, 2013, Millennial Media issued a press release announcing the completion of its acquisition of Jumptap.

155. On November 13, 2013, after the markets had closed, the Company issued a press release announcing its results of operations for the third quarter of 2013. The Company reported pro forma combined revenue of $86.3 million, pro forma combined gross margin of 38.6 percent, and more than 500 million monthly unique users worldwide on a non-combined basis. The Company also offered total pro forma combined revenue guidance for the fourth quarter of between $95 million and $100 million.

156. In connection with these results, CEO Palmieri stated:

> We've made substantial progress building and strengthening our full-stack mobile advertising platform this year. Through our acquisition of Jumptap, the global launch of MMX, our mobile ad exchange, and the introduction of our Omni Measurement suite, we are uniquely positioned to be the partner of choice to the world's largest advertisers and agencies. In the third quarter we generated $86 million in combined pro forma revenues driven by strong brand and international results and growth in programmatic performance revenues via the newly acquired Jumptap capabilities. *Our integration is going well and we are very enthusiastic about bringing our combined capabilities to the global mobile advertising market.*

157. Later that day, Millennial Media hosted a conference call for investors and analysts to discuss these results. As part of his prepared remarks, CEO Palmieri stated:

> 2013 has been a year where this industry has been in transition. In some cases, like the international or video opportunity, we were the first in line for new opportunities and, in many cases, the authors of change, flexing our competitive advantages in data and global scale. *In other cases, like addressing the growing importance of performance advertising and RTB buying capability, we saw a need to make big moves, to fill in real gaps, that represent key parts of the future of the platform.*

\*      \*      \*

- 48 -

The market for performance business is moving rapidly towards programmatic buying and Jumptap's key real-time bidding capabilities are complementary to the platform.

\*     \*     \*

As we move through the integration phase of this acquisition, we're even more excited about this combination than we were when we first announced the deal. *Our companies fit very well together, with complementary strength in both our capabilities and our cultures. Our teams are working very well together. The two companies are culturally similar and share a history of competing in the same space.* We're rapidly bringing the companies together as one, and we're very impressed with Jumptap's team.

158.    On November 14, 2013, prior to the opening of the markets, Millennial Media filed its quarterly report on Form 10-Q with the SEC, which included substantially similar financial results as those set forth in the Company's earlier press release. The Company's Form 10-Q also included certifications substantially similar to those described in paragraph 111.

159.    In response to this partial disclosure of the effect that ongoing weaknesses in the Company's proprietary software and related technologies were having on its results and outlook, Millennial Media's stock price fell $0.86 per share, or 11.98 percent, to close at $6.32 per share on November 14, 2013. However, the Company's stock price remained inflated because the Exchange Act Defendants offered false and misleading explanations for, and continued to conceal the true extent of, these problems.

160.    On January 27, 2014, the Company issued a press release announcing preliminary results for the fourth quarter of 2013. In connection with these preliminary results, CFO Avon stated:

> We are very pleased with Millennial Media's strong fourth quarter performance. With the addition of Jumptap's capabilities we bring to market an expanded suite of offerings, delivering solid results for our brand and performance clients. *The integration plan is ahead of schedule, enabling us to complement our historical*

> *strength among brand advertisers with market leading solutions for our performance clients through our demand-side programmatic buying capabilities and our premium exchange (MMX).* Millennial Media enters 2014 with a much stronger and more comprehensive suite of capabilities than at this time last year positioning us well to capitalize on these assets in the year ahead.

The Company did not offer guidance for the coming quarter or full year in connection with its earnings pre-announcement.

161. On January 30, 2014, Millennial Media filed a Form 8-K with the SEC setting forth its January 27, 2014 press release. Additionally, the Company disclosed that on January 25, 2014, CEO Palmieri had resigned from his roles as President and CEO of the Company and as a member of the Company's Board. Further, the Company revealed that the Board had appointed Michael Barrett as the Company's President and CEO, and had appointed CEO Barrett to the Board, effective January 25, 2014.

162. On February 19, 2014, after the markets had closed, the Company issued a press release announcing its results of operations for the fourth quarter and full year of 2013. The Company reported pro forma combined revenue in the fourth quarter of $109.5 million and pro forma combined gross margin of 38.2 percent. The Company's full-year results included pro forma combined revenue of $341.8 million and pro forma combined gross margin 39.4 percent.

163. Millennial Media further offered disappointing revenue guidance for the first quarter of 2014 of between $72 million and $76 million—far below analysts' expectations of $83 million. The Company also gave weak guidance for EBITDA of between −$5 million and −$6 million, sharply diverging from analysts' expectations of +$8.8 million.

164. In connection with these results, CFO Avon stated:

> Our fourth quarter success is a testament to the strategic decisions we made in 2013. From the acquisition of Jumptap, and our measured approach to integration, to the launch of our own mobile ad exchange, MMX, we have been able to innovate and execute on

behalf of our clients. We are entering 2014 with a solid foundation
to continue our growth in the coming months.

CEO Barrett added:

> I am delighted to join Millennial Media at such an exciting time.
> The Company has long led its industry; a fearless innovator with
> the technology and creative capabilities to match. I'm incredibly
> proud of what this Company has achieved and look forward to
> pushing the limits as we grow.

165. In connection with the earnings release, Millennial Media hosted a conference call

to discuss its results with analysts and investors. As part of his prepared remarks, CEO Barrett

stated in part:

> We are at an important and unique time in the evolution of the
> mobile advertising industry, and the same goes for our company.
> *As the industry is in the state of evolution, transition and growth,*
> *so is Millennial.*
>
> \*     \*     \*
>
> In Q4 we delivered some very strong results, but we also had some
> revenue generation during the quarter, which is not likely to repeat
> in Q1. *I believe this is a business that should grow its topline at*
> *20% or maybe a bit more, based on where the market is today*,
> with some quarters growing faster and some quarters growing
> slower.

Later, as part of the question-and-answer session, CEO Barrett participated in the following

exchange:

> [Analyst]: [J]umping in on the 20% general long-term revenue
> outlook. Most people probably think that the mobile industry is
> growing faster than that if you think about all of the different types
> of mobile ad product. *So does that imply that there are things*
> *happening out there that Millennial's not involved in* and could
> Millennial [] get involved in those to potentially grow even faster
> than 20%?
>
> CEO Barrett: As far as the annual guidance again, it is my choice
> as the new kid on the block that the direction we're going in this
> year is taking an overall look at both the market opportunities, with
> some of the capabilities we have, capabilities that we're building

- 51 -

> upon, and *we think that it's fair to say that this is a company we expect to have 20% growth this year.* I think that, that's all we can say about it at this juncture.

166.     In response to this partial disclosure that Millennial Media's proprietary software, related technologies and integration after the acquisition of Jumptap were far from the state of development that would allow the Company to grow at a rate commensurate with the balance of its own industry, but rather would require significant additional investment and development, and that the Company's corporate acquisitions had not filled the gaps in the Company's technology, Millennial Media's stock price fell $1.05 per share, or 14.58 percent, to close at $6.15 per share following the next trading session on February 20, 2014.

167.     On March 3, 2014, after the markets closed, Millennial Media filed its Annual Report on Form 10-K with the SEC, which included substantially similar financial results as those set forth in the Company's earlier press release. The Company's Form 10-K also included certifications substantially similar to those described in paragraph 111 executed by CEO Barrett and CFO Avon.

### 3.     The Truth Is Revealed

168.     Finally, on May 7, 2014, after the markets had closed, the Company issued a press release announcing its results of operations for the first quarter of 2014. The Company reported revenue of $72.6 million compared to analysts' expectations of $75.5 million. Additionally, Millennial Media gave dour revenue guidance for the second quarter of 2014 of between $70 million and $75 million, 22 percent below analysts' expectations of $96.4 million.

169.     In connection with these results, CEO Barrett stated:

> Now into my first full quarter, I am pleased with my decision to join Millennial Media and drive this Company to the next level. While I would have liked to have seen stronger performance in the quarter, we have developed an aggressive strategy and I have high

> confidence that we can execute and capitalize on the growth and
> promise of mobile.

Further, Millennial Media announced that CFO Avon would leave the Company "to pursue other

career interests" at the end of the second quarter of 2014.

170.    In connection with this earnings release, Millennial Media hosted a conference

call to discuss its results with analysts and investors. As part of his prepared remarks, CEO

Barrett stated in part:

> Based on what I have seen to this point, I'm enthusiastic . . . [b]ut,
> I also realize that *we have some significant work to do*.

> \*        \*   .       \*

> [O]ur performance business, especially the app download business,
> was *down year-over-year and substantially from Q4, and these
> trends continue*.

> \*        \*        \*

> In late 2013, the team recognized the need to shift much of the
> performance business to what are called programmatic platforms.
> Through acquisitions, internal development and a big partnership
> last year, Millennial built out its programmatic platform. But *there
> is still work to be done to capture the benefits of the shift to
> programmatic*.

> \*        \*        \*

> By self-service interfaces and API's, performance advertisers can
> access Millennial's inventory, either directly or through a third-
> party DSP. For Millennial, this is a much more efficient way to
> serve small and midsize performance advertisers, which will help
> us build a performance business that is based on many singles and
> doubles each quarter instead of being reliant on the home runs.
> But *shifting from this home run business, relying on big hits,
> spending a lot of money, to a more healthy longer-term business
> based on singles and doubles, is a shift that will take some time to
> work through*.

Later, as part of the question-and-answer session, CEO Barrett participated in the following

exchange:

[Analyst]: I think last quarter you had talked about looking at kind of a 20[ percent] full-year growth rate. I guess, our assumption would be that that may change a little bit. And I apologize if I missed it, but I am just wondering if you are updating that view for the full year?

CEO Barrett: For the 20% outlook, I will address that right on. Because that was the guide—I said it, with the caveat that I was with the company for about 14 days. . . . *That guidance was loose.* It was kind of—we kind of expect it to grow in the 20% range. Brand was growing over 30%, and they expect it to grow so—at probably even at a faster rate in Q2. Performance is growing in the triple-digit area—I mean, I'm sorry platform is growing in the triple-digit area. *It is just that very difficult for me to sit here, and try to do the same loose guidance that I did in Q1.*

171.     On May 8, 2014, prior to the opening of the markets, Millennial Media filed its quarterly report on Form 10-Q with the SEC, which included substantially similar financial results as those set forth in the Company's earlier press release. The Company's Form 10-Q also included certifications substantially similar to those described in paragraph 111 executed by CEO Barrett and CFO Avon.

172.     In response to the full disclosure of the extent to which Millennial Media's proprietary software and related technologies required additional investment and development to allow for revenue and earnings growth, and that the Company's corporate acquisitions had failed to fill the gaps in the Company's technology, Millennial Media's stock price stock price fell sharply, declining $1.99 per share, or 37.20 percent, to close at $3.36 per share following the next trading session on May 8, 2014.

173.     The Exchange Act Defendants' false statements and omissions during the Class Period caused the Company's stock to trade at artificially inflated prices during the Class Period. However, as the conditions described above were revealed to the market, the Company's stock price fell by $21.64 per share—or 86.56 percent—from its Class Period-high closing price of $25.00 per share on March 29, 2012.

174. The true facts, which were known to, or recklessly disregarded by, the Exchange Act Defendants and concealed from Millennial Media's shareholders and the investing public during the Class Period, were as follows:

(a) technological products and services crucial to the Company's business model were not fully functional, but in fact were still in nascent stages when announced, leading to rushed, slipshod programming, poor performance, and failure;

(b) the Company had little meaningful ability to track and report end-user clicks, leading to significant over-billing, which in turn led the Company's core customers to abandon Millennial Media;

(c) corporate acquisitions that Millennial Media undertook during the Class Period did not offer the business synergies claimed by the Company, but were rather undertaken to fill gaping holes in the Company's capabilities;

(d) corporate acquisitions that Millennial Media undertook during the Class Period were misrepresented as progressing well through integration, when, in fact, the Company faced insurmountable integration challenges stemming from its own prior rushed and slipshod development; and

(e) the Exchange Act Defendants' statements regarding the outlook and prospects of the Company were materially false at all relevant times.

## C. Loss Causation

175. During the Class Period, as detailed herein, the Exchange Act Defendants made false and misleading statements and engaged in a scheme to deceive the market and a course of conduct that artificially inflated the price of Millennial Media's stock, and operated as a fraud or deceit on Class-Period purchasers of the Company's stock by misrepresenting the state of the

- 55 -

Company's technology, corporate acquisitions, and the prospects and outlook for Millennial Media.

176. Later, as the truth relating to the Company's prior false statements, misrepresentations, and fraudulent conduct were disclosed to the market, the price of Millennial Media's stock fell as the prior artificial inflation came out of its price. As a result of their purchases of the Company's stock during the Class Period, Plaintiff and other members of the Class suffered economic loss, i.e., damages, under the federal securities laws.

## D. Inapplicability of Statutory Safe Harbor

177. The Exchange Act Defendants' verbal "Safe Harbor" warnings accompanying their oral forward-looking statements ("FLS") issued during the Class Period were ineffective to shield those statements from liability.

178. The Exchange Act Defendants are also liable for any false or misleading FLS pleaded because, at the time each FLS was made, the speaker knew the FLS was false or misleading and the FLS was authorized and/or approved by an executive officer of Millennial Media who knew that the FLS was false. None of the historic or present tense statements made by the Exchange Act Defendants were assumptions underlying or relating to any plan, projection, or statement of future economic performance, as they were not stated to be such assumptions underlying or relating to any projection or statement of future economic performance when made, nor were any of the projections or forecasts made by the Exchange Act Defendants expressly related to, or stated to be dependent on, those historic or present tense statements when made.

## E. Scienter Allegations

179. During the Class Period, the Exchange Act Defendants had both the motive and opportunity to commit fraud. They also had actual knowledge of the misleading nature of the

statements they made or acted with reckless disregard for the true information known to them at the time for the reasons discussed above. In so doing, the Exchange Act Defendants committed acts, and practiced and participated in a course of business that operated as a fraud or deceit on purchasers of Millennial Media's stock during the Class Period.

**F.   Presumption of Reliance**

180.   Plaintiff will rely upon the presumption of reliance established by the fraud-on-the-market doctrine in that, among other things:

(a)   the Exchange Act Defendants made public misrepresentations or failed to disclose material facts during the Class Period;

(b)   the omissions and misrepresentations were material;

(c)   Millennial Media stock traded in an efficient market;

(d)   the misrepresentations alleged would tend to induce a reasonable investor to misjudge the value of Millennial Media stock; and

(e)   Plaintiff and other members of the Class purchased Millennial Media stock between the time the Exchange Act Defendants misrepresented or failed to disclose material facts and the time the true facts were disclosed, without knowledge of the misrepresented or omitted facts.

181.   At all relevant times, the market for Millennial Media stock was efficient for the following reasons, among others:

(a)   as a regulated issuer, Millennial Media filed periodic public reports with the SEC;

(b)   Millennial Media regularly communicated with public investors via established market communication mechanisms, including through regular disseminations of press releases on the major news wire services and through other wide-

ranging public disclosures, such as communications with the financial press, securities analysts, and other similar reporting services;

(c)     Millennial Media was followed by several securities analysts employed by major brokerage firm(s) who wrote reports that were distributed to the sales force(s) and certain customers of their respective brokerage firm(s) and that were publicly available and entered the public marketplace; and

(d)     Millennial Media stock actively traded in efficient markets, including the NYSE, where the Company's stock trades under the ticker symbol "MM."

182.    As a result of the foregoing, the market for Millennial Media stock promptly digested current information regarding the Company from all publicly available sources and reflected such information in the price of Millennial Media stock. Under these circumstances, all purchasers of Millennial Media stock during the Class Period suffered similar injury through their purchase of Millennial Media stock at artificially inflated prices and the presumption of reliance applies.

183.    Further, to the extent that the Exchange Act Defendants concealed or improperly failed to disclose material facts with regard to the Company, Plaintiff is entitled to a presumption of reliance in accordance with *Affiliated Ute Citizens v. United States*, 406 U.S. 128, 153 (1972).

## G.     Counts Against the Exchange Act Defendants

### COUNT V
**For Violation of Section 10(b) of the Exchange Act and
Rule 10b-5 Promulgated Thereunder Against the Exchange Act Defendants**

184.    Plaintiff repeats, incorporates, and realleges paragraphs 1 through 183 by reference.

185.    During the Class Period, the Exchange Act Defendants disseminated or approved the false statements specified above, which they knew or recklessly disregarded were misleading

in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

186. The Exchange Act Defendants violated Section 10(b) of the Exchange Act and Rule 10b-5 in that they:

(a) employed devices, schemes, and artifices to defraud;

(b) made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and/or

(c) engaged in acts, practices, and a course of business that operated as a fraud or deceit upon Plaintiff and others similarly situated in connection with their purchases of Millennial Media stock during the Class Period.

187. Plaintiff and other members of the Class have suffered damages in that, in reliance on the integrity of the market, they paid artificially inflated prices for Millennial Media stock. Plaintiff and other members of the Class would not have purchased Millennial Media stock at the prices they paid, or at all, if they had been aware that the market prices had been artificially and falsely inflated by the Exchange Act Defendants' misleading statements.

188. As a direct and proximate result of the Exchange Act Defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their purchases of Millennial Media stock during the Class Period.

## COUNT VI
### For Violations of Section 20(a) of the Exchange Act
### Against the Individual Defendants

189. Plaintiff repeats, incorporates, and realleges paragraphs 1 through 188 by reference.

190. The Individual Defendants acted as controlling persons of Millennial Media within the meaning of Section 20(a) of the Exchange Act. By virtue of their positions and their power to control public statements about Millennial Media, the Individual Defendants had the power and ability to control the actions of Millennial Media and its employees. By reason of such conduct, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act.

## VIII. PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for judgment as follows:

A. Declaring this action to be a proper class action pursuant to Federal Rule of Civil Procedure 23;

B. Awarding Plaintiff and the members of the Class damages and interest;

C. Awarding Plaintiff's reasonable costs, including attorneys' fees; and

D. Awarding such equitable/injunctive or other relief as the Court may deem just and proper.

## IX.    JURY DEMAND

Plaintiff demands a trial by jury.

DATED:  September 30, 2014

Respectfully submitted,

Christopher J. Keller
Eric J. Belfi
Michael W. Stocker
**LABATON SUCHAROW LLP**
140 Broadway
New York, New York 10005
Telephone: (212) 907-0700
Facsimile:  (212) 818-0477
E-mail: ckeller@labaton.com
ebelfi@labaton.com
mstocker@labaton.com

Gerald H. Silk
Avi Josefson
**BERNSTEIN LITOWITZ BERGER
  & GROSSMANN LLP**
1285 Avenue of the Americas
New York, New York 10019
Telephone: (212) 554 1400
Facsimile:  (212) 554 1444
jerry@blbglaw.com
avi@blbglaw.com

*Counsel for Proposed Lead Plaintiff,
Public Employees' Retirement System of
Mississippi, and Proposed Lead Counsel
for the Class*

## CERTIFICATION

I, George W. Neville, as Special Assistant Attorney General in the Office of the Attorney General of the State of Mississippi on behalf of the Public Employees' Retirement System of Mississippi ("Mississippi PERS"), hereby certify as follows:

1.      I am fully authorized to enter into and execute this Certification on behalf of Mississippi PERS. I have reviewed a complaint prepared against Millennial Media, Inc. ("Millennial Media") alleging violations of the federal securities laws and authorized its filing;

2.      Mississippi PERS did not purchase securities of Millennial Media at the direction of counsel or in order to participate in any private action under the federal securities laws;

3.      Mississippi PERS is willing to serve as a lead plaintiff and representative party in this matter, including providing testimony at deposition and trial, if necessary;

4.      Mississippi PERS' transactions in Millennial Media securities during the Class Period are reflected in Exhibit A, attached hereto;

5.      Mississippi PERS sought to serve as a lead plaintiff in the following class actions filed under the federal securities laws during the last three years:

*In re Diamond Foods, Inc. Securities Litigation*, No. 3:11-cv-05386 (N.D. Cal.)
*Louisiana Municipal Police Employees' Retirement Systems v. Green Mountain Coffee Roasters, Inc.*, No. 2:11-cv-00289 (D. Vt.)

6.      Mississippi PERS is currently serving as a lead plaintiff in the following class actions filed under the federal securities laws during the last three years:

*In re Diamond Foods, Inc. Securities Litigation*, No. 3:11-cv-05386 (N.D. Cal.)
*Louisiana Municipal Police Employees' Retirement Systems v. Green Mountain Coffee Roasters, Inc.*, No. 2:11-cv-00289 (D. Vt.)

7.      Beyond its pro rata share of any recovery, Mississippi PERS will not accept payment for serving as a lead plaintiff and representative party on behalf of the Class, except the

reimbursement of such reasonable costs and expenses (including lost wages) as ordered or approved by the Court.

I declare under penalty of perjury, under the laws of the United States, that the foregoing is true and correct this 30ᵗʰ day of September, 2014.

George W. Neville,
*Special Assistant Attorney General in the*
*Office of the Attorney General of the State of*
*Mississippi on behalf of the Public Employees'*
*Retirement System of Mississippi*

2

## EXHIBIT A

## TRANSACTIONS IN MILLENNIAL MEDIA, INC.

| Transaction Type | Trade Date | Shares | Price Per Share | Cost / Proceeds |
|---|---|---|---|---|
| Purchase | 03/28/12 | 347.00 | $13.00 | ($4,511.00) |
| Purchase | 03/28/12 | 2,900.00 | $13.00 | ($37,700.00) |
| Sale | 03/29/12 | -347.00 | $25.01 | $8,677.15 |
| Sale | 03/30/12 | -2,900.00 | $23.65 | $68,580.07 |
| Purchase | 09/20/12 | 6,660.00 | $14.92 | ($99,333.90) |
| Purchase | 09/20/12 | 230.00 | $14.92 | ($3,432.20) |
| Purchase | 09/20/12 | 3,520.00 | $14.99 | ($52,761.63) |
| Purchase | 09/20/12 | 4,440.00 | $15.20 | ($67,488.00) |
| Purchase | 09/21/12 | 35,030.00 | $14.87 | ($520,941.64) |
| Purchase | 09/21/12 | 1,350.00 | $15.06 | ($20,324.25) |
| Purchase | 09/21/12 | 3,410.00 | $15.14 | ($51,617.51) |
| Purchase | 09/21/12 | 22,550.00 | $15.25 | ($343,887.50) |
| Purchase | 09/24/12 | 2,690.00 | $14.90 | ($40,077.50) |
| Purchase | 09/25/12 | 34,390.00 | $14.61 | ($502,468.85) |
| Purchase | 09/26/12 | 1,620.00 | $14.18 | ($22,967.39) |
| Purchase | 09/26/12 | 3,170.00 | $14.30 | ($45,346.53) |
| Purchase | 09/27/12 | 5,920.00 | $14.22 | ($84,173.52) |
| Purchase | 09/27/12 | 3,640.00 | $14.29 | ($52,012.32) |
| Purchase | 09/27/12 | 7,310.00 | $14.30 | ($104,518.38) |
| Purchase | 09/28/12 | 14,030.00 | $14.33 | ($201,079.36) |
| Purchase | 10/01/12 | 3,450.00 | $14.27 | ($49,230.12) |
| Purchase | 10/02/12 | 400.00 | $14.39 | ($5,756.88) |
| Purchase | 10/03/12 | 5,790.00 | $14.44 | ($83,613.97) |
| Purchase | 10/04/12 | 2,450.00 | $14.52 | ($35,562.24) |
| Purchase | 10/05/12 | 7,510.00 | $14.95 | ($112,260.98) |
| Purchase | 10/05/12 | 3,550.00 | $14.96 | ($53,102.68) |
| Purchase | 10/15/12 | 1,000.00 | $14.98 | ($14,984.50) |
| Purchase | 10/23/12 | 18,030.00 | $14.15 | ($255,124.50) |
| Purchase | 10/24/12 | 5,100.00 | $15.74 | ($80,274.00) |
| Purchase | 10/24/12 | 7,210.00 | $15.77 | ($113,671.42) |
| Sale | 12/11/12 | -21,320.00 | $12.37 | $263,728.40 |
| Purchase | 12/12/12 | 340.00 | $12.05 | ($4,096.46) |
| Purchase | 12/13/12 | 3,130.00 | $12.00 | ($37,559.69) |
| Purchase | 12/14/12 | 1,440.00 | $12.20 | ($17,569.87) |
| Purchase | 12/14/12 | 1,040.00 | $12.32 | ($12,814.05) |
| Purchase | 12/17/12 | 210.00 | $12.01 | ($2,522.10) |
| Purchase | 12/17/12 | 2,180.00 | $12.13 | ($26,436.42) |
| Purchase | 12/19/12 | 1,340.00 | $12.75 | ($17,078.43) |

| Transaction Type | Trade Date | Shares | Price Per Share | Cost / Proceeds |
|---|---|---|---|---|
| Purchase | 12/20/12 | 350.00 | $12.87 | ($4,504.75) |
| Purchase | 12/20/12 | 570.00 | $12.88 | ($7,340.86) |
| Purchase | 12/21/12 | 2,410.00 | $12.76 | ($30,751.36) |
| Purchase | 12/21/12 | 690.00 | $12.91 | ($8,904.45) |
| Purchase | 12/24/12 | 3,250.00 | $12.37 | ($40,200.23) |
| Purchase | 12/26/12 | 2,800.00 | $12.13 | ($33,961.48) |
| Purchase | 12/27/12 | 3,400.00 | $12.05 | ($40,953.00) |
| Purchase | 12/28/12 | 2,680.00 | $11.98 | ($32,113.37) |
| Purchase | 12/31/12 | 1,410.00 | $12.25 | ($17,273.06) |
| Purchase | 01/02/13 | 130.00 | $12.73 | ($1,654.87) |
| Purchase | 01/03/13 | 2,980.00 | $12.62 | ($37,594.49) |
| Purchase | 01/04/13 | 2,800.00 | $12.43 | ($34,809.60) |
| Purchase | 06/21/13 | 24,580.00 | $8.52 | ($209,333.11) |
| Purchase | 06/24/13 | 45,050.00 | $8.27 | ($372,689.64) |
| Purchase | 06/25/13 | 9,140.00 | $8.47 | ($77,413.06) |
| Sale | 08/15/13 | -50,050.00 | $6.91 | $345,880.54 |
| Sale | 08/16/13 | -26,920.00 | $7.01 | $188,693.05 |
| Sale | 08/22/13 | -800.00 | $7.01 | $5,606.96 |
| Sale | 08/22/13 | -8,920.00 | $7.01 | $62,514.04 |
| Sale | 08/23/13 | -3,430.00 | $7.01 | $24,034.35 |
| Sale | 08/26/13 | -12,070.00 | $7.07 | $85,286.62 |
| Sale | 09/04/13 | -10,850.00 | $6.56 | $71,180.34 |
| Sale | 09/05/13 | -1,971.00 | $6.60 | $13,004.07 |
| Sale | 09/05/13 | -2,487.00 | $6.60 | $16,408.48 |
| Sale | 09/05/13 | -17,872.00 | $6.60 | $117,914.09 |
| Sale | 09/06/13 | -5,660.00 | $6.58 | $37,239.40 |
| Sale | 09/09/13 | -2,140.00 | $6.52 | $13,953.44 |
| Sale | 09/09/13 | -5,960.00 | $6.53 | $38,914.63 |
| Sale | 09/10/13 | -4,290.00 | $6.50 | $27,885.43 |
| Sale | 09/11/13 | -3,060.00 | $6.65 | $20,363.99 |
| Sale | 09/11/13 | -59,460.00 | $6.62 | $393,637.09 |
| Sale | 09/12/13 | -5,100.00 | $7.13 | $36,337.50 |
| Sale | 09/12/13 | -19,040.00 | $7.05 | $134,205.34 |
| Sale | 09/16/13 | -550.00 | $7.03 | $3,864.52 |
| Sale | 09/16/13 | -22,090.00 | $7.00 | $154,592.45 |
| Sale | 09/17/13 | -32,330.00 | $7.33 | $237,124.39 |