**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
--------------------------------------------------------x
                                     :

IN RE MILLENNIAL MEDIA, INC.     :     14 Civ. 7923 (PAE)
SECURITIES LITIGATION          :
                                     :
                                     :     **JURY TRIAL DEMANDED**
                                     :     Consolidated with:  14 Civ. 8330 (PAE)
                                     :
                                     :
                                     :
                                     :
--------------------------------------------------------- x

**AMENDED CONSOLIDATED CLASS ACTION COMPLAINT**
**FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS**

# TABLE OF CONTENTS

Page(s)

I.    INTRODUCTION .......................................................................................................... 3

II.   JURISDICTION AND VENUE .................................................................................. 6

III.  THE EXCHANGE ACT CLAIMS.............................................................................. 7

    A.   THE EXCHANGE ACT PARTIES.................................................................... 7

        1.   The Co-Lead Plaintiffs............................................................................. 7

        2.   The Exchange Act Defendants.................................................................. 7

            (a)   The Company.................................................................................. 7

            (b)   The Individual Exchange Act Defendants ..................................... 8

    B.   BACKGROUND ON MILLENNIAL MEDIA AND THE MOBILE
        ADVERTISING INDUSTRY ............................................................................ 9

        1.   Millennial Media's Business Depended on Its Technology ..................... 9

        2.   Advertisers and Developers Depended on Millennial Media's
            Ability to Accurately Track and Report User Data ................................. 12

    C.   THE DEFENDANTS' FRAUDULENT SCHEME ............................................ 13

        1.   In the March 2012 IPO, Millennial Media and Company Insiders
            Sold More than $152 Million in Stock to Investors Based on
            Material Misrepresentations and Omissions............................................ 13

            (a)   Millennial Media Misstated the Company's Ability to
                Accurately Measure, Attribute and Report User Behavior........... 14

            (b)   Millennial Media Misstated that the Company's
                Technology Was "Designed to Address" the Needs of
                Performance Advertising Clients................................................... 18

            (c)   Millennial Media Misrepresented the True Condition of Its
                mMedia Self-Service Function ...................................................... 19

            (d)   Millennial Media Misstated Its "Real-Time Bidding"
                Capability...................................................................................... 20

            (e)   The Offering Documents Did Not Satisfy Item 303 or
                Regulation C ................................................................................. 21

      (f)     Millennial Media and Company Insiders Sold Tens of Millions of Dollars of Stock in the IPO ........................................ 23

2.    Defendants Artificially Inflated the Price of Millennial Media Stock in the Months Leading Up to the Company's October 2012 Secondary Offering .................................................................................. 24

      (a)    The Company's False and Misleading Disclosures Concerning First Quarter 2012 Financial Results........................ 24

      (b)    Palmieri's Statements to *CNBC* on May 22, 2012........................ 28

      (c)    The Company's False and Misleading Disclosures Concerning Second Quarter 2012 Financial Results ................... 28

      (d)    The August 14, 2012 Oppenheimer Technology, Internet & Communications Conference ........................................................ 30

      (e)    The August 15, 2012 Canaccord Global Growth Conference ................................................................................... 30

      (f)     Palmieri's Statements to *CNBC* on September 12, 2012 ............. 30

      (g)    The September 20, 2012 Goldman Sachs Communacopia Conference ................................................................................... 31

3.    In Its October 2012 Secondary Offering, Millennial Media Insiders Sold More than $38.7 Million in Stock to Investors Based on Material Misrepresentations and Omissions ............................................ 32

4.    Defendants Made Materially False and Misleading Statements in the Third Quarter of 2012 ........................................................................ 35

5.    In February 2013, the Company Announced Disappointing Revenues and the Need to Acquire Metaresolver, Yet Continued to Issue Materially False and Misleading Statements to Reassure Investors ................................................................................................... 37

      (a)    Defendants Disclosed Negative Fourth Quarter 2012 Financial Results and the Need to Acquire Metaresolver ............. 37

      (b)    Defendants Continued to Falsely Tout the Effectiveness of the Company's Platform ............................................................... 39

6.    In March Through April 2013, Palmieri Established a Rule 10b-5 Trading Plan, the Company's CTO and COO Resigned, and the Company Terminated the Lead MYDAS Engineers ................................ 42

7.      The Exchange Act Defendants Made Additional Materially False and Misleading Claims Concerning the Company's First Quarter 2013 Financial Results .................................................................. 43

8.      In July 2013, CEO Palmieri Sold an Additional $2.63 Million in Stock ................................................................................................. 44

9.      In August 2013, the Company Announced its Acquisition of Jumptap And Continued to Issue Materially False and Misleading Statements to Reassure the Market ......................................... 45

        (a)     Defendants Disclose the Need to Acquire Jumptap .................... 45

        (b)     The Company's False and Misleading Disclosures Concerning Second Quarter 2013 Financial Results ................... 47

10.     In November 2013, The Company Completes the Acquisition of Jumptap But Faces Undisclosed Difficulties Integrating Jumptap's Technology ............................................................................ 48

        (a)     Defendants Disclose Disappointing Financial Results and How the Company's Acquisitions in 2013 Filled "Real Gaps" ........................................................................................ 48

        (b)     Defendants Falsely Reassure Investors that Millennial Media's Integration of Jumptap Was Proceeding Efficiently ....... 49

11.     January-May 2014:  Millennial Media Announced the Resignation of CEO Palmieri, Disappointing Revenue Guidance, and the Resignation of CFO Avon ..................................................... 53

        (a)     On January 25, 2014, CEO Palmieri Resigned ........................... 53

        (b)     The Company's False and Misleading Disclosures Concerning Fourth Quarter 2013 Preliminary Financial Results ........................................................................................ 54

        (c)     On February 19, 2014, the Company Issued Disappointing Guidance ................................................................................... 55

        (d)     The Company's False and Misleading Disclosures Concerning Full Year 2013 Financial Results ............................. 57

        (e)     On May 7, 2014, CFO Avon Resigned ........................................ 58

12.     In July 2014, Millennial Media's New CEO Disclosed That He Was Taking Drastic Steps to "Reshape" the Company ........................... 60

13. In August 2014, the Company Again Disclosed Disappointing Earnings, and Executive Vice President Spilman and Board Director MacIntosh Resigned ................................................... 61

14. The Exchange Act Defendants Failed To Disclose Material, Non-Public Facts During the Class Period........................................................ 64

D. LOSS CAUSATION / ECONOMIC LOSS .......................................................... 66

E. THE EXCHANGE ACT DEFENDANTS ACTED WITH SCIENTER............. 70

1. The Exchange Act Defendants Profited from Massive Insider Sales ....... 71

2. Additional Facts Give Rise to a Strong Inference of Scienter ................. 80

F. THE PRESUMPTION OF RELIANCE WITH RESPECT TO THE EXCHANGE ACT CLAIMS ................................................................ 91

G. THE INAPPLICABILITY OF THE STATUTORY SAFE HARBOR AND BESPEAKS CAUTION DOCTRINE........................................................ 93

H. CLAIMS FOR RELIEF UNDER THE EXCHANGE ACT................................ 94

IV. THE SECURITIES ACT CLAIMS................................................................ 95

A. THE SECURITIES ACT PARTIES ................................................................ 96

1. The Co-Lead Plaintiff................................................................ 96

2. The Securities Act Defendants................................................................ 97

(a) The Company................................................................ 97

(b) The Individual Securities Act Defendants .................................. 97

(c) The Principal Shareholder Defendants ......................................... 99

(d) The Underwriter Defendants........................................................ 101

B. THE SECURITIES ACT DEFENDANTS ARE LIABLE FOR MATERIAL MISSTATEMENTS AND OMISSIONS IN THE OFFERING DOCUMENTS ................................................................ 102

1. In the March 2012 IPO, Millennial Media and Company Insiders Sold More than $152 Million in Stock to Investors Based on Material Misrepresentations and Omissions........................................... 102

(a) Millennial Media Misstated the Company's Ability to Accurately Measure, Attribute and Report User Behavior......... 103

(b)    Millennial Media Misstated that the Company's Technology Was "Designed to Address" the Needs of Performance Advertising Clients .................................................. 107

(c)    Millennial Media Misstated the True Condition of Its mMedia Self-Service Function ................................................... 108

(d)    Millennial Media Misstated Its "Real-Time Bidding" Capability .................................................................................... 109

(e)    The Offering Documents Did Not Satisfy Item 303 or Regulation C .............................................................................. 110

2.    Millennial Media's Secondary Offering in October 2012 ...................... 112

C.    CLAIMS FOR RELIEF UNDER THE SECURITIES ACT ............................. 117

V.    CLASS ACTION ALLEGATIONS ............................................................... 125

VI.    PRAYER FOR RELIEF ............................................................................. 127

VII.    JURY TRIAL DEMAND ............................................................................ 127

Co-Lead Plaintiffs Public Employees' Retirement System of Mississippi ("Mississippi PERS") and the Bernard T. Selz 2008 15-Year Charitable Lead Annuity Trust; the Bernard T. Selz 2008 20-Year Charitable Lead Annuity Trust; Karnak Partners, L.P.; and GAM Selection Hedge Investments Inc. (collectively, the "Selz Funds" and, together with Mississippi PERS, "Co-Lead Plaintiffs") bring this action individually and on behalf of all persons and entities who purchased or otherwise acquired the common stock of Millennial Media, Inc. ("Millennial Media" or the "Company") between March 28, 2012 and August 11, 2014, inclusive (the "Class Period"), and were damaged thereby (the "Class"). Excluded from the Class are Defendants (as set forth herein), present or former executive officers of Millennial Media and their immediate family members (as defined in 17 C.F.R. § 229.404, Instructions (1)(a)(iii) and (1)(b)(2)).

Co-Lead Plaintiffs bring this class action pursuant to the Securities Exchange Act of 1934 (the "Exchange Act") on behalf of the Class. The Exchange Act claims allege that certain Defendants engaged in a fraudulent scheme to artificially inflate the price of Millennial Media's common stock during the Class Period. Co-Lead Plaintiff Mississippi PERS also brings this action pursuant to the Securities Act of 1933 (the "Securities Act") on behalf of all persons or entities who purchased the common stock of Millennial Media pursuant and/or traceable to two registered public offerings. On or about March 28, 2012, Millennial Media commenced its initial public offering (the "IPO") through which the Company and certain of its shareholders sold more than 11.7 million shares of common stock (including the full exercise of an underwriters' option) at $13.00 per share for aggregate gross proceeds of more than $152 million. Through a second stock offering, commenced on or about October 24, 2012 (the "Secondary Offering" and together with the IPO, the "Offerings"), Millennial Media and certain of its shareholders sold an additional 11.5 million shares (including the full exercise of an underwriters' option) at $14.15

per share for aggregate gross proceeds of more than $162 million.  The shareholders selling through the Secondary Offering included venture capital firms and Defendants Bessemer Venture Partners, Columbia Capital, Charles River Ventures, and New Enterprise Associates, Inc. ("NEA"), who were members of Millennial Media's board of directors (the "Board").  These shareholders liquidated approximately 7.7 million of their privately held shares through the Secondary Offering.

Pursuant to the Securities Act, the Securities Act Defendants (as defined herein) are strictly liable for material misstatements in the Registration Statements and Prospectuses issued in connection with the Offerings (the "Offering Documents"), and the Securities Act claims alleged herein specifically exclude any allegations of knowledge or scienter.  The Securities Act claims are based solely on strict liability and negligence, and are not based on any reckless or intentionally fraudulent conduct by or on behalf of Defendants—*i.e.*, the Securities Act claims do not allege, arise from, or sound in, fraud.  Co-Lead Plaintiff Mississippi PERS specifically disclaims any allegation of fraud, scienter, or recklessness in its non-fraud claims.

Co-Lead Plaintiffs allege the following based upon personal knowledge as to themselves and their own acts and upon information and belief as to all other matters.  Co-Lead Plaintiffs' information and belief is based on, *inter alia*, the independent investigation of Court-appointed Co-Lead Counsel, which included a review of U.S. Securities and Exchange Commission ("SEC") filings by Millennial Media; securities analysts' reports about the Company; transcripts of investor conference calls; press releases and media reports about the Company; interviews of confidential witnesses ("CWs"); economic analyses of securities movements and pricing data; and other publicly available material and data identified herein.  Co-Lead Counsel's investigation into the factual allegations contained herein is continuing, and relevant facts are known only to

the Defendants named herein, or are exclusively within their custody or control.  Co-Lead Plaintiffs believe that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for further investigation and discovery.

## I.    INTRODUCTION

1.    This case is about the executives who took Millennial Media public based on materially false and misleading claims about the Company and the capabilities of its advertising technology.  Millennial Media is an online advertising company that reports its revenues based on the number of times mobile users click on its clients' advertisements or download its clients' apps.  It is therefore critically important to the Company and its investors that Millennial Media accurately report those key user metrics to its clients, and that the Company had the technology to track and report such data.

2.    During the Class Period, the Company and its executives falsely and misleadingly claimed that the Company accurately measured user behavior, attributed actions to specific users, and provided developers with accurate reports of user behavior.  For example, in the Registration Statement filed on March 27, 2012 and the Prospectus filed on March 29, 2012 (together, the "IPO Offering Documents"), the Company claimed that Millennial Media's reports help developers "gain insight into user interaction and behavior and the performance of their apps" and that the Company has "sophisticated reporting and analytics," which include "comprehensive ad revenue generation reports."

3.    These claims were materially false and misleading because, unbeknownst to investors, products and services crucial to Millennial Media's business model were not fully functional, and, in fact, were still in nascent stages when announced, leading to poor performance and an inability to compete with more advanced competitors.  Millennial Media in

fact had little meaningful ability to accurately track and report end-user clicks, leading to significant over-billing, which in turn led many of the Company's customers to abandon it.

4.    Specifically, third party data tracking companies hired by the Company's own clients found serious differences between the number of user interactions that Millennial Media reported, and the actual number of user interactions the third parties tracked.  The discrepancies between Millennial Media's reported numbers and those of the third party data trackers caused Millennial Media's clients to withdraw from the Company's platform, or significantly reduce their advertising expenditures with Millennial Media, resulting in significant losses in revenue.

5.    Millennial Media and its executives also falsely and misleadingly claimed that the Company's technology platform, MYDAS, was "designed to address the needs" of performance advertisers.  Performance advertisers base their payments to Millennial Media not only on advertising impressions but when users engage with an advertisement through, for example, clicking on an advertisement or downloading an application (*i.e.*, "conversions").  The claim that the Company's platform was "designed" for performance advertisers was materially false and misleading because Millennial Media's technology was unable to accurately track conversions, which is a key requirement of performance-based advertisers.  In fact, according to CW1, Millennial Media did not have a competitive programmatic advertising business, and this required the Company to engage in a costly acquisition of its competitor, Jumptap, which led to significant dilution in the Company's stock and loss of shareholder value.

6.    After the Company acknowledged in November 2013, at the time it completed its acquisition of Jumptap, that it needed to acquire Jumptap in order to "fill in real gaps" in Millennial Media's platform, it falsely represented to investors that the integration of Jumptap's technology with Millennial Media's was "going well," that the companies "fit very well

together," and that, "We're rapidly bring[ing] the companies together as one." In fact, numerous confidential witnesses explained that these representations were false because it was nearly impossible to integrate the Millennial Media and Jumptap technologies with one another because of limitations inherent in each firm's software.

7.     The Defendants' false and misleading statements to investors overstated the Company's true financial state and artificially inflated its stock price. Millennial Media's executives and venture capital investors directly benefited from this inflation by selling tens of millions of dollars of their own Millennial Media stock during the Company's March 2012 IPO and its October 2012 Secondary Offering without disclosing the truth to investors, and shortly before the truth first began to emerge.

8.     For example, Millennial Media co-founder and former CEO Paul J. Palmieri ("Palmieri") sold more than $8.85 million of his shares in the IPO and $14.80 million of his shares in the Secondary Offering, which represented *25%* of the shares that he held as of the IPO. Former CFO Michael Avon ("Avon") also sold more than $897,000 of his shares in the IPO and $1.59 million of his shares in the Secondary Offering, which represented *43%* of the shares he held as of the IPO.

9.     As the truth about Millennial Media's operations and outlook became known to investors, the artificial inflation was removed and the price of Millennial Media's common stock fell, declining by more than *89%* from its Class Period high, causing significant damages to Co-Lead Plaintiffs and the Class.

10.     The revelation of the Defendants' misstatements occurred through a series of partial disclosures that included announcements of disappointing revenues and guidance, and that Millennial Media needed to acquire competing businesses (such as Jumptap) in order to fill the

gaps in its technology platform.  Within approximately two years of the Company's IPO, the Company also announced the resignations of its Chief Technology Officer ("CTO") and co-founder, Chris Brandenburg ("Brandenburg"), its Chief Operating Officer ("COO"), Stephen Root ("Root"), its Chief Executive Officer ("CEO"), Defendant Palmieri, and its Chief Financial Officer ("CFO"), Defendant Avon.  The reason for their resignations is clear: unbeknownst to investors, Millennial Media simply could not deliver on the false claims the Defendants made about the purported strength of the Company's technology and its supposed financial success.

## II.   JURISDICTION AND VENUE

11.     The claims asserted herein arise under Sections 10(b) and 20(a) of the Exchange Act, 15 U.S.C. §§ 78j(b) and 78t(a), and Rule 10b-5 promulgated thereunder by the SEC, 17 C.F.R. § 240.10b-5; and Sections 11, 12(a)(2), and 15 of the Securities Act, 15 U.S.C. §§ 77k, 77l(a)(2) and 77o.  Accordingly, this Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331, Section 27 of the Exchange Act, 15 U.S.C. § 78aa, and Section 22 of the Securities Act, 15 U.S.C. § 77v.

12.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(b), Section 27 of the Exchange Act, and Section 22(a) of the Securities Act.  The Company conducted the Offerings in this District and many of the acts that constitute the violations of law complained of herein, including dissemination to the public of materially false and misleading information to the investing public in connection with those transactions, occurred in and/or were issued from this District.  Additionally, a number of the Underwriter Defendants (as defined herein) maintain their principal places of business in this District.

13.     In connection with the acts alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not

limited to, the mails, interstate telephone communications, and the facilities of the national securities markets.

III.    THE EXCHANGE ACT CLAIMS

    A.    THE EXCHANGE ACT PARTIES

        1.    The Co-Lead Plaintiffs

14.    Mississippi PERS, headquartered in Jackson, Mississippi, is a defined benefit retirement system, established for the benefit of current and retired public employees of the State of Mississippi, including individuals employed by the state's public school districts, municipalities, counties, community colleges, and state universities.  As set forth in Exhibit B, Mississippi PERS purchased Millennial Media common stock at artificially inflated prices during the Class Period and was damaged thereby.

15.    The Bernard T. Selz 2008 15-Year Charitable Lead Annuity Trust and the Bernard T. Selz 2008 20-Year Charitable Lead Annuity Trust (the "Trusts") are charitable lead annuity trusts.  Karnak Partners, L.P. ("Karnak") is a private investment limited partnership.  GAM Selection Hedge Investments Inc. ("GAM") is a private investment fund.  The Trusts, Karnak and GAM are collectively referred to herein as the "Selz Funds."  As set forth in Exhibit C, the Selz Funds purchased Millennial Media common stock at artificially inflated prices during the Class Period and were damaged thereby.

        2.    The Exchange Act Defendants

           (a)    The Company

16.    Defendant Millennial Media is a Delaware corporation that maintains its principal executive offices at 2400 Boston Street, Suite 201, Baltimore, Maryland.  At all relevant times, Millennial Media's common stock traded under the ticker symbol "MM" on the New York Stock Exchange (the "NYSE").

**(b)      The Individual Exchange Act Defendants**

17.      Defendant Palmieri was, at all relevant times prior to January 25, 2014, President and CEO of Millennial Media, and a member of the Company's Board.  Defendant Palmieri was also the co-founder of the Company.  He resigned from Millennial Media less than two years after the IPO.  During the Class Period, CEO Palmieri made materially false and misleading statements to investors, including in the Company's periodic financial reports that he certified and filed with the SEC, during investor conference calls and in statements to the media.

18.      Defendant Avon was, at all relevant times prior to July 1, 2014, CFO and an Executive Vice President of the Company.  During the Class Period, CFO Avon made materially false and misleading statements to investors, including in the Company's periodic financial reports that he certified and filed with the SEC, during investor conference calls and in statements to the media.

19.      Defendant Andrew J. Jeanneret ("Jeanneret") was Chief Accounting Officer ("CAO") and a Senior Vice President of the Company during the Class Period and currently serves as its CFO.  During the Class Period, CAO Jeanneret made materially false and misleading statements to investors, including in the Company's periodic financial reports that he certified and filed with the SEC, during investor conference calls and in statements to the media.

20.      Defendant Michael Barrett ("Barrett") was, at all relevant times after January 25, 2014, President and CEO of the Company, and a member of the Company's Board.  During the Class Period, CEO Barrett made materially false and misleading statements to investors, including in the Company's periodic financial reports that he certified and filed with the SEC, during investor conference calls and in statements to the media.

21.     The Defendants described in paragraphs 17 to 20 are referred to collectively as the "Individual Exchange Act Defendants."  Collectively, Defendant Millennial Media and the Individual Exchange Act Defendants are referred to herein as the "Exchange Act Defendants."

**B.     BACKGROUND ON MILLENNIAL MEDIA AND THE MOBILE ADVERTISING INDUSTRY**

22.     As Co-Lead Plaintiffs' investigation has revealed, and as described by numerous confidential witnesses discussed below: (a) Millennial Media's success was critically dependent on its technology; (b) the Company's technology was not fully functional, was in nascent stages when announced and lacked the capability to capitalize on performance advertisements; (c) the Company's revenues failed to meet Company and analyst expectations because its technology was flawed and third parties exposed serious discrepancies in Millennial Media's ability to accurately track and report user data; and (d) the Company's attempts at integrating its own technology with the technology of its acquisition target utterly failed.

**1.     Millennial Media's Business Depended on Its Technology**

23.     As a mobile advertising platform company, Millennial Media offers services to two constituencies:

  a.     Advertisers and advertising agencies seeking to advertise to consumers on mobile devices such as smartphones and tablets; and

  b.     Mobile application and website developers seeking to "monetize" their software applications—otherwise known as "apps," where consumers engage with and consume digital content on their personal mobile devices—by displaying advertisements to users.

24.     Advertising clients pay Millennial Media to deliver their advertisements to consumers on apps, and Millennial Media in turn pays developers a fee to place client advertisements on their apps.

25.     In order to integrate the developers' software into Millennial Media's platform and collect and transfer users' data, developers downloaded Millennial Media's "Software Development Kits," or SDKs, along with other data tools into their apps from the Company's "mMedia" self-service portal.  An SDK is a set of software tools that can be used to develop software applications targeting a specific platform.  SDKs allow the developer's app to display several types of advertisements, including:

- "display banners," which are static, animated or expandable advertisements that appear on part of the screen in an app;

- "rich media," which are interactive advertisements that exhibit dynamic motion over time or in response to user interaction, such as a streaming ticker or an interactive animated presentation; and

- "interactive videos," which are videos that include buttons allowing the consumer to interact with the advertisement by visiting a website, purchasing a product, or recommending the product or video on social media sites.

26.     Millennial Media generated revenue by charging advertisers to deliver advertisements to mobile users.  It recognized that revenue on three bases:

- cost per thousand (or "mille") advertising impressions ("CPM"), where the Company charged advertisers for each advertisement delivered to a consumer;

- cost per click ("CPC"), where the Company charged advertisers for each advertisement clicked on by a consumer; or

- cost per action ("CPA"), where the Company charged advertisers each time a consumer took a specified action, such as downloading an app.

27.     Millennial Media's "brand" advertisers, who purchased advertisements intended only to be displayed before a user, such as display banners, rich media or video advertisements, typically used CPM pricing.  Millennial Media's "performance" advertisers, who purchased advertisements intended to spur users to engage in some action, such as interactive advertisements, typically used CPC or CPA pricing.

28.    The core of Millennial Media's proprietary technology was, at the time of its IPO, a data platform called "MYDAS."  According to the Company's Preliminary Prospectus filed with the SEC on January 5, 2012, MYDAS purportedly matches advertising campaigns with target audiences automatically in real time, "with the objective of delivering the right mobile ad to the right person at the right time in the right place."

29.    When developers download and implement Millennial Media's SDK, they provide the Company with anonymous data about their apps and the users of their apps.

30.    According to the Company, its platform provides developers with "sophisticated reporting and analytics through an integrated dashboard on [the Company's] mMedia portal, which includes comprehensive ad revenue generation reports for their apps across all major operating systems."  The Company also claims that these reports help developers gain insight into user interaction and behavior to improve their apps and maximize their ad revenue.

31.    Throughout the Class Period, the securities analysts that covered Millennial Media reiterated the Company's claims about its technology and reported that the Company's purportedly superior technology was the key to its success.  For example:

- On May 8, 2012, Morgan Stanley commented that Millennial Media's suite of analytics was "a key retention product for existing users, and a key selling point for new users" and that "real-time audience profiling" was a feature that "may be unique to [the Company] among competing mobile ad networks."

- On July 19, 2012, ThinkEquity also wrote that "Millennial's advertiser and publisher services are built upon the company's core technology engine, MYDAS" which performs its " key functions with high reliability, speed (within 50 milliseconds) and scale (over 1.5B ad requests per day)." ThinkEquity further stated that the Company's "specialized and advanced MYDAS mobile ad technology platform" was a "competitive advantage" and represented "significant sources of competitive differentiation" that raised "barriers to competitive entry."

- On August 9, 2012, Capstone Investments stated: "Technology Increasingly A Differentiator.    Mgmt highlighted technological

competitive advantages that we believe are overlooked by investors but are important for MM to continue stealing share in mobile.  In addition to analytics for advertisers MM provides developers strong analytic software in its SDK.  For example, developers can choose among many ad formats and track performance across its inventory.  It will be difficult for startups to replicate this efficiently, in our opinion."

**2.      Advertisers and Developers Depended on Millennial Media's Ability to Accurately Track and Report User Data**

32.     As discussed above, Millennial Media's business includes brand advertising and performance advertising.  Performance advertisements are intended to spur mobile users to engage in some action, including clicking on the advertisement and further interacting with it (such as by purchasing the advertised product or filling out a form with the user's contact information).  A user taking additional steps after clicking on an advertisement is called a "conversion" because a customer's click has translated – or "converted" – into business, and the conversion reflects the advertisement's ability to involve the user.

33.     It is critically important for advertisers to accurately track each conversion because tracking allows the advertiser to understand which of its advertisements are driving conversions and which are not.  This process is called "conversion tracking" and it allows advertisers to understand the return they are receiving on their advertising investments, *i.e.*, how much "bang" they are receiving for their advertising "buck."

34.     Millennial Media's ability to accurately track conversions was therefore critical to its ability to attract and retain advertising and developer clients and generate revenue.  If advertisers or developers were to find that Millennial Media were overstating the number of its users' conversions, that would severely damage the advertisers' and developers' confidence in Millennial Media's platform and its value to them.  Millennial Media has attempted to track user conversions in at least three different ways.  First, "mobile web tracking" allows advertisers or developers to pass conversion data directly from their servers to Millennial Media's server.

Second, "application tracking" allows Millennial Media to track conversions using its SDK after an advertiser or developer embeds the SDK into its application.  A third way that Millennial Media may track conversions is by collecting conversion data from third party data tracking services.

35.     Millennial Media admits on its website that "[t]he tricky part for conversion tracking is the matching" of a conversion to the initial click that led to the conversion.[1] Millennial Media acknowledges that this process "can be difficult" because, for example, there may sometimes be a significant time gap between a click and its conversion.  However, the Company claims that Millennial Media's technology has been developed "to deliver very effective matching results."  As alleged below, such claims are materially false and misleading.

C.     **THE DEFENDANTS' FRAUDULENT SCHEME**

1.     **In the March 2012 IPO, Millennial Media and Company Insiders Sold More than $152 Million in Stock to Investors Based on Material Misrepresentations and Omissions**

36.     On January 5, 2012, Millennial Media filed a Form S-1 Registration Statement with the SEC in connection with the Company's contemplated IPO.  The Company filed five amended versions of the IPO Registration Statement between February 10 and March 27, 2012.

37.     On March 28, 2012, Millennial Media's IPO Registration Statement was declared effective and the Company finalized its completed IPO Prospectus.  As set forth in the IPO Offering Documents, Millennial Media registered 10.2 million shares of common stock plus an

---

[1] http://docs.millennialmedia.com/conversion-tracking/references/what-is-conversion-tracking.html

- 13 -

underwriters' over-allotment option for an additional 1,530,000 shares to be offered to the public at $13.00 per share.[2]

38.     On March 29, 2012, prior to the opening of the markets, Millennial Media filed the effectiveness order for the IPO Offering Documents pursuant to Rule 424(b)(4) with the SEC.  The IPO Offering Documents included materially false and misleading descriptions of the Company and its technology in the four respects discussed below.

> (a)     **Millennial Media Misstated the Company's Ability to Accurately Measure, Attribute and Report User Behavior**

39.     In the IPO Offering Documents, the Company and Exchange Act Defendants Palmieri, Avon and Jeanneret, made the materially false and misleading claims that:

> Each time an app makes a request to receive an ad, the MYDAS platform performs several tasks automatically and in real-time, including identifying unique users; targeting ads based on user interest, behavior and location; delivering those ads to millions of users through tens of thousands of apps, running on thousands of different device types; ensuring that the ads will work over wireless connections of varying quality and speed; and ***measuring user engagement and ad performance.***
>
> \*     \*     \*
>
> We offer developers ***sophisticated reporting and analytics*** through an integrated dashboard on our mmDev portal, which includes ***comprehensive ad revenue generation reports*** for their apps across all major mobile operating systems.  ***These reports help developers gain insight into user interaction and behavior and the performance of their apps.***  We share this performance data with developers to help them improve their apps and their deployment of our [software development kits, or "SDK"s] in order to maximize their ad revenue.[3]

---

    [2]  On or about April 4, 2012, Millennial Media completed its IPO, including the full exercise of the underwriters' over-allotment option.

    [3]  A chart of the false and misleading statements alleged herein is attached hereto as Exhibit A.

40.     The foregoing statements were materially false and misleading because they misstated and overstated the Company's ability to "measure[e] user engagement and ad performance"; issue reports that "help developers gain insight into user interaction and behavior and the performance of their apps"; "gain important insights about users"; and how Millennial Media had "sophisticated reporting and analytics," which include "comprehensive ad revenue generation reports."

41.     In reality, as discussed below, third party data tracking companies were able to expose serious deficiencies in how Millennial Media reported to developers the amount of user interaction on Millennial Media's platform; the Company was unable to accurately perform conversion matching; and the Company's reports to developers were inaccurate, which was causing Millennial Media's clients to depart or significantly reduce their advertising expenditures with the Company.

42.     According to CW2, in or around February and March of 2012, Millennial Media's clients began employing "third party tracking services," which exposed the Company's inability to accurately track and report advertisement-related clicks and actions by users.  CW2 joined the Company in October 2011 in its home office in Baltimore as an account associate on the performance team, and relocated to the San Francisco office in September 2012 where he was promoted to account executive.  In October 2013, CW2 left the Company in part because of Millennial Media's chronic technology issues.  CW2 explained that, once third party tracking services began tracking revenue and customer lifetime value information (*i.e.*, the projected revenue that a customer will generate during their lifetime) for apps, it became apparent that Millennial Media had "huge integration issues" with how it integrated its technology with

developers' apps, which, while it was not common knowledge, would force Millennial Media to entirely rebuild its systems.

43.     Specifically, CW2 stated that he learned from Millennial Media's engineers that the Company's technology was originally built very quickly, and adaptations were built on top of that foundation, making adaptation to changes time consuming.  As a result, ***Millennial Media's foundation needed to be completely rebuilt***.   According to CW2, Millennial Media had difficulty matching conversions by users.  For example, CW2 explained that, when a user opened an app, a conversion event occurred, which was then transmitted to the third party to track.  The third party then in turn sent the conversion event to Millennial Media to "match" the conversion. But a disconnect occurred when Millennial Media tried to match the conversions.  And when Millennial Media tracked user conversions directly (as opposed to when they were tracked by third parties), according to CW2, Millennial Media ***over-counted*** user conversions.

44.     CW2 stated that, after Millennial Media's clients began employing these tools, the Company's revenue decreased substantially, by approximately 60%.  This included clients who had been spending $50,000 per day on advertising through Millennial Media, and suddenly, with the advent of third party trackers, the amount they spent on advertising dropped to $6,000 per day because of huge discrepancies in user tracking data between what Millennial Media reported and what the data trackers reported.

45.     For example, CW2 stated that Millennial Media saw a significant decline in the revenue generated from Supercell (the developer of the video game "Clash of Clans," among others), who began using a third party tracking service known as "HasOffers" in February and March of 2012.

46.     Millennial Media's inability to collect and report clean and accurate user data is corroborated by confidential witnesses by CW3, who was a User Interface Architect in Millennial Media's Baltimore office from May 2011 through March 2013.  According to CW3, data reporting at Millennial Media was not sophisticated and an overhaul was long overdue. According to CW3, there were seven or eight tools on the Company's "backend" from which the Company needed to collect data, which made it difficult to perform reporting.  In addition, a former salesperson at Millennial Media, who did not have a programming background, was the person responsible for handling internal queries for reporting purposes, and, overall, the Company's approach was not an effective way to report its data.

47.     The fact that these technological failings existed at Millennial Media at the time of the IPO is corroborated by developments that occurred after the IPO.  For example, according to CW2, Danielle Repetti (currently Vice President of Performance at Millennial Media) met regularly with Defendant Palmieri in the Fall of 2012 about discrepancies in Millennial Media's revenue due to the introduction of third party trackers.  The third party trackers were able to expose Millennial Media's inability to accurately track users and report accurate data (which existed at the time of the IPO) and caused the Company to lose clients and revenue.  By the time CW2 left Millennial Media in October 2013, the Company was no closer to finding a solution to this problem.

48.     CW5 corroborated Millennial Media's loss of customers after the emergence of third party tracking.  CW5 was a Millennial Media account executive and director of sales from approximately March 2010 to August 2012, and Regional Vice President of Performance from approximately August 2012 to November 2013.  CW5 focused on driving users of an application or game to view an advertiser's website or to download their application.  To do so, CW5's team

paired advertisers with application and game developers.   According to CW5, significant customers such as Zillow, a real-estate website, and DeNA, a Japanese mobile developer, materially reduced or eliminated their budgets at Millennial Media beginning in late 2012 due to the increased usage of third party tracking services.   As a result, CW5 stated that CW5's performance advertising team lost "well over" 50% of their revenue in early 2013, a trend that progressively worsened.

> **(b)** **Millennial Media Misstated that the Company's Technology Was "Designed to Address" the Needs of Performance Advertising Clients**

49.   In the IPO Offering Documents, the Company and Exchange Act Defendants Palmieri, Avon and Jeanneret, made the materially false and misleading claims that Millennial Media was successfully selling performance advertisements to large and small clients:

> ***Our solutions are designed to address the needs of*** large brand advertisers and advertising agencies as well as smaller, ***performance-based advertisers***.   Large brand and performance advertisers typically buy ads on our platform through our sales teams.

50.   The foregoing statements in paragraph 49 were materially false and misleading because they misstated that the Millennial Media platform was "designed to address" the needs of performance-based advertisers – *i.e.*, companies whose advertisements depend on the ability to track user actions and conversions.   As discussed above in paragraphs 40 through 48, these claims were materially false and misleading because the Company was unable to accurately track and report user conversions.

51.   The Company's true lack of performance advertising capability is also corroborated by the fact that Millennial Media announced its need to acquire its competing mobile advertising platform, Jumptap, approximately 17 months after the IPO.   As Palmieri told investors on August 13, 2013, when announcing the acquisition of Jumptap, "where Millennial is

known as the leader in mobile brand advertising, Jumptap has more of a focus on the performance advertising side of the business."

52.     CW6, an executive previously at Jumptap from August 2012 until November 2013, and then an executive at Millennial Media until October 2014, confirmed that it was "necessary" for Millennial Media to acquire Jumptap because Millennial Media did not have the technological capability to grow its performance business, which was "dwindling fast." Moreover, after CW6 joined Millennial Media from Jumptap, CW6 found out that not only was Millennial Media's technology lacking, but that it was having issues with attribution – *i.e.*, its ability to attribute user actions to advertisements.

53.     In addition, CW1, a senior executive at Fiksu, Inc., a media buying entity that represents over 1000 clients, such as Zillow, confirmed that Millennial Media needed to acquire Jumptap because its then-current platform could not capitalize on programmatic advertising. At Fiksu, CW1 oversees Fiksu's operations, strategic management, planning and implementation across all of the company's groups.  According to CW1, one of Fiksu's missions is to track, attribute, and optimize mobile advertising for clients.  CW1 stated that Millennial Media needed to acquire Jumptap because ***Millennial Media's programmatic tools were not competitive and did not yield the installs necessary for client optimization***.

> **(c)     Millennial Media Misrepresented the True Condition of Its mMedia Self-Service Function**

54.     In the IPO Offering Documents, the Company and Exchange Act Defendants Palmieri, Avon and Jeanneret, also made the materially false and misleading claim that, "Smaller advertisers typically buy ads either through our sales team or through our self-service advertising portal, mMedia."  This statement was materially false and misleading because the Company's technological products and services crucial to Millennial Media's business model, such as the

mMedia self-service advertising portal, were still in nascent stages when announced, leading to rushed, slipshod programming, poor performance, failure and an inability to compete with more advanced competitors.

55.     CW7 stated that CW7's testing of the Company's mMedia software often revealed that it was not functioning well enough to be released.  CW7 was a Quality Assurance Manager at Millennial Media from approximately October 2010 to May 2013.  CW7 managed a team of five employees who tested new software and software updates related to the Company's mMedia self-service advertising portal.  CW7's team was responsible for testing how mMedia's software interacted across various platforms and operating systems, such as how the software might function on an Android system and Apple's iOS system simultaneously.  During CW7's time at the Company, Millennial Media published software that was not functioning properly.  Yet, CW7 was pressured by the Vice President of Technology to approve the release of software updates and releases almost simultaneously with "hot" or "bug" fixes for the underlying, malfunctioning software.  Significantly, even though CW7 voiced objections to the release of malfunctioning software on Millennial Media's internal Production Software Release Forms, which were signed by the Vice President of Technology, Millennial Media still released the malfunctioning software.  According to CW7, the Vice President of Technology was pressured by upper management to push out software releases, often commenting that "management wants this thing out, [so] it's going out," regardless of whether the software was ready to be released.

### (d)     Millennial Media Misstated Its "Real-Time Bidding" Capability

56.     In the IPO Offering Documents, the Company and Exchange Act Defendants Palmieri, Avon and Jeanneret, also made the materially false and misleading claim that Millennial media had "real-time bidding" ("RTB") capability.  RTB capability is a means by

which advertising inventory is bought and sold on a per-impression basis, via programmatic, instantaneous auction, similar to financial markets. The IPO Offering Documents claimed that:

> After MYDAS identifies the unique user associated with a specific ad request, the context around the ad request and the audiences to which the user belongs, MYDAS delivers the request to a ***real-time, bidded marketplace*** in which it matches available ads with available ad requests. MYDAS performs a sophisticated statistical analysis to automatically run an instantaneous virtual auction in which each qualified ad campaign bids on each available ad request. We call this process optimization and decisioning . . . . When MYDAS enters an ad request into the marketplace, each agent bids on the ad request, and the platform then matches the best available ad to the specific ad request.

57.     These claims were materially false and misleading because Millennial Media's platform did not have a "real time, bidded marketplace" until it acquired another company called Metaresolver with apparent RTB expertise one year later, in April 2013. In fact, as Palmieri told investors on May 8, 2013, Millennial Media acquired Metaresolver because Metaresolver offered "programmatic buying and selling" – *i.e.*, real-time bidded marketplace technology, which was an admission that the Company had this significant gap in its own technological capabilities.

### (e)     The Offering Documents Did Not Satisfy Item 303 or Regulation C

58.     Pursuant to Item 303 of SEC Regulation S-K, the Offering Documents were required to disclose, "any known trends or uncertainties that have had, or that you reasonably expect will have, a material favorable or unfavorable impact on sales or results of operations." 17 C.F.R. § 229.303. In addition to the identification of such "known trends," Item 303 requires disclosure of (i) whether those trends have had or are reasonably expected to have a material unfavorable impact on revenue; and (ii) the extent of any such impact on revenue.

59.     Accordingly, the Company and Defendants Palmieri, Avon and Jeanneret had a duty to disclose: (i) whether the increasing presence of "third party tracking services" in the

market had or was reasonably expected to have a "material . . . unfavorable impact on . . . revenues," and (ii) to what extent those trends had impacted or were reasonably expected to impact Millennial Media's revenue.  Nevertheless, Defendants omitted this information from the Offering Documents and/or otherwise failed to adequately disclose it during the Class Period. Specifically, in violation of Item 303, the IPO and Secondary Offering Registration Statements and Prospectuses failed to disclose that:   the known trends of increasing third party tracking services in the market and the Company's increasing technological failures were having a material unfavorable impact on Millennial Media's revenues and financial results.  *See* ¶¶ 40-48.

60.      Finally, the Offering Documents were also materially false and misleading because they failed to disclose the information required by Rule 408 of SEC Regulation C, pursuant to which registrants have an overarching duty to disclose material information necessary to ensure that representations in a registration statement are not misleading. Specifically, Rule 408 requires that, "[i]n addition to the information expressly required to be included in a registration statement, there shall be added such further material information, if any, as may be necessary to make the required statements, in light of the circumstances under which they are made, not misleading."  17 C.F.R. § 230.408(a).

61.      The IPO Offering Documents, in their entirety, and as set forth specifically above, were materially untrue and misleading and omitted to state material information necessary to make them not misleading, in violation of Defendants' duty of disclosure under Rule 408. Similarly, the Secondary Offering Registration Statement and Prospectus, in their entirety, and as set forth specifically below, were materially untrue and misleading and omitted to state material information necessary to make them not misleading, in violation of Defendants' duty of disclosure under Rule 408.   The Offering Documents specifically failed to disclose that the

growing presence of third party tracking services in the market and the Company's increasing technological failures was having a material unfavorable impact on the Company's revenues and financial results.  *See* ¶¶ 40-48.

> **(f)     Millennial Media and Company Insiders Sold Tens of Millions of Dollars of Stock in the IPO**

62.     On March 29, 2012, prior to the opening of the markets, Millennial Media filed the effectiveness order for the IPO Registration Statement and filed its IPO Prospectus pursuant to Rule 424(b)(4) with the SEC.  Trading in Millennial Media shares commenced on the NYSE on March 29, 2012.  The Company's stock price rose $12.00, or 92.31%, to close at $25.00 per share during the trading session that day.

63.     Based on the materially false and misleading public disclosures discussed above, Millennial Media and certain of its officers and directors, including Exchange Act Defendants Palmieri and Avon, sold more than $152 million in stock to public investors in the IPO.  Insider sales amounted to approximately 13% of the total value of the IPO.  Indeed, Defendants Palmieri and Avon, and CTO Brandenburg and COO Root, alone, sold nearly $20 million in stock, as reflected in the chart below:

| Individual | Number of Shares Sold | Price[4] | Value of Shares Sold |
|---|---|---|---|
| Former CEO Paul Palmieri | 732,562 | $12.09 | $8,856,674.58 |
| Former CTO Chris Brandenburg | 605,605 | $12.09 | $7,321,764.45 |
| Former COO Stephen Root | 237,936 | $12.09 | $2,876,646.24 |
| Former CFO Michael Avon | 74,241 | $12.09 | $897,573.69 |
| **Total** | *1,650,344* | | *$19,952,658.96* |

---

[4] $12.09 was the proceeds per share to selling stockholders in the IPO.  $13.00 was the price to the public.

      **2.**      **Defendants Artificially Inflated the Price of Millennial Media Stock in the Months Leading Up to the Company's October 2012 Secondary Offering**

64.     For the six months following Millennial Media's IPO, a massive percentage of the Company's shares were restricted from being sold by the Company or its executives in connection with "lock-up agreements" between the Company and the underwriters for the IPO. This included shares held by the selling stockholders in the IPO.

65.     As alleged below, during the lock-up period, in the months before Millennial Media executives Palmieri and Avon could again sell their shares, the Exchange Act Defendants continued to issue materially false and misleading statements to the public that inflated the Company's share price.  As *Seeking Alpha* wrote on September 20, 2012, "[o]n September 25, 64.3 million shares, representing 84.5% of shares outstanding, of Millennial Media come off of lock-up . . . .  With the upcoming lock-up expiration, management has chosen not to maintain a low profile, but instead has been ***actively touting their story***."

      **(a)**      **The Company's False and Misleading Disclosures Concerning First Quarter 2012 Financial Results**

66.     On May 14, 2012, after the markets had closed, the Company issued a press release on Form 8-K signed by Defendant Avon announcing its results of operations for the first quarter of 2012.  The Company reported that "total revenue was $32.9 million," gross margin was 39.5%, and the Company had 300 million monthly unique users worldwide.  The Company also offered revenue guidance for: (1) the second quarter of between $37 million and $38 million; and (2) the full year 2012 of between $173 million and $176 million.

67.     In connection with these results, in the Company's May 14, 2012 press release, CEO Palmieri made the materially false and misleading claim that:

> Our first quarter performance exceeded expectations with strong year over year revenue growth, as well as expansion in the

numbers of unique users and apps on the Millennial Media
platform. . . . As a market leader, we believe Millennial Media is
well-positioned to drive the business model of the worldwide app
economy.

68.     That same day, Millennial Media hosted a conference call for investors and

analysts to discuss these results.  As part of his prepared remarks, CEO Palmieri made the

materially false and misleading claim:

> We designed MYDAS for the mobile environment, where the
> delivery and targeting of ads must allow for a much greater
> number of variables than in traditional online advertising.  When
> an ad request comes to the system, MYDAS accounts for and
> analyzes hundreds of variables in real time.  The system uses our
> own anonymous identifier; appends profile, location, usage and
> audience data; and operates a realtime marketplace to determine ad
> placement.  We then use our technology to handshake with our
> SDK software that developers have already embedded in their apps
> to determine and execute the best display of the ad within the app
> for mobile site.

69.     Equity analysts reported positively on the Company's results and disclosures.  For

example, on May 14, 2012, Morgan Stanley issued a report entitled *Millennial Media Inc*

*CQ1:2012: A Great Start*, which stated in part:

> **Our take:** MM's 1Q outperformance across revenue, gross
> margin, and EBITDA metrics underscores our belief that MM
> delivers market-leading ad targeting capabilities to advertisers and
> superior monetization to developers.  At a closing price of $15.45,
> our risk/reward view improves relative to our May 8 report "*A
> Pure Play on Mobile Advertising, but Upside May Be Priced In*".

70.     On May 15, 2012, prior to the opening of the markets, Millennial Media filed its

quarterly report on Form 10-Q with the SEC, signed by Defendants Palmieri and Avon, which

also reported revenue of $32.93 million.

71.     The Company's May 15, 2012 Form 10-Q included a certification pursuant to

Section 302 of the Sarbanes-Oxley Act of 2002 signed by CEO Palmieri, incorporated therein as

Exhibit 31.1, which made the materially false and misleading claims that:

I, Paul J. Palmieri, certify that:

1. I have reviewed this Quarterly Report on Form 10-Q of Millennial Media, Inc.;

2. Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3. Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4. The registrant's other certifying officer(s) and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

   a) designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

   b) designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

   c) evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

   d) disclosed in this report any change in the registrant's internal control over financial reporting that occurred

during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5. The registrant's other certifying officer(s) and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

a) all significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

b) any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

72.     The Company's May 15, 2012 Form 10-Q also included a substantially similar materially false and misleading certification, signed by CFO Avon, as Exhibit 31.2.

73.     The foregoing statements made by the Company and Defendants Palmieri and Avon in paragraphs 66 to 68 and 70 to 72, when reporting on the Company's results of operations for the first quarter of 2012, including the Company's reported revenues and the features of its technology, were materially false and misleading for the reasons set forth in paragraphs 40 to 48, 51 to 55 and 57 above.

74.     In addition, the foregoing statements in the Sarbanes Oxley certifications signed by Defendants Palmieri and Avon regarding the Company's purported internal controls over financial reporting to reflect the Company's results of operations were materially false and misleading because the Company lacked adequate internal control to ensure that its reporting of

critical user metrics (like user clicks and conversions) were accurate, and the Company's reported revenues were inaccurate as a result.

### (b)    Palmieri's Statements to *CNBC* on May 22, 2012

75.    In his first television interview following the Company's IPO, with *CNBC* on May 22, 2012, Defendant Palmieri made the materially false and misleading claim that ***"We're seeing incredible growth***."[5]    When asked how Millennial Media was monetizing apps for developers with users clicking on advertisements in those apps, Palmieri responded, "***The technology is difficult to do*** . . . .   This transition based on the technologies of all different handsets with different flavors of the operating systems is what's difficult to do, ***[but] it's what we've focused on for the last six years, it's the reason for our success***."

76.    Palmieri's statements touting the Company's growth, and about the Company's ability to accomplish the "difficult" task of tracking user clicks based on the Company's technology in paragraph 75 were materially false and misleading when made for the reasons set forth in paragraphs 40 to 48, 51 to 55 and 57 above.

### (c)    The Company's False and Misleading Disclosures Concerning Second Quarter 2012 Financial Results

77.    On August 8, 2012, after the markets had closed, the Company issued a press release on Form 8-K signed by Defendant Avon announcing the Company's results of operations for the second quarter of 2012.  The Company reported that "total revenue was $39.4 million," gross margin was 39.7%, and there were more than 350 million monthly unique users worldwide.  The Company also offered revenue guidance for: (1) the third quarter of between $43.5 million and $45 million; and (2) the full year 2012 of between $176 million and $179 million.

---

[5] http://video.cnbc.com/gallery/?video=3000091712

78.     That same day, Millennial Media hosted a conference call for investors and analysts to discuss these results.  As part of his prepared remarks, CEO Palmieri made the materially false and misleading claims that:

> **We have built the technologies and products that solve for the complexities and challenges inherent in mobile, while also taking advantage of an entirely new opportunity presented by mobile...**
>
> \*     \*     \*
>
> [O]nce a campaign has run, **we are able to provide increasingly more comprehensive analytics and insights,** enabling them to develop even more effective campaigns in the future on our platform.

79.     On August 9, 2012, prior to the opening of the markets, Millennial Media filed its quarterly report on Form 10-Q with the SEC, signed by Defendants Palmieri and Avon, which also reported revenue of "$39.4 million" as set forth in the Company's August 8, 2012 press release.  The Company's Form 10-Q also included certifications pursuant to Section 302 of the Sarbanes-Oxley Act of 2002, signed by Defendants Palmieri and Avon, substantially similar to those described in paragraphs 71 and 72.

80.     The foregoing statements made by the Company and Defendants Palmieri and Avon in paragraphs 77 to 79 when reporting on the Company's results of operations for the second quarter of 2012, including their materially false and misleading statements that Millennial Media had "built the technologies and products that solve for the complexities and challenges inherent in mobile" and that "once a campaign has run, [Millennial Media is] able to provide increasingly more comprehensive analytics and insights," were materially false and misleading for the reasons set forth in paragraphs 40 to 48, 51 to 55, 57 and 74 above.

(d)     **The August 14, 2012 Oppenheimer Technology, Internet & Communications Conference**

81.     On August 14, 2012, Millennial Media presented at the Oppenheimer Technology, Internet & Communications Conference.  During the Company's presentation, Defendant Avon made the materially false and misleading statement that:

> We designed MYDAS for the mobile environment where the delivery and targeting of ads must allow for a larger number of variables that are not traditional in online advertising . . . .  ***We have built an industry-leading technology and data asset***, and we believe we will drive meaningful leverage in our model moving forward.

82.     Defendant Avon's statement that the Company had an "industry-leading technology asset" in paragraph 81 was materially false and misleading for the reasons set forth in paragraphs 40 to 48, 51 to 55 and 57 above.

(e)     **The August 15, 2012 Canaccord Global Growth Conference**

83.     On August 15, 2012, CFO Avon conducted a presentation in connection with Canaccord's Global Growth Conference.  As part of his prepared remarks, CFO Avon made the materially false and misleading claims that:

> [W]e offer ***sophisticated reporting and analytics for developers*** through an integrated dashboard.  Our deep level of technical integration with apps across our platform drives our ability to deliver rich, differentiated ad experiences to advertisers.  Advertisers use our platform to reach[,] target and engage specific audiences of consumers via apps on the platform.

84.     These statements in paragraph 83 were materially false and misleading for the reasons set forth in paragraphs 40 to 48, 51 to 55 and 57 above.

(f)     **Palmieri's Statements to *CNBC* on September 12, 2012**

85.     On September 12, 2012, Defendant Palmieri was a guest on Jim Cramer's *CNBC* television show "Mad Money" and touted the Company's purported ability to track conversions

and provide advertisers with hard, actionable data regarding the return on their investment. Palmieri made the materially false and misleading claim on the broadcast that: "I love to close the loop.  So, not only show an ad but then come back and say, 'well, how did that work and did it really deliver return on investment for the advertiser?'  Because return on investment ["ROI"] for the advertiser is the way that advertisers care less about price and I can be more aggressive on pricing, when we're really hitting ROI."[6]

86.     Defendant Palmieri's statements in paragraph 85 that Millennial Media was able to "close the loop" through conversion tracking and inform advertisers about their "return on equity" for an advertisement, and therefore increase the Company's prices for its advertising clients, were materially false and misleading for the reasons set forth in paragraphs 40 to 48, 51 to 55 and 57 above.

### (g)     The September 20, 2012 Goldman Sachs Communacopia Conference

87.     On September 20, 2012, Millennial Media presented at the Goldman Sachs Communacopia Conference.  During the Company's presentation Defendant Palmieri falsely and misleadingly claimed with respect to Millennial Media's technology that,

> [W]e . . . believe that the largest companies in the world with unlimited resources couldn't really replicate what we've been building over the past six years or so, given how much investment and time and expertise that we have specifically in utilizing this data from mobile consumers.

88.     This statement in paragraph 87 was materially false and misleading for the reasons set forth in paragraph 40 to 48, 51 to 55 and 57 above.

---

[6] http://www.stockrants.com/2012/09/12/millennial-media-ceo-desktop-to-mobile-advertising.html

>    **3.    In Its October 2012 Secondary Offering, Millennial Media Insiders Sold More than $38.7 Million in Stock to Investors Based on Material Misrepresentations and Omissions**

89.    The Defendants' statements to the media leading up to the Secondary Offering artificially inflated the price of Millennial Media stock and allowed them to sell their own shares of the Company at inflated prices.  For example, on September 11, 2012, Canaccord issued a report on its meetings with Millennial Media entitled "*Upbeat Management Meetings; Sound Competitive Position*," which stated in part:

> • We believe business trends remain strong for the long term, and we note potential for Q3 and Q4 to show upside based on seasonal factors including election ad spending, shift to higher mix of brand advertising, and Apple device launches.
>
> • We believe that Millennial's model offers more forecasting visibility than would appear at first glance, and that ***the risk of a miss in the short term appears low***.

90.    As *Seeking Alpha* also reported, CFO Avon had participated in investor meetings with Canaccord Genuity analyst Michael Graham, "which left Graham gushing."  As Canaccord reported on September 12, 2012, based on the investor meetings with Avon, "We believe there is room for increased sponsorship for MM stock as investors grow their comfort levels with key pillars of the story, mostly around market growth and competitive position."

91.    On October 15, 2012, less than seven months after its IPO, Millennial Media filed a Form S-1 Registration Statement with the SEC in connection with the Company's contemplated Secondary Offering.  The Company filed an amended version of the Secondary Offering Registration Statement on October 18, 2012.

92.    On October 23, 2012, the Secondary Offering Registration Statement, signed by Exchange Act Defendants Palmieri, Avon and Jeanneret, was declared effective and the Company finalized the Secondary Offering Prospectus.

93.     On October 24, 2012, prior to the opening of the markets, Millennial Media filed

the effectiveness order for the Secondary Offering Registration Statement and filed its Secondary

Offering Prospectus pursuant to Rule 424(b)(4) with the SEC.  As set forth in the Registration

Statement and the Prospectus for the Secondary Offering (together, the "Secondary Offering

Documents"), Millennial Media registered 10 million shares of common stock plus an

underwriters' over-allotment option for an additional 1.5 million shares to be offered to the

public at $14.15 per share.

94.     The Secondary Offering Documents included false and misleading claims

concerning the Company's abilities to accurately track and report user data; its "design" for

performance advertising; the mMedia self-service platform; and a real-time bided marketplace,

in substantially the same way as the IPO Offering Documents.  For example, in the Secondary

Offering Prospectus the Company and Defendants Palmieri, Avon and Jeanneret made the

materially false and misleading claims that:

>       We enable advertisers to gain insights into the performance of their
>       ad campaigns and to manage their campaigns with a view to
>       maximizing return on their advertising investment.  ***Our solutions
>       are designed to address the needs of large brand advertisers and
>       advertising agencies as well as smaller, performance-based
>       advertisers.***  Large brand and performance advertisers typically
>       buy ads on our platform through our sales teams.   Smaller
>       advertisers typically buy ads either through our inside sales team or
>       through our mMedia self-service advertising portal.
>
>                   *         *         *
>
>       As a result of the amount and nature of the data we collect through
>       our platform, ***our reporting to advertisers goes beyond traditional
>       post-campaign analysis to provide actionable insights for current
>       ad campaigns and future marketing strategies.  We offer real-
>       time reporting and analytics to help advertisers understand why
>       some campaigns perform better than others***.
>
>                   *         *         *

After MYDAS identifies the unique user associated with a specific ad request, the context around the ad request and the audiences to which the user belongs, ***MYDAS delivers the request to a real-time, bidded marketplace in which it matches available ads with available ad requests. MYDAS performs a sophisticated statistical analysis to automatically run an instantaneous virtual auction in which each qualified ad campaign bids on each available ad request.*** We call this process optimization and decisioning . . . .   When MYDAS enters an ad request into the marketplace, each agent bids on the ad request, and the platform then matches the best available ad to the specific ad request.

\*       \*       \*

We offer developers ***sophisticated reporting and analytics through an integrated dashboard on our mMedia portal***, which includes comprehensive ad revenue generation reports for their apps across all major mobile operating systems. These reports help developers gain insight into user interaction and behavior and the performance of their apps. We share this performance data with developers to help them improve their apps and their deployment of our SDKs in order to maximize their ad revenue. In addition, through the more than 1.5 billion ad requests that we typically receive each day, we are able to gain important insights about users that we are able to share with developers on an aggregated basis.

95.     The foregoing statements made in the Company's Secondary Offering Documents in paragraph 94 were materially false and misleading for the reasons set forth in paragraphs 40 to 48, 51 to 55 and 57 above.  Specifically, according to CW2, Danielle Repetti (currently Vice President of Performance at Millennial Media's Baltimore office) met regularly with CEO Palmieri in the fall of 2012 to discuss the Company's significant loss of revenue caused by third-party tracking services exposing the Company's inability to accurately track and report user data. Despite these significant material internal developments, and the Defendants' failure to disclose the material omitted facts set forth in paragraph 171 below, the Company and the selling shareholders went forward with the Secondary Offering.

96.     On or about October 30, 2012, Millennial Media completed the Secondary Offering including the full exercise of the underwriters' over-allotment option.  The Principal

Shareholder Defendants (as defined herein) approximately 7.7 million of their privately held shares through the Secondary Offering.

97.     Millennial Media executives, including Individual Defendants, used the Company's October 2012 Secondary Offering to sell more than $38.7 million of their personally-held Millennial Media shares to unwitting investors, while the same insiders were in possession of material adverse non-public information about the Company.   As set forth below, these individuals sold the following massive amounts of Millennial Media shares at artificially-inflated prices on or about October 29, 2012:

| Individual | Number of Shares Sold | Price | Value of Shares Sold[7] |
|---|---|---|---|
| Former CEO Paul Palmieri | 1,100,862 | $13.4425 | $14,798,337.44 |
| Former CTO Chris Brandenburg | 895,672 | $13.4425 | $12,040,070.86 |
| Former COO Stephen Root | 355,861 | $13.4425 | $4,783,661.49 |
| Former CFO Michael Avon | 118,349 | $13.4425 | $1,590,906.43 |
| Former Director Alan MacIntosh | 205,273 | $13.4425 | $2,759,382.30 |
| Former Director John D. Markley, Jr. | 88,423 | $13.4425 | $1,188,626.18 |
| Director Wenda H. Millard | 85,155 | $13.4425 | $1,144,696.09 |
| Director James A. Tholen | 30,025 | $13.4425 | $403,611.06 |
| **Total** | *2,879,620* | | *$38,709,291.85* |

**4.     Defendants Made Materially False and Misleading Statements in the Third Quarter of 2012**

98.     On November 5, 2012, after the markets had closed, the Company issued a press release on Form 8-K signed by Defendant Avon, announcing its final results of operations for the third quarter of 2012.  The Company reported that "revenue was $47.4 million," gross margin was 40.9%, and there were more than 380 million monthly unique users worldwide.   The Company also offered revenue guidance for: (1) the fourth quarter of between $61.5 million and $63 million; and (2) the full year 2012 of between $181 million and $182.5 million.

---

[7] The cost basis for almost all of the above transactions is not publicly available.

99.     That same day, Millennial Media hosted a conference call for investors and analysts to discuss these results.   As part of his prepared remarks CEO Palmieri made the materially false and misleading claims that:

> *Performance advertisers, such as app developers who want to drive downloads of their apps, use our platform to reach and target customers who will generate positive lifetime value for them*.   Lifetime value, or LTV, is a specific financial metric used by performance advertisers to determine the difference between the cost to drive a download and the revenue generated from that download over the lifetime of that app's usage by a single consumer.   *Because we are able to deliver this long-term value-- or lifetime value, by quality downloads in[] addition to the quantity of downloads, we have become an invaluable source for delivering differentiated value for this segment of our advertiser base*.

100.     Later, during the question-and-answer portion of the November 5, 2012 conference call, CFO Avon engaged in the following exchange, and made the following materially false and misleading statements:

> **[Analyst]:**   [I w]ould love to get your thoughts on real-time bidding as it relates to the mobile industry, specifically where are we currently in terms of adoption and how do you kind of see that evolving over the next 12 months or so?
>
> **CFO Avon:**   Yes, you're hearing a lot about real-time bidding [("RTB")] in mobile.   I think it's still the very early days for RTB and mobile.   There are few companies out there that are starting to put offerings out in the market.   I think it's still some time before you see broad adoption of RTB in mobile given the complexities on the supply side of mobile, the many different devices and capabilities of the devices.   But all that said, we run a real-time bidding exchange within our core platform internally and over the long term, we think we're very well positioned if the market moves to real-time bidding.   But I think it's early days today.   It's a very small percentage of the market and we'll see how it increases from there.

101.     On November 6, 2012, prior to the opening of the markets, Millennial Media filed its quarterly report on Form 10-Q with the SEC, signed by Defendants Palmieri and Avon, which

included revenues of "47.4 million" as those set forth in the Company's November 5, 2012 press release.  The Company's November 6, 2012 Form 10-Q also included certifications substantially similar to those described in paragraphs 71 and 72 signed by Defendants Palmieri and Avon.

102.   The foregoing statements made by the Company and Defendants Palmieri and Avon in paragraphs 98 to 101 when reporting on the Company's results of operations for the third quarter of 2012 were materially false and misleading for the reasons set forth in paragraphs 40 to 48, 51 to 55, 57 and 74 above.  In addition, these statements were materially false and misleading because, unbeknownst to investors, according to CW5, significant customers such as Zillow, a real-estate website, and DeNA, a Japanese mobile developer, materially reduced or eliminated their budgets at Millennial Media beginning in late 2012 due to the increased usage of third party tracking services.

> **5.** **In February 2013, the Company Announced Disappointing Revenues and the Need to Acquire Metaresolver, Yet Continued to Issue Materially False and Misleading Statements to Reassure Investors**
>
> **(a)** **Defendants Disclosed Negative Fourth Quarter 2012 Financial Results and the Need to Acquire Metaresolver**

103.   On February 19, 2013, after the close of the markets, the Company issued a press release announcing revenue for the fourth quarter of 2012 of $58 million—sharply below analysts' expectations of $62.9 million.  Millennial Media also offered disappointing revenue guidance for: (1) the first quarter of 2013 of between $48 million and $50 million; and (2) the full year 2013 of between $270 million and $280 million.

104.   In addition, on February 19, 2013, the Company disclosed that it would acquire Metaresolver.   As alleged below, Millennial Media's disclosure of its need to acquire Metaresolver partially disclosed the Company's technological gap in its ability to collect clean and reliable user data, and its real-time bidding marketplace capabilities.

105.    Early rumors of Millennial Media's potential acquisition of Metaresolver circulated as early as February 11, 2013.  As *Advertising Age* (or "*AdAge*") reported that day, Metaresolver would be attractive to Millennial Media because, as Metaresolver founder and CEO Seamus McAteer had claimed, Metaresolver's strength was in providing "**clean**" data compared to other demand-side platforms that offered a glut of inaccurate information.[8] According to *AdAge*, Metaresolver was able to target mobile advertisements based on device type, mobile carrier, location and time of day and in turn allow for programmatic buying based on such data.[9]  Millennial Media's announcement on February 19, 2013 that it would be acquiring Metaresolver reflected that Millennial Media lacked technology to collect such "clean" user data.  This is corroborated by the statements of confidential witness CW3 discussed above. *See* ¶ 46.

106.    Indeed, in Millennial Media's February 20, 2013 press release, the Company stressed that it was acquiring Metaresolver because "Metaresolver uses **highly accurate data** to identify and build audiences that brands can target with campaigns" and collected "**clean and accurate** foundational data."  Defendant Palmieri stressed the importance of Metaresolver's "clean" data technology and stated that "[a]ccurately gathering and categorizing this [mobile] data can be the difference between serving an ad that is relevant to a consumer and one that is not," and stated that "Metaresolver's data-driven approach and technology will allow our platform to go **one step further** and provide **additional value** to our advertiser and developer partners."

---

[8] http://adage.com/article/digital/millennial-media-talks-acquire-mobile-ad-buying-platform-metaresolver/239729
[9] *Id.*

107.    As analysts observed, the Company's announcement of its acquisition of Metaresolver also revealed the gaps in Millennial Media's purported real-time bidding technology.    For example, on February 20, 2013, Oppenheimer stated:    "***Metaresolver acquisition boosts RTB capabilities*** . . . .    While [Millennial Media's MYDAS] platform has focused on leveraging analytics for premium advertisers, ***the company intends to offer RTB inventory in 2013***."    The same day, Janney Capital Markets stated similarly:    "[Millennial Media] management intends to use Metaresolver to give advertiser clients the option to buy inventory from Millennial's ad network on a direct, self-service basis, just using Millennial's targeting technology, audience data and segmentation, ***and RTB***."

108.    In response to the partial disclosure of the true state of the Company's financial state and the poor state of its proprietary software and related technologies, Millennial Media's stock price fell $5.38 per share, or ***37.54%***, to close at $8.95 per share on February 20, 2013.

### (b)    Defendants Continued to Falsely Tout the Effectiveness of the Company's Platform

109.    In order to reassure investors about the Company's financial state and the purported capabilities of its technology, Millennial Media continued to issue materially false and misleading statements to investors during the Class Period.

110.    As discussed above, on February 19, 2013, after the close of the markets, the Company issued a press release on Form 8-K signed by Defendant Avon, announcing its results of operations for the fourth quarter and full year of 2012.  The Company reported revenue in the fourth quarter of "$58.0 million" as well as gross margin of 41.2%, and more than 400 million monthly unique users worldwide.  The Company's full-year results included revenue of $177.7 million and gross margin of 40.5%.

111.    The February 19, 2013 press release also included the following materially false and misleading statement by Defendant Palmieri:

> *Our success in 2012 speaks to the effectiveness of our platform model in delivering highly targeted and compelling mobile advertising solutions*.   We delivered 68% revenue growth with record profitability in the fourth quarter.

112.    In addition, on February 19, 2013, in connection with the earnings release, Millennial Media hosted an earnings conference call.  As part of his prepared remarks, CEO Palmieri again falsely claimed that the Company had a "proven" technological platform and attempted to falsely attribute the Company's disappointing revenue from the fourth quarter of 2012 to certain "choices" that the Company had itself made:

> [A]s we conduct this call today, *there is no question Millennial Media is the leading independent platform in the Mobile Advertising business and powering the app economy*.  *There now also can be no doubt that our model is proven and strong*.   Our platform is having success and our investments in technology and data are delivering the solutions that show marketers the power and value of mobile.
>
> *         *         *
>
> *[W]e have some choices that we made in Q4* consistent with our long-held strategy on whether to chase some business in some performance segments or to continue to focus on large budget brand campaigns and premium performance campaigns that have always been our bread-and-butter business.  *It wasn't until very late in the quarter that we saw that our choice not to participate in some of these lower end performance segments, coupled with a few large brand deals that didn't materialize would moderate our revenue growth metric for the quarter*.

113.    Moreover, CEO Palmieri falsely and misleadingly explained that his Company's failure to meet revenue expectations in 2012 would not be indicative of its "long-term sustainable growth":

> [W]hile we could have *chosen* to chase a lower value, incentivize downloads business segment where small companies with limited

technology battle to drive downloads that are of limited lifetime value, or LTV, to developers, we chose and will continue to **choose** adherence to our long-term strategy of providing value. **We are building Millennial Media for long-term sustainable growth** and plan to stay true to our core principles.

114.   On February 20, 2013, prior to the opening of the markets, Millennial Media filed

its Annual Report for 2012 on Form 10-K with the SEC, signed by Defendants Palmieri, Avon

and Jeanneret, which included 2012 revenues of $177 million.   The Company's 2012 Annual

Report also included certifications substantially similar to those described in paragraphs 71 and

72, signed by Defendants Palmieri and Avon.   In addition, the February 20, 2013 Form 10-K

made the following false and misleading statements about the MYDAS platform's purported

ability to track conversions:

> *Reporting and analysis*.   Once MYDAS has delivered an ad to a specific device, MYDAS analyzes the user's engagement with the ad, measuring whether the user clicked on the ad or engaged with the ad in some other meaningful way, such as swiping the ad, opening a video, sharing the ad with a friend or downloading an app in response to the ad.   These results are then incorporated back into the MYDAS platform, which can use the data to analyze whether the specific ad served to the user was actually the best available ad to deliver to that user.

115.   The foregoing statements made by the Company and Defendant Palmieri in

paragraphs 110 to 114 when reporting on the Company's results of operations for the fourth

quarter and full year of 2012 were materially false and misleading for the reasons set forth in

paragraphs 40 to 48, 51 to 55, 57 and 74.   For example, it was materially false and misleading for

Palmieri to tout the "effectiveness of our platform," claim that Millennial Media's "model is

proven and strong," and attribute the decline in revenue to "choices" the Company had made

about performance advertising.   Millennial Media's decline in revenue that quarter was not due

to "choice[s]" the Company had made about certain performance advertising.   Instead, as stated

above in paragraphs 40 to 48, confidential witnesses confirmed that, beginning in early 2012,

Millennial Media's clients began employing third party tracking devices that exposed the Company's inability to accurately track and report advertisement-related clicks and actions by users, and Millennial Media lacked the capability to capitalize on performance advertising, which caused a significant loss of business. Indeed, Palmieri had internally discussed the impact that those deficiencies were having on the Company's revenues in the Fall of 2012 (*see* ¶¶ 48, 95), not "very late in the [fourth] quarter" of 2012, as he falsely and misleadingly stated.

> **6.** **In March Through April 2013, Palmieri Established a Rule 10b-5 Trading Plan, the Company's CTO and COO Resigned, and the Company Terminated the Lead MYDAS Engineers**

116. On March 8, 2013, in the wake of the Company's disappointing financial results issued in February 2013 and the market's negative reaction to the Company's disclosure of its acquisition of Metaresolver, Defendant Palmieri entered into a Rule 10b5-1 trading plan that would allow him to sell massive additional quantities of his personally-held Millennial Media stock. At the time Palmieri entered into the plan, he was aware that the Company's revenues had been declining since the Fall of 2012 due to third party data trackers and that his explanation for the Company's disappointing results disclosed in February 2013—*i.e.*, that they were purportedly based on the Company's own "choices"—were false and misleading. In addition, he entered into the plan just weeks before the Company announced the resignations of its co-founder and CTO, Brandenburg, and its COO, Root.

117. Indeed, on April 5, 2013, when Millennial Media issued a press release announcing the completion of the Metaresolver acquisition, it also announced a "streamlin[ing]" of the Company's management, including the termination of employment of the Company's co-founder and CTO, Brandenburg, and the Company's COO, Root, only one year after the IPO and less than two months after announcing disappointing revenue for the fourth quarter of 2012 and guidance for 2013. As CTO, Brandenburg had been "responsible for the overall technical

direction of Millennial Media," and, as COO, Root managed the Company's "day-to-day operations and results and for executing its overall growth and vision." Like Brandenburg, Root had been with Millennial Media for years and had served as the Company's COO since November 2006.

118.    Unbeknownst to investors, in May 2013, only one month after Millennial Media's CTO and COO left the Company, Millennial Media terminated nearly the entire Millennial Media engineering team responsible for the Company's MYDAS platform.  According to CW8, who was a Senior Software Engineer at Millennial Media from September 2012 to June 2014, "essentially the entire [MYDAS] platform team" was fired.  This included the Senior Vice President of Technology, Eric Hastings, the Principal Software Engineer in charge of the MYDAS platform, Rick Kilkoyne, and seven or eight other key engineers.  This is corroborated by CW7, who said that s/he was terminated in early May 2013 along with seven others in top engineering.  This reflected an apparent internal shift away from the Company's MYDAS platform.

### 7.    The Exchange Act Defendants Made Additional Materially False and Misleading Claims Concerning the Company's First Quarter 2013 Financial Results

119.    On May 8, 2013, after the markets had closed, the Company issued a press release on Form 8-K announcing its results of operations for the first quarter of 2013.  The Company reported revenue of "$49.4 million," gross margin of 41.6%, and more than 420 million monthly unique users worldwide.  The Company also offered revenue guidance for: (1) the second quarter of between $58 million and $60 million, which was below analyst estimates; and (2) the full year 2013 of between $270 million and $280 million.

120.   Later that same day, Millennial Media hosted a conference call for investors and analysts to discuss these results.  As part of his prepared remarks, CEO Palmieri made the materially false and misleading claims that:

> The second area in making it easier for clients to buy and transact on the platform is ***programmatic buying and selling*** [*i.e.*, real-time bidding].   We are determined to be a major player in premium programmatic media.   We have made some aggressive moves in Q1 to move in that direction, and we intend to invest and make more moves in the coming quarters.   ***It's important to note that our MYDAS platform operates via a real-time bidded marketplace, and has throughout our history, so adding the interfaces for the strategic and growing sales channel is an extension of the platform, and not a change to it.***

121.   On May 9, 2013, prior to the opening of the markets, Millennial Media filed its quarterly report on Form 10-Q with the SEC, signed by Defendants Palmieri and Avon, which also stated that "Revenue was $49.4 million for the three months ended March 31, 2013."  The Company's Form 10-Q also included certifications substantially similar to those described in paragraphs 71 and 72, signed by Defendants Palmieri and Avon.

122.   The foregoing statements made by the Company and Defendants Palmieri and Avon in paragraphs 119 to 121 when reporting on the Company's results of operations for the first quarter of 2013 were materially false and misleading for the reasons set forth in paragraphs 40 to 48, 51 to 55, 57, 74 and 117 to 118 above.

**8.      In July 2013, CEO Palmieri Sold an Additional $2.63 Million in Stock**

123.   From July 24 to 26, 2013, less than three weeks prior to the Company's August 13, 2013 announcement that it was making a stock-based acquisition of competing, Boston-based mobile advertising platform Jumptap that valued Jumptap at $200 million, and the Company's announcement that Millennial Media would not issue guidance for the third quarter of 2013, CEO Palmieri engaged in another round of stock sales, selling 262,500 shares of his own

Millennial Media stock at prices of $10.00-10.04, for gross proceeds of more than $2.63 million. As explained in further detail in section III.D.1. below, these sales were highly suspicious in scope and timing and stand in contrast to the balance of the Class Period after the Secondary Offering when CEO Palmieri only disposed of 1,692 shares once for tax purposes.

> **9.    In August 2013, the Company Announced its Acquisition of Jumptap And Continued to Issue Materially False and Misleading Statements to Reassure the Market**

> **(a)    Defendants Disclose the Need to Acquire Jumptap**

124.    On August 13, 2013, Millennial Media issued a press release announcing that the Company had reached an agreement to acquire Jumptap in a transaction that would be funded nearly entirely by 24.6 million shares of Millennial Media stock.  Concurrently, the Company issued a press release announcing its results of operations for the second quarter of 2013, and the Company reported revenue of $57 million (which was below analyst estimates).  The Company did not include guidance for the coming quarter or an update to its guidance for the full year in the press release in a manner consistent with prior practice, but rather directed investors to a presentation on its website and stated that guidance would be discussed on its earnings call that day.

125.    On Millennial Media's conference call with investors and analysts held on August 13, 2013, Defendant Avon disclosed that the Company would not be separating out financial guidance between Millennial Media and Jumptap.  In this regard, he said:

> Also, note that the future outlook we'll be giving today and moving forward will be on a pro forma combined basis.  We decided to give combined guidance, because it will be extremely difficult to separate the discussion of results for these two businesses on a going-forward basis in a relevant manner.

126.    In response to these disclosures, analysts raised questions about the performance of Millennial Media's core business.  Additionally, analysts expressed concern about the

- 45 -

Company's disclosure that it would thereafter issue pro forma, combined financial results of the two companies, which would obscure how Millennial Media was performing as a stand-alone entity.

127.    For example, on August 13, 2013, Canaccord Genuity stated that "we believe that in the short term [the acquisition of Jumptap] presents some execution risk **along with less transparency regarding Millennial stand-alone business progression, and we note that management declined to provide guidance for Millennial ex-Jumptap."** The Canaccord analyst continued, "we believe that the amount of dilution being incurred and potential **integration**/customer overlap **risks** warrant caution in the near term. We will be looking for signs that intended scale, data, and **integration benefits** are taking hold." Likewise, on August 14, Morgan Stanley commented that, "MM acquiring a smaller, loss-making competitor **may suggest, in our view, that it is attempting to purchase market share it formerly believed it could acquire organically**." PiperJaffray opined that, "[w]hile we view this transaction as likely long term positive for the company, **it does create some difficulty in assessing underlying fundamentals at the core Millennial business**, which investors will likely want to scrutinize more carefully following two consecutive revenue misses." Finally, analysts at Telsey Advisory Group wrote that "[w]e think concerns over the outlook will linger given limited clarity into MM's standalone performance."

128.    Millennial Media apparently needed to acquire Jumptap to fix problems in Millennial Media's core business. Jumptap's major strengths included third-party data and programmatic buying, services that Millennial Media claimed its MYDAS platform already provided. As CEO Palmieri claimed in the Company's press release announcing the acquisition on August 13, "Jumptap's expertise in **performance**, cross-screen, real-time bidding and **third-**

*party data fit well with, and provide incremental scale to Millennial Media's existing platform.*"

129.    In response to the disclosure of the need to acquire Jumptap, partially exposing additional weaknesses in the Company's proprietary software and related technologies, Millennial Media's stock price fell $1.60 per share, or ***18.82%***, to close at $6.90 per share on August 14, 2013.

### (b)    The Company's False and Misleading Disclosures Concerning Second Quarter 2013 Financial Results

130.    As discussed above, on August 13, 2013, Millennial Media issued press releases announcing its acquisition of Jumptap and its results of operations for the second quarter of 2013 that reported revenue of $57 million.  In the press release announcing the Jumptap acquisition, Defendant Palmieri stated that "Jumptap's expertise in performance, cross-screen, real-time bidding and  third-party data fit well with, and ***provide incremental scale*** to Millennial Media's existing platform."  On August 14, 2013, prior to the opening of the markets, Millennial Media filed its quarterly report on Form 10-Q with the SEC, signed by Defendants Palmieri and Avon, which included revenue of "57.0 million for the quarter ended June 30, 2013."  The Company's Form 10-Q also included certifications substantially similar to those described in paragraphs 71 and 72, signed by Defendants Palmieri and Avon.

131.    The foregoing statements made by the Company and Defendant Palmieri in paragraph 130 when reporting on the Company's results of operations for the second quarter and of 2013 and the announcement of the acquisition of Jumptap as simply providing "incremental scale" to Millennial Media's performance and real-time bidding capabilities were materially false and misleading for the reasons set forth in paragraphs 40 to 48, 51 to 55, 57, 74 and 117 to 118, including the fact that Millennial Media failed to disclose the extent to which it needed to acquire

Jumptap's performance advertising and real-time bidding technology business to fill a serious gap in its technology portfolio.

132.    As stated by CW1, Millennial Media needed to acquire Jumptap because its then-current MYDAS platform could not capitalize on programmatic advertising.  Specifically, CW1 stated that Millennial Media needed to acquire Jumptap because Millennial Media's programmatic tools were not competitive and did not yield the installs necessary for client optimization.  *See* ¶ 53.

133.    CW6 also stated that it was "necessary" for Millennial Media to acquire Jumptap because Millennial Media did not have the technological capability to grow its performance business, which was "dwindling fast."   Indeed, after CW6 joined Millennial Media from Jumptap, he found out that not only was Millennial Media's technology lacking, but that it was having issues with attribution.   Attribution is the measurement of user events in response to advertisements.  *See* ¶ 52.

> **10.    In November 2013, The Company Completes the Acquisition of Jumptap But Faces Undisclosed Difficulties Integrating Jumptap's Technology**
>
> **(a)    Defendants Disclose Disappointing Financial Results and How the Company's Acquisitions in 2013 Filled "Real Gaps"**

134.    On November 13, 2013, after the markets had closed, the Company issued a press release announcing its disappointing results of operations for the third quarter of 2013.   The Company reported pro forma combined revenue of $86.3 million, pro forma combined gross margin of 38.6%, and more than 500 million monthly unique users worldwide on a non-combined basis.   The Company also offered total pro forma combined revenue guidance for the fourth quarter of between $95 million and $100 million.

135.    On November 13, 2013, during the Company's conference call with analysts and investors, Defendant Palmieri admitted that the Company's acquisitions in 2013 of Metaresolver and Jumptap were to "fill in real gaps" in Millennial Media's platform that existed at the time – specifically "performance advertising and RTB buying capability."   Defendant Palmieri also reiterated that a reason for Millennial Media's acquisition of Jumptap was to obtain Jumptap's expertise in "*aggregation strategy around third-party data*."

136.    In response to this partial disclosure of the continued negative effect of unresolved weaknesses in the Company's proprietary software and related technologies on the Company's ability to generate revenue, Millennial Media's stock price fell $0.86 per share, or *11.98%*, to close at $6.32 per share on November 14, 2013.

> **(b)    Defendants Falsely Reassure Investors that Millennial Media's Integration of Jumptap Was Proceeding Efficiently**

137.    In its November 13, 2013 press release on Form 8-K signed by Defendant Avon discussing the Company's third quarter 2013 results, Defendant Palmieri made the following materially false and misleading claims about the integration of Millennial Media's technology with Jumptap's:

> *We've made substantial progress building and strengthening our full-stack mobile advertising platform this year* . . . .   Through our acquisition of Jumptap, the global launch of MMX, our mobile ad exchange, and the introduction of our Omni Measurement suite, we are uniquely positioned to be the partner of choice to the world's largest advertisers and agencies.   In the third quarter we generated $86 million in combined pro forma revenues driven by strong brand and international results and growth in programmatic performance revenues via the newly acquired Jumptap capabilities.   *Our integration is going well and we are very enthusiastic about bringing our combined capabilities to the global mobile advertising market*.

138.   Later that day, Millennial Media hosted its conference call for investors and analysts.   As part of his prepared remarks, CEO Palmieri made the materially false and misleading claim that:

> As we move through the integration phase of this acquisition, we're even more excited about this combination than we were when we first announced the deal.  ***Our companies fit very well together, with complementary strength in both our capabilities and our cultures.  Our teams are working very well together. The two companies are culturally similar and share a history of competing in the same space.  We're rapidly bringing the companies together as one, and we're very impressed with Jumptap's team***.

139.   On November 14, 2013, prior to the opening of the markets, Millennial Media filed its quarterly report on Form 10-Q with the SEC, signed by Defendants Palmieri and Avon, reported pro forma combined revenue of $86.3 million.   The Company's Form 10-Q also included certifications substantially similar to those described in paragraphs 71 and 72, signed by Defendants Palmieri and Avon.

140.   The foregoing statements made by the Company and Defendant Palmieri in paragraphs 137 to 139 when announcing the completion of the acquisition of Jumptap and reporting on the Company's results of operations for the third quarter of 2013 were materially false and misleading for the reasons stated in paragraphs 40 to 48, 51 to 55, 57, 74 and 117 to 118.

141.   In addition, it was materially false and misleading for CEO Palmieri to state that the Company had a single "full-stack," and that Millennial Media's integration with Jumptap "is going well," that the companies "fit very well together," their "teams are working very well together," and that, "We're rapidly bring[ing] the companies together as one," when, in fact, numerous confidential witnesses confirmed that Millennial Media and Jumptap had severe

difficulty integrating their respective teams and technologies and did not even begin the actual

integration until January 2014.  For example:

> (a)     CW9 stated that Millennial Media's and Jumptap's respective "tech stacks," or layers of components and software used to provide advertising solutions, failed to function together.  CW9 worked at Jumptap's Boston headquarters from May 2011 until it was acquired by Millennial Media in November 2013.  CW9 remained at Millennial Media, in Boston, as a Product Manager until November 2014, when CW9 left to join another company.  CW9 managed a creative team at Millennial Media tasked with developing unique advertisements and rich media, such as images or video advertisements that involve user interaction, for the Company's brand advertising.
>
>       CW9 explained that Millennial Media's inability to merge its "tech stacks" with that of Jumptap's was discussed openly at weekly, monthly and quarterly meetings of Millennial Media's Product Development staff.  The meetings were run by the Senior Vice President of Product Development, and were sometimes attended by Bob Hammond, the Chief Technology Officer.
>
> (b)     CW6 stated that, when both companies tried to "smash" together their technology platforms, ***they realized that they were "incomplete" even before the acquisition***.  As a result, CW6 explained, eventually it became clear that, in order to move forward, Millennial Media would need to keep one platform and not the other because ultimately ***neither platform was as complete as initially believed.***
>
> (c)     CW8 stated that the executives from Millennial Media and Jumptap failed to understand the "depth of functionality" of the two platform systems, and confirmed that each "tech stacks" had its own functionality limits that integration ***would not be able to solve***.  Additionally, CW8 explained that, even though the Company completed the acquisition in November 2013, it didn't hold a "kick-off" meeting until January 2014.  At that meeting, the CTO from Jumptap, Bob Hammond, was put in charge and the companies' engineering teams were reorganized.  The engineers from both companies were divided into a "Blue Team," from Jumptap's platform, and a "Green Team," from Millennial Media's MYDAS platform.  These two "tech stacks," as described above, were run separately.  However, as of June 2014, when CW8 resigned from Millennial Media, the Company was still running two separate systems and still employing a Blue Team and a Green Team organizational structure.
>
> (d)     CW10 echoed that the efforts to integrate the technologies of Millennial Media with Jumptap's were a "mess."  Specifically, testing, updating, and determining which part of which system to keep or discard and how best

to integrate them was very difficult, because each system had to remain operational to keep up with current operations. Each proprietary technology had its own idiosyncrasies, the Jumptap engineers and sales staff were not familiar with the Millennial Media systems and vice versa, and to make matters worse, experienced engineers from both companies, but particularly Millennial Media, had left. CW10 stated that, by the time CW10 left the Company in July 2014, Millennial Media's and Jumptap's technology stacks were still not integrated.

142.    Postings by current and former Millennial Media employees on the website *Glassdoor.com* also corroborate the accounts of the confidential witnesses detailed herein. These postings independently highlighted that Millennial Media faced significant undisclosed challenges with integrating its technology and culture with those of its acquisition targets:

(e)    On June 19, 2014, a person identified as a then-current Millennial Media employee wrote on Glassdoor to describe working at the Company in the following terms: "*Utter lack of direction since the merger*. *There has been zero integration plan to date*. No one is taking responsibility either which is baffling to see at the senior exec level. Where is the accountability? Engineers are leaving in record numbers, can't get necessary work done to operate efficiently or potentially scale. There is a general inability to attract solid talent which is a vicious cycle. We have far more attrition than anyone can keep up with. The identity of the company since the merger seems in question. The Baltimore HQ no longer has the weight it used to but those here haven't fully recognized that."

(f)    On July 18, 2014, a person identified as a former Millennial Media Software Engineer posted on Glassdoor that: "After the co-founder and CTO [Brandenburg] left they went through a series of frankly bad moves. First they fired all of the tech managers (including the people in charge of QA [quality assurance].) *This caused quality to seriously drop*. So they bought a much less successful company from Boston [Jumptap is headquartered in Boston] and *had their people replace all of the managers they just fired*. The new managers wanted to try to replace all of the Baltimore tech (not perfect but was well tested and is making most of our revenue) with Boston tech (many problems and frankly some parts don't work at all.) We basically spent 6 months trying to put features that were already in the Baltimore tech into the Boston tech (and in most cases the resultant product wasn't as well engineered as what was always in the Baltimore tech.) They are now backing off that position but *the damage has been done*. A huge amount of the best people who knew the most about the Baltimore tech have now left the company (Baltimore tech is still making the lion's share of the revenue and the Boston tech cannot replace it without serious work and maybe even a re-write.) The people

who are left are going to have to take years to relearn how everything works.  If you ask "does anyone know anything about such and such software from the Baltimore tech?" and you get a lot of "no, everyone who did left . . . ."  The commenter's "Advice to Management" was to "***check to see if a company's algorithms actually work before you buy them; not after you buy them, place all of the people at the new company in charge of technology, and then have them try to replace all of your tech with their tech*** (thus forcing many of your best people to find other companies.).""

(g)     On January 15, 2015, a person identified as a former Millennial Media employee wrote in a Glassdoor post:  "The company has made the choice to grow through acquisition rather than innovation. The result of this is *multiple technology stacks all in varying states of decay*."

(h)     On January 15, 2015, a person identified as a former Millennial Media employee wrote on Glassdoor:  "W[a]nder the halls and you'll routinely hear people referring to each other as green [the color of Millennial Media's logo] or blue (a reference to former Jumptap employees)."

(i)     On January 16, 2015, a person identified as a former Millennial Media employee also wrote on Glassdoor:  "Most acquisitions or mergers bring in further animosity into organization with people referring to each other as team green (legacy millennial), or team blue (jumptap), or by Office location name."

143.    Accordingly, Millennial Media's integration with Jumptap was not "going well" and the companies were not "working very well together" as of November 2013, let alone well into 2014, as the Company represented.

**11.     January-May 2014:  Millennial Media Announced the Resignation of CEO Palmieri, Disappointing Revenue Guidance, and the Resignation of CFO Avon**

**(a)     On January 25, 2014, CEO Palmieri Resigned**

144.    On January 25, 2014, Defendant Palmieri stepped down from the Board and as CEO of the company that he had founded eight years prior.  He left the Company less than two years after its March 2012 IPO and became a Venture Advisor with Defendant NEA, one of the original investors in Millennial Media that itself made millions of dollars in the Company's Offerings.  At the time of his departure, Palmieri stated that he had decided to leave the

Company "some time ago," and that Millennial Media had been conducting a search for his replacement, for "months, not weeks."[10]   This reflected that Palmieri's recognition of the problems at the Company stretched back months prior to January 2014.

145.   That same day, Millennial Media appointed Defendant Barrett as the Company's President and CEO, effective immediately, and the Board appointed Barrett as a member.

> **(b)   The Company's False and Misleading Disclosures Concerning Fourth Quarter 2013 Preliminary Financial Results**

146.   Also on January 27, 2014, the Company issued a press release announcing preliminary results for the fourth quarter of 2013.  In connection with these preliminary results, CFO Avon made the following materially false and misleading claims:

> We are very pleased with Millennial Media's strong fourth quarter performance.  With the addition of Jumptap's capabilities we bring to market an expanded suite of offerings, delivering solid results for our brand and performance clients.  ***The integration plan is ahead of schedule***, enabling us to complement our historical strength among brand advertisers with market leading solutions for our performance clients through our demand-side programmatic buying capabilities and our premium exchange (MMX). Millennial Media enters 2014 with a much stronger and more comprehensive suite of capabilities than at this time last year positioning us well to capitalize on these assets in the year ahead.

147.   The Company did not offer guidance for the coming quarter or full year in connection with its earnings pre-announcement.  On January 30, 2014, Millennial Media filed a Form 8-K with the SEC setting forth its January 27, 2014 press release announcing the preliminary financial results for the fourth quarter of 2013.

148.   The foregoing statements made by the Company and Defendant Avon in paragraphs 146 to 147 when announcing preliminary results of operations for the fourth quarter of 2013 were materially false and misleading for the reasons set forth in paragraphs 40 to 48, 51

---

[10] http://technical.ly/baltimore/2014/02/05/millennial-media-paul-palmieri-qa/

to 55, 57, 117 to 118 and 141 to 142.  For example, it was false and misleading for CFO Avon to state that "the integration plan [with Jumptap] is ahead of schedule," when, in fact, as set forth in paragraphs 141 to 142, Millennial Media and Jumptap had severe difficulty integrating their teams and technologies.  Additionally, it was false and misleading for CFO Avon to tout the purported growing strength of the Company when, in fact, that same day—January 25, 2014—Defendant Palmieri stepped down from the Board and as CEO of the Company that he had founded less than two years after its March 2012 IPO, reflecting that problems at the Company stretched back months prior to January 2014.

### (c)     On February 19, 2014, the Company Issued Disappointing Guidance

149.     On February 19, 2014, after the markets had closed, the Company issued a press release revealing disappointing revenue guidance for the first quarter of 2014 of between $72 million and $76 million—far below analysts' expectations of $83 million—and weak guidance for earnings before interest, taxes, depreciation and amortization ("EBITDA"), projecting a *loss* of between $5 million and $6 million, which sharply diverged from analysts' expectations of a *gain* of $8.8 million.  Millennial Media also revealed that, based on the then-current state of its technology, it could not expect to achieve earlier growth projections.

150.     In response to this partial disclosure that the Company's proprietary software and related technologies would require significant additional investment and development and were not ameliorated by the Company's costly corporate acquisitions, Millennial Media's stock price fell $1.05 per share, or *14.58%*, to close at $6.15 per share on February 20, 2014.

151.     In connection with the earnings release, Millennial Media hosted a conference call on February 19, 2014 to discuss its results with analysts and investors.  As part of his prepared remarks, CEO Barrett made the materially false and misleading claim that:

In Q4 we delivered some very strong results, but we also had some revenue generation during the quarter, which is not likely to repeat in Q1. *I believe this is a business that should grow its topline at 20% or maybe a bit more, based on where the market is today*, with some quarters growing faster and some quarters growing slower.

152. Later, as part of the question-and-answer session, CEO Barrett participated in the following exchange and made the following false and misleading claims:

[Analyst]: [J]umping in on the 20% general long-term revenue outlook. Most people probably think that the mobile industry is growing faster than that if you think about all of the different types of mobile ad product. *So does that imply that there are things happening out there that Millennial's not involved in* and could Millennial [] get involved in those to potentially grow even faster than 20%?

CEO Barrett: As far as the annual guidance again, it is my choice as the new kid on the block that the direction we're going in this year is taking an overall look at both the market opportunities, with some of the capabilities we have, capabilities that we're building upon, and *we think that it's fair to say that this is a company we expect to have 20% growth this year*. I think that, that's all we can say about it at this juncture.

153. CFO Avon also made the following false and misleading statements concerning Millennial Media's integration with Jumptap:

Of course, our biggest move in 2013 was our acquisition of Jumptap, which closed in early November . . . .

*Integration is underway. Our cultures and combined abilities are meshing very well, and as evidenced by our fourth-quarter results, we began to see some immediate results from the acquisition*.

Both our Q4 revenue and adjusted EBITDA were well ahead of our initial guidance ranges of $95 million to $100 million, and break even to $2 million, respectively. Our out performance on revenue was driven by stronger-than-expected branded performance spending on our platform during the quarter. Our adjusted EBITDA performance was driven by a combination of better-than-expected revenues, combined with less operating expense than initially expected, driven largely by Jumptap's

integration proceeding efficiently.

\*       \*       \*

First of all, Jumptap, if you're talking about Q1 in the guide, we don't breakout Jumptap versus Millennial. *We're one company. We've been one company since we closed the deal back in early November*.

154.   The foregoing statements made by the Company and Defendants Barrett and Avon in paragraphs 149 and 151 to 153, when announcing results of operations for the fourth quarter and full year of 2013, were materially false and misleading as set forth in paragraphs 40 to 48, 51 to 55, 57, 117 to 118 and 141 to 142.  For example, Defendant Barrett had no rational basis and could not have subjectively believed his statement that the Company would grow by 20% in 2014.  In fact, just three months later, on May 7, 2014, Defendant Barrett admitted that this claim of Millennial Media's growth by 20% was false, and attempted to explain that his 20% guidance was "loose" and offered at a time when he had been with the Company for "about 14 days."  In addition, it was misleading for CFO Avon to claim that the "combined abilities" of Millennial Media and Jumptap were "meshing very well"  and to claim that the two companies were one, when, in fact, as set forth in paragraphs 141 to 142, Millennial Media and Jumptap had severe difficulty integrating their technologies.

**(d)     The Company's False and Misleading Disclosures Concerning Full Year 2013 Financial Results**

155.   On March 3, 2014, after the markets closed, Millennial Media filed its Annual Report on Form 10-K with the SEC, signed by Defendants Barrett, Avon and Jeanneret, which reported 2013 revenue of $259.17 million.   The Company's Form 10-K also included certifications substantially similar to those described in paragraphs 71 and 72, signed by Defendants Barrett and Avon.  These reported financial results and certifications were materially

false and misleading for the reasons stated in paragraphs 40 to 48, 51 to 55, 57, 74, 117 to 118 and 141 to 142.

**(e)      On May 7, 2014, CFO Avon Resigned**

156.    On May 7, 2014, after the markets had closed, the Company issued a press release announcing its results of operations for the first quarter of 2014.   The Company reported disappointing revenue of $72.6 million compared to analysts' expectations of $75.5 million.   It also gave dour revenue guidance for the second quarter of 2014 of between $70 million and $75 million, 22% below analysts' expectations of $96.4 million.

157.    In addition, Millennial Media announced that CFO Avon would leave the Company "to pursue other career interests" effective July 1, at the end of the second quarter of 2014.   However, the Company announced that it had not yet appointed a new or even interim CFO, until CEO Barrett took over the role of principal finance officer on August 7 2014, and the Company later appointed CAO Jeanneret as Executive Vice President and CFO on September 2, 2014.

158.    In connection with this earnings release, on May 7, 2014, Millennial Media hosted a conference call to discuss its results with analysts and investors.  As part of his prepared remarks, CEO Barrett stated in part:

> Based on what I have seen to this point, I'm enthusiastic . . . [b]ut, I also realize that ***we have some significant work to do***.

*        *        *

> [O]ur performance business, especially the app download business, was ***down year-over-year and substantially from Q4, and these trends continue***.

*        *        *

> In late 2013, the team recognized the need to shift much of the performance business to what are called programmatic platforms.

Through acquisitions, internal development and a big partnership last year, Millennial built out its programmatic platform.  But *there is still work to be done to capture the benefits of the shift to programmatic*.

\*        \*        \*

By self-service interfaces and the API's, performance advertisers can access Millennial's inventory, either directly or through a third-party DSP.  For Millennial, this is a much more efficient way to serve small and mid-size performance advertisers, which will help us build a performance business that is based on many singles and doubles each quarter, instead of being reliant on the home runs.  But *shifting from this home run business, relying on big hits, spending a lot of money, to a more healthy longer-term business based on singles and doubles, is a shift that will take some time to work through*.

159.    Later, as part of the question-and-answer session, CEO Barrett participated in the

following exchange:

> **[Analyst]:**  I think last quarter you had talked about looking at kind of a 20% full-year growth rate.  I guess, our assumption would be that that may change a little bit.  And I apologize if I missed it, but I am just wondering if you are updating that view for the full year?
>
> **CEO Barrett**:  Yes, thanks, Jordan. *For the 20% outlook, I will address that right on. Because that was the guide -- I said it, with the caveat that I was with the Company for about 14 days.* But again, we are going back to the idea, this heavy concentration of a small number of advertisers in the performance app download business, it seemed like a reasonable projection at the time, because we saw brand strength. We saw the strength of the platform, our MMX, and we anticipated the renewal of -- renewal of these larger advertisers. At the same time, we had budgeted the client and their spend.
>
> \*        \*        \*
>
> And that obviously hasn't happened, and that is the biggest change, in terms of my outlook as I looked at the Company. *That guidance was loose.  It was kind of -- we kind of expect it to grow in the 20% range. Brand was growing over 30%, and they expect it to grow so -- at probably even at a faster rate in Q2. Performance is growing in the triple-digit area -- I mean, I'm sorry -- platform is*

- 59 -

*growing in the triple-digit area. It is just that very difficult for me to sit here, and try to do the same loose guidance I did in Q1.* And so, my approach now is to really back off any guidance, as it relates to annual.

160.    In response to this partial disclosure of the state of the Company's competitive position, low revenue visibility, poor outlook for growth and the deleterious effects of its weak and underdeveloped technology on its prospects, Millennial Media's stock price fell $1.99 per share, or more than *37%*, to close at $3.36 per share on May 8, 2014.

161.    On May 8, 2014, prior to the opening of the markets, Millennial Media filed its quarterly report on Form 10-Q with the SEC, signed by Defendants Barrett and Avon, which reported first quarter 2014 revenues of $72.6 million.  The Company's Form 10-Q also included certifications substantially similar to those described in paragraphs 71 and 72 executed by CEO Barrett and CFO Avon.  These reported financial results and certifications were materially false and misleading for the reasons stated in paragraphs 40 to 48, 51 to 55, 57, 74, 117 to 118 and 141 to 142.

## 12.    In July 2014, Millennial Media's New CEO Disclosed That He Was Taking Drastic Steps to "Reshape" the Company

162.    On the morning of July 8, 2014, *AdAge* published an article titled "Michael Barrett Is Crafting a Plan to Keep Millennial Media in the Mobile-Ad Party:  How Struggling Company Will To [sic] Stay Afloat, Stand Apart In a Field Of Giants."  The article revealed for the first time that the Company was on the brink of failure, and that its new CEO, Defendant Barrett, was taking drastic steps to "reshape" the Company's strategy.   Defendant Barrett admitted that Millennial Media's ad platform was not fully developed when he began his due diligence before accepting a position with the Company.  In his words:  "But when I started to take a look at all the assets that they had and the platform strategy -- that was *embryonic at the time* -- that really became a huge appeal."  When he came aboard, contrary to the statements

made by his predecessor, who proclaimed Millennial Media's sophisticated advertising placement and tracking technology, he instead observed that "[Millennial Media] ha[d] *all the pieces* necessary to build a really important mobile platform company."  In response to this disclosure, Millennial Media's stock price fell $0.36 per share, or *8.55%*, to close at $3.85 per share on July 8, 2014.

> **13.    In August 2014, the Company Again Disclosed Disappointing Earnings, and Executive Vice President Spilman and Board Director MacIntosh Resigned**

163.    On August 11, 2014, after the markets closed, Millennial Media issued a press release reporting revenue for the second quarter of 2014 of just $67.3 million.  The Company also issued third quarter revenue guidance in the range of $65 million to $70 million, again short of analysts' expectation of $77.95 million.  In addition, the Company announced the resignations of Mary "Mollie" Spilman, Executive Vice President of Global Sales and Operations, and Defendant Alan MacIntosh ("MacIntosh"), a member of the Board.  The Company's Prospectus for the Secondary Offering had identified Spilman (along with Palmieri, Root and Brandenburg) as the executives whose "continued service" the Company was "substantially dependent on."  By the end of the Class Period, they had all resigned.

164.    In connection with these results, CEO Barrett acknowledged that he was "not happy" and that the Company would "continue to see challenges in the near future," particularly tied to its inability to capitalize on performance advertising.  Barrett explained, in part:

> *In the second quarter, we saw a significant year-over-year and sequential drop-off of performance revenues, largely attributable to a small number of very large app download advertisers.*
>
> \*        \*        \*
>
> As we mentioned in our last quarterly call in our summary of Q2, *we've recently experienced a very significant drop-off in our*

*performance business*, due mainly to a small number of large clients spending far less with us than at this time last year. While there are a number of factors at play here, clearly a few big players entering the mobile space are *taking significant chunks of the app download business*.

\*     \*     \*

I continue to see a great early-stage opportunity here at Millennial. We have work to do and *we'll continue to see challenges in the near future*.

\*     \*     \*

*I'm convinced we have many of the component pieces here to have a great mobile advertising business.* This won't happen overnight and it will take lots of hard work in some and some patience. It's not going to take three years but *it won't happen in a quarter or two either*.

165.   CAO Jeanneret reiterated the "*significant drop-off* in the app download performance business, both year-over-year on a pro forma combined basis, and sequentially since last quarter":

As Michael mentioned, this decrease in performance revenue can be attributed to a number of factors, *including a significant drop-off of a few large performance advertisers*, as well as competitive pressures.

166.   Millennial Media thereby disclosed the fact that it was losing significant clients years after it first observed that clients were leaving based on the significant deficiencies in its technology.

167.   On the same day, August 11, 2014, Millennial Media filed its quarterly report on Form 10-Q with the SEC, reporting revenue of just $67.3 million for the second quarter of 2014.

168.   Early the next day, on August 12, 2014, the *Wall Street Journal* reported that Millennial Media's foundational brand advertising approach was failing and that its claims that it could capitalize on programmatic advertising appeared to be simply "bluster":

MOBILE SHORTFALL: Millennial Media, an early mover in mobile advertising, is having a really tough time in what has become an intensely competitive market. While the company's second quarter revenue climbed 18% to $67.3 million, that was below Wall Street estimates. ***And the company's losses are widening***, reports WSJ's CMO Today. ***Millennial CEO Michael Barrett acknowledged during Monday's earnings call that he's disappointed. And with the stock dropping 12% after hours, it seems so is the stock market.*** But beyond Wall Street, Millennial may have a tougher time winning back the interest of Madison Avenue. Sure, mobile ads are a hot growth sector. But ***Millennial's business is built on mobile banners ads–even as Google, Facebook and Twitter become the dominant mobile ad players and the market moves away from mobile display ads in favor of video, search and native treatments.*** Millennial has looked to own mobile programmatic advertising, launching an exchange platform with the ad technology firm AppNexus. ***But early talk among the two partners about the billions of ad impressions that will change hands on that exchange is increasingly feeling like bluster.***

169.     Similarly, an Evercore analyst reported that key questions remained as Millennial

Media might be unable to compete in an industry that is based on ad targeting and attribution:

> ***Millennial reported a second disappointing quarter in a row***, with both revenue and EBITDA missing the company's own guidance and Street expectations. Though the performance business drove the y/y revenue declines, the guidance miss this quarter was attributed to lower than expected growth on the Brand side of the business due to a pipeline that did not materialize in June. While Millennial's programmatic offering (MMX) continues to perform well, the company's core non-programmatic ad network is hitting competitive headwinds from which it may be difficult to recover as larger platforms build an advantage around ad targeting, formats, and attribution, all critical on mobile. As such, until MMX can scale to the point of driving overall revenue growth, ***the question we have remains the value of the company's software development kits installed on over 60k publishers, a number which has remained steady despite the declining revenue***.

170.     In response to the disclosure of the true state of the Company's earnings outlook

and these resignations, Millennial Media's stock price fell $0.43 per share, or 14.58%, to close at

$2.52 per share on August 12, 2014, marking a new all-time low, *i.e.*, 80.62% below the IPO

price and $11.63 or 82.19% below the Secondary Offering price.

14. **The Exchange Act Defendants Failed To Disclose Material, Non-Public Facts During the Class Period**

171.    The foregoing false and misleading statements were also false and misleading for their failure to disclose material, non-public facts whose non-disclosure rendered the Exchange Act Defendants' statements materially misleading.   During the Class Period, the Exchange Act Defendants failed to disclose the material adverse facts below that were in existence at the time each of the foregoing materially false and misleading statements was made, the disclosure of which would have led to a sharp decline in the price of Millennial Media's common stock:

a.    technological products and services crucial to the Company's business model were not fully functional, but in fact were still in nascent stages when announced, leading to rushed, slipshod programming, poor performance, and failure;

b.    the Company had little meaningful ability to accurately track and report end-user clicks, leading to significant over-billing, which in turn led customers to abandon Millennial Media;

c.    third party data trackers had a serious negative impact on the Company's ability to retain clients and generate revenue as they revealed Millennial Media's reported user performance was materially overstated and its backend analytics were not accurate or trustworthy, which led to a loss of important Company clients;

d.    Danielle Repetti (currently Vice President of Performance at Millennial Media) met with Defendant Palmieri in the Fall of 2012 about discrepancies in Millennial Media's revenue due to the introduction of third party trackers, which was a serious, undisclosed threat to Millennial Media's ability to retain clients and generate revenue;

e.    In the Spring of 2013, Millennial Media's Senior Vice President of Technology, the principal software engineer in charge of the MYDAS platform, and seven to eight key engineers left the Company;

f.    Millennial Media undertook corporate acquisitions during the Class Period to fill gaping holes in the Company's technological capabilities;

g.    The Jumptap acquisition was misrepresented as progressing well through integration, when, in fact, the integration of the two technology "stacks" proved impossible stemming from its own prior rushed and slipshod development., and the Company's operations were in fact divided among

"team green" (Millennial Media) and "team blue" (Jumptap); and

h.   Millennial Media's revenues and user data included significant amounts of traffic from "click fraud."  A December 2014 report by Pixalate (the ("Pixalate Report"), a leading analytics platform for programmatic advertising, confirms Millennial Media's longstanding inability to accurately track and report advertisement-related clicks and actions by users.  On December 10, 2014, Pixalate released a new rating standard called the "Global Seller Trust Index."  The Index analyzed "more than 100 billion monthly impressions and deliver[ed] ratings based upon inventory quality and ad performance, along with classic reach rating."  In other words, the Index measured fake traffic on mobile advertisements that are never seen by humans.  According to the results of Pixalate's Index from November 2014, Millennial Media ranked number ***300*** out of the 400 companies analyzed, due to a "high ratio of fraudulent traffic" on its platform.

According to CW11, a Sales Director in the Company's San Francisco office from May 2013 through December 2014, fraudulent traffic was created by unscrupulous app developers.  Because app developers were paid every time a consumer or user clicked on an advertisement on their app, they were incentivized to increase the number of clicks on the advertisement.  To increase the number of clicks, some app developers utilized "Bots," or automated programs to falsely inflate the number of clicks an advertisement received.   However, according to CW11, Millennial Media did not effectively police fraudulent Bot-driven traffic, which was reflected in the Pixalate Report.

CW10 agreed.   CW10 was a Director of Account Management at Millennial Media from November 2013 through July 2014, and prior to that worked at Jumptap.   According to CW10, advertisers are not interested in paying for internet traffic that is based on automated systems (or "click fraud"), but Millennial Media did not invest much time, effort or technology trying to police inflated internet traffic, and that failure was fully reflected in the Pixalate Index.

172.   The Exchange Act Defendants' false statements and omissions during the Class Period caused the Company's stock to trade at artificially inflated prices during the Class Period. However, as the truth about the Company's flawed technology and failed integration efforts described above were revealed to the market, the Company's stock price fell by $22.48 per share—or 89.92%—from its Class Period-high closing price of $25.00 per share on March 29, 2012, causing significant harm to Plaintiffs and the Class.

D.     LOSS CAUSATION / ECONOMIC LOSS

173.     As set forth above, throughout the Class Period, Millennial Media executives were aware or recklessly disregarded that Millennial Media's technology was flawed, it was unable to accurately track and report critical commercial metrics, it failed to integrate Jumptap's technology into its existing technology, and it was unable to sufficiently generate revenue.  When the Company revealed these truths to investors through a series of partial disclosures discussed below, the Company's share price fell precipitously, ultimately losing more than 89% of its value from the Class Period high closing price of $25.00 per share and falling more than 80% below the price at which shares were sold in the Company's IPO.

174.     On February 19, 2013, after the close of the markets, the Company issued a press release announcing revenue for the fourth quarter of 2012 of $58 million—sharply below analysts' expectations of $62.9 million—and full-year revenues of $177.7 million, below the Company's own estimates.  The Company also gave disappointing revenue guidance for 2013 and disclosed that it would acquire Metaresolver to "help [the Company] deliver additional programmatic buying solutions and will enhance our ability to capture and analyze highly relevant data to produce results for advertisers and developers."  In response to this partial disclosure of the true state of the Company's proprietary software and related technologies, Millennial Media's stock price fell $5.38 per share, or 37.54%, to close at $8.95 per share on February 20, 2013.  However, the Company's stock price remained inflated because the Exchange Act Defendants offered false and misleading explanations for, and continued to conceal, the true extent of the Company's problems during the remainder of the Class Period, as set forth above.

175.     On August 13, 2013, Millennial Media issued press releases announcing the Company's disappointing results of operations for the second quarter of 2013 and that the

Company had reached an agreement to acquire Jumptap.  The Company reported revenue of $57 million, which was below analyst estimates.  The Company did not include guidance for the coming quarter or an update to its guidance for the full year in the press release in a manner consistent with prior practice, but rather directed investors to a presentation on its website and stated that guidance would be discussed on its earnings call that day.  In response to this partial disclosure and the need to acquire Jumptap, which revealed weaknesses in the Company's proprietary software and related technologies, Millennial Media's stock price fell $1.60 per share, or 18.82%, to close at $6.90 per share on August 14, 2013.  However, the Company's stock price remained inflated because the Exchange Act Defendants offered false and misleading explanations for, and continued to conceal, the true extent of the Company's problems during the remainder of the Class Period, as set forth above.

176.   On November 13, 2013, after the markets had closed, the Company issued a press release announcing disappointing results for the third quarter of 2013 and unexpectedly downcast guidance for the fourth quarter.  During a conference call for investors later that day, Defendant Palmieri admitted that the reason for the Metaresolver and Jumptap acquistions to "fill in real gaps" in Millennial Media's platform that existed at the time – specifically "performance advertising and RTB buying capability"  –  and that the reason for the Jumptap acquisition was to obtain Jumptap's expertise in third party data.  In response to this partial disclosure of the continued erosive effect of unresolved weaknesses in the Company's proprietary software and related technologies on the Company's ability to generate revenue, Millennial Media's stock price fell $0.86 per share, or 11.98%, to close at $6.32 per share on November 14, 2013. However, the Company's stock price remained inflated because the Exchange Act Defendants

offered false and misleading explanations for, and continued to conceal, the true extent of the Company's problems during the remainder of the Class Period, as set forth above.

177.    On February 19, 2014, after the markets had closed, the Company issued a press release revealing disappointing revenue guidance for the first quarter of 2014 of between $72 million and $76 million—far below analysts' expectations of $83 million—and weak guidance for EBITDA, projecting a loss of between $5 million and $6 million, which sharply diverged from analysts' expectations of a gain of $8.8 million.   Millennial Media also revealed that, based on the then-current state of its technology, it could not expect to achieve earlier growth projections.   In response to this partial disclosure that the Company's proprietary software and related technologies would require significant additional investment and development and were not ameliorated by the Company's costly corporate acquisitions, Millennial Media's stock price fell $1.05 per share, or 14.58%, to close at $6.15 per share on February 20, 2014.   However, the Company's stock price remained inflated because the Exchange Act Defendants offered false and misleading explanations for, and continued to conceal, the true extent of the Company's problems during the remainder of the Class Period, as set forth above.

178.    On May 7, 2014, after the markets had closed, the Company issued a press release announcing its results of operations for the first quarter of 2014.   The Company reported revenue of $72.6 million compared to analysts' expectations of $75.5 million.   It also gave dour revenue guidance for the second quarter of 2014 of between $70 million and $75 million, 22% below analysts' expectations of $96.4 million.   That day, the Company also announced that Defendant Avon would step down "to pursue other career interests."   In response to this resignation and the partial disclosure of the state of the Company's competitive position, low revenue visibility, poor outlook for growth and the deleterious effects of its weak and underdeveloped technology on its

prospects, Millennial Media's stock price fell $1.99 per share, or more than 37%, to close at $3.36 per share on May 8, 2014. However, the Company's stock price remained inflated because the Exchange Act Defendants offered false and misleading explanations for, and continued to conceal, the true extent of the Company's problems during the remainder of the Class Period, as set forth above.

179.    On the morning of July 8, 2014, *Advertising Age* published an article titled "Michael Barrett Is Crafting a Plan to Keep Millennial Media in the Mobile-Ad Party: How Struggling Company Will To [sic] Stay Afloat, Stand In a Field Of Giants." The article revealed that the Company was on the brink of failure, and that its new CEO, Barrett, was taking drastic steps to "reshape" the Company's strategy. Defendant Barrett admitted that Millennial Media's ad platform was not fully developed when he began his due diligence before accepting a position with the Company: "But when I started to take a look at all the assets that they had and the platform strategy -- that was *embryonic at the time* -- that really became a huge appeal." When he came aboard, contrary to the statements made by his predecessor, who proclaimed Millennial Media's sophisticated advertising placement and tracking technology, he instead observed that "[Millennial Media] ha[d] *all the pieces* necessary to build a really important mobile platform company." In response to this disclosure, Millennial Media's stock price fell $0.36 per share, or 8.55%, to close at $3.85 per share on July 8, 2014. However, the Company's stock price remained inflated because the Exchange Act Defendants offered false and misleading explanations for, and continued to conceal, the true extent of the Company's problems during the remainder of the Class Period, as set forth above.

180.    On August 11, 2014, after the markets had closed, Millennial Media issued a press release reporting revenue for the second quarter of 2014 of just $67.3 million. The Company

also issued third quarter revenue guidance in the range of $65 million to $70 million, again short

of analysts' expectation of $77.95 million.  On an earnings call that same day, Defendant Barrett

acknowledged to the market that he was "not happy" with these results.  Defendant Jeanneret

reiterated the "*significant drop-off* in the app download performance business, both year-over-

year on a pro forma combined basis, and sequentially since last quarter."  Millennial Media

thereby disclosed for the first time the full extent of the truth regarding it losing significant

clients years after it first observed that clients were leaving based on the significant deficiencies

in its technology.  In addition, the Company announced the resignations of Spilman, Executive

Vice President of Global Sales and Operations, and Defendant MacIntosh, a member of the

Board.  In response to the disclosure of the true state of the Company's earnings outlook and

these resignations, Millennial Media's stock price fell $0.43 per share, or 14.58%, to close at

$2.52 per share on August 12, 2014, marking a new all-time low, *i.e.*, 80.62% below the IPO

price and 82.19% below the Secondary Offering price.

### E.     THE EXCHANGE ACT DEFENDANTS ACTED WITH SCIENTER

181.    During the Class Period, the Exchange Act Defendants had motive and

opportunity to commit fraud.  The Exchange Act Defendants had, by virtue of their positions in

the Company, the means to achieve a concrete and personal benefit, and they indeed benefitted

in a concrete and personal way, from the alleged fraud by, *inter alia*:

> a.    seeking to recoup their investments in the Company by inflating Millennial Media's share price through the false and misleading statements so that they could "cash out" in the IPO, the Secondary Offering and otherwise;
>
> b.    selling a portion of their holdings at inflated prices and thereby limiting the risk on their investment;
>
> c.    establishing and benefiting from exorbitant pay packages that, according to the Company's Prospectuses, accelerated upon the officers' resignations;

d.  with respect to Defendant Palmieri, limiting his risk of being CEO by working out an exit plan to be employed by Defendant venture capital firm Defendant NEA after he left the Company; and

e.  with respect to Palmieri, engaging in short-swing profits transactions by purchasing 20,000 shares of Company stock in November 2013 at prices of $5.92 to $6.58 per share, less than six months after he sold 262,500 shares of his stock in July 2013 at prices of $10.00 to $10.04 per share.

182.  In addition, the facts alleged herein give rise to a strong inference of scienter because the Exchange Act Defendants engaged in deliberately illegal behavior; and acted recklessly, knew facts or had access to information showing that their public statements were not accurate; and/or failed to check information they had a duty to monitor.  In so doing, the Exchange Act Defendants committed the illegal acts alleged herein, and practiced and participated in a course of business that operated as a fraud or deceit on purchasers of Millennial Media's stock during the Class Period.

### 1.  The Exchange Act Defendants Profited from Massive Insider Sales

183.  As discussed below, Millennial Media executives sold tens of millions of dollars of their personally-held shares in the Company's March 2012 IPO and the October 2012 Secondary Offering.  These insider sales included sales by Exchange Act Defendants Palmieri and Avon.

184.  On or about April 3, 2012, in the Company's March 2012 IPO, Defendants Palmieri and Avon sold close to $10 million of their personally-held Millennial Media shares to investors, while the same insiders were in possession of material adverse non-public information about the Company.  As set forth below, these investors sold the following amounts of Millennial Media shares at artificially-inflated prices:

| Individual | No. of Shares Sold | Price | Value of Shares Sold |
|---|---|---|---|
| Paul Palmieri | 732,562 | $12.09 | $8,856,674.58 |
| Michael Avon | 74,241 | $12.09 | $897,573.69 |
| *Total* | *806,803* | | *$9,754,248.27* |

185.     On October 29, 2012, in the Company's October 2012 Secondary Offering, Defendants Palmieri and Avon also sold more than $16.3 million of their personally-held Millennial Media shares to investors, while they were in possession of material adverse non-public information about the Company.  As set forth below, these Defendants sold the following amounts of Millennial Media shares at artificially-inflated prices:

| Individual | No. of Shares Sold | Price | Value of Shares Sold |
|---|---|---|---|
| Paul Palmieri | 1,100,862 | $13.4425 | $14,798,337 |
| Michael Avon | 118,349 | $13.4425 | $1,590,906 |
| *Total* | *1,219,211* | | *$16,389,243* |

186.     These insider sales were highly suspicious in both scope and timing.  First, the massive size of these insiders' sales (totaling more than *$26.14 million in total value*) was staggering.

187.     Second, these sales represent large percentages of the shares in Millennial Media that Palmieri and Avon held prior to the IPO.  Prior to the IPO, Defendant Palmieri beneficially owned 7,397,327 shares of Company stock, and Defendant Avon held 448,541 shares of Company stock.  Through the IPO and the Secondary Offering, Palmieri sold 1,833,424 of his Company shares and Avon sold 192,590 shares, which represented *25%* (Palmieri) and *43%* (Avon) of the shares they held at the time of the IPO.  In other words, the Company's CEO sold one quarter of his shares in the Company, and the CFO sold close to half his shares in the Company in connection with, or within seven months of, the IPO.  It is appropriate to aggregate each of these Defendants' sales in the IPO and in the Secondary Offering because Palmieri and

Avon were restricted in the number of shares they could sell in the IPO.  In addition, pursuant to lock-up agreements between Millennial Media's officers and the underwriters of the IPO, Millennial Media officers could not sell Millennial Media shares – in addition to what they sold in the IPO – until at least 6 months after the IPO.  This lock-up period expired on September 25, 2012, and the Secondary Offering followed shortly thereafter.[11]

188.    Third, the net profits from Defendants Palmieri's and Avon's sales were several times greater than their customary salary and bonus compensation for 2012 and represent massive profits for these executives.  Defendant Avon's cost basis for his shares sold on April 3, 2012 was $0.76 per share and his profits on this transaction were $841,151.  Defendant Avon's cost basis for his shares sold on October 29, 2012 was also $0.76 and his profits on this transaction were $1,500,961.

189.    Since Defendant Palmieri sold shares of Millennial Media stock in the IPO and the Secondary Offering that he acquired prior to the IPO, the cost basis of those shares he sold is not publicly reported.  To reach some approximation of Palmieri's net profits, it is noted that over a year prior to the IPO, in December 2010, Palmieri and other executives sold a portion of their shares of Millennial Media to the Company's venture capital investors for $3.2572 per share.  That price is likely significantly higher than Palmieri's cost basis for the shares he sold in the IPO and in the Secondary Offering.  However, even using $3.2572 as a proxy for Palmieri's

---

[11] Between the IPO and the Secondary Offering, Palmieri acquired 81,200 shares of Company common stock through restricted stock units from the Company on September 11, 2012 (rather than open market purchases), and those shares should accordingly be disregarded from this analysis.  Similarly, between the IPO and the Secondary Offering, Avon acquired a total of 57,307 shares of Company common stock through restricted stock units from the Company on April 3, 2012 and September 11, 2012, and those shares should also accordingly be disregarded from this analysis.

cost basis for those shares, Palmieri's imputed net profits in the IPO were at least $6.47 million, and his imputed net profits in the Secondary Offering were at least $11.2 million.

190.    The publicly-reported salary and bonus compensation for Palmieri and Avon, as well as the multiple by which their net profits (including Palmieri's imputed net profits) on their IPO and Secondary Offering stock sales exceeded that compensation, is set forth in the table below:

| Individual | Net Profits | 2012 Salary and Bonus | Multiple |
|---|---|---|---|
| Paul Palmieri | $17,683,184 (imputed) | $528,363 | 33.5x |
| Michael Avon | $2,342,112 | $367,898 | 6.4x |

The fact that these executives engaged in insider sales whose value ranged from between *6.4* to *33.5 times* each executive's annual salary and bonus compensation is highly suspicious.

191.    Fourth, the timing of these sales was highly suspicious because these executives made the sales after they and the Company made a series of statements to investors, which artificially inflated the value of Millennial Media stock in the run-up to the Secondary Offering. For example:  (1) on August 8, 2012, Millennial Media raised its projections for full-year 2012 by $3 million; (2) on September 12, 2012, Palmieri appeared on *CNBC*'s "Mad Money" with Jim Cramer to promote the Company's stock and claimed that he "love[d] to close the loop.  So, not only show an ad but then come back and say, 'well, how did that work and did it really deliver on investment for the advertiser?'  Because return on investment for the advertiser is the way that advertisers care less about price and I can be more aggressive on pricing, when we're really hitting ROI."  This claim was false and misleading because of the Company's serious problems with tracking conversions; (3) also on September 12, 2012, it was reported that Avon participated in "a series of investors meetings" hosted by Canaccord Genuity, resulting in

Canaccord reporting that, "there is room for increased sponsorship for MM stock as investors grow their comfort levels with key pillars of the story, mostly around market growth and competitive position"; (4) on October 15, 2012, Millennial Media pre-announced its third quarter 2012 earnings, which claimed a revenue increase of 85% year over year, and quarter over quarter growth of 19%; and (5) on October 23-24, 2012, the Company issued the materially false and misleading Secondary Offering Documents, which made false claims about the Company's software tools and related technological services and features.  The selling shareholders in the Secondary Offering benefited from the positive impact that these disclosures had on the market for Millennial Media's common stock and allowed the Exchange Act Defendants to execute the Secondary Offering and sell their shares at a price of $13.44 per share.

192.    Fifth, the timing of these sales was highly suspicious because CW2 stated that Danielle Repetti (who is currently Vice President of Performance at Millennial Media) met regularly with Defendant Palmieri in the ***Fall of 2012*** about discrepancies in Millennial Media's revenue due to the introduction of third party trackers, which was a serious negative trend that threatened Millennial Media's revenues at the time these sales were made, yet Defendants Palmieri and Avon failed to disclose it prior to the Secondary Offering.

193.    Sixth, the timing of the late October 2012 insider sales is highly suspicious because they fell during the third quarter of 2012, and the Company disclosed on February 19, 2013 sharply disappointing financial results for the very next quarter—the fourth quarter of 2012, announcing the Company's disappointing revenue guidance for 2013, and announcing the Company's acquisition of Metaresolver.  Specifically, on February 19, 2013, Millennial Media reported fourth quarter revenues of only $58 million—sharply below analysts' expectations of $62.9 million.  The release of this information led to a ***37.54%*** decline in Millennial Media's

stock price, to close at $8.95 on February 20, 2013.  This price was $4.49 lower than the price at which Palmieri and Avon sold their more than 1.2 million shares in October 2012.  As a result, their October 2012 sales resulted in the executives avoiding a loss in value of their shares of more than ***$5.47 million***.

194.    The following chart reflects the suspicious timing of the October 29-30, 2012 insider sales with respect to these material events:



195.    In addition, from July 24 to 26, 2013, CEO Palmieri engaged in another round of stock sales, selling 262,500 shares of his own Millennial Media stock at prices of $10.00-10.04, for gross proceeds of more than $2.63 million.  The sales amounted to an additional 4.6% of Palmieri's holdings at the time of the sales.  Palmieri's cost basis for these shares was not publicly available but using an imputed cost of $3.2572 as a proxy, Palmieri's imputed profits were approximately $1.78 million.

196.    Palmieri's July 24 to 26, 2013 sales were highly suspicious in scope and timing and stand in contrast to the balance of the Class Period after the Secondary Offering when CEO Palmieri only disposed of 1,692 shares once for tax purposes.   Palmieri's sales were also suspicious because they were made pursuant to a Rule 10b5-1 plan that he entered into on March 8, 2013—at a time when Palmieri knew the true undisclosed reasons for the Company's disappointing financial results and Millennial Media was experiencing significant undisclosed internal turmoil.   For example, following the February 19, 2013 disclosure of the Company's disappointing fourth quarter 2012 results and its need to acquire Metaresolver, the Company's CTO and COO resigned on April 5, 2013, and the chief engineer of Millennial Media's MYDAS platform (and numerous other software engineers) were fired in May 2013.   Palmieri entered into his Rule 10b-5 plan in the middle of these negative developments.

197.    Palmieri's July 2013 sales are also suspicious in timing because, along with the Millennial Media executives' October 2012 sales, they represent a pattern of Millennial Media insiders selling large quantities of personally-held stock shortly after the Company issued materially false and misleading statements, and before the Company's announcement of an acquisition and the release of negative financial information.   Specifically, prior to Palmieri's July 24 to 26, 2013 stock sales, the Company again issued materially false and misleading statements on May 8 and 9, 2013 about the Company's software tools and related technological services and features, which led to a run-up in the Company's stock price from May through July 2013.   And, shortly after Palmieri's July 2013 stock sales, less than three weeks later, on August 13, 2013, the Company announced that it was making a stock-based acquisition of Jumptap that valued Jumptap at $200 million, and that Millennial Media would not issue guidance for the third quarter of 2013 (or update its guidance for the full year in the expected manner).   In response to

that news, the price of Millennial Media's stock fell $1.60 per share, or 18.82 percent, to close at $6.90 per share on August 14, 2013.   This was at least $3.10 lower than the price at which Palmieri sold his 262,500 shares in July, and the timing of Palmieri's July 2013 sales resulted in him avoiding a loss of *$813,750*.

198.    Palmieri also admitted months after his July 2013 stock sales that he understood that the announcement of an acquisition like Millennial Media's acquisition of Jumptap would have been expected to result in dilution of the Company's shares and a decline in its share price, which it did.   As Palmieri admitted during the AppNexus Summit in November 2013, he understood that any time a company announces a stock-based acquisition like Millennial Media's acquisition of Jumptap, the acquisition will necessarily dilute the acquiring company's shares.   In Palmieri's words, when asked to comment on how the Jumptap acquisition had caused a decline in Millennial Media's share price:   "[W]hen you acquire a company for stock and it is 22% of your …22.5% of your new shares that you are issuing *you would expect that the stock would decline as people anticipate taking that dilution*."[12]   In fact, Millennial Media's stock price did decline in response to its August 2013 announcement of its acquisition of Jumptap, exactly as Palmieri understood it would when he made his July 2013 sales.

199.    In addition, the only open-market sales of Company stock by Defendant Jeanneret during the Class Period occurred in the months leading up to the Company's announcement that it would be acquiring Jumptap.   On June 10, 2013, Jeanneret sold 2,336 of his personally-held shares at a weighted average sale price of $8.4569 for proceeds of $19,755, which represented 12.5% of the Company securities he beneficially owned at the time.   According to Jeanneret's

---

[12] https://www.youtube.com/watch?v=irMojDw7FAM

Form 4 dated September 21, 2012, these shares were acquired as part of restricted stock unit grants.[13]

200.    The following chart reflects the suspicious timing of Jeanneret's and Palmieri's June and July 2013 insider sales with respect to these material events:



_____

[13] The lack of alleged insider sales by Exchange Act Defendant Barrett is not relevant to whether the sales by the other Exchange Act Defendants support a strong inference of scienter because Barrett joined Millennial Media as its CEO on January 25, 2014, when the price of Millennial Media's stock had already declined by 43% since its IPO price of $13.00.

## 2.    Additional Facts Give Rise to a Strong Inference of Scienter

201.    The following additional facts give rise to a strong inference of scienter:

a.    Mobile Advertising Is Millennial Media's Sole Business.  Since Millennial Media is engaged in only one line of business – mobile advertising – the Company's executives were responsible for understanding the Company's technological offerings, and any material developments that could negatively impact the Company's customer base and revenue stream.

b.    By February and March 2012, Third Party Data Trackers Demonstrated the Unreliability of Millennial Media's Ability to Track and Verify Users' Actions.  According to CW2, by February and March of 2012, Millennial Media client Supercell (a leading developer of online games, including "Clash of Clans") started to use a third-party tracking tool called HasOffers, which resulted in a steep decline in the revenue that Millennial Media was able to drive with Supercell.

c.    By the Fall of 2012, Millennial Media Recognized the Discrepancies in Its Revenues Due to the Use of Third Party Data Trackers.  According to CW2, Danielle Repetti (currently Vice President of Performance at Millennial Media) met regularly with Defendant Palmieri in the Fall of 2012 about discrepancies in Millennial Media's revenue due to the introduction of third party trackers, which was a serious, undisclosed threat to Millennial Media's ability to retain clients and generate revenue.

d.    The Suspicious Timing and Amount of Millennial Media's October 2012 Secondary Stock Offering Supports a Strong Inference of Scienter.  As discussed in more detail above, the Company's rush to execute its massive October 2012 secondary offering on the heels of its March 2012 IPO was highly suspicious.  This is particularly the case because the Company was experiencing a declining trend in revenues at the time of the Secondary Offering as a result of third-party trackers demonstrating the Company's overstated claims of user actions.  As a result, in the Secondary Offering, Exchange Act Defendants Palmieri and Avon reaped more than *$20 million* in profits from their personally-held Millennial Media stock (using imputed prices for Palmieri) on the basis of material undisclosed information.

e.    CW Accounts Contradict Millennial Media's Statements In the Company's Offering Documents Touting the mMedia Self-Service Platform.  In the Offering Documents, Millennial Media trumpted the mMedia self-service advertising portal.  However, CW7 stated that Millennial Media published software relating to the mMedia portal that was not functioning properly over CW7's objections to the Vice President of Technology, and on internal Production Software Release Forms.  According to CW7, the Vice President of Technology was pressured by

upper management to push out software releases,[14] often commenting that "management wants this thing out, [so] it's going out," regardless of whether the software was ready to be released.

f.  <u>CW Accounts Contradict Millennial Media's Claim That It Experienced Poor Fourth Quarter 2012 Performance Only "Very Late in the Quarter" Supports a Strong Inference of Scienter</u>.  On February 20, 2013, the Company disclosed disappointing financial results that it attributed to declining performance "very late in the quarter" due to strategic decisions to shun "lower end performance" segments.  However, as discussed above, Millennial Media's trend in declining revenue was apparent in the Fall of 2012 and did not begin only at the very end of the fourth quarter of 2012, as Millennial Media claimed.  In fact, when CW2 was read the Company's statement that Millennial Media had departed from its core business of smaller advertisers, CW2 stated that the claim was inaccurate.  According to CW2, the issue during that time period was that the Company's core performance advertisers had begun to use third party tracking tools such as HasOffers and Kochava, and that, once Millennial Media clients began to use those tools, the Company saw revenue decrease substantially, as much as 60%.  According to CW2, this involved clients who were typically spending $50,000 per day but their spend amounts dropped to $6,000 because of huge discrepancies exposed by third party data trackers.

g.  <u>Millennial Media's February 2013 Acquisition of Metaresolver Supports a Strong Inference that Millennial Media Lacked "Clean" User Data</u>.  Although Millennial Media disclosed its acquisition of Metaresolver on February 20, 2013, early reports of a potential acquisition began to circulate as early as February 11, 2013.  As *AdAge* reported that day, Metaresolver was attractive to Millennial Media because, as Metaresolver founder and CEO Seamus McAteer had claimed, Metaresolver's strength was in providing "***clean***" data compared to other demand-side platforms that offered a glut of inaccurate information.[14]  According to *AdAge*, Metaresolver was able to target mobile ads based on device type, mobile carrier, location and time of day (collectively referred to as the "mobile graph") and in turn allow for programmatic buying based on such data.[15]  Millennial Media's acquisition of Metaresolver reflects Millennial Media's lack of technology that could collect such "clean" user data at the time.  In fact, in Millennial Media's February 20, 2013 press release announcing its acquisition of Metaresolver, the Company stressed that, "Metaresolver uses ***highly accurate data*** to identify and build audiences that brands can target with campaigns" and collected "***clean and accurate***

---

[14] http://adage.com/article/digital/millennial-media-talks-acquire-mobile-ad-buying-platform-metaresolver/239729/

[15] *Id.*

foundational data."   Defendant Palmieri stressed the importance of Metaresolver's "clean" data technology and stated that "Accurately gathering and categorizing this [mobile] data can be the difference between serving an ad that is relevant to a consumer and one that is not," and "Metaresolver's data-driven approach and technology will allow our platform to go *one step further* and provide *additional value* to our advertiser and developer partners."   Millennial Media's urgency to fill the hole in its technological capability regarding its lack of clean user data is further supported by how Millennial Media acquired Metaresolver after Metaresovler was in existence less than one year, and before Metaresolver showed a profit.

h.   <u>The April 2013 Departures of Millennial Media's Co-Founder and Chief Technology Officer, and Chief Operating Officer, Support a Strong Inference that the Company's Foundational Technology and Operations Were Not as the Company Claimed</u>.   Prior to his April 3, 2013 departure from the Company, at the approximate age of 38, Millennial Media's co-founder and former CTO Brandenburg had been "responsible for the overall technical direction of Millennial Media."   In addition, prior to his April 2013 departure from Millennial Media at the approximate age of 43, former COO Stephen Root was "responsible for its day-to-day operations and results and for executing its overall growth and vision."[16]   Like Brandenburg, Root had been with Millennial Media for years and served as the COO of the Company since November 2006.   The short time between Millennial Media's March 2012 IPO, its fourth quarter 2012 revenue shortfall and the April 2013 departure of its co-founder and CTO (Brandenburg), and COO (Root), support a strong inference that Millennial Media internally recognized at the time the significant shortcomings in the Company's foundational technology and operations, as corroborated by numerous CWs discussed herein.

i.   <u>Defendant Palmieri's January 25, 2014 Departure from Millennial Media Supports a Strong Inference of Scienter</u>.   On January 27, 2014, at the age of 44, Palmieri stepped down from the Board of Directors and as CEO of the Company he founded eight years prior, less than two years after the Company's March 2012 IPO, in order to become a Venture Advisor with Defendant New Enterprise Associates, which was one of the original investors in Millennial Media and itself made millions of dollars in Millennial Media's IPO.   At the time of his departure, Palmieri stated that he had decided to leave the Company "some time ago," and that Millennial Media had been conducting a search for his replacement, for "months, not weeks."    This reflected that Palmieri's recognition of the

---

16

http://www.bloomberg.com/research/stocks/people/person.asp?personId=10201615&ticker=MM

problems at the Company stretched back months prior to January 2014.[17] Yet, the Company did not disclose the fact of Palmieri's pending departure in December 2013, when Millennial Media awarded Palmieri a raise in base salary from $325,000 to $520,000, an increase in his annual bonus target to 80% of his base salary (from 75%), and an option to purchase 900,000 shares of Millennial Media stock over four years at a price of $6.34 per share.[18]

j.      Millennial Media's Acquisition of Jumptap Supports a Strong Inference that the Company Lacked Key Performance Advertising Capabilities or a Third Party Data Strategy.  At the time of Millennial Media's acquisition of Jumptap, Defendant Palmieri stated that the reason for the acquisition was to obtain Jumptap's expertise in third party data.  In Palmieri's words: "We believe that the combination and integration of our first-party data and ***Jumptap's aggregation strategy around third-party data***, will quickly give us a much better data asset and will drive even better audiences and results for both brand and performance advertisers, while continuing to respect and protect consumers' privacy."  As numerous CWs have stated, the emergence of third-party data trackers had led to sharp declines in Millennial Media's revenues as clients left the Company and Millennial Media's acquisition of Jumptap was an attempt to fill that hole in its portfolio.  In addition, confidential witnesses have stated that Millennial Media's MYDAS platform was incapable of capitalizing on performance advertising, necessitating the Company's acquisition of Jumptap.

k.      Millennial Media Did Not Break Out Its Financial Results Following the Jumptap Acquisition in November 2013 Between Millennial Media and Jumptap, Which Partially Hid That Millennial Media Was Struggling Financially.  Millennial Media's failure to break out its own financial results from Jumptap's following its acquisition of Jumptap supports a strong inference that Millennial Media was itself struggling financially and Millennial Media had purchased Jumptap as a revenue stream to mask the Company's own failures.

l.      Millennial Media Faced Significant Undisclosed Challenges in Integrating Millennial Media with its Acquisition Targets.  Numerous CWs have described how Millennial Media faced significant problems integrating the Company with its acquisition targets, despite how Defendant Palmieri described on November 13, 2013 that the integration of Jumptap into Millennial Media was "going well," and how Defendant Avon stated on February 19, 2014 that "Jumptap's integration [was] proceeding efficiently."

---

[17] http://technical.ly/baltimore/2014/02/05/millennial-media-paul-palmieri-qa/

[18] http://www.bizjournals.com/baltimore/news/2013/12/02/millennial-media-ceo-paul-palmieri.html

m.     The May 2014 Resignation of Millennial Media CFO Michael Avon
       Supports a Strong Inference that Millennial Media Was Experiencing
       Significant Financial Difficulties.  On May 7, 2014, the Company reported
       results for the first quarter of 2014, including revenues significantly below
       analysts' expectations.    The Company also disclosed grim revenue
       guidance for the coming quarter of between $70 million and $75 million,
       22 percent below analysts' predictions of $96.4 million.    That day,
       Millennial Media also announced that Defendant Avon, Millennial
       Media's Executive Vice President and CFO at the time, would step down
       from his position at the end of the second quarter of 2014 to "pursue other
       career interests."  Avon had begun his relationship with Millennial Media
       as a venture investor at Columbia Capital, where he led the Company's
       first round of financing in 2006.

n.     A Post-Class Period Report Corroborates the Exceedingly Poor Quality of
       Millennial Media's Data.    On December 10, 2014, *Business Insider*
       published an article detailing the amount of fraudulent ads that appeared
       on the Millennial Media platform, entitled "Study Shows Millennial
       Media, Yahoo And AOL Are Littered With Low Quality Ads."  The story
       read that:     "Today, Pixalate, a programmatic advertising analytics
       platform, has released its first monthly Global Seller Trust Index, which
       ranks programmatic advertising sellers . . . [based on] areas such as
       viewability, fraud, engagement and domain masking . . . .  [Pixalate CEO
       Jalal] Nasir says the "biggest surprise" among the low rankings was
       publicly listed company Millennial Media, which . . . ranked at No. 300 of
       the 400 companies analyzed, due to a '***high ratio of fraudulent traffic***.'"
       This corroborates the CW accounts herein of Millennial Media's poor
       technological platform and its lack of "clean" data.

o.     Numerous Web Postings by Current and Former Millennial Media
       Employees Corroborate the CWs' Accounts.   Postings by current and
       former Millennial Media employees on the website Glassdoor.com
       corroborate the accounts of CWs detailed herein, including how:
       Millennial Media's foundational technology was of poor quality;
       Millennial Media had significant problems integrating its technology and
       culture with those of its acquisition targets; the Company's sales
       organization made promises to clients on which its technology simply
       could not deliver; and the Company engaged in improper practices to "hit
       the numbers" each quarter.  For example:

       •     On September 24, 2013, a person identified as a current Millennial
             Media employee posted on Glassdoor that the "Cons" of working
             at Millennial Media included "***Shady practices to 'hit the
             numbers' for each quarter***."

       •     On September 21, 2013, a person identified as a former Millennial
             Media Software Engineer posted on Glassdoor that, "The emphasis

- 84 -

seems to be getting software out quickly as possible, as opposed to doing it correctly. The desire for mass-produced software tended to rear its ugly head in the sense that the software teams always seemed to be running around like a chicken with its head cut off, either fixing old bugs or getting that must-have feature by Monday. This meant that overtime was the norm instead of the exception. In addition, the desire to get everything done quickly means that *old technology is used instead of taking the time to learn new technology*. I was rather surprised to find many of the developer's skills were rather stale."

- On January 23, 2014, a person identified as a then-current Millennial Media Developer posted on Glassdoor that the "Cons" of working at Millennial Media included that "*the sales team runs the company - tech and other teams are driven by the wishes and desires of sales for better or worse... in the past year + it hasn't worked out well*" and the Company's "*poor infrastructure in terms of existing technology*."   That person's "Advice to Management" was to "Create products that work and function as planned. This will keep sales from selling things that don't work (or just making it up as they go).. it will also keep the other teams from having to put out fires with duct tape on an hourly basis."

- On February 13, 2014, a person identified as a former Millennial Media Developer wrote on Glassdoor that the "Cons" of working at Millennial Media included how "*The CEO bailed*, and the board brought in someone entirely unfamiliar with the company to fill his shoes," as well as the "*Constantly changing business strategies that never seem to amount to anything*."

- On June 19, 2014, a person identified as a then-current Millennial Media employee wrote on Glassdoor to describe working at the Company in the following terms:  "*Utter lack of direction since the merger. There has been zero integration plan to date*. No one is taking responsibility either which is baffling to see at the senior exec level. Where is the accountability?  Engineers are leaving in record numbers, can't get necessary work done to operate efficiently or potentially scale.  There is a general inability to attract solid talent which is a vicious cycle.  We have far more attrition than anyone can keep up with.  The identity of the company since the merger seems in question. The Baltimore HQ no longer has the weight it used to but those here haven't fully recognized that."

- On July 18, 2014, a person identified as a former Millennial Media Software Engineer posted on Glassdoor that:  "After the co-founder and CTO [Brandenburg] left they went through a series of

frankly bad moves.  First they fired all of the tech managers (including the people in charge of QA [quality assurance].)  ***This caused quality to seriously drop***. So they bought a much less successful company from Boston [Jumptap] and had their people replace all of the managers they just fired. The new managers wanted to try to replace all of the Baltimore tech (not perfect but was well tested and is making most of our revenue) with Boston tech (many problems and frankly some parts don't work at all.) We basically spent 6 months trying to put features that were already in the Baltimore tech into the Boston tech (and in most cases the resultant product wasn't as well engineered as what was always in the Baltimore tech.) They are now backing off that position but the damage has been done. A huge amount of the best people who knew the most about the Baltimore tech have now left the company (Baltimore tech is still making the lion's share of the revenue and the Boston tech cannot replace it without serious work and maybe even a re-write.) The people who are left are going to have to take years to relearn how everything works. If you ask "does anyone know anything about such and such software from the Baltimore tech?" and you get a lot of "no, everyone who did left." I think they can probably recover from this but it will likely take quite a while (in the mean time the company's competitors haven't exactly stopped innovating.)"  The commenter's "Advice to Management" was to "Maybe you should ***check to see if a company's algorithms actually work before you buy them; not after you buy them***, place all of the people at the new company in charge of technology, and then have them try to replace all of your tech with their tech (thus forcing many of your best people to find other companies.).""

- On October 4, 2014, a person identified as a then-current Millennial Media Account Executive wrote on Glassdoor: "I once heard an Account executive wonder out loud ho[w] it was that she became such a liar, telling her clients that she was delivering on contracted media as the agency wanted.   When presented with making revenue, ***no one in operations or sales seems to care about being honest with the client***."

- On November 17, 2014, a person identified as a former Millennial Media Account Executive wrote about the Company:  "***Weak technology***, poor managers who didn't know what they were doing, lack of communication between sales and operations ***leading to breakdown, inability to deliver what was promised to our clients***."

- On January 15, 2015, a person identified as a former Millennial Media employee wrote in a Glassdoor post:  "The company has made the choice to grow through acquisition rather than

innovation. The result of this is ***multiple technology stacks all in varying states of decay***."

- Millennial Media's failure to integrate employees and technology following its acquisitions is shown by statements from former Millennial Media employees on Glassdoor.  On January 15, 2015, a person identified as a former Millennial Media employee wrote: "W[a]nder the halls and you'll routinely hear people referring to each other as green or blue (a reference to former Jumptap employees)"; and On January 16, 2015, a person identified as a former Millennial Media employee wrote:  "Most acquisitions or mergers bring in further animosity into organization with people referring to each other as team green (legacy millennial), or team blue (jumptap) , or by Office location name."

p.  <u>The Exchange Act Defendants had a duty to monitor Millennial Media's financial performance, the status of its technological offerings, and the status of its integration with Metaresolver and Jumptap.</u>  The Exchange Act Defendants failed to check information they had a duty to monitor and their recklessness led Defendant Barrett to issue bullish guidance shortly after becoming CEO and then later admit, on May 7, 2014, that he was wrong to have done so since he was only at the Company 14 days when he made those statements, and the Company's true financial condition proved to be worse than he claimed.

202.    Additionally, the following facts, taken collectively with the scienter allegations above, give rise to a strong inference of scienter with respect to each of the Individual Exchange Act Defendants:

a.  <u>Defendant Palmieri</u>

   i.    Palmieri was, at all relevant times prior to January 25, 2014, President and CEO of the Company, and a member of the Company's Board.  He also acted as Principal Operating Officer from April 5, 2013 until his resignation.  By virtue of his positions, Palmieri knew and/or had access to material non-public information about the Company.

   ii.    During the Class Period, Palmieri certified the Company's periodic financial reports filed with the SEC and spoke with investors and securities analysts regarding the Company on a regular basis.  Palmieri also signed the Registration Statements of the Company in connection with the Offerings.

iii.     On or about April 3, 2012, in the March 2012 IPO, Palmieri sold more than $8.85 million of his personally-held Millennial Media shares to investors, while he was in possession of material adverse non-public information about the Company.

iv.     In the Fall of 2012, Palmieri met regularly with Repetti regarding discrepancies in Millennial Media's revenue due to the introduction of third party trackers, which was a serious, undisclosed threat to Millennial Media's ability to retain clients and generate revenue.

v.     In September 2012, Palmieri received a grant of restricted stock units ("RSUs") that would vest in the event of termination for cause, or "as a result of [his] resignation for good reason." Further, as stated in the Secondary Offering Registration Statement filed on October 15, 2012, in the event of change of control or termination, Palmieri, under the terms of his key employee agreement effective July 21, 2006 was entitled to: "(i) continuation of base salary for six months, and (ii) payment of that portion of healthcare premiums that the company was paying prior to the effective date of termination for six months, subject to him signing a release of claims. Additionally, under the stock option grant notice for an option to purchase 10,000 shares of our common stock granted on March 31, 2009, Mr. Palmieri is entitled to (i) acceleration of 50% of the then-unvested shares of stock subject to the option upon a change in control, and (ii) acceleration of 100% of the then-unvested shares of stock subject to the option if he is terminated by the company without cause or resigns for good reason within one month prior to or 12 months after a change in control."

vi.     On or about October 29, 2012, in the Secondary Offering, Palmieri sold $14.8 million of his personally-held Millennial Media shares to investors, while he was in possession of material adverse non-public information about the Company.

vii.     In 2012, Palmieri's total compensation was $1,550,851. This was comprised of $298,750 in base salary, $229,613 in bonus, $993,888 in stock awards, and $28,600 in all other compensation.

viii.     From July 24 to 26, 2013, Palmieri engaged in another round of stock sales, selling 262,500 shares of his own Millennial Media stock at prices of $10.00-10.04, for gross proceeds of more than $2.63 million. These sales were made pursuant to a Rule 10b5-1 plan that Palmieri entered into on March 8, 2013—at a time when Millennial Media was experiencing significant undisclosed internal turmoil.

ix.      On November 9, 2013, Millennial Media filed a form 8-K with the SEC which announced that Palmieri's base salary would increase from $325,000 to $520,000 and his bonus target would be increased to 80% of his base salary. Additionally, Palmieri was given an option to purchase 900,000 shares at an exercise price of $6.34 to vest over four years, ending November 15, 2017, "subject to accelerated vesting in specified circumstances."

x.      In 2013, Palmieri's total compensation was $7,304,058. This was comprised of $343,688 in base salary, $210,000 in bonus, $1,014,000 in stock awards, $5,706,000 in option awards, and $29,970 in all other compensation.

xi.      On January 25, 2014, Palmieri resigned from his roles as President, CEO, and member of the Board. Palmieri remained as a consultant and advisor to the Company through February 1, 2015. In exchange for his services, the Company agreed to pay his 2013 executive bonus, which he would have received if he had remained employed by the Company. The Company also accelerated vesting of his outstanding RSUs over the course of his consulting agreement.

b.    <u>Defendant Avon</u>

i.      Avon was CFO of Millennial Media from November 2009 through July 1, 2014. He also served as an Executive Vice President of Finance & Corporate Strategy. He was responsible for the Company's overall financial, legal and corporate development activities. By virtue of his positions, Avon knew and/or had access to material non-public information about the Company.

ii.     During the Class Period, Avon certified the Company's periodic financial reports filed with the SEC and spoke with investors and securities analysts regarding the Company on a regular basis. Avon also signed the Registration Statements of the Company in connection with the Offerings.

iii.    Prior to joining Millennial Media, Avon was principal at Columbia Capital. The Company's Schedule 14A dated April 30, 2013 states that, Avon "co-led" Columbia Capital's investment in Millennial Media and served as an "observer" to the Board from 2006 to 2009.

iv.    On or about April 3, 2012, in the IPO, Avon sold more than $897,000 of his personally-held Millennial Media shares to investors, while he was in possession of material adverse non-public information about the Company.

v.      On or about October 29, 2012, in the Secondary Offering, Avon sold more than $1.59 million of his personally-held Millennial Media shares to investors, while he was in possession of material adverse non-public information about the Company.

vi.      In 2012, Avon's total compensation was $1,082,489. This was comprised of an annual base salary of $232,250, a bonus of $135,648 and stock awards for the amount of $714,591. In March 2012, the compensation committee approved an RSU grant to Avon with a fair value of $225,000 that was effective upon the closing of the IPO. These RSUs vested in full six months after the IPO.

vii.      In 2013, Avon's total compensation was $4,261,722. This was comprised of an annual base salary of $322,500, a bonus of $300,000, stock awards for the amount of $77,847, option awards for the amount of $3,555,000, and $6,375 in 401(k) plan matching contributions.

viii.      On July 1, 2014, Avon resigned from his roles as CFO and Executive Vice President to "pursue other career interests." Avon remained a consultant and advisor to the Company through December 31, 2014. In exchange for his services, the Company agreed to pay him a pro-rated portion of his 2014 executive bonus and $10,000 per month. The Company also accelerated vesting of his outstanding RSUs over the course of his consulting agreement.

c.      <u>Defendant Jeanneret</u>

i.      Jeanneret was appointed Senior Vice President of Accounting and CAO in 2011 and served in that role throughout the Class Period. By virtue of his position, Jeanneret knew and/or had access to material non-public information about the Company.

ii.      During the Class Period, Jeanneret signed the Company's annual financial reports filed with the SEC and spoke with investors and securities analysts regarding the Company on a regular basis. He also signed the Registration Statements of the Company in connection with the Offerings.

iii.      Jeanneret's base salary was initially $325,000 per year eligible for an annual discretionary cash bonus of up to 70% of his then-current base salary.

iv.      Jeanneret's only open-market sales of Company stock during the Class Period occurred in the months leading up to the announcement that the Company would be acquiring Jumptap. On June 10, 2013, Jeanneret sold 2,336 of his personally-held shares at

a weighted average sale price of $8.4569 for proceeds of $19,755, which represented 12.5% of the stock he beneficially owned at the time.  According to Jeanneret's Form 4 dated September 21, 2012, these shares were acquired as part of RSU grants.

    d.    <u>Defendant Barrett</u>

        i.    Barrett was, at all relevant times after January 25, 2014, President and CEO of the Company, and a member of the Company's Board. He has also acted as Principal Operating Officer since January 25, 2014.  By virtue of his positions, Barrett knew and/or had access to material non-public information about the Company.

       ii.    During the Class Period, Barrett certified the Company's periodic financial reports filed with the SEC and spoke with investors and securities analysts regarding the Company on a regular basis.

      iii.    Barrett's base salary under his employment agreement was initially $500,000 per year, with eligibility for an annual discretionary cash bonus of up to 80% of his then-current base salary.  Barrett is also eligible to receive restricted stock unit awards with a value of up to $2,000,000 annually, if he meets performance goals as may be determined by the Company in its sole discretion.

      iv.    On January 28, 2014, the Board approved a new hire equity award to Barrett that covered 2,000,000 shares of common stock, consisting of an option to purchase 1,500,000 shares of common stock as well as 500,000 RSUs.  The RSUs and stock option are subject to accelerated vesting in specified circumstances, including one-half of any then-unvested shares will vest upon a "change in control" and 100% of any then-unvested shares will vest if Barrett's employment is terminated without "cause."

## F.    THE PRESUMPTION OF RELIANCE WITH RESPECT TO THE EXCHANGE ACT CLAIMS

203.    Co-Lead Plaintiffs are entitled to a presumption of reliance established by the fraud-on-the-market doctrine in that, among other things:

    a.    the Exchange Act Defendants made material public misrepresentations or failed to disclose material facts during the Class Period;

    b.    Millennial Media stock traded in an efficient market;

    c.    the misrepresentations alleged would tend to induce a reasonable investor to misjudge the value of Millennial Media stock; and

d.    Co-Lead Plaintiffs and other members of the Class purchased Millennial Media stock between the time the Exchange Act Defendants misrepresented or failed to disclose material facts and the time the true facts were disclosed, without knowledge of the misrepresented or omitted facts.

204.    At all relevant times, the market for Millennial Media stock was efficient for the following reasons, among others:

a.    as a regulated issuer, Millennial Media filed periodic public reports with the SEC;

b.    Millennial Media regularly communicated with public investors via established market communication mechanisms, including through regular disseminations of press releases on the major news wire services and through other wide-ranging public disclosures, such as communications with the financial press, securities analysts, and other similar reporting services;

c.    Millennial Media was followed by several securities analysts employed by major brokerage firm(s) who wrote reports that were distributed to the sales force(s) and certain customers of their respective brokerage firm(s) and that were publicly available and entered the public marketplace; and

d.    Millennial Media stock actively traded in efficient markets, including the NYSE, where the Company's stock trades under the ticker symbol "MM."

205.    As a result of the foregoing, the market for Millennial Media stock promptly digested current information regarding the Company from all publicly available sources and reflected such information in the price of Millennial Media stock.  Under these circumstances, all purchasers of Millennial Media stock during the Class Period suffered similar injury through their purchase of Millennial Media stock at artificially inflated prices and the presumption of reliance applies.

206.    Further, to the extent that the Exchange Act Defendants concealed or improperly failed to disclose material facts with regard to the Company, Co-Lead Plaintiffs are entitled to a presumption of reliance pursuant to *Affiliated Ute Citizens v. United States*, 406 U.S. 128, 153 (1972).

G.     THE INAPPLICABILITY OF THE STATUTORY SAFE HARBOR AND
       BESPEAKS CAUTION DOCTRINE

207.    The safe harbor provisions for forward-looking statements under the Private
Securities Litigation Reform Act of 1995 are applicable only under certain circumstances that do
not apply to any of the materially false and misleading statements and omissions alleged in this
Complaint.

208.    First, many of the identified false and misleading statements and omissions herein
are not forward-looking statements, but instead are statements of current or historic fact.

209.    Second, to the extent there were any forward-looking statements that were
identified as such at the time made, there were no meaningful cautionary statements identifying
important factors that could cause actual results to differ materially from those in the purportedly
forward-looking statements.

210.    Third, such false and misleading statements were not accompanied by cautionary
language that was meaningful because any such warnings or "risk" factors contained in, or
incorporated by reference in, the relevant press release, SEC filings, earnings calls, or other
public statements described herein were general, "boilerplate" statements of risk that would
affect any mobile advertising company, and misleadingly contained no factual disclosure of any
of the specific details of the endemic problems affecting the Company during the Class Period,
or similar important factors that would give investors adequate notice of such risks.

211.    Fourth, to the extent there were any forward-looking statements that were
identified as such at the time made, Defendants are liable for those false and misleading forward-
looking statements because at the time each of those forward-looking statements was made, the
particular speaker knew that the particular forward-looking statement was false, or, by reason of
what the speaker failed to note, was materially false and/or misleading, and/or that each such

statement was authorized and/or approved by a director and/or executive officer of Millennial

Media who actually knew that each such statement was false and/or misleading when made.

### H.    CLAIMS FOR RELIEF UNDER THE EXCHANGE ACT

#### COUNT I

**For Violation of Section 10(b) of the Exchange Act
and SEC Rule 10b-5 Promulgated Thereunder
Against the Exchange Act Defendants**

212.    Co-Lead Plaintiffs repeat, incorporate, and reallege paragraphs 1 to 211 by

reference.

213.    During the Class Period, the Exchange Act Defendants disseminated or approved

the false statements specified above, which they knew or recklessly disregarded were misleading

in that they contained misrepresentations and failed to disclose material facts necessary in order

to make the statements made, in light of the circumstances under which they were made, not

misleading.

214.    The Exchange Act Defendants violated Section 10(b) of the Exchange Act and

SEC Rule 10b-5 in that they:

   (a)    employed devices, schemes, and artifices to defraud;

   (b)    made untrue statements of material facts or omitted to state material facts
          necessary in order to make the statements made, in light of the
          circumstances under which they were made, not misleading; and/or

   (c)    engaged in acts, practices, and a course of business that operated as a
          fraud or deceit upon Co-Lead Plaintiffs and others similarly situated in
          connection with their purchases of Millennial Media stock during the
          Class Period.

215.    Co-Lead Plaintiffs and other members of the Class have suffered damages in that,

in reliance on the integrity of the market, they paid artificially inflated prices for Millennial

Media stock.  Co-Lead Plaintiffs and other members of the Class would not have purchased

Millennial Media stock at the prices they paid, or at all, if they had been aware that the market prices had been artificially and falsely inflated by the Exchange Act Defendants' misleading statements.

216.    As a direct and proximate result of the Exchange Act Defendants' wrongful conduct, Co-Lead Plaintiffs and the other members of the Class suffered damages in connection with their purchases of Millennial Media stock during the Class Period.

## COUNT II

### For Violation of Section 20(a) of the Exchange Act
### Against the Individual Exchange Act Defendants

217.    Co-Lead Plaintiffs repeat, incorporate, and reallege paragraphs 1 to 216 by reference.

218.    The Individual Exchange Act Defendants acted as controlling persons of Millennial Media within the meaning of Section 20(a) of the Exchange Act.  By virtue of their positions and their power to control public statements about Millennial Media, as well as their substantial participation in the fraud, the Individual Exchange Act Defendants had the power and ability to control the actions of Millennial Media and its employees.  By reason of such conduct, the Individual Exchange Act Defendants are liable pursuant to Section 20(a) of the Exchange Act.

## IV.    THE SECURITIES ACT CLAIMS

219.    In the allegations and claims set forth in this part of the Complaint, Co-Lead Plaintiff Mississippi PERS asserts claims under the Securities Act.  These claims are asserted against Millennial Media; the Individual Securities Act Defendants (defined herein); and the Principal Shareholder Defendants (defined herein)—who signed Millennial Media's Offering Documents and/or were members of the Board, or had certain of their agents on the Board at the

time of the filing of the documents incorporated by reference in the Offering Documents; and the Underwriter Defendants (collectively, the "Securities Act Defendants").

220.    Each of the Securities Act Defendants is statutorily liable under Section 11 of the Securities Act for the materially inaccurate statements contained in Millennial Media's Offering Documents.  Co-Lead Plaintiff Mississippi PERS also asserts claims under Section 12(a)(2) of the Securities Act against the Underwriter Defendants and the Individual Securities Act Defendants, and control person liability claims under Section 15(a) of the Securities Act against the Individual Securities Act Defendants and the Principal Shareholder Defendants.

221.    Co-Lead Plaintiff Mississippi PERS expressly disclaims any allegations of scienter in these non-fraud claims, which are pleaded separately in this Complaint from Co-Lead Plaintiffs' Exchange Act claims except that any challenged statements of opinion or belief made in connection with the Offerings are alleged to have been materially misstated statements of opinion or belief when made.

A.    THE SECURITIES ACT PARTIES

1.    The Co-Lead Plaintiff

222.    Mississippi PERS, headquartered in Jackson, Mississippi, is a defined benefit retirement system, established for the benefit of current and retired public employees of the State of Mississippi, including individuals employed by the state's public school districts, municipalities, counties, community colleges, and state universities.  As set forth in Exhibit B, Mississippi PERS purchased Millennial Media common stock at artificially inflated prices pursuant and/or traceable to the Offering Documents and has been damaged thereby.

2.      **The Securities Act Defendants**

(a)      **The Company**

223.      Defendant Millennial Media is a corporation that is organized under Delaware law and maintains its principal executive offices at 2400 Boston Street, Suite 201, Baltimore, Maryland.  Millennial Media completed offerings of its common stock through the IPO and Secondary Offering on the NYSE, where its common stock trades under the ticker symbol "MM."

(b)      **The Individual Securities Act Defendants**

224.      Defendant Palmieri was, at all relevant times prior to January 25, 2014, President and CEO of Millennial Media, and a member of the Company's Board.  Defendant Palmieri was also the co-founder of the Company.  He resigned from Millennial Media less than two years after the IPO.  Palmieri signed the Company's Registration Statements in connection with the Offerings.  Palmieri is currently a Venture Advisor with Defendant NEA, which held more than 9.8 million shares of Millennial Media common stock prior to the IPO, held more than 5% of Millennial Media's voting securities at the time of the IPO, and had a partner of NEA (Defendant Kerins) serve as a member of the Millennial Media Board.  NEA sold more than 1.6 million shares of Millennial Media stock in the Secondary Offering.

225.      Defendant Avon was, at all relevant times prior to July 1, 2014, CFO and an Executive Vice President of the Company.  Avon signed the Company's Registration Statements in connection with the Offerings.  Prior to joining Millennial Media, Avon was a principal at Defendant Columbia Capital, whose affiliate entities held investments in Millennial Media stock and sold more than 2.2 million shares through the Secondary Offering.  He is currently the Founder and Managing Partner of ICX Ventures.

226.    Defendant Jeanneret was CAO and a Senior Vice President of the Company during the Class Period and currently serves as its CFO.   Jeanneret signed the Company's Registration Statements in connection with the Offerings.

227.    Defendant Robert P. Goodman ("Goodman") is a member of the Company's Board and signed the Company's Registration Statements in connection with the Offerings. Goodman is also the founding partner of Defendant Bessemer Venture Partners' investment office in Larchmont, New York.   At the time of the Secondary Offering, Goodman was a managing member of Deer Management Co. LLC, the management company for Bessemer Venture Partners' investment funds, including Bessemer Venture Partners VI L.P., Bessemer Venture Partners VI Institutional L.P., and Bessemer Venture Partners Co-Investment L.P. (the "Bessemer Funds"), which held investments in Millennial Media stock and sold 2.2 million shares of Millennial Media stock through the Secondary Offering.   At the time of the Secondary Offering, Goodman also was a member of the board of directors of several private Bessemer Venture Partners portfolio companies.

228.    Defendant Arun Gupta ("Gupta") was a member of the Company's Board prior to the conclusion of the Company's 2013 Annual Meeting of Stockholders held on or about June 11, 2013, and signed the Company's Registration Statements in connection with the Offerings. In addition, at the time of the Secondary Offering, Gupta was a partner with Defendant Columbia Capital.   At that time, Gupta also served on the boards of directors of several privately held Columbia Capital portfolio companies.

229.    Defendant Patrick J. Kerins ("Kerins") is Chairman of the Company's Board and signed the Company's Registration Statements in connection with the Offerings.   In addition, at the time of the Secondary Offering, Kerins was a general partner of Defendant NEA, whose

affiliate entities held investments in Millennial Media stock and sold more than 1.6 million shares of Millennial Media stock through the Secondary Offering.  At that time, Kerins also served on the boards of directors of a number of privately held portfolio companies of NEA.

230.    Defendant MacIntosh was a member of the Company's Board during the Class Period until his resignation on August 11, 2014, and signed the Company's Registration Statements in connection with the Offerings.

231.    Defendant John D. Markley, Jr. ("Markley") was a member of the Company's Board and signed the Company's Registration Statements in connection with the Offerings. From 1996 to 2009, Markley was a partner at Defendant Columbia Capital.  He is currently a member of the board of directors at Bear Creek Capital Management.

232.    Defendant Wenda H. Millard ("Millard") is a member of the Company's Board and signed the Company's Registration Statements in connection with the Offerings.

233.    Defendant James A. Tholen ("Tholen") is a member of the Company's Board and signed the Company's Registration Statements in connection with the Offerings.

234.    Defendant George Zachary ("Zachary") is a member of the Company's Board and signed the Company's Registration Statements in connection with the Offerings.  Zachary was at the time of the Secondary Offering, and still is, a general partner of Defendant Charles River Ventures, whose affiliate entities held investments in Millennial Media stock and sold almost 1.7 million shares of Millennial Media stock through the Secondary Offering.

235.    The Defendants described in paragraphs 224 to 234 are referred to collectively as the "Individual Securities Act Defendants."

### (c)    The Principal Shareholder Defendants

236.    Defendant Bessemer Venture Partners advised or managed funds, including, but not limited to, the Bessemer Funds, that held more than 13.5 million shares of Millennial Media

stock prior to the IPO, held more than 5% of Millennial Media's voting securities at the time of the IPO, and had a partner of Bessemer Venture Partners (Defendant Goodman) serve as a member of Millennial Media's Board.  Bessemer Venture Partners sold more than 2.2 million shares of Millennial Media stock in the Secondary Offering.  Bessemer Venture Partners is headquartered at 1865 Palmer Avenue, Suite 104, Larchmont, New York.

237.   Defendant Columbia Capital, a communications, media and technology investment firm, advised or managed funds, including, but not limited to, Columbia Capital Equity Partners IV (QP), L.P., Columbia Capital Equity Partners IV (QPCO), L.P., and Columbia Capital Employee Investors IV, L.P., that held more than 13.5 million shares of Millennial Media stock prior to the IPO, held more than 5% of Millennial Media's voting securities at the time of the IPO, and had an affiliate (Defendant Gupta) serve as a member of Millennial Media's Board. Columbia Capital sold more than 2.2 million shares of Millennial Media stock in the Secondary Offering.  Columbia Capital is headquartered at 204 South Union Street, Alexandria, Virginia.

238.   Defendant Charles River Ventures is a venture capital firm that advised or managed funds, including, but not limited to, Charles River Partnership XIII, LP and Charles River Friends XIII-A, LP, that held more than 10.3 million shares of Millennial Media stock prior to the IPO, held more than 5% of Millennial Media's voting securities at the time of the IPO, and had a partner of Charles River Ventures (Defendant Zachary) serve as a member of Millennial Media's Board.  Charles River Ventures sold almost 1.7 million shares of Millennial Media stock in the Secondary Offering.   Charles River Ventures is headquartered at One Broadway, 15th Floor, Cambridge, Massachusetts.

239.   Defendant NEA advised or managed funds, including, but not limited to, New Enterprise Associates 13, L.P. and New Enterprise Associates Ventures 2009, L.P., that held

more than 9.8 million shares of Millennial Media stock prior to the IPO, held more than 5% of Millennial Media's voting securities at the time of the IPO, and had a partner of NEA (Defendant Kerins) serve as a member of Millennial Media's Board.  NEA sold more than 1.6 million shares of Millennial Media stock in the Secondary Offering.  NEA is headquartered at 5425 Wisconsin Avenue, Suite 800, Chevy Chase, Maryland.

240.    The Defendants listed in paragraphs 236 to 239 are referred to as the "Principal Shareholder Defendants."

### (d)    The Underwriter Defendants

241.    Defendant Morgan Stanley & Co. LLC ("Morgan Stanley") acted as an underwriter of the Offerings and as a representative of the underwriters for the Offerings. Morgan Stanley maintains its principal place of business at 1585 Broadway, New York, New York.

242.    Defendant Goldman, Sachs & Co. ("Goldman") acted as an underwriter of the Offerings and as a representative of the underwriters for the Offerings.  Goldman maintains its principal place of business at 200 West Street, New York, New York.

243.    Defendant Barclays Capital Inc. ("Barclays") acted as an underwriter of the Offerings and as a representative of the underwriters for the Offerings.  Barclays maintains its principal place of business at 745 Seventh Avenue, New York, New York.

244.    Defendant Allen & Company LLC ("Allen & Company") acted as an underwriter of the Offerings.  Allen & Company maintains its principal place of business at 711 Fifth Avenue, New York, New York.

245.    Defendant Stifel, Nicolaus & Company, Incorporated ("Stifel") acted as an underwriter of the Offerings.  Stifel maintains its principal place of business at 501 N. Broadway, St. Louis, Missouri.

246.    Defendant Canaccord Genuity Inc. ("Canaccord") acted as an underwriter of the Secondary Offering.  Canaccord maintains an office at 350 Madison Avenue, New York, New York, and its principal place of business at 609 Granville Street, Vancouver, British Columbia, Canada.

247.    Defendant Oppenheimer & Co. Inc. ("Oppenheimer") acted as an underwriter of the Secondary Offering.  Oppenheimer maintains its principal place of business at 85 Broad Street New York, New York.

248.    The Defendants listed in paragraphs 241 to 247 are referred to as the "Underwriter Defendants."

**B.    THE SECURITIES ACT DEFENDANTS ARE LIABLE FOR MATERIAL MISSTATEMENTS AND OMISSIONS IN THE OFFERING DOCUMENTS**

249.    The Offering Documents were misstated and failed to disclose that Millennial Media's software and related technologies were either not yet functional or not sufficiently functional to offer the features and services as set forth in the Offering Documents.  Co-Lead Plaintiff Mississippi PERS incorporates by reference herein the allegations in paragraphs 23 to 35 above setting forth the materiality of Millennial Media's technology to its business, and the materiality of Millennial Media's ability to accurately track and report user data to the Company and its clients.

**1.    In the March 2012 IPO, Millennial Media and Company Insiders Sold More than $152 Million in Stock to Investors Based on Material Misrepresentations and Omissions**

250.    On January 5, 2012, Millennial Media filed a Form S-1 Registration Statement with the SEC in connection with the Company's contemplated IPO.  The Company filed five amended versions of the IPO Registration Statement between February 10 and March 27, 2012.

251.   On March 28, 2012, Millennial Media's IPO Registration Statement was declared effective and the Company finalized its completed IPO Prospectus.  As set forth in the IPO Offering Documents, Millennial Media registered 10.2 million shares of common stock plus an underwriters' over-allotment option for an additional 1,530,000 shares to be offered to the public at $13.00 per share.[19]

252.   On March 29, 2012, prior to the opening of the markets, Millennial Media filed the effectiveness order for the IPO Registration Statement and filed its IPO Prospectus pursuant to Rule 424(b)(4) with the SEC.  The IPO Offering Documents included materially false and misleading descriptions of the Company and its technology in the four respects discussed below.

>   **(a)   Millennial Media Misstated the Company's Ability to Accurately Measure, Attribute and Report User Behavior**

253.   In the IPO Offering Documents, the Company and the Individual Securities Act Defendants made material misstatements that:

>   Each time an app makes a request to receive an ad, the MYDAS platform performs several tasks automatically and in real-time, including identifying unique users; targeting ads based on user interest, behavior and location; delivering those ads to millions of users through tens of thousands of apps, running on thousands of different device types; ensuring that the ads will work over wireless connections of varying quality and speed; and ***measuring user engagement and ad performance.***
>
>   \*      \*      \*
>
>   We offer developers ***sophisticated reporting and analytics*** through an integrated dashboard on our mmDev portal, which includes ***comprehensive ad revenue generation reports*** for their apps across all major mobile operating systems.  ***These reports help developers gain insight into user interaction and behavior and the performance of their apps.***  We share this performance data with developers to help them improve their apps and their deployment of our [software development kits, or "SDK"s] in

---

[19]   On or about April 4, 2012, Millennial Media completed its IPO, including the full exercise of the underwriters' over-allotment option.

order to maximize their ad revenue.

254.   The foregoing statements in paragraph 253 were misstated and overstated the Company's ability to "measure[e] user engagement and ad performance"; issue reports that "help developers gain insight into user interaction and behavior and the performance of their apps"; "gain important insights about users"; and how Millennial Media had "sophisticated reporting and analytics," which include "comprehensive ad revenue generation reports."

255.   In reality, as discussed below, third party data tracking companies were able to expose serious deficiencies in how Millennial Media reported to developers the amount of user interaction on Millennial Media's platform; the Company was unable to accurately perform conversion matching; and the Company's reports to developers were inaccurate, which was causing Millennial Media's clients to depart or significantly reduce their advertising expenditures with the Company.

256.   According to CW2, in or around February and March of 2012, Millennial Media's clients began employing "third party tracking services," which exposed the Company's inability to accurately track and report advertisement-related clicks and actions by users.  CW2 joined the Company in October 2011 in its home office in Baltimore, as an account associate on the performance team, and relocated to the San Francisco office in September 2012 where he was promoted to account executive.  In October 2013, CW2 left the Company in part because of Millennial Media's chronic technology issues.  CW2 explained that, once third party tracking services began tracking revenue and customer lifetime value information (*i.e.*, the projected revenue that a customer will generate during their lifetime) for apps, it became apparent that Millennial Media had "huge integration issues" with how it integrated its technology with developers' apps, which, while it was not common knowledge, would force Millennial Media to entirely rebuild its systems.

257.     Specifically, CW2 stated that he learned from Millennial Media's engineers that the Company's technology was originally built very quickly, and adaptations were built on top of that foundation, making adaptation to changes time consuming.  As a result, ***Millennial Media's foundation needed to be completely rebuilt***.  According to CW2, Millennial Media had difficulty matching conversions by users.  For example, CW2 explained that, when a user opened an app, a conversion event occurred, which was then transmitted to the third party to track.  The third party then in turn sent the conversion event to Millennial Media to "match" the conversion.  But a disconnect occurred when Millennial Media tried to match the conversions.  And when Millennial Media tracked user conversions directly (as opposed to when they were tracked by third parties), according to CW2, Millennial Media ***over-counted*** user conversions.

258.     CW2 stated that, after Millennial Media's clients began employing these tools, the Company's revenue decreased substantially, by approximately 60%.  This included clients who had been spending $50,000 per day on advertising through Millennial Media, and suddenly, with the advent of third party trackers, the amount they spent on advertising dropped to $6,000 per day because of huge discrepancies in user tracking data between what Millennial Media reported and what the data trackers reported.

259.     For example, CW2 stated that Millennial Media saw a significant decline in the revenue generated from Supercell (the developer of the video game "Clash of Clans," among others), who began using a third party tracking service known as "HasOffers" in February and March of 2012.

260.     Millennial Media's inability to collect and report clean and accurate user data is corroborated by confidential witnesses by CW3, who was a User Interface Architect in Millennial Media's Baltimore office from May 2011 through March 2013.  According to CW3,

data reporting at Millennial Media was not sophisticated and an overhaul was long overdue. According to CW3, there were seven or eight tools on the Company's "backend" from which the Company needed to collect data, which made it difficult to perform reporting.  In addition, a former salesperson at Millennial Media, without a programming background, was the person responsible for handling internal queries for reporting purposes, and, overall, the Company's approach was not a particularly clean way to report its data.

261.    The fact that these technological failings existed at Millennial Media at the time of the time of the IPO is corroborated by developments that occurred after the IPO.  For example, according to CW2, Danielle Repetti (currently Vice President of Performance at Millennial Media) met regularly with Defendant Palmieri in the Fall of 2012 about discrepancies in Millennial Media's revenue due to the introduction of third party trackers.  The third party trackers were able to expose Millennial Media's inability to accurately track users and report accurate data (which existed at the time of the IPO) and caused the Company to lose clients and revenue.  By the time CW2 left Millennial Media in October 2013, the Company was no closer to finding a solution to this problem.

262.    CW5 corroborated Millennial Media's loss of customers after the emergence of third party tracking.  CW5 was a Millennial Media account executive and director of sales from approximately March 2010 to August 2012, and Regional Vice President of Performance from approximately August 2012 to November 2012.  CW5 focused on driving users of an application or game to view an advertiser's website or to download their application.  To do so, CW5's team paired advertisers with application and game developers.  According to CW5, significant customers such as Zillow, a real-estate website, and DeNA, a Japanese mobile developer, materially reduced or eliminated their budgets at Millennial Media beginning in late 2012 due to

the increased usage of third party tracking services.   As a result, CW5 stated that CW5's performance advertising team lost "well over" 50% of their revenue in early 2013, and the trend progressively worsened.

> **(b)     Millennial Media Misstated that the Company's Technology Was "Designed to Address" the Needs of Performance Advertising Clients**

263.     In the IPO Offering Documents, the Company and the Individual Securities Act Defendants materially misstated that Millennial Media was successfully selling performance advertisements to large and small clients:

> ***Our solutions are designed to address the needs of*** large brand advertisers and advertising agencies as well as smaller, ***performance-based advertisers***.   Large brand and performance advertisers typically buy ads on our platform through our sales teams.

264.     The foregoing statements in paragraph 263 materially misstated that the Millennial Media platform was "designed to address" the needs of performance-based advertisers – *i.e.*, companies whose advertisements depend on the ability to track user actions and conversions.   As discussed above in paragraphs 254 to 262, these claims were materially misstated because the Company was unable to accurately track and report user conversions.

265.     The Company's true lack of performance advertising capability is also corroborated by the fact that Millennial Media announced its need to acquire its competing mobile advertising platform, Jumptap, approximately 17 months after the IPO.   As Palmieri told investors on August 13, 2013, when announcing the acquisition of Jumptap, "where Millennial is known as the leader in mobile brand advertising, Jumptap has more of a focus on the performance advertising side of the business."

266.     CW6, an executive previously at Jumptap from August 2012 until November 2013, and then an executive at Millennial Media until October 2014, confirmed that it was

"necessary" for Millennial Media to acquire Jumptap because Millennial Media did not have the technological capability to grow its performance business, which was "dwindling fast." Moreover, after CW6 joined Millennial Media from Jumptap, CW6 found out that not only was Millennial Media's technology lacking, but that it was having issues with attribution – *i.e.*, its ability to attribute user actions to advertisements.

267.    In addition, CW1, a senior executive at Fiksu, Inc., a media buying entity that represents over 1000 clients, such as Zillow, confirmed that Millennial Media needed to acquire Jumptap because its then-current platform could not capitalize on programmatic advertising.  At Fiksu, CW1 oversees Fiksu's operations, strategic management, planning and implementation across all of the company's groups.  According to CW1, one of Fiksu's missions is to track, attribute, and optimize mobile advertising for clients.  CW1 stated that Millennial Media needed to acquire Jumptap because ***Millennial Media's programmatic tools were not competitive and did not yield the installs necessary for client optimization***.

**(c)    Millennial Media Misstated the True Condition of Its mMedia Self-Service Function**

268.    In the IPO Offering Documents, the Company and the Individual Securities Act Defendants also made the material misstatement that, "Smaller advertisers typically buy ads either through our sales team or through our self-service advertising portal, mMedia."  This statement was materially misstated because the Company's technological products and services crucial to Millennial Media's business model, such as the mMedia self-service advertising portal, were still in nascent stages when announced, leading to rushed, slipshod programming, poor performance, failure and an inability to compete with more advanced competitors.

269.    CW7 stated that CW7's testing of the Company's mMedia software often revealed that it was not functioning well enough to be released.  CW7 was a Quality Assurance Manager

at Millennial Media from approximately October 2010 to May 2013.  CW7 managed a team of five employees who tested new software and software updates related to the Company's mMedia self-service advertising portal.  CW7's team was responsible for testing how mMedia's software interacted across various platforms and operating systems, such as how the software might function on an Android system and Apple's iOS system simultaneously.  During CW7's time at the Company, Millennial Media published software that was not functioning properly.  Yet, CW7 was pressured by the Vice President of Technology, to approve the release of software updates and releases almost simultaneously with "hot" or "bug" fixes for the underlying, malfunctioning software.  Significantly, even though CW7 voiced objections to the release of malfunctioning software on Millennial Media's internal Production Software Release Forms, which were signed by the Vice President of Technology, Millennial Media still released the malfunctioning software.  According to CW7, the Vice President of Technology was pressured by upper management to push out software releases, often commenting that "management wants this thing out, [so] it's going out," regardless of whether the software was ready to be released.

### (d)    Millennial  Media  Misstated  Its  "Real-Time  Bidding" Capability

270.    In the IPO Offering Documents, the Company and the Individual Securities Act Defendants also materially misstated that Millennial Media had "real-time bidding" ("RTB") capability.  RTB capability is a means by which advertising inventory is bought and sold on a per-impression basis, via programmatic, instantaneous auction, similar to financial markets.  According to the IPO Offering Documents:

> After MYDAS identifies the unique user associated with a specific ad request, the context around the ad request and the audiences to which the user belongs, MYDAS delivers the request to a *real-time, bidded marketplace* in which it matches available ads with available ad requests. MYDAS performs a sophisticated statistical analysis to automatically run an instantaneous virtual auction in

which each qualified ad campaign bids on each available ad request. We call this process optimization and decisioning . . . . When MYDAS enters an ad request into the marketplace, each agent bids on the ad request, and the platform then matches the best available ad to the specific ad request.

271.    These statements in paragraph 270 were materially false and misleading because Millennial Media's platform did not have a "real time, bidded marketplace" until it acquired Metaresolver one year later, in April 2013.  In fact, as Palmieri told investors on May 8, 2013, Millennial Media acquired Metaresolver because Metaresolver offered "programmatic buying and selling" – *i.e.*, real-time bidded marketplace technology, which was an admission that the Company had this significant gap in its own technological capabilities.

### (e)    The Offering Documents Did Not Satisfy Item 303 or Regulation C

272.    Pursuant to Item 303 of SEC Regulation S-K, the Offering Documents were required to disclose, "any known trends or uncertainties that have had, or that you reasonably expect will have, a material favorable or unfavorable impact on sales or results of operations." 17 C.F.R. § 229.303.  In addition to the identification of such "known trends," Item 303 requires disclosure of (i) whether those trends have had or are reasonably expected to have a material unfavorable impact on revenue; and (ii) the extent of any such impact on revenue.

273.    Accordingly, the Company and the Individual Securities Act Defendants had a duty to disclose:  (i) whether the increasing presence of "third party tracking services" in the market had or was reasonably expected to have a "material . . . unfavorable impact on . . . revenues," and (ii) to what extent those trends had impacted or were reasonably expected to impact Millennial Media's revenue.  Nevertheless, Defendants omitted this information from the Offering Documents and/or otherwise failed to adequately disclose it during the Class Period. Specifically, in violation of Item 303, the IPO and Secondary Offering Registration Statements

and Prospectuses failed to disclose that the known trends of increasing third party tracking services in the market and the Company's increasing technological failures were having a material unfavorable impact on Millennial Media's revenues and financial results.  *See* ¶¶ 254-262.

274.   Finally, the Offering Documents were also materially false and misleading because they failed to disclose the information required by Rule 408 of SEC Regulation C, pursuant to which registrants have an overarching duty to disclose material information necessary to ensure that representations in a registration statement are not misleading. Specifically, Rule 408 requires that, "[i]n addition to the information expressly required to be included in a registration statement, there shall be added such further material information, if any, as may be necessary to make the required statements, in light of the circumstances under which they are made, not misleading."  17 C.F.R. § 230.408(a).

275.   The IPO Offering Documents, in their entirety, and as set forth specifically above, were materially untrue and misleading and omitted to state material information necessary to make them not misleading, in violation of Defendants' duty of disclosure under Rule 408. Similarly, the Secondary Offering Registration Statement and Prospectus, in their entirety, and as set forth specifically below, were materially untrue and misleading and omitted to state material information necessary to make them not misleading, in violation of Defendants' duty of disclosure under Rule 408.  The Offering Documents specifically failed to disclose that the growing presence of third party tracking services in the market and the Company's increasing technological failures was having a material unfavorable impact on the Company's revenues and financial results.  *See* ¶¶ 254-262.  The Offering Documents also failed to disclose the material

undisclosed facts in paragraphs 171 (a), (b), (c), (d) and (h) that were in existence at the time of the IPO and the Secondary Offering.

276.    On March 29, 2012, prior to the opening of the markets, Millennial Media filed the effectiveness order for the IPO Registration Statement and filed its IPO Prospectus pursuant to Rule 424(b)(4) with the SEC.  Trading in Millennial Media shares commenced on the NYSE on March 29, 2012.  The Company's stock price rose $12.00, or 92.31%, to close at $25.00 per share during the trading session that day.

277.    On or about April 4, 2012, Millennial Media completed its IPO, including the full exercise of the underwriters' over-allotment option.

278.    In the IPO, Millennial Media and certain of its officers and directors, including Securities Act Defendants Palmieri and Avon, sold more than $152 million in stock to public investors.  Insider sales amounted to approximately 13% of the total value of the IPO.  Indeed, Defendants Palmieri and Avon, and CTO Brandenburg and COO Root, alone, sold nearly $20 million in common stock:

| Individual | Number of Shares Sold | Price | Value of Shares Sold[20] |
|---|---|---|---|
| Former CEO Paul Palmieri | 732,562 | $12.09 | $8,856,674.58 |
| Former CTO Chris Brandenburg | 605,605 | $12.09 | $7,321,764.45 |
| Former COO Stephen Root | 237,936 | $12.09 | $2,876,646.24 |
| Former CFO Michael Avon | 74,241 | $12.09 | $897,573.69 |
| **Total** | *1,650,344* | | *$19,952,658.96* |

## 2.    Millennial Media's Secondary Offering in October 2012

279.    On October 15, 2012, less than seven months after its IPO, Millennial Media filed a Form S-1 Registration Statement with the SEC in connection with the Company's contemplated Secondary Offering.

---

[20] The cost basis for almost all of the above transactions is not publicly available.

280.     On October 18, 2012, the Company filed an amended version of the Secondary Offering Registration Statement.

281.     On October 23, 2012, the Secondary Offering Registration Statement was declared effective and the Company finalized the Secondary Offering Prospectus.

282.     On October 24, 2012, prior to the opening of the markets, Millennial Media filed the effectiveness order for the Secondary Offering Registration Statement and filed its Secondary Offering Prospectus pursuant to Rule 424(b)(4) with the SEC.

283.     As set forth in the Offering Documents for the Secondary Offering, Millennial Media registered 10 million shares of common stock plus an underwriters' over-allotment option for an additional 1.5 million shares to be offered to the public at $14.15 per share.

284.     The Secondary Offering Documents included misstatements concerning the Company's abilities to accurately track and report user data; its "design" for performance advertising; the mMedia self-service platform; and a real-time bided marketplace, in substantially the same way as the IPO Offering Documents.   For example, the Secondary Offering Prospectus claimed:

> We enable advertisers to gain insights into the performance of their ad campaigns and to manage their campaigns with a view to maximizing return on their advertising investment.   ***Our solutions are designed to address the needs of large brand advertisers and advertising agencies as well as smaller, performance-based advertisers.***   Large brand and performance advertisers typically buy ads on our platform through our sales teams.   Smaller advertisers typically buy ads either through our inside sales team or through our mMedia self-service advertising portal.
>
> *             *             *
>
> As a result of the amount and nature of the data we collect through our platform, ***our reporting to advertisers goes beyond traditional post-campaign analysis to provide actionable insights for current ad campaigns and future marketing strategies.   We offer real-time reporting and analytics to help advertisers understand why***

*some campaigns perform better than others*.

\*      \*      \*

After MYDAS identifies the unique user associated with a specific ad request, the context around the ad request and the audiences to which the user belongs, ***MYDAS delivers the request to a real-time, bidded marketplace in which it matches available ads with available ad requests. MYDAS performs a sophisticated statistical analysis to automatically run an instantaneous virtual auction in which each qualified ad campaign bids on each available ad request.*** We call this process optimization and decisioning . . . .  When MYDAS enters an ad request into the marketplace, each agent bids on the ad request, and the platform then matches the best available ad to the specific ad request.

\*      \*      \*

We offer developers ***sophisticated reporting and analytics through an integrated dashboard on our mMedia portal***, which includes comprehensive ad revenue generation reports for their apps across all major mobile operating systems. These reports help developers gain insight into user interaction and behavior and the performance of their apps. We share this performance data with developers to help them improve their apps and their deployment of our SDKs in order to maximize their ad revenue. In addition, through the more than 1.5 billion ad requests that we typically receive each day, we are able to gain important insights about users that we are able to share with developers on an aggregated basis.

285.    The foregoing statements made in the Company's Secondary Offering Documents in paragraph 284 were materially false and misleading for the reasons set forth in paragraphs 254 to 262, 265 to 269 and 271 above.  Specifically, according to CW2, Danielle Repetti (currently Vice President of Performance at Millennial Media's Baltimore office) met regularly with CEO Palmieri in the fall of 2012 to discuss the Company's significant loss of revenue caused by third-party tracking services exposing the Company's inability to accurately track and report user data. Despite these significant material internal developments, and the Defendants' failure to disclose the material omitted facts set forth in paragraphs 171 (a), (b), (c), (d) and (h) above, the Company and the selling shareholders went forward with the Secondary Offering.

286.     In addition, pursuant to Item 303 of SEC Regulation S-K, the Secondary Offering Documents were required to disclose, "any known trends or uncertainties that have had, or that you reasonably expect will have, a material favorable or unfavorable impact on sales or results of operations."  17 C.F.R. § 229.303.  In addition to the identification of such "known trends," Item 303 requires disclosure of (i) whether those trends have had or are reasonably expected to have a material unfavorable impact on revenue; and (ii) the extent of any such impact on revenue. Accordingly, Defendants had a duty to disclose:  (i) whether the increasing presence of "third party tracking services" in the market had or was reasonably expected to have a "material . . . unfavorable impact on . . . revenues," and (ii) to what extent those trends had impacted or were reasonably expected to impact Millennial Media's revenue.  Nevertheless, Defendants omitted this information from the Secondary Offering Documents and/or otherwise failed to adequately disclose it during the Class Period.  Specifically, in violation of Item 303, the IPO and Secondary Offering Registration Statements and Prospectuses failed to disclose that the known trends of increasing third party tracking services in the market and the Company's increasing technological failures were having a material unfavorable impact on Millennial Media's revenues and financial results.  *See* ¶¶ 254-262, 285.

287.     Finally, the Secondary Offering Documents were also materially false and misleading because they failed to disclose the information required by Rule 408 of SEC Regulation C, pursuant to which registrants have an overarching duty to disclose material information necessary to ensure that representations in a registration statement are not misleading.  Specifically, Rule 408 requires that, "[i]n addition to the information expressly required to be included in a registration statement, there shall be added such further material information, if any, as may be necessary to make the required statements, in light of the

circumstances under which they are made, not misleading." 17 C.F.R. § 230.408(a). The Secondary Offering Registration Statement and Prospectus, in their entirety, and as set forth specifically above, were materially untrue and misleading and omitted to state material information necessary to make them not misleading, in violation of Defendants' duty of disclosure under Rule 408.

288.   On or about October 30, 2012, Millennial Media completed the Secondary Offering including the full exercise of the underwriters' over-allotment option. The Principal Shareholder Defendants (as defined herein) sold approximately 7.7 million of their privately held shares through the Secondary Offering.

289.   Millennial Media executives, including Individual Defendants, used the Company's October 2012 Secondary Offering to sell more than $38.7 million of their personally-held Millennial Media shares to unwitting investors, while the same insiders were in possession of material adverse non-public information about the Company. As set forth below, these executives and Individual Defendants sold the following massive amounts of Millennial Media shares at artificially-inflated prices on or about October 29, 2012:

| Individual | Number of Shares Sold | Price | Value of Shares Sold[21] |
|---|---|---|---|
| Former CEO Paul Palmieri | 1,100,862 | $13.4425 | $14,798,337.44 |
| Former CTO Chris Brandenburg | 895,672 | $13.4425 | $12,040,070.86 |
| Former COO Stephen Root | 355,861 | $13.4425 | $4,783,661.49 |
| Former CFO Michael Avon | 118,349 | $13.4425 | $1,590,906.43 |
| Former Director Alan MacIntosh | 205,273 | $13.4425 | $2,759,382.30 |
| Former Director John D. Markley, Jr. | 88,423 | $13.4425 | $1,188,626.18 |
| Director Wenda H. Millard | 85,155 | $13.4425 | $1,144,696.09 |
| Director James A. Tholen | 30,025 | $13.4425 | $403,611.06 |
| **Total** | **2,879,620** | | **$38,709,291.85** |

---

[21] The cost basis for almost all of the above transactions is not publicly available.

290.    The Securities Act Defendants owed Co-Lead Plaintiff Mississippi PERS and the Class a duty to make a reasonable and diligent investigation of the statements contained in the Offering Documents to ensure that the statements contained or incorporated by reference therein were true and that there was no omission to state a material fact required to be stated therein or necessary to make the statements therein not misleading.

291.    The Securities Act Defendants did not make a reasonable and diligent investigation of the statements contained in or incorporated by reference into the Offering Documents and did not possess reasonable grounds for believing that the Offering Documents did not contain an untrue statement of material fact or omit to state a material fact required to be stated therein or necessary to make the statements therein not misleading.

292.    Co-Lead Plaintiff Mississippi PERS and the other members of the Class purchased or acquired Millennial Media's common stock pursuant and/or traceable to the IPO, the Secondary Offering, or both, and were damaged thereby.

293.    Co-Lead Plaintiff Mississippi PERS and the other members of the Class did not know, nor in the exercise of reasonable diligence could they have known, of the untrue statements of material facts or omissions of material facts in the Offering Documents when they purchased or acquired Millennial Media's common stock.

### C.    CLAIMS FOR RELIEF UNDER THE SECURITIES ACT

### COUNT III

**For Violation of Section 11 of the Securities Act**
**Against the Securities Act Defendants**

294.    Co-Lead Plaintiff Mississippi PERS repeats and realleges paragraphs 219 to 293, as if fully set forth herein, except that for purposes of Counts III, IV, V and VI, Co-Lead Plaintiff Mississippi PERS expressly excludes and disclaims any allegation that could be construed as

alleging fraud or intentional or reckless misconduct, as these counts are based solely on claims of strict liability and/or negligence under the Securities Act.

295.    This Count is brought against the Securities Act Defendants on behalf of all those who purchased or otherwise acquired the Company's common stock pursuant and/or traceable to the Offerings.   The Offering Documents for the Offerings were inaccurate and misleading, contained untrue statements of material facts, omitted to state other facts necessary to make the statements made not misleading, and concealed and failed to adequately disclose material facts, as described above.

296.    The Securities Act Defendants are strictly liable for the misstatements and omissions and for the damages that Co-Lead Plaintiff Mississippi PERS and the other members of the Class have sustained thereby.   The Securities Act Defendants are responsible for the contents and dissemination of the Offering Documents, and did not conduct a reasonable investigation or possess reasonable grounds for the belief that the statements contained in the Offering Documents were true and without omissions of any material facts and were not misleading.

297.    The Securities Act Defendants issued, caused to be issued, and participated in the issuance of materially false and misleading written statements to the investing public that were contained in the Offering Documents, which misrepresented or failed to disclose, among other things, the facts set forth above.   By reasons of the conduct herein alleged, each of the Securities Act Defendants violated and/or controlled a person who violated, Section 11 of the Securities Act.

298.    Less than one year elapsed between the time the facts upon which this Count is based were or could reasonably have been discovered and the time this claim was brought.   Less

than three years elapsed between the time that the securities upon which this Count is brought were bona fide offered to the public and the time this action was commenced.

## COUNT IV

**For Violations of Section 12(a)(2) of the Securities Act**
**Against the Underwriter Defendants and the Individual Securities Act Defendants**

299.   Co-Lead Plaintiff Mississippi PERS repeats and realleges paragraphs 219 to 298, as if fully set forth herein, except that for purposes of Counts III, IV, V and VI, Co-Lead Plaintiff Mississippi PERS expressly excludes and disclaims any allegation that could be construed as alleging fraud or intentional or reckless misconduct, as these counts are based solely on claims of strict liability and/or negligence under the Securities Act.  This Count is brought against the Underwriter Defendants and the Individual Securities Act Defendants on behalf of all persons or entities who purchased the Company's common stock issued pursuant to the Offerings.

300.   The Underwriter Defendants and the Individual Securities Act Defendants were sellers, offerors, and/or solicitors of purchasers of the Company's common stock offered pursuant to the Offering Documents.  The Offering Documents contained untrue statements of material facts, omitted to state other facts necessary to make the statements made not misleading, and failed to disclose material facts.  Their actions of solicitation included participating in the preparation and dissemination of the false and misleading Offering Documents.

301.   Additionally, the Individual Securities Act Defendants signed the Offering Documents pursuant to which Millennial Media common stock was offered and sold.  Each of the Underwriter Defendants and the Individual Securities Act Defendants was motivated in part to serve Millennial Media's financial interest and their own.

302.   The Underwriter Defendants and the Individual Securities Act Defendants owed to the purchasers of the Company's common stock, including Co-Lead Plaintiff Mississippi

PERS and the other members of the Class, the duty to make a reasonable and diligent investigation of the statements contained in the Offering Documents to ensure that such statements were true and that there was no omission to state a material fact required to be stated in order to make the statements contained therein not misleading.  The Underwriter Defendants and the Individual Securities Act Defendants knew of, or in the exercise of reasonable care should have known of, the misstatements and omissions contained in the Offering Documents, as set forth above.

303.   Co-Lead Plaintiff Mississippi PERS and other members of the Class purchased the Company's common stock from the Underwriter Defendants and the Individual Securities Act Defendants pursuant to the defective Offering Documents.  Co-Lead Plaintiff Mississippi PERS did not know, nor in the exercise of reasonable diligence could have known, of the false nature of the statements and omissions contained in the Offering Documents.

304.   By reason of the conduct alleged herein, the Underwriter Defendants and the Individual Securities Act Defendants violated and/or controlled a person who violated Section 12(a)(2) of the Securities Act.  Accordingly, Co-Lead Plaintiff Mississippi PERS and the other members of the Class who hold the Company's common stock purchased pursuant and/or traceable to the Offerings have the right to rescind their purchases of and recover the consideration paid for their Millennial Media common stock.

305.   Co-Lead Plaintiff Mississippi PERS, individually and representatively, hereby offers to tender to the Underwriter Defendants and the Individual Securities Act Defendants any Millennial Media common stock that Co-Lead Plaintiff Mississippi PERS and the other members of the Class continue to own, on behalf of all members of the Class who continue to own such common stock, in return for the consideration paid for that stock, together with interest thereon.

Co-Lead Plaintiff Mississippi PERS, individually and representatively on behalf of Class members who have sold their Millennial Media common stock, is entitled to and hereby claims rescission damages.

306.     Less than one year elapsed between the time the facts upon which this Count is based were or could reasonably have been discovered and the time this claim was brought.  Less than three years elapsed between the time that the securities upon which this Count is brought were bona fide offered to the public and the time this action was commenced.

## COUNT V

### For Violation of Section 15 of the Securities Act
### Against the Individual Securities Act Defendants

307.     Co-Lead Plaintiff Mississippi PERS repeats and realleges paragraphs 219 to 306, as if fully set forth herein, except that for purposes of Counts III, IV, V and VI, Co-Lead Plaintiff Mississippi PERS expressly excludes and disclaims any allegation that could be construed as alleging fraud or intentional or reckless misconduct, as these counts are based solely on claims of strict liability and/or negligence under the Securities Act.

308.     This Claim is brought against the Individual Securities Act Defendants pursuant to Section 15 of the Securities Act on behalf of all persons or entities who purchased the Company's common stock pursuant and/or traceable to the Offerings conducted pursuant to the Offering Documents.

309.     As set forth in Count I herein, the Company is liable pursuant to Section 11 of the Securities Act.  Each of the Individual Securities Act Defendants was a control person of the Company with respect to the Offerings by virtue of such individual's position as a senior executive officer and/or director of the Company and had direct and/or indirect business and/or personal relationships with other directors, officers, and/or major shareholders of the Company.

By reason of their positions within the Company and/or positions on the board of directors of the Company, the Individual Securities Act Defendants had the requisite power to directly or indirectly control or influence the specific corporate policies that resulted in the unlawful acts and conduct alleged in Count I.

310.    Each of the Individual Securities Act Defendants was a culpable participant in the violations of Section 11 of the Securities Act alleged in Count I above, based on their having signed the IPO Documents and/or the Secondary Offering Documents and having otherwise participated in the process that allowed the Offerings to be executed.  The Individual Securities Act Defendants, by virtue of their managerial and/or board positions with the Company, controlled the Company, as well as the contents of the Offering Documents, at the time of the Offerings.  Each of the Individual Securities Act Defendants was provided with or had unlimited access to copies of the Offering Documents, and had the ability to either prevent their issuance or cause them to be corrected.

311.    As a result, the Individual Securities Act Defendants are liable pursuant to Section 15 of the Securities Act for the primary violations of Section 11 of the Securities Act by the Company.

312.    By virtue of the foregoing, Co-Lead Plaintiff Mississippi PERS and other members of the Class who purchased or otherwise acquired the Company's common stock pursuant and/or traceable to the Offerings are entitled to damages against the Individual Securities Act Defendants.

313.    Less than one year elapsed between the time Co-Lead Plaintiff Mississippi PERS discovered or reasonably could have discovered the facts upon which this Count is based and the time this claim was brought.  Less than three years elapsed between the time that the securities

upon which this Count is brought were bona fide offered to the public and the time this action was commenced.

## COUNT VI

### For Violation of Section 15 of the Securities Act
### Against the Principal Shareholder Defendants

314.    Co-Lead Plaintiff Mississippi PERS repeats and realleges paragraphs 219 to 313, as if fully set forth herein, except that for purposes of Counts III, IV, V and VI, Co-Lead Plaintiff Mississippi PERS expressly excludes and disclaims any allegation that could be construed as alleging fraud or intentional or reckless misconduct, as these counts are based solely on claims of strict liability and/or negligence under the Securities Act.

315.    This Claim is brought against the Principal Shareholder Defendants pursuant to Section 15 of the Securities Act on behalf of all persons or entities who purchased the Company's common stock pursuant and/or traceable to the Offerings conducted pursuant to the Offering Documents.

316.    Immediately prior to the IPO, the Principal Shareholder Defendants owned 71.6% of Millennial Media's common stock (or the equivalent number of shares of Millennial Media preferred stock, which automatically converted into common stock at the time of the IPO) giving them 71.6% of Millennial Media's total voting power.  Immediately prior to the Secondary Offering, the Principal Shareholder Defendants owned of 61.5% of Millennial Media's common stock giving them 61.5% of Millennial Media's total voting power.

317.    The Principal Shareholder Defendants, through their voting power and the appointment of Defendants Goodman, Gupta, Zachary, and Kerins as their designated directors to Millennial Media's nine-member board of directors, were each controlling persons of

Millennial Media within the meaning of Section 15 of the Securities Act at the time of the IPO and the Secondary Offering.

318.    According to the Offering Documents, prior to the IPO, the Principal Shareholder Defendants had entered into a fourth amended and restated voting agreement, pursuant to which Defendants Palmieri, Millard, Zachary, Goodman, Gupta, Kerins, MacIntosh, Markley and Tholen would serve on the Board of Directors during the IPO.

319.    At the time of the IPO, Defendants Goodman, Gupta, Zachary, and Kerins served as representatives of Bessemer Venture Partners, Columbia Capital, Charles River Ventures, and NEA, respectively, on the Millennial Media Board of Directors and were, effectively, the agents of those entities:

- Bessemer Venture Partners, Columbia Capital, Charles River Ventures, and NEA were the direct employers of Goodman, Gupta, Zachary, and Kerins, respectively;

- Bessemer Venture Partners, Columbia Capital, Charles River Ventures, and NEA had access to all reports, agendas, information and other information available to Goodman, Gupta, Zachary, and Kerins as Company directors;

- Bessemer Venture Partners, Columbia Capital, Charles River Ventures, and NEA participated in the preparation and dissemination of the IPO Documents through Goodman, Gupta, Zachary, and Kerins.

320.    At the time of the Secondary Offering, Defendants Goodman, Gupta, Zachary, and Kerins served as representatives of Bessemer Venture Partners, Columbia Capital, Charles River Ventures, and NEA, respectively, on the Millennial Media Board of Directors and were, effectively, the agents of those entities:

- Bessemer Venture Partners, Columbia Capital, Charles River Ventures, and NEA were the direct employers of Goodman, Gupta, Zachary, and Kerins, respectively;

- Bessemer Venture Partners, Columbia Capital, Charles River Ventures, and NEA had access to all reports, agendas, information and other information available to Goodman, Gupta, Zachary, and Kerins as Company directors;

- Bessemer Venture Partners, Columbia Capital, Charles River Ventures, and NEA participated in the preparation and dissemination of the Secondary Offering Documents through Goodman, Gupta, Zachary, and Kerins.

321.   By reason of the foregoing, the Principal Shareholder Defendants were able to, and did, control the contents of the Offering Documents, which contained materially untrue or misleading information and omitted material facts.

322.   As a result, the Principal Shareholder Defendants are liable pursuant to Section 15 of the Securities Act for the primary violations of Section 11 of the Securities Act by the Company and Defendants Goodman, Gupta, Zachary, and Kerins.

323.   By virtue of the foregoing, Co-Lead Plaintiff Mississippi PERS and other members of the Class who purchased or otherwise acquired the Company's common stock pursuant and/or traceable to the Offerings are entitled to damages against the Principal Shareholder Defendants.

324.   Less than one year elapsed between the time Co-Lead Plaintiff Mississippi PERS discovered or reasonably could have discovered the facts upon which this Count is based and the time this claim was brought.  Less than three years elapsed between the time that the securities upon which this Count is brought were bona fide offered to the public and the time this action was commenced.

## V.   CLASS ACTION ALLEGATIONS

325.   Co-Lead Plaintiffs bring this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of all persons who purchased or otherwise acquired Millennial Media's common stock during the Class Period and were damaged thereby.  Excluded from the Class are Defendants and their families, directors and officers of Millennial Media and their families, and affiliates.

326.    The members of the Class are so numerous that joinder of all members is impracticable.  The disposition of their claims in a class action will provide substantial benefits to the parties and the Court.  As of March 9, 2015, Millennial Media had 139,032,526 shares of common stock, $.001 par value, outstanding.

327.    There is a well-defined community of interest in the questions of law and fact involved in this case.  Questions of law and fact common to the members of the Class that predominate over questions that may affect individual Class members include:

 a.    whether the Securities Act Defendants violated the Securities Act;

 b.    whether the Exchange Act Defendants violated the Exchange Act;

 c.    whether Defendants misrepresented material facts;

 d.    whether Defendants' statements omitted material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading;

 e.    with respect to Co-Lead Plaintiffs' Exchange Act claims, whether the Exchange Act Defendants knew or recklessly disregarded that their statements were false and misleading;

 f.    whether the prices of the Company's securities were artificially inflated; and

 g.    the extent of damage sustained by Class members and the appropriate measure of damages.

328.    Co-Lead Plaintiffs' claims are typical of those of the Class because Co-Lead Plaintiffs and the members of the Class sustained damages from Defendants' wrongful conduct.

329.    Co-Lead Plaintiffs will adequately protect the interests of the Class and have retained counsel experienced in class action securities litigation.  Co-Lead Plaintiffs have no interests that conflict with those of the Class.

330.    A class action is superior to other available methods for the fair and efficient adjudication of this controversy.

## VI.    PRAYER FOR RELIEF

WHEREFORE, Co-Lead Plaintiffs pray for judgment as follows:

1.     Declaring this action to be a proper class action pursuant to Federal Rule of Civil

Procedure 23 on behalf of the Class defined herein;

2.     Awarding Co-Lead Plaintiffs and the members of the Class damages and interest;

3.     Awarding Co-Lead Plaintiffs reasonable costs and expenses incurred in this

action, including attorneys' fees and expert fees; and

4.     Awarding such equitable or other relief as the Court may deem just and proper.

## VII.    JURY TRIAL DEMAND

Co-Lead Plaintiffs demand a trial by jury.


DATED:  April 15, 2015                     Respectfully submitted,

                                           /s/ Thomas A. Dubbs
                                           Thomas A. Dubbs
                                           Louis Gottlieb
                                           Thomas G. Hoffman, Jr.
                                           **LABATON SUCHAROW LLP**
                                           140 Broadway
                                           New York, New York  10005
                                           Telephone: (212) 907-0700
                                           Facsimile:  (212) 818-0477
                                           lgottlieb@labaton.com
                                           thoffman@labaton.com


                                           /s/ Avi Josefson
                                           Avi Josefson
                                           Adam Wierzbowski
                                           **BERNSTEIN LITOWITZ BERGER
                                             & GROSSMANN LLP**
                                           1285 Avenue of the Americas
                                           New York, New York  10019
                                           Telephone: (212) 554-1400
                                           Facsimile:  (212) 554-1444
                                           jerry@blbglaw.com
                                           avi@blbglaw.com

adam@blbglaw.com

*Counsel for Co-Lead Plaintiff*
*Public Employees' Retirement System of*
*Mississippi, and Co-Lead Counsel*
*for the Class*


/s/ Solomon B. Cera
Solomon B. Cera
Thomas C. Bright
Louis A. Kessler
**CERA LLP**
595 Market Street, Suite 2300
San Francisco, CA 94105
Telephone: (415) 777-2230
Facsimile:   (415) 777-5189
scera@cerallp.com
tbright@cerallp.com

*Counsel for Co-Lead Plaintiffs the Bernard T.*
*Selz 2008 15-Year Charitable Lead Annuity*
*Trust, the Bernard T. Selz 2008 20-Year*
*Charitable Lead Annuity Trust, Karnak*
*Partners, L.P., and GAM Selection Hedge*
*Investments Inc., and Co-Lead Counsel for the*
*Class*