# EXHIBIT 2
# TO MAY 8, 2015 DECLARATION
# OF LOUIS GOTTLIEB

Louis Gottlieb
Partner
212 907 0872 direct
212 883 7072 fax
lgottlieb@labaton.com

May 5, 2015

**VIA EMAIL**

The Honorable Paul A. Engelmayer
United States District Court
  for the Southern District of New York
40 Foley Square
New York, NY 10007

Re:    ***In re Millennial Media, Inc. Securities Litigation*, 14 Civ. 7923 (S.D.N.Y.) (PAE)**

Dear Judge Engelmayer:

Pursuant to Your Honor's Order of April 21, 2015, enclosed please find attorney affidavits by (1) me, a Partner at Labaton Sucharow LLP who was personally involved in re-contacting, and efforts to re-contact, all of the Confidential Witnesses (except CW1) referenced in the Amended Consolidated Class Action Complaint (Dkt. No. 67) in this Action, and (2) Thomas C. Bright, a Partner at Cera LLP who was personally involved in re-contacting CW1. Also attached are affidavits by Confidential Witnesses 1, 3, and 7, which we are transmitting to the Court on their behalf. We appreciate that the Court ordered that these documents were to be submitted *in camera*.

In light of current circumstances, taking into account Your Honor's instructions and recent Orders, and the status of our recent contacts with the Confidential Witnesses, Co-Lead Plaintiffs are also filing today a Notice of Voluntary Dismissal Without Prejudice of this Action, which is also enclosed herewith. Defendants do not oppose the filing of a Notice of Voluntary Dismissal Without Prejudice.

Respectfully submitted,

Louis Gottlieb

cc:    All Co-Lead Counsel
       All Counsel for the Defendants (without attachments)

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

———————————————————— X
               :
IN RE MILLENNIAL MEDIA, INC.    :    14 Civ. 7923 (PAE)
SECURITIES LITIGATION         :
               :    **AFFIDAVIT OF LOUIS GOTTLIEB IN**
               :    **RESPONSE TO THE COURT'S ORDER**
               :    **OF APRIL 21, 2015 REGARDING**
               :    **CONFIDENTIAL WITNESSES**
               :
               :
———————————————————— X

        I, Louis Gottlieb, declare under penalty of perjury pursuant to 28 U.S.C. § 1746 as follows:

        1.      I am a partner at the law firm Labaton Sucharow LLP, Co-Lead Counsel in the above-referenced Action. I have personal knowledge of the facts set forth herein.

        2.      I respectfully submit this Affidavit in response to the Court's April 21, 2015 Order (the "April 21 Order"). I have been personally involved in re-contacting, and efforts to re-contact, all of the confidential witnesses ("CWs") (other than CW1) referenced in the Consolidated Class Action Complaint (the "Complaint" or "First Amended Complaint") in this Action (Dkt. No. 61), after Co-Lead Plaintiffs filed the Complaint on March 20, 2015, including in response to the April 21 Order.[1]

        3.      My attempts to reach the confidential witnesses, and my communications with those I was able to reach, are summarized below.

---

[1] An attorney from Co-Lead Counsel, Cera LLP is providing a separate affidavit to the Court regarding CW1 because an investigator from that firm had interviewed CW1.

**Review of Contacts with Confidential Witnesses**
**Since the Filing of the First Amended Complaint on March 20, 2015**

4.　　In connection with my contacts with the confidential witnesses since the filing of the First Amended Complaint, I met with all of the Labaton Sucharow investigators who spoke with the confidential witnesses, and I also spoke with a former Labaton Sucharow investigator who had conducted phone interviews with several of the confidential witnesses in 2014.  I also reviewed relevant documents, including investigators' interview memos, e-mails and Federal Express delivery confirmation receipts related to communications with the confidential witnesses.

5.　　As discussed in the Affidavit of Thomas G. Hoffman, Jr., provided to the Court on April 17, 2015 (the "Hoffman Affidavit"), on March 24, 2015, Labaton Sucharow sent, by Federal Express, a copy of the Complaint and a cover letter with contact information to each of the confidential witnesses.  *See* Hoffman Affidavit at ¶¶ 13-14.  At that time, with the exception of CW4, none of the eleven confidential witnesses contacted us to report any inaccuracies in, or to request to be removed from, the Complaint.

6.　　On April 7 and 8, 2015, after CW4 requested that references to him/her be removed from the Complaint, I (along with an attorney from Co-Lead Counsel Bernstein Litowitz Berger and Grossmann LLP) attempted to reach by phone each of the confidential witnesses other than CW1 and CW4 to confirm that they had received and read the Complaint and to determine whether they had been contacted by defense counsel.  We were able to reach five of the confidential witnesses (CWs 3, 6, 7, 9 and 10), and left voice mail messages for the remaining four (who did not return my calls or otherwise contact Co-Lead Counsel at that time).  None of the witnesses contacted us to report any inaccuracies in, or to request to be removed

from, the Complaint.[2]  At that time, none of the five confidential witnesses with whom we spoke reported that he or she had been contacted by defense counsel.

7.      In accordance with the Court's April 21 Order, and as described in more detail below, I made at least three additional attempts to contact each of the confidential witnesses to obtain from them an affidavit in response to the April 21 Order, including phone calls and a letter sent by Federal Express.

8.      On April 22, I attempted to reach by phone each of the nine confidential witnesses referenced above.  I spoke with confidential witnesses 3, 6, 7 and 8 and I left voice mail messages for the remaining witnesses.  The voice mail messages stated that on April 21, 2015, the Court issued an Order, which, among other things, directed all of the confidential witnesses in this case to provide an affidavit discussing the circumstances under which they became a confidential witness and the accuracy of their statements in the Complaint.  I asked each of them to contact me to discuss this matter and I provided my office phone number.

9.      In addition, on April 23, I sent a brief letter by Federal Express, next day delivery, to the five witnesses with whom I had left a voice mail message on April 22, *i.e.*, CWs 2, 5, 9, 10 and 11.  This letter notified them of the Court's April 21 Order and asked them to contact me.

10.      Subsequently, I made contact with, or heard from, CWs 5, 10 and 11.

11.      In summary, since the Court's April 21 Order, I was able to speak by phone with CWs 3, 6, 7, 8, 10 and 11 and I received an e-mail from CW5.  I did not hear from CWs 2 and 9.

12.      Along with this affidavit, we are providing to the Court the affidavits of CWs 1, 3 and 7.  We were not able to obtain additional affidavits from the other confidential witnesses.

---

[2] As discussed in more detail below, CW6 noted that one of the statements attributed to him was not based on his direct knowledge but was based on what he had heard from others. However, I believe that is consistent with the way his statement was presented in the Complaint.

13.     Based on my review, and based on my conversations with the confidential witnesses as described herein, I believe that prior to the filing of the Complaint, each confidential witness contacted by Labaton Sucharow (i) was informed that the caller was an investigator working for the law firm; (ii) confirmed that he or she was a former employee of Millennial Media; and (iii) was told that the purpose of the call was to gather information to use in a potential securities case on behalf of investors against Millennial Media (with respect to calls made in 2014) or to gather additional information to use in a securities action against Millennial Media (with respect to calls made in January, February and March of 2015).  To my knowledge, the possibility that the CW's identity could be disclosed was not discussed in the interviews.

14.     Below is a description of my and my firm's contacts with each confidential witness other than CW1 (whose contacts are addressed in the accompanying affidavit of Thomas C. Bright) and CW4 (who has already been removed from the Complaint).

### Discussion of Contacts with the Confidential Witnesses

### Confidential Witness 2 ("CW2")

15.     On March 7, 2014, a Labaton Sucharow investigator interviewed CW2 via telephone.  Based on my discussion with the investigator, I believe that CW2 (i) was informed that the caller was an investigator working for the law firm; (ii) confirmed that (s)he was a former employee of Millennial Media; and (iii) was told that the purpose of the call was to gather information to use in a potential securities case on behalf of investors against Millennial Media. According to Labaton Sucharow phone records, CW2 answered the investigator's questions about Millennial Media for approximately 45 minutes.  A Latabon Sucharow investigator attempted to contact CW2 for a follow up interview in February and March of 2015, but the investigator was not able to reach CW2 via telephone.  Based on the interview of CW2 in which

CW2 provided information to Labaton Sucharow about how, among other things, the emergence of third party tracking services exposed Millennial Media's inability to accurately track and report conversions and caused significant loss of clients and revenue (which was corroborated by CW5 who stated that his/her performance advertising team lost over 50% of their revenue in early 2013 due to the increased usage of third party tracking services), Co-Lead Plaintiffs included statements by CW2 in the Complaint.

16.     On March 24, 2015, Labaton Sucharow sent CW2 a Federal Express package containing a copy of the Complaint filed on March 20, 2015 and a cover letter that included contact information for a Labaton Sucharow investigator.  According to a Federal Express delivery confirmation notice, the package was delivered to CW2 on March 27, 2015.  CW2 did not contact us to report any inaccuracies in, or to request to be removed from, the Complaint.

17.     On April 7, 2015, I (along with an attorney from Co-Lead Counsel Bernstein Litowitz Berger and Grossmann, LLP) attempted to reach CW2 by phone.  CW2 did not answer and I left a voice mail message.  CW2 did not contact us to report any inaccuracies in, or to request to be removed from, the Complaint.

18.     On April 22, 2015, I attempted to reach CW2 by phone again.  I left a voice mail message for CW2 explaining that on April 21, 2015, the Court issued an Order, which, among other things, directed all of the confidential witnesses in this case to provide an affidavit discussing the circumstances under which they became a confidential witness and the accuracy of their statements in the Complaint.  I asked CW2 to contact me to discuss this matter and I provided my office phone number.  I did not hear back from CW2.

19.     On April 23, I sent a brief letter, by Federal Express next day delivery, to CW2 advising him/her of the Court's April 21 Order and asking CW2 to contact me.

20.     On April 28, I attempted to reach CW2 by phone again and left a voice message. As of the filing of this affidavit, CW2 has not returned my phone calls or responded to my letter of April 23.

**Confidential Witness 3 ("CW3")**

21.     On March 17, 2014, a Labaton Sucharow investigator interviewed CW3 via telephone.   Based on my discussion with the investigator and as confirmed by CW3, I believe that (i) CW3 was informed that the caller was an investigator working for the law firm; (ii) CW3 confirmed that (s)he was a former employee of Millennial Media; and (iii) CW3 was told that the purpose of the call was to gather information to use in a potential securities case on behalf of investors against Millennial Media.   According to Labaton Sucharow phone records, CW3 answered the investigator's questions about Millennial Media for approximately 19 minutes.

22.     On March 19, 2015, a Labaton Sucharow investigator conducted a follow up telephone interview of CW3.   Based on my discussion with the investigator and as confirmed by CW3, I believe that (i) CW3 was again informed that the caller was an investigator working for the law firm; (ii) CW3 confirmed that (s)he was a former employee of Millennial Media; and (iii) CW3 was told that the purpose of the call was to gather additional information to use in the filed securities action against Millennial Media.   That interview lasted approximately six minutes. Based on the interviews of CW3 in which CW3 provided information to Labaton Sucharow about how, among other things, data reporting at Millennial Media was not sophisticated and an overhaul was long overdue (which was corroborated by CW2, who stated that the Company had difficulty matching conversions by users, and CW6, who, after joining Millennial Media from Jumptap, found out that the Company was having issues with its ability to attribute user actions to advertisements), Co-Lead Plaintiffs included statements by CW3 in the Complaint.

23.     On March 24, 2015, Labaton Sucharow sent CW3 a copy of the Complaint filed on March 20, 2015, with a cover letter, by Federal Express.  According to a Federal Express delivery confirmation notice, the package was delivered to CW3 on March 25, 2015.  CW3 did not contact us to report any inaccuracies in, or to request to be removed from, the Complaint.

24.     On April 8, 2015, I called and spoke with CW3.  CW3 did not tell me that there were any inaccuracies in the statements attributed to him/her in the Complaint, or that (s)he wished to be removed from the Complaint.  At that time, CW3 did not report that (s)he had been contacted by defense counsel.

25.     On April 22, 2015, I called CW3 again and explained that on April 21, 2015, the Court issued an Order, which, among other things, directed all of the confidential witnesses in this case to provide an affidavit discussing the circumstances under which they became a confidential witness in the case and the accuracy of their statements in the Complaint.  CW3 asked me to call back the following day.

26.     On April 23, 2015, I called CW3 back.  I informed CW3 that I was not his/her counsel, did not represent him/her, and could not offer him/her legal advice.  CW3 stated that (s)he had understood that (s)he would be quoted in the Complaint.  We then reviewed line-by-line the statements in the Complaint that were attributed to him/her.

27.     First, I read aloud paragraph 46 of the Complaint to CW3 and asked for his/her comments regarding its accuracy after each sentence.  Paragraph 46 states:

> Millennial Media's inability to collect and report clean and accurate user data is corroborated by confidential witnesses by CW3, who was a User Interface Architect in Millennial Media's Baltimore office from May 2011 through March 2013.  According to CW3, data reporting at Millennial Media was not sophisticated and an overhaul was long overdue.  According to CW3, there were seven or eight tools on the Company's "backend" from which the Company needed to collect data, which made it difficult to perform

reporting. In addition, a former salesperson at Millennial Media, who did not have a programming background, was the person responsible for handling internal queries for reporting purposes, and, overall, the Company's approach was not an effective way to report its data.

28.    CW3 told me that each sentence in paragraph 46 is accurate. However, CW3 stated that, as to the third sentence, (s)he did not have detailed knowledge that "there were seven or eight tools on the Company's 'backend' from which the Company needed to collect data, which made it difficult to performing reporting." Instead, CW3 told me that (s)he heard that from other employees at the Company. Additionally, CW3 stated that, in the last sentence of paragraph 46, it would be more accurate to say that the Company's approach was not "a particularly clean" way to report its data rather than "an effective" way to report its data.

29.    I also read aloud paragraph 108 of the Complaint to CW3 and asked if his/her statements corroborated it. Paragraph 108 states:

> Early rumors of Millennial Media's potential acquisition of Metaresolver circulated as early as February 11, 2013. As Advertising Age (or "AdAge") reported that day, Metaresolver would be attractive to Millennial Media because, as Metaresolver founder and CEO Seamus McAteer had claimed, Metaresolver's strength was in providing "clean" data compared to other demand-side platforms that offered a glut of inaccurate information.[3] According to AdAge, Metaresolver was able to target mobile advertisements based on device type, mobile carrier, location and time of day and in turn allow for programmatic buying based on such data.[4] Millennial Media's announcement on February 19, 2013 that it would be acquiring Metaresolver reflected that Millennial Media lacked technology to collect such "clean" user data. This is corroborated by the statements of confidential witnesses CW3 and CW4 discussed above. *See* ¶¶ 46-47.

---

[3] http://adage.com/article/digital/millennial-media-talks-acquire-mobile-ad-buying-platform-metaresolver/239729

[4] *Id.*

30.     CW3 stated that paragraph 108 is accurate, and that the issue described in paragraph 108 "was definitely a Millennial Media issue." However, CW3 stated that the meaning of the paragraph would depend on the definition of the word "clean."

31.     On April 24, 2015, I called and spoke with CW3 again to discuss his/her affidavit. On that call, I explained that paragraph 263 in the Complaint is identical to paragraph 46 of the Complaint except for a few words in the last sentence. I read aloud the last sentence of paragraph 263 of the Complaint to CW3 and asked for his/her comments regarding its accuracy. The last sentence of paragraph 263 states:

> In addition, a former salesperson at Millennial Media, without a programming background, was the person responsible for handling internal queries for reporting purposes, and, overall, the Company's approach was not a particularly clean way to report its data.

32.     CW3 told me that the last sentence of 263 in the Complaint is accurate. With the modifications referenced above, CW3 stated, the statements attributed to him/her were accurate. CW3 also told me that his/her allegations could remain in the Complaint.

33.     On April 27, 2015, I spoke with CW3 again regarding his/her draft affidavit.

34.     On April 29, 2015, CW3 signed an affidavit, which we are providing to the Court herewith.

### Confidential Witness 5 ("CW5")

35.     On March 11, 2014, a Labaton Sucharow investigator interviewed CW5 via telephone. Based on my discussion with the investigator, I believe that (i) CW5 was informed that the caller was an investigator working for the law firm; that (ii) CW5 confirmed that (s)he was a former employee of Millennial Media; and that (iii) CW5 was told that the purpose of the call was to gather information to use in a potential securities case on behalf of investors against

Millennial Media.  During that interview, according to Labaton Sucharow phone records, CW5 answered the investigator's questions about Millennial Media for approximately 36 minutes.

36.     On February 25, 2015 and March 3, 2015, a Labaton Sucharow investigator conducted follow up telephone interviews of CW5, which lasted approximately 35 minutes and 11 minutes, respectively.  Based on my discussion with the investigator, I believe that (i) CW5 was again informed that the caller was an investigator working for the law firm; that (ii) CW5 confirmed that (s)he was a former employee of Millennial Media; and that (iii) CW5 was told that the purpose of the call was to gather additional information to use in the securities action against Millennial Media.

37.     During a third telephone interview of CW5 on March 3, 2015, CW5 spoke to two investigators and a Labaton Sucharow associate who asked CW5 follow-up questions related to Millennial Media's technology.  During that interview, CW5 asked if his/her name would appear in the Complaint.  The associate told her that it would not, but that (s)he would be referred to as a confidential witness.[5]

38.     Based on the three interviews in which CW5 provided information to Labaton Sucharow about how, among other things, Millennial Media lost significant customers beginning in late 2012 due to the increased usage of third party tracking services (which was corroborated by CW2, who stated that the emergence of third party tracking services exposed Millennial

---

[5] Labaton Sucharow's practice (which, to my knowledge, is consistent with the practice of other law firms who prosecute securities cases on behalf of shareholders) is to identify all witnesses referenced in a complaint as "Confidential Witnesses" rather than by name.  If a witness asks how (s)he will be identified in a complaint, we inform the witness that (s)he will be identified in the complaint as a confidential witness.  If the witness asks if his/her name will ever be disclosed, we inform the witness that we will try our best to keep his/her name confidential but that courts have ordered the names of confidential witnesses disclosed during the discovery process.

Media's inability to accurately track and report conversions and caused significant loss of clients and revenue), Lead Plaintiffs included statements by CW5 in the Complaint.

39.     On March 24, 2015, Labaton Sucharow sent CW5 a Federal Express package containing a copy of the Complaint filed on March 20, 2015 and a cover letter.  According to a Federal Express confirmation notice, the package was delivered to CW5 on March 26, 2015. CW5 did not contact us to report any inaccuracies in, or to request to be removed from, the Complaint.

40.     On April 7, 2015, I attempted to reach CW5 by phone.  CW5 did not answer and I left him/her a voice mail message.  CW5 did not call me back to report any inaccuracies in, or to be removed from, the Complaint.

41.     On April 22, 2015, I attempted to reach CW5 by phone again and left a voice mail message.  In that message, I explained that on April 21, 2015, the Court issued an Order, which, among other things, directed all of the confidential witnesses in this case to provide an affidavit discussing the circumstances under which they became a confidential witness and the accuracy of their statements in the Complaint.  I asked CW5 to contact me to discuss this matter and I provided my office phone number.  I did not hear back from CW5.

42.     On April 23, 2015, I sent a brief letter, by Federal Express next day delivery, to CW5.  The letter advised CW5 of the Court's April 21 Order and asked CW5 to contact me.

43.     On April 24, 2015, CW5 sent me an email.  In that email, CW5 asked to be withdrawn from the Complaint.  Later that day, I replied to CW5 by email and told him/her that all references to him/her would be removed from the Complaint.  I also asked if (s)he would be willing to call me to further discuss these matters.  CW5 has not called me back.

**Confidential Witness 6 ("CW6")**

44.     On January 14, 2015, a Labaton Sucharow investigator interviewed CW6 via telephone.  Based on my discussion with the investigator and as confirmed by CW6, I believe that (i) CW6 was informed that the caller was an investigator working for the law firm; that (ii) CW6 confirmed that (s)he was a former employee of Millennial Media; and that (iii) CW6 was told that the purpose of the call was to gather additional information to use in a securities action against Millennial Media.  During that interview, according to Labaton Sucharow phone records, CW6 answered the investigator's questions about Millennial Media for approximately 6.5 minutes.

45.     On March 13, 2015, a Labaton Sucharow investigator conducted a follow up telephone interview of CW6, which lasted approximately 19 minutes.  Based on my discussion with the investigator and as confirmed by CW6, I believe that (i) CW6 was again informed that the caller was an investigator working for the law firm; that (ii) CW6 confirmed that (s)he was a former employee of Millennial Media; and that (iii) CW6 was told that the purpose of the call was to gather additional information to use in a securities action against Millennial Media.

46.     Based on the two interviews in which CW6 provided information to Labaton Sucharow about how, among other things, after CW6 joined Millennial Media from Jumptap, (s)he learned that the Company was having issues with user attribution (which was corroborated by CW3, who stated that data reporting at Millennial Media was not sophisticated and an overhaul was longer overdue, and by CW2, who stated that the Company had difficulty matching conversions by users), Lead Plaintiffs included statements by CW6 in the Complaint.

47.     On March 24, 2015, Labaton Sucharow sent CW6 a Federal Express package containing a copy of the Complaint filed on March 20, 2015 and a cover letter.  According to a

Federal Express delivery confirmation notice, the package was delivered to CW6 on March 26, 2015. CW6 did not contact us to report any inaccuracies in, or to request to be removed from, the Complaint.

48.     On April 7, 2015, I called and spoke with CW6. During that call, CW6 stated that (s)he had received a copy of the Complaint and that the allegations attributed to him/her were "dead on." However, CW6 clarified one statement attributed to him/her, stating that (s)he had heard about, but did not have direct knowledge of, Millennial Media's user tracking until (s)he joined the Company. At that time, CW6 did not report that (s)he had been contacted by defense counsel.

49.     After that call, I reviewed the statements attributed to CW6 in the Complaint. I believe that the way CW6's statement was presented in the Complaint is consistent with his/her clarification. The Complaint does not say that CW6 had direct knowledge of Millennial Media's user tracking until (s)he joined the Company. *See* Complaint at ¶¶ 53, 270.

50.     On April 22, 2015, I called CW6 again. On that call, I informed CW6 that I was not his/her counsel, did not represent him/her, and could not offer him/her legal advice. I explained that on April 21, 2015, the Court issued an Order, which, among other things, directed all of the confidential witnesses in this case to provide an affidavit discussing the circumstances under which they became a confidential witness and the accuracy of their statements in the Complaint.

51.     In response, CW6 expressed reservations about whether (s)he would be willing to provide an affidavit because (s)he stated that (s)he is still working in the industry, that (s)he has "no skin in the game," and that (s)he did not think that his/her statements were particularly helpful to either side of the litigation. Additionally, CW6 stated that (s)he would need to retain

an attorney to review an affidavit. However, CW6 agreed to speak to me on April 24 regarding the accuracy of the statements attributed to him/her after (s)he had a chance to review the Complaint again.

52.     On April 24, 2015, I attempted to reach CW6 by phone at the time that we agreed, but CW6 did not answer. I left a voice mail message for CW6 asking him/her to return my call.

53.     On April 27, 2015, I attempted to reach CW6 by phone again and left a second voice mail message. CW6 has not returned my call.

### Confidential Witness 7 ("CW7")

54.     On December 18, 2013, a Labaton Sucharow investigator interviewed CW7 via telephone. Based on my discussion with the investigator and as confirmed by CW7, I believe that (i) CW7 was informed that the caller was an investigator working for the law firm; that (ii) CW7 confirmed that (s)he was a former employee of Millennial Media; and that (iii) CW7 was told that the purpose of the call was to gather information to use in a potential securities case on behalf of investors against Millennial Media. During that interview, according to Labaton Sucharow phone records, CW7 answered the investigator's questions about Millennial Media for approximately 23 minutes.

55.     On February 19, 2015 and March 6, 2015, a Labaton Sucharow investigator conducted follow up telephone interviews of CW7, which lasted approximately 35 minutes each. Based on my discussion with the investigator and as confirmed by CW7, I believe that (i) CW7 was again informed that the caller was an investigator working for the law firm; that (ii) CW7 confirmed that (s)he was a former employee of Millennial Media; and that (iii) CW7 was told that the purpose of the call was to gather additional information to use in a securities action against Millennial Media.

56.     Based on the three interviews in which CW7 provided information to Labaton Sucharow about how, among other things, Millennial Media published software updates related to the Company's mMedia platform that were not functioning properly, and that Millennial Media terminated nearly the entire engineering team responsible for the Company's MYDAS platform (which was corroborated by CW8, who stated that essentially the entire MYDAS platform team was fired), Lead Plaintiffs included statements by CW7 in the Complaint.

57.     On March 24, 2015, Labaton Sucharow sent CW7 a Federal Express package containing a copy of the Complaint filed on March 20, 2015 and a cover letter.  According to a Federal Express confirmation notice, the package was delivered to CW7 on March 25, 2015.

58.     On March 26, 2015, CW7 emailed the investigator who sent CW7 the Complaint. In that email, CW7 stated that (s)he received the Complaint, read it, and that "[t]he facts are accurate and reflect my statements in perfect clarity."  *See* Hoffman Aff. Ex. 1.

59.     On April 7, 2015, I called and spoke to CW7.  CW7 reaffirmed that the statements attributed to ▮ in the Complaint were accurate.  At that time, CW7 did not report that (s)he had been contacted by defense counsel.

60.     On April 22, 2015, I called and spoke with CW7 again.  I informed CW7 that I was not his/her counsel, did not represent him/her, and could not offer him/her legal advice.  I explained that on April 21, 2015, the Court issued an Order, which, among other things, directed all of the confidential witnesses in this case to provide an affidavit discussing the circumstances under which they became a confidential witness and the accuracy of their statements in the Complaint.  In response, CW7 stated that (s)he was told by the Labaton Sucharow investigators that (s)he would be quoted in the Complaint and (s)he confirmed that the statements in the

Complaint attributed to him/her were accurate. CW7 also said that (s)he would be willing to sign an affidavit to that effect.

61.     On April 27, 2015, I spoke with CW7 again and reviewed a draft affidavit with him/her.

62.     On April 29, 2015, CW7 signed an affidavit, which we are providing to the Court herewith.

### Confidential Witness 8 ("CW8")

63.     On March 13, 2015 a Labaton Sucharow investigator interviewed CW8 via telephone. Based on my discussion with the investigator and as confirmed by CW8, I believe that (i) CW8 was informed that the caller was an investigator working for the law firm; that (ii) CW8 confirmed that (s)he was a former employee of Millennial Media; and that (iii) CW8 was told that the purpose of the call was to gather additional information to use in a securities action against Millennial Media. During that call, according to Labaton Sucharow phone records, CW8 answered the investigator's questions about Millennial Media for approximately 40 minutes.

64.     On March 16, 2015, a Labaton Sucharow investigator conducted a follow up telephone interview of CW8, which lasted approximately seven minutes. Based on my discussion with the investigator and as confirmed by CW8, I believe that (i) CW8 was again informed that the caller was an investigator working for the law firm; that (ii) CW8 confirmed that (s)he was a former employee of Millennial Media; and that (iii) CW8 was told that the purpose of the call was to gather additional information to use in a securities action against Millennial Media.

65.     Based on the two interviews in which CW8 provided information to Labaton Sucharow about how, among other things, Millennial Media and Jumptap each had "tech stacks"

with functionality limits that integration would not be able to solve (which was corroborated by CW9, who stated that Millennial Media's and Jumptap's respective "tech stacks" failed to function together), and how essentially the entire MYDAS platform team was terminated (which was corroborated by CW7, who stated that Millennial Media terminated nearly the entire engineering team responsible for the Company's MYDAS platform), Lead Plaintiffs included statements by CW8 in the Complaint.

66.     On March 24, 2015, Labaton Sucharow sent CW8 a copy of the Complaint filed on March 20, 2015 by Federal Express. According to a Federal Express delivery confirmation notice, the package was delivered to CW8 on March 26, 2015. CW8 did not contact us to report any inaccuracies in, or to request to be removed from, the Complaint.

67.     On April 8, 2015, I attempted to reach CW8 by phone. CW8 did not answer and I left a voice mail message. CW8 did not call back to report any inaccuracies in, or to request to be removed from, the Complaint.

68.     On April 22, 2015, I called and spoke with CW8. I informed CW8 that I was not his/her counsel, did not represent him/her, and could not offer him/her legal advice. I explained that on April 21, 2015, the Court issued an Order, which, among other things, directed all of the confidential witnesses in this case to provide an affidavit discussing the circumstances under which they became a confidential witness and the accuracy of their statements in the Complaint. In response, CW8 stated that (s)he understood that (s)he would be quoted in the Complaint but also stated that certain modifications were needed for the statements attributed to him/her to be completely accurate. I reviewed the statements attributed to CW8 in the Complaint line by line with him/her on the phone.

69. First, I read aloud paragraph 121 of the Complaint to CW8 and asked for his/her comments regarding its accuracy after each sentence. Paragraph 121 states:

> Unbeknownst to investors, in May 2013, only one month after Millennial Media's CTO and COO left the Company, Millennial Media terminated nearly the entire Millennial Media engineering team responsible for the Company's MYDAS platform. According to CW8, who was a Senior Software Engineer at Millennial Media from September 2012 to June 2014, "essentially the entire [MYDAS] platform team" was fired. This included the Senior Vice President of Technology, Eric Hastings, the Principal Software Engineer in charge of the MYDAS platform, Rick Kilkoyne, and seven or eight other key engineers. This is corroborated by CW7, who said that s/he was terminated in early May 2013 along with seven others in top engineering. This reflected an apparent internal shift away from the Company's MYDAS platform.

70. CW8 stated that paragraph 121 is accurate with certain modifications. For example, CW8 stated to me that (s)he did not recall if (s)he stated to the investigator that the engineering team mentioned in the second sentence was "fired." CW8 stated that (s)he believes that such engineering team was instead "disbanded." CW8 also stated that (s)he did not recall stating to the investigator that the number of engineers was seven or eight in the third sentence. CW8 stated that CW8 believes that it was approximately seven or eight engineers. With those modifications, CW8 stated, paragraph 121 was accurate.

71. Then I read aloud paragraph 144(c) of the Complaint to CW8 and asked for CW8's comments regarding its accuracy after each sentence. Paragraph 144(c) states:

> CW8 stated that the executives from Millennial Media and Jumptap failed to understand the "depth of functionality" of the two platform systems, and confirmed that each "tech stacks" had its own functionality limits that integration would not be able to solve. Additionally, CW8 explained that, even though the Company completed the acquisition in November 2013, it didn't hold a "kick-off" meeting until January 2014. At that meeting, the CTO from Jumptap, Bob Hammond, was put in charge and the companies' engineering teams were reorganized. The engineers from both companies were divided into a "Blue Team," from

Jumptap's platform, and a "Green Team," from Millennial Media's MYDAS platform. These two "tech stacks," as described above, were run separately. However, as of June 2014, when CW8 resigned from Millennial Media, the Company was still running two separate systems and still employing a Blue Team and a Green Team organizational structure.

72. CW8 stated that (s)he did not recall the exact words said to the investigator, but that the first two sentences of paragraph 144(c) are accurate. As to the third sentence, CW8 stated that (s)he did not recall whether Bob Hammond was "put in charge" at the January 2014 meeting, but (s)he recalled that he was in charge at that meeting. With respect to the fourth through sixth sentences of paragraph 144(c), CW8 stated that (s)he would not refer to a "Blue Team" and a "Green Team" because there instead existed multiple teams which either worked on a "Blue stack" or a "Green stack." With those modifications, CW8 stated, paragraph 144(c) is accurate.

73. CW8 said that (s)he did not wish to continue as a confidential witness in this case because (s)he did not know that sufficient information would be provided in the Complaint that might identify him/her. CW8 also stated that (s)he was not interested in providing an affidavit but agreed to talk to me further on the subject on April 24.

74. On April 24, 2015, I attempted to reach CW8 by phone at our agreed-upon time, but (s)he did not answer. I left a voicemail message asking him/her to return my call.

75. On April 27, 2015, I attempted to reach CW8 by phone again and left a voice mail message. CW8 has not returned my calls.

### Confidential Witness 9 ("CW9")

76. On March 10, 2015, a Labaton Sucharow investigator interviewed CW9 via telephone. Based on my discussion with the investigator, I believe that (i) CW9 was informed that the caller was an investigator working for the law firm; that (ii) CW9 confirmed that (s)he

was a former employee of Millennial Media; and that (iii) CW9 was told that the purpose of the call was to gather additional information to use in a securities action against Millennial Media. During that call, according to Labaton Sucharow phone records, CW9 answered the investigator's questions about Millennial Media for approximately 20 minutes.

77.     Based on the interview in which CW9 provided information to Labaton Sucharow about how, among other things, Millennial Media's and Jumptap's respective "tech stacks" failed to function together, which was discussed at frequent meetings (which was corroborated by CW8, who stated that executives at Millennial Media and Jumptap failed to understand the "depth of functionality" of the two platform systems and that each "tech stack" had its own functionality limits that the integration would not be able to solve), Lead Plaintiffs included statements by CW9 in the Complaint.

78.     On March 24, 2015, Labaton Sucharow sent CW9 a Federal Express package containing a copy of the Complaint filed on March 20, 2015 and a cover letter. According to a Federal Express delivery confirmation notice, the package was delivered to CW9 on March 27, 2015. CW9 did not contact us to report any inaccuracies in, or to request to be removed from, the Complaint.

79.     On April 8, 2015, I called and spoke with CW9. On that call, CW9 did not report any inaccuracies in, or ask to be removed from, the Complaint. At that time, CW9 did not report that (s)he had been contacted by defense counsel.

80.     On April 22, 2015, I attempted to reach CW9 by phone again. I left a voice message for CW9 explaining that on April 21, 2015, the Court issued an Order, which, among other things, directed all of the confidential witnesses in this case to provide an affidavit discussing the circumstances under which they became a confidential witness and the accuracy

of their statements in the Complaint. I asked CW9 to contact me to discuss this matter and I provided my office phone number. I did not hear back from CW9.

81.     On April 23, 2015 I attempted to reach CW9 by phone again and left another voice mail message. Later that day, I sent a brief letter, by Federal Express next day delivery, to CW9. This letter advised CW9 of the Court's April 21 Order and asked CW9 to contact me.

82.     On April 28, 2015, I attempted to reach CW9 by phone a third time and left a voice mail message. As of the filing of this affidavit, CW9 has not returned my phone calls or my letter of April 23.

### Confidential Witness 10 ("CW10")

83.     On March 17, 2015, a Labaton Sucharow investigator interviewed CW10 via telephone. Based on my discussion with the investigator and as confirmed by CW10, I believe that (i) CW10 was informed that the caller was an investigator working for the law firm; that (ii) CW10 confirmed that (s)he was a former employee of Millennial Media; and that (iii) CW10 was told that the purpose of the call was to gather additional information to use in a securities action against Millennial Media. During that call, according to Labaton Sucharow phone records, CW10 answered the investigator's questions about Millennial Media for approximately 43 minutes.

84.     Based on the interview in which CW10 provided information to Labaton Sucharow about how, among other things, efforts to integrate the technologies of Millennial Media with Jumptap's were a "mess" (which was corroborated by CW9, who stated that Millennial Media's and Jumptap's respective "tech stacks" failed to function together, which was discussed at frequent meetings, and by CW8, who stated that executives at Millennial Media and Jumptap failed to understand the "depth of functionality" of the two platform systems and that

each "tech stack" had its own functionality limits that the integration would not be able to solve), Lead Plaintiffs included statements by CW10 in the Complaint.

85.     On March 24, 2015, Labaton Sucharow sent CW10 a Federal Express package containing a copy of the Complaint filed on March 20, 2015 and a cover letter.  According to a Federal Express delivery confirmation notice, the package was delivered to CW10 on March 25, 2015.  CW10 did not contact us to report any inaccuracies in, or to request to be removed from, the Complaint.

86.     On April 8, 2015, I called and spoke with CW10.  On that call, CW10 did not report any inaccuracies in, or request to be removed from, the Complaint.  At that time, CW10 did not report that (s)he had been contacted by defense counsel.

87.     On April 22, 2015, I attempted to reach CW10 by phone again.  I left a voice mail message for CW10 explaining that on April 21, 2015, the Court issued an Order, which, among other things, directed all of the confidential witnesses in this case to provide an affidavit discussing the circumstances under which they became a confidential witness and the accuracy of their statements in the Complaint.  I asked CW10 to contact me to discuss this matter and I provided my office phone number.  CW10 did not return my call to report any inaccuracies in, or to request to be removed from, the Complaint.

88.     On April 23, 2015, I attempted to reach CW10 by phone again and left another voice mail message.  That evening, I sent a brief letter, by Federal Express next day delivery, to CW10.

89.     On April 23, 2015, shortly after I sent a letter to CW10 via Federal Express advising him/her of the Court's April 21 Order and asking him/her to contact me, CW10 called me back.  I informed CW10 that I was not his/her counsel, did not represent him/her, and could

not offer him/her legal advice. CW10 informed me that (s)he had reviewed the Complaint and that the statements attributed to him/her in the Complaint were "absolutely accurate." CW10 also stated that (s)he understood that his/her statements would be used in a complaint against Millennial Media and that (s)he would be identified as a confidential witness. However, CW10 stated that (s)he did not want to continue as a confidential witness in the case and that CW10 did not wish to have any further communications with me about the case. CW10 did not agree to provide an affidavit because (s)he said that (s)he would need legal counsel to review it, which would incur costs.

### Confidential Witness 11 ("CW11")

90.     On March 4, 2015, a Labaton Sucharow investigator interviewed CW11 via telephone. Based on my discussion with the investigator, I believe that (i) CW11 was informed that the caller was an investigator working for the law firm; that (ii) CW11 confirmed that (s)he was a former employee of Millennial Media; and that (iii) CW11 was told that the purpose of the call was to gather additional information to use in a securities action against Millennial Media. During that call, according to Labaton Sucharow phone records, CW11 answered the investigator's questions about Millennial Media for approximately 24 minutes.

91.     Based on the interview in which CW11 provided information to Labaton Sucharow about how, among other things, Millennial Media did not effectively police fraudulent internet traffic (which was corroborated by a public report of fraudulent traffic on Millennial Media's platforms), Lead Plaintiffs included statements by CW11 in the Complaint.

92.     On March 24, 2015, Labaton Sucharow sent CW11 a Federal Express package containing a copy of the Complaint filed on March 20, 2015 and a cover letter. According to a Federal Express delivery confirmation notice, the package was delivered to CW11 on March 25,

2015. CW11 did not contact us to report any inaccuracies in, or to request to be removed from, the Complaint.

93.     On April 8, 2015, I attempted to reach CW11 by phone. CW11 did not answer and I left a voice mail message. CW11 did not return my call.

94.     On April 22, 2015, I attempted to reach CW11 by phone again. I left a voice mail message for CW11 explaining that on April 21, 2015, the Court issued an Order, which, among other things, directed all of the confidential witnesses in this case to provide an affidavit discussing the circumstances under which they became a confidential witness and the accuracy of their statements in the Complaint. I asked CW11 to contact me to discuss this matter and I provided my office phone number. CW11 did not return my call to report any inaccuracies in, or to request to be removed from, the Complaint.

95.     On April 23, I sent a brief letter by Federal Express next day delivery, to CW11, advising CW11 of the April 21 Order and asking CW11 to contact me. I did not receive a call from CW11 in response to that letter.

96.     On April 28, 2015, I called CW11 again. CW11 told me that (s)he was driving to a meeting and that I should call back the next day.

97.     On April 29, 2015, I attempted to reach CW11 by phone at the agreed upon time and left another voice mail message. CW11 has not returned my call.

Executed on May 5, 2015.

Louis Gottlieb

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

-------------------------------------------------------x
                  :

IN RE MILLENNIAL MEDIA, INC.     :    14 Civ. 7923 (PAE)
SECURITIES LITIGATION        :
                  :
                  :    **AFFIDAVIT OF THOMAS C. BRIGHT**
                  :    **IN RESPONSE TO THE COURT'S**
                  :    **ORDER OF APRIL 21, 2015**
                  :    **REGARDING CONFIDENTIAL**
                  :    **WITNESS 1**
                  :
-------------------------------------------------------x

I, Thomas C. Bright, declare under penalty of perjury pursuant to 28 U.S.C. § 1746 as follows:

1.      I am a partner at Cera LLP, one of the Co-Lead Counsel in this Action. I have personal knowledge of the facts set forth herein.

2.      I oversaw my firm's efforts to contact witnesses who had knowledge of facts to support allegations made in Plaintiffs' Consolidated Class Action Complaint for Violations Of The Federal Securities Laws ("Complaint"). ECF No. 61. These efforts included identifying and speaking with customers or former customers of defendant Millennial Media, Inc.

3.      I directed Mr. Peter Zachary, an investigator working on behalf of my firm, to identify and contact an individual at Fiksu, Inc., a customer of Millennial Media, in an effort to learn facts relevant to Plaintiffs' allegations. Mr. Zachary initially identified a specific executive officer at Fiksu.

4.      At my direction, Mr. Zachary communicated with the aforementioned executive officer and the executive officer referred Mr. Zachary to CW1, a senior executive at Fiksu. Mr. Zachary informed me that he exchanged a number of e-mails with CW1 in an effort to schedule a time to speak with ▮ by telephone.

5.  On March 16, 2015, Mr. Zachary informed me that he had interviewed CW1 that afternoon. Mr. Zachary said that the phone call with CW1 lasted approximately 20 minutes. Mr. Zachary told me that during the call he told CW1 that he was investigating a matter which involved securities fraud litigation against Millennial Media on behalf of persons who had purchased shares of Millennial Media. Mr. Zachary further told me that CW1 was cooperative and answered his questions. Mr. Zachary informed me that he told CW1 that the information provided by CW1 may be used in the course of litigation against Millennial Media and if so, it would not be attributed to ███ by name and that CW1 understood this. The possibility of CW1's identity being disclosed was not discussed.

6.  Mr. Zachary informed me that after his call with CW1, he wrote a memorandum of the facts he learned from CW1. Mr. Zachary gave the memorandum to me. I read the memorandum and discussed it with Mr. Zachary. After my conversation with Mr. Zachary, I sent the memorandum by e-mail to Co-Lead Counsel.

7.  Prior to March 20, 2015, I reviewed a number of drafts of the Complaint. The Complaint that was filed did not specifically quote CW1. Based on my review of Mr. Zachary's memorandum and my conversations with him, I believe the Complaint accurately reflects the information provided by CW1. The information provided by CW1 was also consistent with the information provided by other confidential witnesses identified in the Complaint.

8.  On March 26, 2015, CW1 received a copy of the Complaint that was filed in this case by Federal Express from an investigator at Labaton Sucharow.

9.  On April 22, 2015, Mr. Zachary and I called CW1 as a result of the Court's April 21, 2015 Order. ECF No. 68. I informed CW1 that the Court had ordered Plaintiffs' counsel to obtain affidavits from the confidential witnesses cited in the Complaint. I said the affidavit

would set forth the communications ▮ had with the investigator and myself, and would state whether what ▮ told the investigator on March 16, 2015 conformed with the allegations in the Complaint attributed to ▮ During this conversation I informed CW1 that I was not ▮ counsel, do not represent ▮ and could not offer ▮ legal advice but that I would be willing to help prepare ▮ affidavit. CW1 said that if ▮ is going to sign something it had to be accurate and I agreed that ▮ affidavit must be accurate and honest.

10.     CW1 told me during the aforementioned call that ▮ had read the Complaint and stated that what was attributed to ▮ was mostly correct. The portion of the Complaint attributed to ▮ (Complaint at ¶¶5, 54, 135, 271) discussing that Millennial Media needed assistance in the programmatic market and acquired Jumptap because its then-current platform could not capitalize on programmatic advertising, was accurate and ▮ consented to these portions being included in the Complaint. As reflected in CW1's April 28 affidavit, ▮ said that Mr. Zachary had communicated the following sentence to CW1 during his interview of CW1 and that ▮ agreed at the time that it was probably the case: "Millennial Media needed to acquire Jumptap because Millennial Media's programmatic tools were not competitive and did not yield the installs necessary for client optimization." We agreed to communicate the following day about the affidavit.

11.     On April 24, 2015, I sent CW1 a draft of ▮ affidavit and ▮ made edits that are incorporated in ▮ executed affidavit.

12.     This affidavit is accurate and properly sets forth my statements on these subjects.

Executed on May 4, 2015

Thomas C. Bright

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
-------------------------------------------------------x

IN RE MILLENNIAL MEDIA, INC.
SECURITIES LITIGATION

14 Civ. 7923 (PAE)

**AFFIDAVIT OF** ▒▒▒▒▒▒ **IN**
**RESPONSE TO THE COURT'S**
**ORDER OF APRIL 21, 2015**
**REGARDING CONFIDENTIAL**
**WITNESS 1**

-------------------------------------------------------x

I, ▒▒▒▒▒▒, declare under penalty of perjury pursuant to 28 U.S.C. § 1746 as follows:

1.      I am providing this affidavit in response to the Court's Order of April 21, 2015.

2.      I am [a senior executive at] Fiksu, Inc. I have held that position since December 2010.

3.      Between March 6 and March 16, 2015, I exchanged a number of e-mails with an investigator working on behalf of the law firm Cera LLP in an effort to schedule a time to speak.

4.      On March 16, 2015, I received a phone call in the afternoon from an individual who identified himself as Mr. Peter Zachary, an investigator working on behalf of the law firm Cera LLP. At the time I received the call, I was at work.

5.      My phone call with the investigator lasted approximately 20 minutes. During that time, the investigator told me that he was investigating a matter which involved securities fraud litigation against Millennial Media on behalf of the shareholders of Millennial Media. I answered the investigator's questions.

6.      On March 26, 2015, I received a copy of the complaint that was filed in this case by Federal Express from an investigator at Labaton Sucharow. I reviewed the complaint at that time and noted that I was identified as confidential witness number 1.

7.     On April 22, 2015, the investigator I had previously spoken with called me and introduced attorney Thomas Bright of Cera LLP.  Mr. Bright informed me that the Court had ordered plaintiffs' counsel to obtain affidavits from the confidential witnesses cited in the complaint against Millennial Media, and that I was one.  He said the declaration would set forth the communications I have had with the investigator and himself, and would state whether what I told the investigator on March 16, 2015 conformed with the allegations in the complaint attributed to me.  During this conversation Mr. Bright informed me that he was not my counsel, does not represent me, and could not offer me legal advice but that he would be willing to help draft my affidavit.  I said that if I am going to sign something it had to be accurate and he agreed that my affidavit must be accurate and honest.

8.     I told Mr. Bright that what was attributed to me in the complaint was mostly correct.  The portion of the complaint attributed to me where I agreed that Millennial Media needed assistance in the programmatic market and acquired Jumptap because its then-current platform could not capitalize on programmatic advertising, is accurate and I consent to these portions being included in the complaint.  I did not state that "Millennial Media needed to acquire Jumptap because Millennial Media's programmatic tools were not competitive and did not yield the installs necessary for client optimization" but I did agree with Mr. Zachary that this was probably the case.  We agreed to communicate the following day about the affidavit.

9.     On April 24, 2015, Mr. Bright sent me a draft of this affidavit and I made edits that are incorporated in this affidavit.  This affidavit is accurate and properly sets forth my statements on these subjects.

██████████████

HIGHLY CONFIDENTIAL FILED IN CAMERA AND EX PARTE

I declare under penalty of perjury that the foregoing is true and correct.

Executed on this 28rd day of April, 2015.



**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
-------------------------------------------------------------- x

IN RE MILLENNIAL MEDIA, INC.       :     14 Civ. 7923 (PAE)
SECURITIES LITIGATION       :
                   :
                   :     **AFFIDAVIT OF** ▇▇▇▇▇▇
                   :     ▇▇▇▇▇ **IN RESPONSE TO THE**
                   :     **COURT'S ORDER OF APRIL 21, 2015**
                   :     **REGARDING CONFIDENTIAL**
                   :     **WITNESSES**
                   :
                   :
-------------------------------------------------------- x

I, ▇▇▇▇▇▇▇ , declare under penalty of perjury pursuant to 28 U.S.C. § 1746 as follows:

1.      I am providing this affidavit in response to the Court's order of April 21, 2015.

2.      From approximately May 2011 through March 2013, I was a User Interface Architect at Millennial Media, Inc.

3.      About one year ago, I received a phone call from an individual who identified himself as an investigator at the law firm of Labaton Sucharow. I do not remember his name.

4.      On that call, the investigator told me that his law firm was trying to develop information in support of a securities lawsuit against Millennial Media. After the investigator confirmed that I was a former employee of Millennial Media, I answered his questions about the Company. Our conversation lasted approximately 30 minutes.

5.      In March 2015, I received a call from another investigator at Labaton Sucharow who stated that he was trying to develop additional information in support of a securities lawsuit against Millennial Media. I do not recall his name. That investigator also confirmed that I was a former employee of Millennial Media. I answered his questions about Millennial Media.

6.      I understood that my statements on both of these calls could be used in a securities lawsuit against Millennial Media. I do not recall discussing whether my identity might someday be disclosed as a confidential witness.

7.      In late March 2015, I received a copy of the complaint that was filed in this case by Federal Express from Labaton Sucharow. I read it briefly, and did not have any comments.

8.      On April 22, 2015, Louis Gottlieb of Labaton Sucharow called me. He told me that he was an attorney representing the plaintiffs in this case. Mr. Gottlieb informed me that he was not my counsel, did not represent me, and could not offer me legal advice. He explained that the Judge in this case issued an order on April 21 directing the confidential witnesses in the complaint to submit an affidavit by May 5, 2015. I asked him to call me back the next day.

9.      On April 23, Mr. Gottlieb called me again and (after again explaining that he was not my counsel) asked if I would confirm the accuracy of the allegations attributed to me in the complaint. Mr. Gottlieb read aloud to me the following paragraph 46 from the complaint and asked me to confirm its accuracy after reading each sentence:

> Millennial Media's inability to collect and report clean and accurate user data is corroborated by confidential witnesses by CW3, who was a User Interface Architect in Millennial Media's Baltimore office from May 2011 through March 2013. According to CW3, data reporting at Millennial Media was not sophisticated and an overhaul was long overdue. According to CW3, there were seven or eight tools on the Company's "backend" from which the Company needed to collect data, which made it difficult to perform reporting. In addition, a former salesperson at Millennial Media, who did not have a programming background, was the person responsible for handling internal queries for reporting purposes, and, overall, the Company's approach was not an effective way to report its data.

10.     Each sentence in the paragraph above is accurate. However, as to the third sentence, I heard other people talk about, but I did not have detailed knowledge, that "there were

seven or eight tools on the Company's 'backend' from which the Company needed to collect

data, which made it difficult to perform reporting." Additionally, in the last sentence, it is more

accurate to say that the Company's approach was not "a particularly clean" way to report its data

rather than "an effective" way to report its data.

11.     Mr. Gottlieb also read aloud to me the following paragraph 108 from the

complaint and asked if my statements corroborated it:

> Early rumors of Millennial Media's potential acquisition of
> Metaresolver circulated as early as February 11, 2013. As
> *Advertising Age* (or "*AdAge*") reported that day, Metaresolver
> would be attractive to Millennial Media because, as Metaresolver
> founder and CEO Seamus McAteer had claimed, Metaresolver's
> strength was in providing "***clean***" data compared to other demand-
> side platforms that offered a glut of inaccurate information.[1]
> According to *AdAge*, Metaresolver was able to target mobile
> advertisements based on device type, mobile carrier, location and
> time of day and in turn allow for programmatic buying based on
> such data.[2] Millennial Media's announcement on February 19,
> 2013 that it would be acquiring Metaresolver reflected that
> Millennial Media lacked technology to collect such "clean" user
> data. This is corroborated by the statements of confidential
> witnesses CW3 and CW4 discussed above. *See* ¶¶ 46-47.

12.     The above paragraph is accurate—that was definitely a Millennial Media issue,

but it would depend on the definition of the word "clean."

13.     Mr. Gottlieb called me again on April 24, and again explained that he was not

acting as my attorney. He read the draft affidavit to me and I made some edits. Mr. Gottlieb told

me that paragraph 263 in the complaint is the same as paragraph 46, except for the last sentence.

Mr. Gottlieb read aloud to me that sentence and asked me to confirm its accuracy:

> In addition, a former salesperson at Millennial Media, without a
> programming background, was the person responsible for handling

---

[1] http://adage.com/article/digital/millennial-media-talks-acquire-mobile-ad-buying-platform-metaresolver/239729

[2] *Id.*

internal queries for reporting purposes, and, overall, the Company's approach was not a particularly clean way to report its data.

14.     That sentence is accurate.

15.     With the changes I made, as noted above, the statements attributed to me in the complaint are accurate and can stay in the complaint.

16.     On April 27, 2015, Mr. Gottlieb called me again and read this affidavit. I believe this affidavit is accurate and properly sets forth my statements on these subjects.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on this 29th day of April, 2015.



**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

------------------------------------------------------x
:
IN RE MILLENNIAL MEDIA, INC.          :          14 Civ. 7923 (PAE)
SECURITIES LITIGATION                      :
:
:          **AFFIDAVIT OF** ████████ **IN**
:          **RESPONSE TO THE COURT'S**
:          **ORDER OF APRIL 21, 2015**
:          **REGARDING CONFIDENTIAL**
:          **WITNESSES**
:
------------------------------------------------------x

I ████████, declare under penalty of perjury pursuant to 28 U.S.C. § 1746 as

follows:

1.      I am providing this affidavit in response to the Court's order of April 21, 2015.

2.      From approximately October 2010 to May 2013, I was a Quality Assurance

Manager at Millennial Media, Inc.

3.      About one year ago, I recall receiving a phone call from an individual who

identified himself as an investigator at the law firm of Labaton Sucharow.   I do not remember

the name of the investigator who called me.

4.      The phone call with the investigator lasted approximately 30 minutes.  At the start

of the call, the investigator told me that his law firm was investigating a potential securities

lawsuit against Millennial Media on behalf of investors.  The investigator also confirmed that I

was a former employee of Millennial Media.  Then, I answered his questions about the

Company.

5.      A couple of months ago, I received a second phone call from an individual who

also identified himself as an investigator at Labaton Sucharow.  He told me that the investigator

who interviewed me in 2014 had left his firm. He also confirmed that I was a former employee of Millennial Media and explained that he was trying to obtain additional information in support of a securities case against the Company on behalf of investors. Again, I answered the investigator's questions about Millennial Media.

6.     Several weeks later, I received a third phone call from the same investigator. On that call, the investigator introduced an attorney at his firm who stated that he was also working on the Millennial Media securities case. The attorney asked me additional questions about Millennial Media's technology, which I answered.

7.     It was disclosed to me that my statements made during these phone calls could be used in a lawsuit against Millennial Media.

8.     I do not recall a discussion about whether my identity could someday be ordered disclosed by the Court.

9.     On March 25, 2015, I received a copy of the complaint that was filed in this case by Federal Express from Labaton Sucharow. I read the entire complaint and felt that it accurately reflected my statements. I also understood that I was identified in the complaint as Confidential Witness 7.

10.     The next day, March 26, 2015, I emailed the investigator who had sent me the complaint to let him know that I received it, read it, and that it accurately reflected my statements. Today, I continue to believe that the complaint filed in this case accurately reflects my statements.

11.     On April 22, 2015, Louis Gottlieb of Labaton Sucharow called me. Mr. Gottlieb informed me that he was not my counsel, did not represent me, and could not offer me legal advice. He explained that the Judge in this case issued an order on April 21, 2015 directing the

confidential witnesses referenced in the complaint to submit affidavits by May 5, 2015 regarding

the circumstances related to them becoming confidential witnesses and regarding the accuracy of

their statements. I told him what I recalled about my conversations with Labaton Sucharow

investigators, my review of the complaint when I received it by Federal Express, and the e-mail

that I sent to the investigator on March 26. My statements on the April 22 call are the basis of

this affidavit. Mr. Gottlieb told me he would call me again in the next few days about the

affidavit.

12.     On April 27, 2015, Mr. Gottlieb called me again and read a draft of this affidavit.

I believe this affidavit is accurate and properly sets forth my statements on these subjects.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on this 29th day of April, 2015.

