

Lyle Roberts
+1 202 842 7855
lroberts@cooley.com

April 17, 2015

*Submitted Ex Parte by E-mail*

The Honorable Paul A. Engelmayer
United States District Court for the Southern District of New York
40 Foley Square
New York, NY 10007

      Re: ***Public Employees' Ret. Sys. of Mississippi v. Millennial Media, Inc.*,
          No. 1:14-cv-07923-PAE (S.D.N.Y.)**

Dear Judge Engelmayer:

      We represent Defendant Millennial Media, Inc., and all of the individual Defendants in the above-captioned case (the "Corporate Defendants").[1] On April 14, 2015, the Court issued an order addressing the issue of the withdrawal of the allegations attributed to "Confidential Witness 4" (CW4) from the Complaint. The Court directed Plaintiffs' counsel to provide sworn affidavits related to the events surrounding the use of the CW4 allegations so as "to assure that no impropriety has occurred, and if one has occurred, to enable the Court to determine the appropriate response." Order at 4.

      In light of CW4's withdrawal, and consistent with the Corporate Defendants' April 13, 2015 letter to the Court, we have undertaken an inquiry into the other confidential witness allegations in the Complaint. By this letter and the attached declarations, we are providing the Court with the results of our inquiry to date.[2] With regard to the submissions concerning CW4 by Plaintiffs' counsel, the Court instructed that those submissions "[f]or avoidance of doubt . . . be filed, in the first instance, *ex parte*." Consistent with the foregoing, and in an abundance of caution, we are likewise submitting this letter and the accompanying declarations to the Court *ex parte*. If the Court wants copies of any or all of these materials to be electronically filed, or manually served on Plaintiffs, we will do so immediately.

      Here is a summary of the results of our inquiry to date:

      *First*, we have spoken with the confidential witness identified in the Complaint as CW11, who confirms that he is the individual in question. According to CW11, he was never told that his statements would be included in a complaint, and he did not have the opportunity to review the Complaint before it was filed. He affirmatively denies that he made the statement attributed to him that specifically relates to Millennial Media's conduct.

---

[1] Specifically, in addition to Millennial Media, Inc., we represent Paul J. Palmieri, Michael B. Avon, Andrew J. Jeanneret, Michael Barrett, Robert P. Goodman, Arun Gupta, Patrick J. Kearns, Alan Macintosh, John D. Markley, Jr., Wenda H. Millard, James A. Tholen, and George Zachary.

[2] We are mindful that the submission of letters longer than three pages ordinarily is not permitted by the Court, but we respectfully submit that this letter is warranted under the extraordinary circumstances present here.



*Second,* we have spoken with the confidential witness identified in the Complaint as CW8, who confirms that she is the individual in question. According to CW8, she did not have the opportunity to review the Complaint before it was filed, and she affirmatively denies that she made several of the statements concerning Millennial Media that are attributed to her.

*Third,* we have spoken with the confidential witness identified in the Complaint as CW5, who confirms that she is the individual in question. According to CW5, she did not make all of the statements concerning Millennial Media that are attributed to her. CW5 also expressed an interest in being removed from the Complaint and we provided her with contact information for Plaintiffs' counsel and the Court.

*Finally,* on information and belief, we have identified the confidential witness labeled in the Complaint as CW2. Although CW2 is said to have described a series of events that, according to the Complaint, took place in 2012, Millennial Media has found an e-mail written by CW2 appearing to establish that the described events could not have taken place at that time, which is significant for reasons discussed further below.

In sum, leaving aside CW2 and CW4, we have talked with three of the remaining eight confidential witnesses who are former Millennial Media employees.[3] All three of these confidential witnesses – CW11, CW8, and CW5 – have denied that they made statements attributed to them in the Complaint, raising serious concerns about the statements attributed to the remaining confidential witnesses. Accordingly, the Corporate Defendants respectfully request that (a) Plaintiffs be ordered to provide the Court with sworn affidavits from CW1, CW3, CW4, CW6, CW7, and CW10 concerning the circumstances surrounding their inclusion in the Complaint and establishing whether they actually made their attributed statements, (b) Defendants be permitted to take the deposition of CW2 for the limited purpose of determining whether CW2 acknowledges the statements attributed to him in the Complaint, and (c) the briefing schedule for any motion to dismiss be suspended and reinstated only if the Court permits the filing of a new complaint (which, at a minimum, should not include any allegations denied by CW11, CW8, and CW5, or any other CW allegations not expressly acknowledged by the confidential witnesses in question).[4]

\* \* \*

Below is a fuller description of our investigation of the confidential witness allegations to date.

CW11 – In the Complaint, Plaintiffs allege that a series of statements attributed to the Company throughout the putative class period were rendered false or misleading by Defendants' alleged failure to disclose, *inter alia,* that "Millennial Media's revenues and user data included significant amounts of traffic from 'click fraud.'" Amend. Compl. ¶ 171(h). The primary basis for this allegation is a statement from CW11, who is described as "a Sales Director in the Company's San Francisco office from May 2013

---

[3] CW1 is not a former Millennial employee, but instead is described as "a senior executive at Fiksu, Inc., a media buying entity." Amend. Compl. ¶¶ 53, 267.

[4] If the Court deems it appropriate, it also could order that the depositions of CW11, CW8, or CW5 be taken for the limited purpose of further determining whether they acknowledge the statements attributed to them in the Complaint.-



The Honorable Paul A. Engelmayer
April 17, 2015
Page Three

through December 2014." *Id.* According to Plaintiffs, CW11 told them that "Millennial Media did not effectively police fraudulent Bot-driven traffic, which was reflected in the [December 2014] Pixalate Report."

As set forth in the attached Declaration of George Anhang, however, CW11 denies that he ever made that statement. Based on the description in the Complaint, Millennial Media identified a former employee that it believed to be CW11. Two Cooley attorneys called that former employee on April 14, 2015 and spoke with him.[5] Anhang Dec. ¶ 3. The former employee confirmed that he was "a Sales Director in the Company's San Francisco office from May 2013 through December 2014" and that he previously had spoken with someone who said he was investigating Millennial Media. Anhang Dec. ¶¶ 4(b)-(c). The former employee said that no one had informed him that his comments would be used in a complaint. Anhang Dec. ¶ 4(b).

When the former employee was read the statement attributed to him concerning whether Millennial Media "did not effectively police fraudulent Bot-driven traffic," he replied that he had never said to the person who had called him whether the Company did, or did not, engage in that conduct. Anhang Dec. ¶ 4(d). Moreover, the former employee explained that he was not in a position to assess whether the Company "effectively police[d]" fraudulent traffic because his role at the Company was such that he would not have been familiar with the Company's efforts to "police fraudulent Bot-driven traffic." Anhang Dec. ¶ 4(e).

CW8 – In the Complaint, Plaintiffs allege certain statements concerning Millennial Media's technology and the integration of Jumptap with Millennial Media were rendered false or misleading by Defendants' alleged failure to disclose, *inter alia*, that the company had fired, in May 2013, an entire engineering team and would be unable to combine the technology used by the two companies. Amend. Compl. ¶¶ 118, 141. One of the bases for these allegations is a set of statements attributed to CW8, who is described as a "Senior Software Engineer at Millennial Media from September 2012 to June 2014." *Id.* at ¶ 118.

As set forth in the Declaration of George Anhang, however, CW8 denies that she made certain statements attributed to her in the Complaint. Based on the description in the Complaint, Millennial Media identified a former employee that it believed to be CW8. Two Cooley attorneys called that former employee on April 16, 2015 and spoke with her. Anhang Dec. ¶ 5. The former employee confirmed that she was a "Senior Software Engineer at Millennial Media from September 2012 to June 2014" and that she previously had spoken with someone who said he was investigating Millennial Media. Anhang Dec. ¶¶ 6(a), 6(c).

When the former employee was read the statement attributed to her that "'essentially the entire [MYDAS] platform team' was fired," she replied that she never said that to the investigator and, to her knowledge, that statement was inaccurate. Anhang Dec. ¶ 6(d)(i). When the former employee was read the statement attributed to her that "engineers from both companies were divided into a 'Blue Team,' from Jumptap's platform, and a 'Green Team,' from Millennial Media's MYDAS platform" she replied

---

[5] The two Cooley attorneys were George Anhang and Rebecca Welsh. Attached hereto are copies of Declarations from both Mr. Anhang and Ms. Welsh.



The Honorable Paul A. Engelmayer
April 17, 2015
Page Four

that she never said that to the investigator and, to her knowledge, that statement was inaccurate. Anhang Dec. ¶ 6(d)(ii). When the former employee was read the statement attributed to her that "executives from Millennial Media and Jumptap failed to understand the 'depth of functionality' of the two platform systems, and confirmed that each 'tech stacks' had its own functionality limits that integration would not be able to solve," she replied that, contrary to her reported statement, she did not believe that integration would be "not be able to solve" the functionality limits. Anhang Dec. ¶ 6(d)(iii).

CW5 - In the Complaint, Plaintiffs allege that Millennial Media misstated the Company's ability to accurately measure, attribute and report user behavior and inaccurately reported the reasons for its financial results based, *inter alia*, on issues related to third party tracking. Amend. Compl. ¶¶ 39-48, 98-102, 253-262. One of the bases for these allegations is a set of statements attributed to CW5, who is described as a "Millennial Media account executive and director of sales from approximately March 2010 to August 2012, and Regional Vice President of Performance from approximately August 2012 to November 2013." *Id.* at ¶¶ 48, 262.

As set forth in the Declaration of George Anhang, however, CW5 says that she did not make statements attributed to her. Based on the description in the Complaint, Millennial Media identified a former employee that it believed to be CW5. Two Cooley attorneys called that former employee on April 16, 2015 and spoke with her. Anhang Dec. ¶ 7. The former employee confirmed that she was a "Millennial Media account executive and director of sales from approximately March 2010 to August 2012, and Regional Vice President of Performance from approximately August 2012 to November 2013." Anhang Dec. ¶ 8(b).

When the former employee was read the statement attributed to her that "significant customers such as Zillow, a real-estate website, and DeNA, a Japanese mobile developer, materially reduced or eliminated their budgets at Millennial Media beginning in late 2012 due to the increased usage of third party tracking services," she replied that, contrary to her reported statement, she did not believe that any reduction or elimination of budgets was solely due to the increased usage of third party tracking services. Anhang Dec. ¶ 8(c)(i). When the former employee was read the statement attributed to her that "[a]s a result, . . . CW5's performance advertising team lost 'well over' 50% of their revenue in early 2013, a trend that progressively worsened," she replied that she had never made that statement. Anhang Dec. ¶ 8(c)(ii). Moreover, the former employee explained that she was not in a position to assess whether the performance advertising team "lost 'well over' 50% of their revenue in early 2013." Anhang Dec. ¶ 8(c)(ii).

Finally, at the conclusion of the telephone call we had with the former employee, she expressed an interest in being removed from the Complaint. Later that day, in response to her question, we sent her an e-mail in which we told her that if she elected to ask to be removed from the Complaint, we suggested she contact Plaintiffs' counsel or the Court. Anhang Dec. ¶ 8(d).

CW2 – In the Complaint, Plaintiffs allege that Millennial Media misstated the Company's ability to accurately measure, attribute and report user behavior and inaccurately reported the reasons for its financial results based, *inter alia*, on issues related to third party tracking. Amend. Compl. ¶¶ 39-48, 253-262. One of the bases for these allegations is a set of statements attributed to CW2, who is described as



The Honorable Paul A. Engelmayer
April 17, 2015
Page Five

having "joined the Company in October 2011 in its home office in Baltimore as an account associate on the performance team, and relocated to the San Francisco office in September 2012 where he was promoted to account executive." *Id.* at ¶¶ 42, 256. CW2 is cited *thirty-three* times in the Complaint.

As set forth in the attached Declaration of Ho Shin, Millennial Media believes that it has identified CW2. Shin Dec. ¶ 6. Accordingly, we have been able to review certain company e-mails sent by that individual. Among the statements attributed to CW2 is that "Millennial Media saw a significant decline in the revenue generated from Supercell (the developer of the video game 'Clash of Clans,' among others), who began using a third party tracking service known as 'HasOffers' in *February and March of 2012.*" *Id.* at ¶¶ 45, 201(b), 259 (emphasis added). In fact, as clearly stated in a *January 11, 2013* e-mail sent by the relevant individual to Supercell employees recapping a recent meeting, "you'll [Supercell] be integrating with Hasoffers in February and will need to have all of your partners setup and using them for tracking at that time." *See* Shin Dec., Exhibit A.

The timeframe of the alleged third party tracking issues is significant – the statements attributed to CW2 are the only basis for Plaintiffs' assertion that Defendants were aware of third party tracking issues as of early 2012 and, as a result, made alleged false statements to investors at that time. *See* Amend. Compl. ¶ 201(b) (relying solely on alleged statements by CW2 for this claim). The contents of this e-mail raise significant questions as to the reliability of the statements attributed to CW2 in the Complaint. In *Campo v. Sears Holding Corp.*, 371 Fed.Appx. 212 (2d Cir. 2010), the Second Circuit found no error in a district court ordering depositions of confidential witnesses prior to ruling on a motion to dismiss for the purpose of "determining whether CWs acknowledged the statements attributed to them in the complaint," and then considering only the statements corroborated by the confidential witnesses in deciding the motion. *Id.* at n.4; *In re Sony Corp. SXRD Rear Projection Television Mktg., Sales Practices & Products Liab. Litig.*, 268 F.R.D. 509, 511 (S.D.N.Y. 2010) ("[T]he Court, before determining potentially dispositive motions to dismiss, ordered ... that the depositions of the confidential sources be taken by counsel.") The Corporate Defendants would urge this Court to take the same approach here and allow the deposition of CW2. Only to the extent that CW2 actually acknowledges the statements attributed to him in the Complaint should the Court allow those statements to be included in any future complaint.

\* \* \*

The results to date of our investigation of the CW allegations reveal that Plaintiffs may not have had a good faith basis for the filing of their Complaint. We respectfully urge the Court to take immediate action, as set forth above in the opening section of this letter, to address these troubling issues.

Respectfully,

Lyle Roberts