USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED: 5/29/2015

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------------------X
                     :

IN RE MILLENNIAL MEDIA, INC. SECURITIES
LITIGATION

-------------------------------------------------------------------X

14 Civ. 7923 (PAE)

OPINION & ORDER

PAUL A. ENGELMAYER, District Judge:

    Plaintiffs in this putative securities class action have filed a notice of voluntary dismissal without prejudice, which defendants do not oppose. The Court accordingly so dismisses this case. This Opinion and Order addresses two collateral matters.

    First, the Court considers the parties' applications to permit redactions of their filings to the extent that they would tend to reveal the identities of persons described in plaintiffs' First Amended Complaint ("FAC") as "Confidential Witnesses" ("CWs"). The Court approves these redactions so as to protect the confidentiality interests of these persons.

    Second, the Court discusses a practice by plaintiffs' counsel, the revelation of which appears to have led plaintiffs to voluntarily dismiss this lawsuit: attributing statements in a Complaint to persons identified there as CWs, without ever (1) confirming with the CW the accuracy of the statements attributed to him or her, or (2) notifying the CW that counsel intended to quote him or her as such. The FAC here quoted 11 persons as CWs. Plaintiffs' counsel had never spoken to 10 of the 11—the CWs had been interviewed by an investigator. After being alerted that they had been quoted in a Complaint, four CWs asked that all references to them be dropped. And four CWs reported material inaccuracies in statements the FAC had attributed to them.

    These circumstances raise serious questions: Did plaintiffs' counsel take proper care to verify the statements attributed to the CWs before the FAC was filed? And were the CWs fairly

treated when, without notice, they were designated as CWs in a Complaint, thereby creating a

risk that their names would be revealed later in this litigation?  As addressed below, this case

underscores why it is a best practice—if not an ethical imperative—for counsel, before

designating a person as a CW in a Complaint, to notify that person of counsel's intent to do so

and to verify the statements that counsel propose to attribute to him or her.

## I.     Background

In fall 2014, two putative class actions were filed, under the federal securities laws, on

behalf of all purchasers of Millennial Media, Inc. ("MM") securities between March 28, 2012

and May 7, 2014.  On February 10, 2015, the Court consolidated these actions and appointed co-

lead plaintiffs and counsel.  Dkt. 51.

On March 21, 2015, plaintiffs filed the FAC.  *See* Dkt. 61.  The FAC alleged that MM, a

digital advertising company that provides services to developers and advertisers, and the

individual defendants (various directors, officers, and executives) had made false and misleading

statements about MM's technological capabilities and outlook, and that, between March 2012

and August 2014, these uncorrected statements artificially inflated MM's stock price.  *Id.*  The

FAC attributed information to and/or directly quoted 11 persons whom it identified as CWs.  *Id.*

On April 13, 2015, four days before the due date of defendants' anticipated motion to

dismiss, plaintiffs filed a letter with the Court.  Dkt. 64.  Plaintiffs sought leave to file a

"Supplemental Amended Complaint," which would remove all references to "Confidential

Witness 4" ("CW-4").  *Id.*  Plaintiffs explained that, after the FAC had been filed, CW-4 had

informed plaintiffs that he[1] did not wish to be quoted in a Complaint.  *Id.*  Plaintiffs did not

disclose whether CW-4 had ever agreed to be quoted in a Complaint, if so under what

---

[1] To avoid revealing the gender of any of the 11 CWs, the Court uses masculine pronouns to
refer to all CWs.

circumstances CW-4 had done so, or whether before filing the FAC plaintiffs had notified CW-4 that they intended to quote him. Nor, at that time, did plaintiffs reveal whether CW-4 disclaimed any statement the FAC had attributed to him. In their letter, plaintiffs also argued that the due date for defendants' motion to dismiss should not be changed. *Id.* The same day, defendants moved for additional time to answer or move to dismiss, on the grounds that the "Supplemental Amended Complaint" would qualify as an amended complaint, justifying, under Federal Rule of Civil Procedure 15(a), an extension of time to respond. Dkt. 65.

On April 14, 2015, the Court granted plaintiffs leave to file a newly amended complaint, while extending, by two weeks, the deadline by which defendants were to answer or move to dismiss. Dkt. 66. In its order, the Court expressed concern "about the circumstances related to the inclusion, perhaps without the witness's knowledge or consent, of references in the [FAC], to Confidential Witness 4." *Id.*

The Court added:

> To assure that no impropriety has occurred, and if one has occurred, to enable the Court to determine the appropriate response, the Court directs that, by Friday, April 17, 2015, the following two documents be submitted to the Court by plaintiffs' counsel: (1) a sworn affidavit from a personally knowledgeable attorney explaining, with specificity and attaching all relevant correspondence and/or other relevant documentation, the circumstances under which references to Confidential Witness 4 came to be in the [FAC] and all communications—before and after its filing—with the witness relating to this subject; and (2) a sworn affidavit from Confidential Witness 4 recounting, with specificity, his version of these events. For avoidance of doubt, these submissions may be filed, in the first instance, *ex parte*. After reviewing the submissions, the Court will determine whether it is appropriate for these materials to be disclosed to the defense, and if so, whether redactions (apart from references tending to identify Confidential Witness 4) are to be made.

*Id.*

The following day, plaintiffs filed a newly amended complaint, the Second Amended Complaint ("SAC"), which excised all references to CW-4. Dkt. 67.

On April 17, 2015, both sides submitted to the Court a series of documents—by email, *ex parte*—in response to the April 14 order.

Plaintiffs submitted four affidavits: one from CW-4, and three from personnel affiliated with one of plaintiffs' law firms, Labaton Sucharow, LLP ("Labaton")—a partner, a former investigator, and the current director of investigations.  *See* Dkt. 71-1.  Plaintiffs' affidavits were accompanied by exhibits.  These included an investigator's report and memorandum, and strongly worded emails that CW-4 had sent to a Labaton investigator on March 25, March 28, and April 2, 2015, after learning that he had been quoted as a CW.  *Id.*  These materials— described more fully below—revealed that CW-4 had been interviewed one time, telephonically, by a Labaton investigator; that CW-4 not been told, in advance, that he would be quoted in a Complaint; and that CW-4 had learned that the FAC had quoted him, as a CW, only after the FAC had been publicly filed and plaintiffs' counsel had sent him a copy.  *Id.*  They also revealed that CW-4 disputed the accuracy of various statements that the FAC attributed to him, and had told plaintiffs' counsel this in no uncertain terms.  *Id.*

For their part, defendants submitted, unsolicited, materials reflecting their investigation into the CWs cited in the FAC.  *See* Dkt. 72, 74, 75.  These included declarations of attorneys recounting conversations with three persons whom defendants believed to correspond to CWs (CWs 5, 8, and 11) quoted in the FAC.  Dkt. 72, 74.  These witnesses each stated that they objected to being quoted, even pseudonymously, in the Complaint.  Dkt. 72, 74.  Like CW-4, these three witnesses also disputed the accuracy of statements attributed to them.  Dkt. 72, 74.

On April 21, 2015, the Court issued an order summarizing these filings.  Dkt. 68.  The Court stated that the parties' April 17 submissions raised concerns relating to the treatment by plaintiffs' counsel of persons identified as CWs:

4

(1) To what extent does the FAC (and now the SAC) inaccurately attribute statements to such confidential witnesses?; (2) to what extent were the 11 persons identified in the FAC as confidential witnesses notified beforehand that they might be quoted as such in the complaint as publicly filed, and were these persons notified that being quoted as a confidential witness created a risk that their identities would be ordered disclosed, including during discovery, *see, e.g.*, *Plumbers and Pipefitters Local Union No. 630 Pension Annuity Trust Fund v. Arbitron, Inc.*, 278 F.R.D. 335 (S.D.N.Y. 2011)?; and (3) to what extent do other persons identified as confidential witnesses, like CW-4, now ask to have the attributions to them removed?

*Id.* The Court directed:

> To obtain answers to these questions, and to determine appropriate next steps, the Court directs plaintiffs' counsel, by Tuesday, May 5, 2015, to submit to the Court the following two materials as to each of the remaining 10 confidential witnesses (*i.e.*, those other than CW-4): (1) a sworn affidavit from a personally knowledgeable attorney explaining (a) the circumstances under which references to that confidential witness came to be in the FAC (now the SAC), (b) how the witness came to be identified as a "confidential witness" (*i.e.*, as opposed to being referred to by name), (c) whether the witness was informed in advance that he or she would be quoted in the complaint, and that a reference in the complaint to a "confidential witness" created a risk that the witness's identity would be ordered disclosed, *see Arbitron*, and whether the witness consented to being so quoted in the complaint; and (d) whether the witness, having reviewed the FAC (or SAC), confirms that the statements attributed to him or her were accurately attributed; and (2) a sworn affidavit from each confidential witness setting out, with specificity, his or her version of these events.

*Id.* (emphasis omitted). The Court directed that these submissions be filed, in the first instance, *ex parte*, and, on May 8, 2015, publicly. *Id.* The Court authorized counsel to redact the publicly filed versions of these documents to protect witness identities and to protect counsel's work product. *Id.*

On May 5, 2015, plaintiffs filed, *ex parte*, materials in response to the Court's order, including two affidavits from counsel and affidavits from multiple CWs. *See* Dkt. 71-2. In summary, these materials revealed the following:

1. Before filing the FAC, plaintiffs' counsel had never spoken to 10 of the 11 persons identified as CWs. Each instead had been telephonically interviewed by an

investigator employed by Labaton (10 CWs) or its co-counsel Cera LLP ("Cera")

(one CW).  The eleventh CW, CW-5, had been telephonically interviewed first by a

Labaton investigator, and later, by the investigator and a Labaton associate.

2.  None of the 11 CWs had been affirmatively notified that they would be quoted in a

Complaint or designated there as a CW.  (During the interview in which the Labaton

associate participated, CW-5 had asked if his name would appear in the Complaint;

the associate replied that it would not and that CW-5 would be referred to as a

Confidential Witness.  *See* Dkt. 71-2, Affidavit of Louis Gottlieb ("Gottlieb Aff."),

¶ 37.)

3.  Plaintiffs' counsel had sent the FAC to each CW after it had been filed, in March

2015.  *See* Dkt. 71-1, Affidavit of Thomas G. Hoffman ("Hoffman Aff."), ¶¶ 9, 10,

12.  CW-4 promptly contacted plaintiffs' counsel to ask that all attributions to him be

dropped.  *See* Dkt. 71-1, at p. 20, Affidavit of Jerome C. Pontrelli ("Pontrelli Aff."),

Exs. 4, 7, 8.

4.  After the Court's April 21, 2015 order, plaintiffs' counsel had succeeded in

contacting eight of the 10 remaining CWs.  Plaintiffs' counsel attempted, but failed,

to contact the other two CWs (CWs 9 and 11).  Gottlieb Aff. ¶¶ 82, 97.

5.  After being contacted, three additional CWs (CWs 5, 8, and 10) asked to be removed

from the Complaint.  *Id.* ¶¶ 43, 73, 89.  One (CW-8) also stated that certain

statements attributed to him required modifications in order to be accurate.  *Id.* ¶¶ 68–

72.

6.  Plaintiffs' counsel also submitted affidavits from three other CWs (CWs 1, 3, and 7),

who stated that they consented to being cited as CWs.  Two (CWs 1 and 3), however,

stated that certain statements attributed to them were inaccurate or were presented in a misleading context so as to require modification. *See* Dkt. 71-2, Affidavit of Thomas C. Bright ("Bright Affidavit"), ¶ 10; Dkt. 71-2, at p. 31, CW-1 Affidavit ("CW-1 Aff."), ¶ 8; Hoffman Aff. ¶ 28; Dkt. 71-2, at p. 34, CW-3 Affidavit ("CW-3 Aff."), ¶ 10.

Also on May 5, 2015, plaintiffs filed a notice of voluntary dismissal, with defendants' consent. Dkt. 69.

On May 6, 2015, the Court issued an order stating that, notwithstanding the anticipated dismissal, counsel remained obliged to publicly file, on May 8, 2015, redacted versions of their *ex parte* submissions. Dkt. 70. The Court authorized redaction of these filings as necessary to protect the CWs' identities, and stated that: "if counsel believe that additional redactions are justified, *e.g.*, to protect attorney work-product, their public filings may also reflect such redactions. In such an event, counsel are directed to submit, the same day, a letter memorandum explaining, and providing the legal basis for, such redactions." *Id.*

On May 8, 2015, both parties publicly filed redacted versions of their earlier *ex parte* submissions, as directed. *See* Dkt. 71–72, 74–75.

## II.    Appropriateness of Proposed Redactions

The Court approves the parties' proposed redactions as appropriate. Plaintiffs have redacted only the names and other identifying information of the CWs (*e.g.*, email and mailing addresses), as the Court's orders authorized. Dkt. 68, 70. Defendants' redactions, with one exception, similarly cover names and other identifying information of CWs.

The exception concerns one email. *See* Dkt. 75-3, Ex. A. In the publicly filed version of that email, defendants redacted portions that relate to the pricing, budget, and financial figures of

an MM customer.  That redaction, too, is appropriate.  The redacted data is irrelevant to any issue in this case and appears to be confidential.  *See, e.g.*, *SOHC, Inc. v. Zentis Sweet Ovations Holding LLC*, No. 14 Civ. 2270 (JMF), 2014 WL 5643683, at *5 (S.D.N.Y. Nov. 4, 2014) (approving redactions to filings where redactions were "limited to specific financial figures and customer information, which are not relevant to the parties' legal dispute and implicate legitimate privacy interests") (citing *United States v. Amodeo*, 71 F.3d 1044, 1051 (2d Cir. 1995)) (internal quotation marks omitted), *reconsideration denied*, 2014 WL 6603951 (S.D.N.Y. Nov. 20, 2014).

The Court, accordingly, approves the parties' redactions, finding them tailored to valid interests in confidentiality and sufficiently so to overcome the presumption in favor of public access.  *See generally Lugosch v. Pyramid Co. of Onondaga*, 435 F.3d 110, 119–20 (2d Cir. 2006).  The Court will file, under seal, the unredacted versions of both parties' submissions.

## III.    Practices With Respect to Citing Confidential Witnesses

Because plaintiffs have elected to dismiss this lawsuit, the Court has no occasion to rule on the propriety of counsel's practices with respect to quoting persons designated as CWs.  But the facts revealed by the parties' recent submissions, including that four CWs (CWs 4, 5, 8 and 10) have asked that all references to them be struck, are unsettling.  From the affidavits of the CWs and counsel, it appears that, of the 11 persons whom the FAC identified as CWs, (1) 10 were never told that they would be so identified in a Complaint, (2) none was told that his designation as a CW in a public pleading created a possibility that his identity would later be revealed in litigation, and (3) at least four (CWs 1, 3, 4, and 8) claim to have been misquoted or misleadingly quoted.

Plaintiffs' counsel's submissions in response to the Court's April 14 and April 21 orders illuminate how these circumstances came about.  These submissions reveal that, before the Complaint was filed, each of the 11 CWs had been interviewed by an investigator—10 by an investigator working for Labaton.[2]  In each instance, the investigator stated that the purpose of the call was to "gather information" for use in a potential securities lawsuit against MM, but in no instance was "the possibility that the CW's identity could be disclosed . . . discussed." Gottlieb Aff. ¶ 13.  In each instance, the investigator prepared an "investigative report" memorializing the interview.  *See, e.g.*, Pontrelli Aff. Ex. 1.

In preparing the FAC, counsel at Labaton drew upon these investigative reports, and ensured that the statements in the FAC were consistent with these reports.  With the exception of the follow-up phone interview of CW-5, counsel did not, however, contact any interviewee before filing the FAC.  Nor did counsel take any action to confirm with the interviewee the statements that would be attributed to him, or to alert the interviewee that counsel intended to refer to him, in a Complaint, as a CW.

In an affidavit submitted by its lead partner on this case, Labaton explained that the law firm's practice "is to identify all witnesses referenced in a complaint as 'Confidential Witnesses' rather than by name."  Gottlieb Aff., at 10 n.5.  The firm does not affirmatively notify such an interviewee that he will be identified in a Complaint as a CW.  But if an interviewee asks whether or how he will be identified in a Complaint, the investigator will respond that "(s)he will be identified in the complaint as a confidential witness."  *Id.*  And, if the interviewee asks "if his/her name will ever be disclosed, we inform the witness that we will try our best to keep his/her name confidential but that courts have ordered the names of confidential witnesses

---

[2] The eleventh, CW-1, was interviewed by an investigator from Labaton's co-lead counsel, Cera. *See* Gottlieb Aff., at 1 n.1.

disclosed during the discovery process." *Id.*  But unless the interviewee raises these questions, he will not be notified that he will be designated as a CW.  The Labaton partner described these practices as, to his knowledge, "consistent with the practice of other law firms who prosecute securities cases on behalf of shareholders." *Id.*

The Court is not in a position to know whether, as suggested, other firms representing plaintiffs in securities class actions subscribe to these same practices.[3]  But whether or not the practices used in this case are industry-standard, the Court views them, for two reasons, as problematic.

      **1.**    ***Potential for inaccuracy***:  First, counsel's practices with regard to preparing the Complaint create significant potential for inaccuracy.

As the affidavits of counsel and the CWs reveal, plaintiffs' counsel did not attempt to confirm with any of the 11 CWs the quotes attributed to them.  Instead, the quotes used in the FAC were drawn from an investigator's memo summarizing an earlier phone interview of the CW.[4]  The CWs were not given an opportunity to verify, or refute, that these quotes were accurate or presented in fair context.

---

[3] The limited evidence before the Court indicates that, at least in this case, plaintiffs' co-lead counsel, Cera, used similar practices to Labaton's.  *See* Bright Aff. ¶ 5 (when Cera's investigator interviewed CW-1, "[t]he possibility of CW1's identity being disclosed was not discussed."); *see also id.* ¶ 6 (noting that Cera's investigator, like Labaton's, did not tape record the interview, but instead "wrote a memorandum . . . after his [telephone] call with CW1").

[4] As to the conduct of the interviews, the investigators appear to have telephoned each witness, without any colleague participating in the call, and to have taken notes during or after the call without tape-recording it.  As Judge Rakoff has recognized, these practices are less than optimal as a means of obtaining a reliable account of the witnesses' statements for use in a future filing. *See, e.g.*, *City of Pontiac Gen. Emps.' Ret. Sys. v. Lockheed Martin Corp.*, 952 F. Supp. 2d 633, 637 (S.D.N.Y. 2013) (the investigator's "testimony revealed that his interview practices were less rigorous than would have been typical of, say, a federal law enforcement agent; for example, he did not ask any other member of his staff to be with him on his phone calls with the CWs, nor did he ask the CWs if he could tape-record the calls or meet with them in-person, preferring to

Not surprisingly, fully 44% (four of nine) of the CWs whom counsel later contacted repudiated, as inaccurate, misleading, or lacking a foundation in personal knowledge, various statements the FAC had attributed to them.  These CWs reported the following:

*CW-4*:  CW-4, a former product manager at MM, *see* FAC ¶ 56, was telephoned, and was interviewed, by a Labaton investigator, after CW-4 had been drinking at a happy hour event, *see* Pontrelli Aff. Ex. 7 (March 28, 2015 email).  CW-4 told the investigator that he did not want his statements to be used in a legal filing, and so stated in an email sent to the investigator after receiving the FAC.  *See* Pontrelli Aff. Ex. 4 (March 25, 2015 email) ("When you called me, I remember being very clear that I don't approve or agree to anything I said or answered being used for anything other than your personal understanding.  I said that I don't want any of the conversation recorded or used in anything in anyway [sic].").  CW-4 was therefore surprised to learn that he had been quoted in a formal legal document.  *See id.*  In a follow-up email three days later to the Labaton investigator, CW-4 stated that he had been "very adamant" with the investigator at the time that "I didn't want [my statements] used for anything other than his personal research" and that had he known the statements were to be quoted, "I would have rescheduled it and have taken it much more seriously and would have been much more careful about what I said. . . .  Much of what I said was either extremely loose or exaggerated.  If I knew that discussion would have been used in a legal claim, I would have stuck with facts that I knew were true or that I believed to be true, and I would have clarified which one of those for each discussion topic."  Pontrelli Aff. Ex. 7 (March 28, 2015 email).  In the same email, CW-4 repudiated as inaccurate or misleading many statements which the FAC had attributed to him.

---

rely, instead, on his non-stenographic notes of their telephone conversations made even while the conversations were continuing.").

CW-4 stated that he did not have a basis to knowledgably opine on many areas in which the FAC treated his statements as authoritative.  Specifically:

- Paragraphs 47 and 264 of the FAC each alleged that:  *"As CW4 corroborated, even as of 2014, the Company [i.e., MM] used spreadsheets and email to track and transfer the number of advertising impressions and revenue derived therefrom, which CW4 considered an 'absolute joke.'"*  In fact, CW-4 stated in his email to plaintiffs' investigator, he had never seen any such spreadsheet or email at MM that presented such metrics as the "system of record for deriving revenue or costs for clients."  Pontrelli Aff. Ex. 7.  And, CW-4 stated, MM's accounting department, to which CW-4 did not belong, "is the only group who can confidently or with any certainty explain the accounting process."  *Id.*  Further, CW-4 stated, it "isn't a problem" for a company to use spreadsheets and emails to "shar[e] numerical data *internally*."  *Id.*  Therefore, CW-4 stated, his statement to the investigator "is being used completely out of context."  *Id.*

- Paragraphs 47 and 264 of the FAC each alleged that:  *"As CW4 said, Millennial Media may be a data company but they have no idea how to track data."*  In fact, CW-4 stated in his email to plaintiffs' investigator, "[m]y comment about them being a data company but not knowing how to track data should never be used in a legal situation.  I wasn't on the data team and I don't specialize in data management or transport.  I don't actually know anything about moving data.  As someone shooting the shit with a friend while drinking beers, this is the type of comment you'll get out of anybody who has a dislike for their previous company['s] offerings.  But it's not fair to say they have no idea how to track data.  Of course they do.  They've been doing it for years . . . .  I would never state that under oath because I believe they do actually know how to track data."  Pontrelli Aff. Ex. 7.

- Paragraphs 56 and 273 of the FAC each alleged that:  *"CW-4 stated that Millennial Media overstated the capability of its technology, including the functionality of the Company's mMedia self-service platform."*  In fact, CW-4 stated in his email to plaintiffs' investigator, "I don't actually believe that Millennial Media overstated their capabilities anymore [sic] than any other technology company does. . . .  I don't think they overstated them. . . .  So that's entirely untrue. . . .  I have some distaste for the product because of personal issues I had with my boss or other people who worked on it, and also because of the nature of the product which[, as I stated, I never ended up enjoying.  Therefore, when drinking beers and shooting the shit, I tended to talk down about the product.  But I don't actually believe that it wasn't capable of delivering what it was supposed to offer."  Pontrelli Aff. Ex. 7.

- Paragraphs 56 and 273 of the FAC each alleged that:  *"CW4 worked with other engineers at the Company to build web platforms for the Company's technology products."*  In fact, CW-4 stated in his email to plaintiffs' investigator, "[t]his is

just a dumb sentence. Every product could be considered to be a technology product, and I never actually built or attempted to build any technical platforms." Pontrelli Aff. Ex. 7.

- Paragraph 56 of the FAC (paraphrased in ¶ 273) alleged that: *"CW4 stated that, in some cases, Millennial Media would claim that it already had certain technology when the Company was in fact just starting to consider developing it. For example, toward the end of 2011, just prior to the Company filing its IPO, CW4 stated that the Company was touting its mMedia self-serve advertising capability."* In fact, CW-4 stated in his email to plaintiffs' investigator, "I don't actually know this for a fact. MM had a labs team. They worked on most products before those products were introduced to the rest of the company. I have no idea how long they worked on them. They could have worked on them for 2 years for all I know. If I were under oath, what I would be saying is that Millennial would tout products soon after being released from the labs team. That could be news to other employees who weren't on the labs team like me and therefore perception could be that the product is new. But in actuality, it could be a well formed product that has been actively developed for several years. . . . I was bitter about being kept [in] the dark [about new product developments] until late so I sometimes talk negatively about it when shooting the shit with friends over beers. But the tru[th] is probably that they were working on it for a long time." Pontrelli Aff. Ex. 7.

- Paragraphs 56 and 273 of the FAC each alleged that: *"[P]rior to the IPO, the Company had just started to build such a product, and it hastily rushed to build the mMedia self-service platform by January 1, 2012."* In fact, CW-4 stated in his email to plaintiffs' investigator, "I don't know how long the labs group worked on the product. It could have been 1-2 years for all I know. Which would have been sufficient time to launch a first version of it. I don't know when it was officially conceived, when development began or when it officially launched. I should not be referenced as a source on this because I just don't know the facts at all. As I said, I exaggerated a lot while chatting and I wouldn't have if he was honest about how the conversation would be used in the future." Pontrelli Aff. Ex. 7.

- Paragraph 59 of the FAC (paraphrased in ¶¶ 110 and 125) alleged that: *"As CW4 stated, although the Company touted its ability to offer advertisers real-time bidding capability, it never had such a product until it acquired Metaresolver in April 2013. And even after it acquired Metaresolver, Millennial failed to employ its real-time bidding technology for its clients."* In fact, as CW-4 stated in his email to plaintiffs' investigator, "I don't actually know anything about RTB. I never did. I was a novice in the industry and never took a liking to it much. I don't actually know what products Metaresolver truly supported or what we got out of that acquisition. . . . I have no idea if MM failed or succeeded in employing its RTB capabilities for its clients after the acquisition. I literally have no clue." Pontrelli Aff. Ex. 7.

- Paragraph 108 of the FAC alleged that:  *"Millennial Media's announcement on February 19, 2013 that it would be acquiring Metaresolver reflected that Millennial Media lacked technology to collect such 'clean' user data.  This is corroborated by the statements of confidential witnesses CW3 and CW4 discussed above."*  In fact, as CW-4 stated in his email to plaintiffs' investigator, "I'm not a data expert but I'm guessing that MM had data as clean as any other third-party collector. . . .  [T]he fact of the matter is that I don't think they didn't have 'clean' user data.  I have no idea how 'clean' their user data was or not."  Pontrelli Aff. Ex. 7.

- Paragraph 144(e) of the FAC alleged that:  *"CW4 learned from colleagues still at the Company that integrating Jumptap's technology with Millennial Media's has been next to impossible, for technological and organizational reasons.  As CW-4 stated, Millennial Media's technology was difficult to integrate with the technologies of the companies that it acquired because Millennial Media's technology was developed over a long period of time, often on the fly and was of low quality."*  In fact, as CW-4 stated in his email to plaintiffs' investigator, "[t]his is a total generalization and exaggeration.  I don't even have friends at the company anymore really.  And definitely no factual knowledge as to whether or not the technology is being integrated well or not. . . .  It's an extremely irresponsible and loose comment to say that the tech was built 'often on the fly and was of low quality.'  Must have been the beers talking.  No product manager is ever satisfied with their product output.  They always want it to be better and think it could have been better."  Pontrelli Aff. Ex. 7.

- Paragraph 144(e) of the FAC alleged that:  "*[A]ccording to CW4, COO Root's April 2013 departure from Millennial Media was a blow to the Company's ability to handle large-scale integration projects since much of the Company's remaining management came from marketing and advertising (rather than technology)."*  In fact, as CW-4 stated in his email to plaintiffs' investigator, "I have a hard time believing this came out of my mouth.  I don't believe it.  I don't even think Steve Root was involved in integrations of technology initiatives.  If he was, I was unaware. . . .  Regardless, he was so high up that I truly don't know what he did or didn't do.  I never worked with him."  Pontrelli Aff. Ex. 7.

*CW-1*:  CW-1 attested in an affidavit that although "what was attributed to me in the complaint was mostly correct," there was a significant exception.  CW-1 Aff. ¶ 8.  The FAC alleged that MM had issued false and misleading press releases about the company's acquisition of Jumptap and the reasons for it.  As support for that claim of falsity, the FAC repeatedly cited CW-1's purported statement that "CW1 stated that Millennial Media needed to acquire Jumptap because Millennial Media's programmatic tools were not competitive and did not yield the

14

installs necessary for client optimization."  *See* FAC ¶¶ 54, 271 (emphases omitted); *see also id.* ¶¶ 5, 135.  In fact, CW-1 attested, he never made that statement.  CW-1 Aff. ¶ 8.  Rather, CW-1 attested, the investigator (a Cera employee) had made this statement to him, and CW-1 had agreed with the investigator "that this was probably the case," *id.*, without reciting any basis for this speculation.[5]

> *CW-3*:  In an affidavit, CW-3, a former user interface architect at MM, *see* FAC ¶ 46, similarly attested that the FAC attributed to him a factual statement for which he lacked a foundation in personal knowledge.  The FAC, in recounting MM's technological difficulties, which are central to its theory of securities fraud, stated:  "According to CW3, there were seven or eight tools on the Company's 'backend' from which the Company needed to collect data, which made it difficult to perform reporting."  FAC ¶¶ 46, 263.  In fact, CW-3 attested, he had "heard other people talk about" these allegations, but personally lacked "detailed knowledge" as to them.  CW-3 Aff. ¶ 10.  CW-3 also took issue with the statement the FAC had attributed to him that "overall, the Company's approach was not an effective way to report its data."  FAC ¶ 46.  CW-3 stated that it would instead be "more accurate to say that the Company's approach was not 'a particularly clean' way to report its data."  CW-3 Aff. ¶ 10.

> *CW-8*:  CW-8, a former senior software engineer at MM, *see* FAC ¶ 121, did not submit an affidavit.  However, plaintiffs' counsel's affidavit, submitted after MM had contacted CW-8 in response to the April 24 order, reported that CW-8 had "stated that certain modifications were needed for the statements attributed to him/her to be completely accurate."  Gottlieb Aff. ¶ 68.

---

[5] CW-1 was never an MM employee.  He was a senior executive overseeing operations at Fiksu, Inc., a media buying company that tracks mobile advertising for clients.  *See* FAC ¶ 54.  By attributing to CW-1 the statement that MM's programmatic tools were not competitive, the FAC misleadingly suggested that CW-1, presumably by virtue of his work at Fiksu, had a factual basis for this assertion.

Among the modifications, the FAC, purporting to quote CW-8, had alleged, in reference to the engineering team responsible for MM's MYDAS software platform, that "'essentially the entire platform team' was fired."  FAC ¶ 121.  In fact, counsel reported, CW-8 did not recall stating to the investigator that "the engineering team . . . was 'fired.'"  Gottlieb Aff. ¶ 70.  CW-8 also did not recall stating to the investigator that a Bob Hammond had been "put in charge" during a January 2014 meeting; Hammond was merely in charge of that particular meeting.  *Id.* ¶ 72 (citing FAC ¶ 144(c)).

Viewed in combination, the inaccuracies reported by CWs 1, 3, 4 and 8[6] significantly undermine the integrity of the FAC, such that, had plaintiffs not voluntarily dismissed the case, these recantations would have left a materially thinner Complaint for the Court to review on a motion to dismiss.  This is not a case of merely isolated or immaterial differences between a Complaint and the declarations of a recanting witness, deficiencies which, although regrettable, do not fundamentally affect the integrity of a Complaint.  *See, e.g.*, *Minneapolis Firefighters' Relief Ass'n v. Medtronic, Inc.*, 278 F.R.D. 454, 463–64 (D. Minn. 2011); *Local 703, I.B. of T. Grocery & Food Emps. Welfare Fund v. Regions Fin. Corp.*, No. 10 Civ. 2847 (IPJ), 2011 WL 12627599, at *3 (N.D. Ala. Aug. 23, 2011).  The deficiencies reported by the CWs here are pervasive.  And they run a gamut:  They infect statements of major as well as minor importance; and they involve statements that witnesses denied making, statements that were made but which

---

[6] According to defense counsel, a witness corresponding to CW-11 also repudiated information attributed to him in the FAC.  *See* Dkt. 74, Declaration of George Anhang ("Anhang Decl."), ¶¶ 3–4.  In a declaration submitted by the defense, the witness, a former MM employee, denied, among other things, making the statement apparently attributed to him that MM "did not effectively police fraudulent Bot-driven traffic," FAC ¶ 174(h); the witness stated that, because he had worked in brand sales, he was in no position to know this.  Anhang Decl. ¶ 4(d)–(e).  Plaintiffs' counsel attempted but were unable to contact CW-11 following the Court's April 21 order.  *See* Gottlieb Aff. ¶¶ 93–97.

the FAC presented out of context, and statements of knowledge or opinion for which the witness lacked a factual basis.

These deficiencies could have been avoided had counsel sought to confirm with these witnesses the facts and quotations that counsel proposed to attribute to them. The necessary refinements could have been made to ensure that quotes were used accurately; that information was presented in proper context; and that opinions, assumptions, hearsay, and speculation were not commingled and confused with representations of facts acquired firsthand by a percipient witness.

It is difficult to come up with a good reason why counsel would *not* attempt to confirm with a witness, let alone any of 11 CWs, the accuracy of the statements that counsel intended to attribute to them in a Complaint. Perhaps counsel feared that, confronted with such statements, the witness might repudiate, or unhelpfully modify or contextualize, the investigator's account of his earlier statements. Perhaps counsel were pleased with the pungent sound-bites that the investigator reported from CW-4 in particular. Perhaps counsel feared that a follow-up call to CW-4 to confirm his quotes and determine whether there was a factual basis for them might have led CW-4 to back away, resulting in adjustments that might weaken the draft Complaint. But those are not good reasons to refrain from checking factual accuracy. And the Federal Rules of Civil Procedure do not countenance a "see no evil" approach to pleading. A quest for ignorance when preparing a federal-court Complaint diminishes counsel and ill behooves the litigation process. *See generally City of Livonia Emps.' Ret. Sys. v. Boeing Co.*, No. 09 Civ. 7143 (RC), 2014 WL 4199136, at *7 (N.D. Ill. Aug. 21, 2014) (imposing Rule 11 sanctions in securities class action for plaintiffs' counsel's "ostrich tactics").

The practice revealed by this case, in which plaintiffs' counsel makes literally no attempt to confirm the quotes of a witness on whom counsel proposes to rely in a public filing, sits at best uneasily alongside Federal Rule of Civil Procedure 11. In pertinent part, Rule 11 provides:

> (b) *Representations to the Court.* By presenting to the court a pleading . . . — whether by signing, filing, submitting, or later advocating it—an attorney . . . certifies that to the best of the person's knowledge, information, and belief, formed after an inquiry reasonable under the circumstances: . . . (3) the factual contentions have evidentiary support or, if specifically so identified, will likely have evidentiary support after a reasonable opportunity for further investigation or discovery.

Fed. R. Civ. P. 11(b).

To be clear, Rule 11's command that counsel conduct "an inquiry reasonable under the circumstances" does not require counsel personally to participate in an initial witness interview. It is, of course, permissible and customary, not to mention economical, for facts to be gathered first by investigators. *See, e.g.*, *In re BankAtlantic Bancorp, Inc. Sec. Litig.*, 851 F. Supp. 2d 1299, 1311 (S.D. Fla. 2011), *aff'd sub nom. Hubbard v. BankAtlantic Bancorp, Inc.*, 503 F. App'x 677 (11th Cir. 2012); *Garr v. U.S. Healthcare, Inc.*, 22 F.3d 1274, 1278 (3d Cir. 1994). But, by the time counsel are readying to file a Complaint, an "inquiry reasonable under the circumstances" demands more. Particularly where a Complaint proposes to rely on quotes drawn from an investigator's memo recounting an unrecorded witness interview, it is reasonable to expect counsel, before filing the Complaint, to attempt to confirm with the witness the statements that counsel proposes to attribute to him and to assure that the Complaint is presenting these statements in fair context.[7]

---

[7] *See generally Cooter & Gell v. Hartmarx Corp.*, 496 U.S. 384, 399 (1990) (in "[d]etermining whether an attorney has violated Rule 11 . . . [t]he court must consider factual questions regarding the nature of the attorney's prefiling inquiry and the factual basis of the pleading or other paper."); *see also City of Livonia*, 2014 WL 4199136, at *7 ("Plaintiffs' counsel violated Rule 11(b) by filing its [complaints] without conducting a reasonable pre-filing investigation and

If the unreasonableness of failing to undertake rudimentary fact-checking with a witness were not intuitively obvious, the growing body of cases chronicling the repudiation by CWs of statements attributed to them in securities class-action complaints would cinch the need to insist upon such care.  Numerous reported decisions have recounted claims by CWs that such complaints inaccurately attributed facts and statements to them.  *See, e.g.*, *City of Livonia*, 2014 WL 4199136, at *7; *City of Pontiac Gen. Emps.' Ret. Sys. v. Lockheed Martin Corp.*, 952 F. Supp. 2d 633, 636–37 (S.D.N.Y. 2013); *Belmont Holdings Corp. v. SunTrust Banks, Inc.*, 896 F. Supp. 2d 1210, 1231–33 (N.D. Ga. 2012); *Campo v. Sears Holdings Corp.*, 635 F. Supp. 2d 323, 330 & n.54 (S.D.N.Y. 2009), *aff'd*, 371 F. App'x 212 (2d Cir. 2010) (summary order); *cf. In re St. Jude Med., Inc. Sec. Litig.*, 836 F. Supp. 2d 878, 901 n.9 (D. Minn. 2011); *In re Dynex Capital, Inc. Sec. Litig.*, No. 05 Civ. 1897 (HB) (DF), 2011 WL 2581755, at *2 (S.D.N.Y. Apr. 29, 2011), *report and recommendation adopted*, 2011 WL 2471267 (S.D.N.Y. June 21, 2011). And common sense explains why an investigator's memo of an initial witness interview is an inadequate substitute for counsel's independent confirmation of accuracy.  The investigator may have taken notes hurriedly while conducting the interview, unaided by a tape recorder and unassisted by a colleague.  The witness may have been interviewed before a nuanced

---

by asserting and defending factual contentions that lacked evidentiary support."); *id.* at *6 ("Plaintiffs' counsel filed the [complaints] after their investigators interviewed Singh[, a CW]. Plaintiffs' counsel never interviewed Singh themselves, however, and never attempted to verify any of the information he allegedly provided the investigator."); *Perry v. S.Z. Rest. Corp.*, 45 F. Supp. 2d 272, 274–75 (S.D.N.Y. 1999) (imposing Rule 11 sanctions on plaintiff's counsel where plaintiff's trial testimony flatly contradicted plaintiff's earlier affidavit, which had been the sole basis for denial of summary judgment; court found that facts that emerged at trial "would have emerged in a 'reasonable' inquiry of [plaintiff] prior to bringing suit"); *accord Chandler v. Nw. Bank Minn., Nat'l Ass'n*, 137 F.3d 1053, 1057 (8th Cir. 1998) (affirming imposition of sanctions when attorney failed to conduct a reasonable inquiry, despite counsel's "arguably . . . reasonable belief" that the allegations were based in fact); *Childs v. State Farm Mutual Auto. Ins. Co.*, 29 F.3d 1018, 1024–26 (5th Cir. 1994) (affirming imposition of sanctions where plaintiff's attorney failed to investigate auto insurance company's allegations that the accident at issue in the case had been staged).

understanding of the facts and context, and before counsel's theory of illegality, took shape.  And the investigator may have mistaken hearsay, opinion, or conjecture for facts, or the investigator's interview memo may not have carefully distinguished between them.

An analogy to the process used by counsel in quoting documents in public filings is instructive.  It is *de rigeur* for counsel, before quoting a document (*e.g.*, a Form 10-K, a press release, an email, or a corporate memorandum) in a putative securities class action Complaint— or any court filing—to check, and double-check, that the document was quoted precisely right. Particularly given the salience of CWs to such complaints, counsel should use comparable rigor to confirm with the CW the accuracy of quotations to be attributed to him.

Had counsel used such diligence here, the pervasive inaccuracies that the CWs have reported in the FAC would have been avoided.  And this lawsuit would have been able to proceed to resolution on the merits, rather than being derailed by irregularities.  The Court expects plaintiffs' counsel, in the interests of the integrity of future litigation, to be far more assiduous in confirming the statements they attribute to Confidential Witnesses before filing Complaints.

**2.**      ***Fairness to the witnesses***:  Plaintiffs' counsel's designation in a Complaint of 11 witnesses as CWs, without their foreknowledge, also raises issues of fairness to these witnesses.

As lawyers who practice in the area of shareholder class actions are well aware, counsel's designation in a Complaint of a witness as a "Confidential Witness" does not by any means assure the witness anonymity throughout the litigation.  This Court, and a growing number of courts, have held that after a Complaint survives a motion to dismiss and a case reaches the discovery phase, the balance of interests shifts, as between the interest of the witness in confidentiality and the interest of the parties and the truth-seeking process in fulsome discovery.

There is, thus, a meaningful possibility that a court will order counsel to reveal the names of

CWs, so as to enable these presumably knowledgeable fact witnesses to be deposed.  *See*

*Arbitron*, 278 F.R.D. at 339–42 (holding that CWs' identities are not entitled to work product

protection and that, for a CW to retain confidentiality, a concrete basis to fear retaliation must be

articulated) (citing, *inter alia*, *In re Marsh & McLennan Sec. Litig.*, No. 04 Civ. 8144 (SWK),

2008 WL 2941215, at *3 (S.D.N.Y. July 30, 2008)); *see also Fort Worth Emps.' Ret. Fund v.*

*J.P. Morgan Chase & Co.*, No. 09 Civ. 3701 (JPO) (JCF), 2013 WL 1896934, at *1 (S.D.N.Y.

May 7, 2013) ("While there is some disagreement within this district as to whether the identities

of confidential informants referenced in the complaint are privileged, the majority view,

especially more recently, is that 'the names of the persons identified in the [complaint] as

confidential informants are not entitled to any work product protection.'. . . [T]he defendants'

application for disclosure of the identities of the confidential informants referenced in the

complaint is granted.") (quoting *Arbitron*, 278 F.R.D. at 340); *accord In re Am. Int'l Grp.,*

*Inc.2008 Sec. Litig.*, No. 08 Civ. 4772 (DCF), 2012 WL 1134142, at *4 (S.D.N.Y. March 6,

2012); *In re Bear Stearns Cos. Sec., Derivative, & ERISA Litig.*, No. 08 MDL 1963 (RWS), 2012

WL 259326, at *3 (S.D.N.Y. Jan. 27, 2012).[8]

A witness approached by a fact-gathering investigator, however, may not know any of

this.  Ideally, of course, such a witness, before agreeing to participate in an interview, would

know what questions to ask and what directives to give the investigator to protect his interests,

including in remaining anonymous:  "Will you quote what I say?"  "If you quote me, will you

use my name?"  "If you quote me as a confidential witness, is there a chance my identity will be

---

[8] *But see In re SLM Corp. Sec. Litig.*, No. 08 Civ. 1029 (WHP), 2011 WL 611854, at *1
(S.D.N.Y. Feb. 15, 2011); *In re Veeco Instruments, Inc. Sec. Litig.*, No. 05 MD 0169 (GAY),
2007 WL 274800, at *1 (S.D.N.Y. Jan. 29, 2007).

revealed?"  "If identifying me as a confidential witness might lead to my name being revealed, you don't have permission to quote me—this interview is for background only."

But not all witnesses will have the sophistication or intuition to ask the right questions.  A former or current employee—a lab technician, a secretary, a marketing specialist, an industrial worker—who is approached for an interview by an investigator may supply information with little or no idea that doing so may result in his name later being disclosed, potentially with significant adverse career or personal ramifications.  And such a witness may be unaware that, even if described as a "Confidential Witness," he is at risk of being identified by name if the case proceeds to discovery.  Such a witness, in short, is at risk of having his good nature—his willingness to participate in an interview with counsel or an investigator—exploited.

This case supplies an excellent illustration.  Counsel did not affirmatively notify any of the 11 witnesses in advance that they would be identified as CWs in a publicly filed Complaint, let alone that this designation exposed them to the risk of identification by name.[9]  Upon learning this, first CW-4, and then three other CWs (CWs 5, 8, and 10), demanded that their names be dropped from the FAC so as to safeguard their anonymity.  *See, e.g.*, Pontrelli Aff. Ex. 4 (CW-4 March 25, 2015 email) ("I want to be very clear that I want no involvement in this situation.").  Two CWs (CWs 4 and 8) expressed distress that the FAC had described their titles and tenures with such unexpected specificity as to effectively identify them individually to MM.  *See* Pontrelli Aff. Ex. 5; *id.* Ex. 8 (CW-4 April 2, 2015 email) ("I'm very uncomfortable.  Firstly, your firm included me in something which I adamantly was against. . . .  [P]eople from MM ask if that CW is me . . . .");  Gottlieb Aff. ¶ 73 ("CW8 said that (s)he did not wish to continue as a

_____

[9] As noted, CW-5, on his own initiative, raised this question and was told he would be identified as a CW.  According to plaintiffs' counsel's affidavit, three other CWs (CWs 3, 8, and 10) have stated that they understood that their statements could be used in a lawsuit, although the subject was not addressed in their interview.  *See* Gottlieb Aff. ¶¶ 26, 68, 89; *see also* CW-3 Aff. ¶ 6.

confidential witness in this case because (s)he did not know that sufficient information would be provided in the Complaint that might identify him/her.").

The Court, to be sure, is unaware of any case or ethics canon requiring that plaintiffs' counsel notify a witness of an intention to quote him or of the possibility that being designated as a CW may result in his identification.  And, in fairness to plaintiffs' counsel, there is a good reason for the widespread reliance upon CWs in modern securities class action Complaints:  The pleading requirements of the 1995 Private Securities Litigation Reform Act ("PSLRA") are demanding.  *See generally City of Pontiac*, 952 F. Supp. 2d at 635 (noting that unintended consequence of the PSLRA's heightened pleading requirements has been to cause "counsel to undertake surreptitious pre-pleading investigations designed to obtain 'dirt' from dissatisfied corporate employees," leading complaints often to "rel[y] heavily . . . on information attributed to 'confidential witnesses.'").  The PSLRA's high pleading hurdles no doubt may tempt plaintiffs' counsel not to alert a helpful witness of the risks to him of being quoted as a CW in a Complaint, lest the witness back away.

The issue presented by a law firm's practice of not notifying an interviewee—unless he asks—that he will be designated as a Confidential Witness is therefore, predominantly, not one of law.[10]  It is one of basic decency.  When counsel designates an interviewee as a CW, counsel exposes the interviewee to the risk of public disclosure of his name and, potentially, professional or personal tumult.  The interviewee may still work at the defendant company, or in the same industry or community.  Disclosure of the interviewee as a source of negative information or

---

[10] A law firm's practice of reflexively designating all witnesses as "Confidential Witnesses" in a Complaint, *see* Gottlieb Aff. at 10 n.5, does raise an issue of pleading accuracy.  Counsel who have not inquired of a witness whether he in fact desires confidentiality have no basis to label the witness a "confidential" witness.  The witness is "confidential" only insofar as *counsel* prefers that the names of their sources go undisclosed for as long as possible.

leads may affect his employment, employability, or reputation.  Disclosure of the interviewee as a source may also harm the interviewee's co-workers, friends, or family.

To fortify their Complaint in this case, however, plaintiffs' counsel exposed 11 interviewees to such risks, without notice and without ascertaining whether the benefit to quoting the witnesses justified the potential harm.  Counsel did not ask of any of the 11 interviewees whether he was willing to bear the risk of public disclosure of his identity.  Nor did counsel ask any of the 11 what the consequences to him of being outed as an informant against MM might be.  Nor had plaintiffs' investigators, when they earlier interviewed these witnesses, surfaced these risks.

The Court, the public, and above all such witnesses have the right to expect better of counsel.  They have a right to expect counsel to treat witnesses with decency.  They have a right to expect counsel, before designating a person as a CW, to take into account how that person might be affected were this designation to lead to his identification.  They have a right to expect counsel to consider thoughtfully, for each person who submits to an interview, whether the consequences of potentially outing that person are justified—genuinely justified—by counsel's duty of zealous representation of their clients.

By globally identifying 11 interviewees as Confidential Witnesses with no advance notice to them and no consideration given to their situations and interests, counsel here treated these people shabbily.  The Court's hope and expectation is that, in future cases, counsel will aspire to better.

## CONCLUSION

The Clerk of Court is respectfully directed to terminate all pending motions, and, in light of plaintiffs' voluntary dismissal of this case without prejudice, to close this case.[11]

SO ORDERED.

PAUL A. ENGELMAYER
United States District Judge

Dated: May 29, 2015
       New York, New York

---

[11] For avoidance of doubt, defendants have not sought, and the Court is not imposing, sanctions on counsel. The PSLRA's mandatory sanctions provision, 15 U.S.C. § 78u–4(c)(1), which requires a court "upon final adjudication of [an] action," to make "specific findings regarding compliance by each party and each attorney representing any party with each requirement of Rule 11(b) of the Federal Rules of Civil Procedure as to any complaint, responsive pleading, or dispositive motion," does not apply here, because, as a result of plaintiffs' voluntary dismissal, there has been no final adjudication. *See Unite Here v. Cintas Corp.*, 500 F. Supp. 2d 332, 337 (S.D.N.Y. 2007) ("[W]hile the PSLRA does not define the term 'final adjudication' and there is little case law on its meaning as it is used in Section 78u–4(c)(1), a plaintiff's voluntary dismissal without prejudice pursuant to Fed. R. Civ. P. 41(a)(1)(i) does not constitute a 'final adjudication' for the purpose of applying PSLRA Section 78u–4(c).") (citation and internal quotation marks omitted); *see also Blaser v. Bessemer Trust Co.*, No. 01 Civ. 11599 (DLC), 2002 WL 31359015, at *3 (S.D.N.Y. Oct. 21, 2002) (defining "adjudicate" and explaining: "To the extent that plaintiff voluntarily dismissed her complaint without prejudice pursuant to Rule 41(a)(1)(i), this dispute has not been 'resolv[ed]' and the Court has not 'decid[ed]' the case. Nor has it 'hear[d] and settle[d]' the case. By the plain meaning of the term, there has been no 'adjudication' in this case, let alone adjudication that is 'final.'"); *accord High View Fund, L.P. v. Hall*, 27 F. Supp. 2d 420, 430 n.7 (S.D.N.Y. 1998); *Scone Invs., L.P. v. Am. Third Mkt. Corp.*, No. 97 Civ. 3802 (SAS), 1998 WL 205338, at *11 n.3 (S.D.N.Y. Apr. 28, 1998). And, in the Court's assessment, plaintiffs' counsel responded professionally to the Court's April 14 and April 21 orders. These orders called upon counsel to do significant, and no doubt unwelcome, work, on an expedited timetable. This work included reconstructing the factual basis for much of the FAC and contacting, and obtaining affidavits from, various CWs. Plaintiffs' counsel fully complied with these orders, and the resulting submissions gave the Court a detailed understanding of relevant events. Plaintiffs' counsel's decision voluntarily to dismiss this case was also an act of professional responsibility. Notwithstanding the deficiencies in plaintiffs' Complaints, these circumstances weigh against any consideration of sanctions.